Marc Van Der Hout (CA Bar #80778)
Johnny Sinodis (CA Bar #290402)
Van Der Hout LLP
360 Post St., Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Attorneys for Plaintiff
John Doe

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| John Doe,<br><br>        Plaintiff,<br>        v.<br><br>Donald J. TRUMP, in his official capacity, President of the United States of America;<br><br>Moises BECERRA, in his official capacity, Acting Field Office Director of San Francisco Office of Detention and Removal, U.S. Immigrations and Customs Enforcement; U.S. Department of Homeland Security;<br><br>Todd M. LYONS, in his official capacity, Acting Director, Immigration and Customs Enforcement, U.S. Department of Homeland Security; and<br><br>Kristi NOEM, in her official capacity, Secretary, U.S. Department of Homeland Security;<br><br>        Defendants. | Case No. 4:25-cv-03140-JSW<br><br>**DECLARATION OF JOHNNY SINODIS IN SUPPORT OF PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |

*Doe v. Trump et al.,* No. 4:25-cv-03140-JSW
DECLARATION OF JOHNNY SINODIS

I, Johnny Sinodis, hereby declare as follows:

1.  I am a partner at Van Der Hout LLP, which is located at 360 Post Street, Suite 800, San Francisco, California 94108. I have personal knowledge of the matters stated herein because I am John Doe's attorney in the instant matter. I make this declaration in support of his Reply in Support of Motion for a Temporary Restraining Order.

2.  Attached as <u>Exhibit A</u> is a Notice of Intent to Deny (NOID) issued by the U.S. Citizenship and Immigration Services (USCIS) on April 18, 2025, regarding an application to change status from F-1 to H-1B. In that NOID, USCIS states that, because the noncitizen applicant's Student and Exchange Visitor Information System (SEVIS) record was terminated, he is not in valid F-1 nonimmigrant status and therefore cannot change from F-1 status to H-1B status.

3.  Attached as <u>Exhibit B</u> is a declaration from Brian Childs, Senior Director of the International Student & Scholar Services office of Western Michigan University (WMU) and a Designated School Official (DSO) for WMU, that was filed in *B K, et al. v. Noem, et al.*, 1:25-cv-00419-JMB-PJG (Dkt. 12-1). DSOs are responsible for an institution's communication with the Student Exchange Visitor Program (SEVP), updating F-1 student records, helping F-1 students maintain their status by providing guidance, and creating the Form I-20, Certificate of Eligibility for Nonimmigrant Student Status, for F-1 students and post-graduate workers.

4.  Attached as <u>Exhibit C</u> is the transcript from *Patel v. Lyons*, 1:25-cv-01096-ACR, (D.D.C., Apr. 16, 2025).

5.  Attached as <u>Exhibit D</u> is the Order granting a Temporary Restraining Order in *Patel v. Lyons*, 1:25-cv-01096-ACR, April 17, 2025.

6.  Attached as <u>Exhibit E</u> is a transcript from *Nali v. Noem, et al.*, 1:25-cv-03969 (N.D. Ill. Apr. 18, 2025).

7.  Attached as <u>Exhibit F</u> is the Order granting a Temporary Restraining Order in *Nali v. Noem, et al.*, 1:25-cv-03969 (N.D. Ill. Apr. 18, 2025).

8.  Attached as <u>Exhibit G</u> is a Declaration from Linus Chan filed in filed in *Student Doe #1 v. Trump et al.*, 25-cv-00174-TUC-JGZ (D. Ariz).

9.   Attached as <u>Exhibit H</u> is a Declaration from Ami Hutchinson filed in *Student Doe #1 v. Trump et al.*, 25-cv-00174-TUC-JGZ (D. Ariz).

10. Attached as <u>Exhibit I</u> is a Temporary Restraining Order granted in *Mohammed H. v. Trump et al.*, 0:25-cv-01576-JWB-DTS (D. Minn., Apr. 22, 2025), a case in which, on March 28, 2025, U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE) officers detained petitioner Mohammed H outside his home based on a visa revocation and termination of his SEVIS record.

11. Attached as <u>Exhibit J</u> is a demonstrative exhibit demonstrating the similarities between Plaintiff John Doe in this case and Mohammed H.

12. Attached as <u>Exhibit K</u> is a Notice to Appear (NTA) of Rumeysa Ozturk, who was arrested, placed into proceedings, and immediately transferred to Louisiana after her F-1 visa was revoked.

13. Attached as <u>Exhibit L</u> are Plaintiff's H-1B Approval Notices, issued after USCIS sent Requests for Evidence seeking additional information as to Plaintiff's misdemeanor conviction records, which Plaintiff submitted.

-    On June 20, 2024, John Doe's employer filed a Form I-129, Petition for Nonimmigrant Worker, with USCIS to classify him as an H-1B specialty occupation worker. On October 10, 2024, USCIS issued a Request for Evidence seeking additional information, as relevant here, regarding John Doe's misdemeanor conviction. In compliance with the Request for Evidence, Mr. Doe's employer provided conviction records. On January 10, 2025, USCIS approved Mr. Doe for an H-1B visa to continue his work as a software engineer. Importantly, as stated above, USCIS granted the H-1B petition after requesting additional evidence regarding Mr. Doe's conviction.

-    On January 28, 2025, Mr. Doe's employer filed a second Form I-129, Petition for Nonimmigrant Worker, on behalf of Mr. Doe The only relevant change in this petition, which was submitted for the same job at the same employer, was that his employer sought to allow Mr. Doe to remain in the United States and

change his status from his F-1 student visa to an H-1B nonimmigrant status. This would mean Mr. Doe would not have to leave the United States to obtain a visa at a consulate abroad and could continue his work uninterrupted. On February 10, 2025, USCIS issued a Request for Evidence, again seeking additional information regarding his conviction. Mr. Doe's employer again filed a timely response with USCIS.

- On March 25, 2025, USCIS approved Mr. Doe's Form I-129 Petition for a change of status to H-1B to coincide with the expiration of his STEM OPT status in late June 2025. This approval meant that Mr. Doe would not have to leave the United States to receive a physical visa stamp in his passport for his H-1B to become valid. Instead, USCIS had authorized him to continue working as a software engineer without interruption when his employment authorization through STEM OPT status expires on June 27, 2025. As with the initial H-1B approval, USCIS granted Mr. Doe's change of status fully aware of the fact that he had been arrested and convicted of a misdemeanor.

14. Attached as <u>Exhibit M</u> are printouts of Mr. Doe's SEVIS records from March 28, 2025, showing a termination reason as "OTHERWISE FAILING TO MAINTAIN STATUS – Student identified in criminal records check. Terminated pursuant to INA 237(a)(1)(C)(i)/ 8 USC 1227(a)(1)(C)(i)."

15. Attached as <u>Exhibit N</u> are copies of Temporary Restraining Orders (TROs) issued by courts in substantially identical fact situations, including:

- *Liu v. Noem et al.*, 25-cv-133-SE (D.N.H., Apr. 10, 2025)
- *Zhou v. Lyons et al.*, 2:25-cv-02994-CV (C.D.Cal., Apr. 15, 2025)
- *Doe v. Noem et al.*, 2:25-cv-01103-DAD-AC (E.D.Cal., Apr. 17, 2025)
- *Doe v. Noem*, 2:25-CV-00633-DGE (W.D. Wash. Apr. 17, 2025)
- *Ziliang J. v. Noem et al.*, 25-cv-01391-PJS (D.Minn., Apr. 17, 2025)
- *Oruganti v. Noem et al.*, 2:25-cv-00409-ALM-EPD (E.D.OH., Apr. 18, 2025)
- *Chen v. Noem et al.*, 1:25-cv-00733-TWP-MG (S.D.IN., Apr. 21, 2025)

3

- *W.B. v. Noem et al.*, 25-cv-03407 (N.D. Cal., Apr. 23, 2025)

I declare under penalty of perjury that the foregoing statement is true and correct to the best of my own personal knowledge.  Executed this 23rd day of April 2025 at San Francisco, California.

/s/ Johnny Sinodis
Johnny Sinodis
Declarant

4

# EXHIBIT A



April 18, 2025

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
California Service Center
2642 Michelle Drive
Tustin, CA 92780



**U.S. Citizenship
and Immigration
Services**



Form I-129,
Petition for a Nonimmigrant Worker

## PREMIUM PROCESSING

## NOTICE OF INTENT TO DENY

On March 6, 2025, your organization,                                    , filed a Form I-129,
Petition for a Nonimmigrant Worker (Form I-129), with U.S. Citizenship and Immigration Services
(USCIS), seeking to classify                         (beneficiary) as a temporary worker in a specialty
occupation (H-1B) under section 101(a)(15)(H)(i)(b) of the Immigration and Nationality Act (INA).

Section 101(a)(15)(H)(i)(b) of the INA relates to an alien:

> ...who is coming temporarily to the United States to perform services...in a specialty occupation
> described in section 214(i)(1)..., who meets the requirements for the occupation specified in
> section 214(i)(2)..., and with respect to whom the Secretary of Labor determines and certifies to
> the Attorney General that the intending employer has filed with the Secretary an application
> under 212(n)(1).

You seek new employment for the beneficiary and requested that USCIS change the beneficiary's
status.

You stated on the petition that you are a public school district with 583 employees. You seek to
employ the beneficiary as an Elementary Teacher.

In visa petition proceedings, the petitioner bears the burden of establishing eligibility for the benefits
sought. *Matter of Brantigan*, 11 I&N Dec. 493 (BIA 1966).

USCIS reviewed the initial record of evidence for eligibility in accordance with the INA; Title 8, Code
of Federal Regulations (8 CFR); and any other applicable statutes and regulations, and could not
determine whether you had established eligibility for the benefit sought.

In accordance with *Matter of Chawathe*, 25 I&N Dec. 369 (AAO 2010), USCIS has examined the
evidence of record for relevance, probative value, and credibility, both individually and within the
context of the totality of the evidence, and determined that you have not established eligibility for the
requested classification by a preponderance of the evidence.

Accordingly, USCIS intends to deny the petition and any change of status for reasons discussed below. In accordance with 8 CFR 103.2(b)(16)(i), when USCIS intends to make a decision that will be adverse to you and it is based on information of which you are unaware, USCIS must notify you and allow a period of time for rebuttal.

We have encountered potentially adverse information related to the beneficiary. In order to continue processing your application or petition, we require an updated address for the beneficiary so that we may collect biometric data.

### Maintenance of Status

The first issue to be discussed is whether the beneficiary maintained the beneficiary's nonimmigrant status.

INA 248(a) states, in part:

> The Secretary of Homeland Security may, under such conditions as he may prescribe, authorize a change from any nonimmigrant classification to any other nonimmigrant classification in the case of any alien lawfully admitted to the United States as a nonimmigrant who is continuing to maintain that status...

8 CFR 248.1(b) states:

> Except in the case of an alien applying to obtain V nonimmigrant status in the United States under §214.15(f) of this chapter, a change of status may not be approved for an alien who failed to maintain the previously accorded status or whose status expired before the application or petition was filed, except that failure to file before the period of previously authorized status expired may be excused in the discretion of USCIS, and without separate application, where it is demonstrated at the time of filing that:
>
> > (1) The failure to file a timely application was due to extraordinary circumstances beyond the control of the applicant or petitioner, and USCIS finds the delay commensurate with the circumstances;
> >
> > (2) The alien has not otherwise violated his or her nonimmigrant status;
> >
> > (3) The alien remains a bona fide nonimmigrant; and
> >
> > (4) The alien is not the subject of removal proceedings under 8 CFR part 240.

USCIS records show that the beneficiary attended          `University as an F-1 nonimmigrant from August 7, 2022 to May 11, 2024 (N0017163255). The beneficiary was approved for post-completion Optional Practical Training (OPT) from July 10, 2024 to July 9, 2025 (IOE9700371633). However, records show that the Department of State revoked the beneficiary's F-1 visa on March 20, 2025. According to the beneficiary's SEVIS record (N0017163255) their F-1 nonimmigrant status was terminated on April 10, 2025 because of the criminal records check and the revocation of their F-1 visa.

You filed the current petition on March 6, 2025. It appears that the beneficiary is not in valid F-1 nonimmigrant status, as such, the request for a change of nonimmigrant status may not be approved. If the petition is approved, it will be forwarded to a U.S. consulate abroad for visa processing. Therefore, identify a location abroad for visa notification.

As such, the beneficiary failed to maintain the beneficiary's nonimmigrant status.

## CRIMINAL OFFENSES



Records show the beneficiary has been arrested. You provided no evidence to account for, and explain, the circumstances surrounding the beneficiary's arrest.

USCIS records currently indicate that the beneficiary's criminal history as follows:

- The beneficiary's arrest and charges on February 22, 2025.

You must provide documentation about the beneficiary's arrest, the associated charges, and the subsequent dispositions for each charge, whether dropped, suspended, or resulting in a conviction.

Please submit certified copies of all court and police records showing the charges and dispositions for every arrest listed above. This evidence is requested even if the beneficiary's criminal records were sealed, expunged, cleared, or otherwise closed. Certified court dispositions should be issued from the court that held jurisdiction over the beneficiary's criminal proceedings.

The documents you provide should address each of the following:

    a)  The final disposition or outcome (sentence, probation, dismissal, etc.) of all charges since the beneficiary's admission as a F-1 nonimmigrant. The charges and dispositions must be specifically identified, listing only numeric citations or legal codes is not sufficient unless provided with clarifying documentation.

    b)  If the beneficiary was convicted of any charges, you should also provide evidence showing whether the charge for which the beneficiary was convicted was classified as a felony or misdemeanor. You may submit a copy of the pertinent statute, sentencing guideline, or statement from the court clerk or police department for this purpose.

If the beneficiary's conviction resulted in an alternative sentencing program, suspended sentence, or the participation in a rehabilitative program (such as a drug treatment or community service program), you should submit an original or court certified copy of the beneficiary's sentencing record for each incident, and evidence that the beneficiary completed their sentence. Specifically, you should submit:

    a)  An original or certified copy of the beneficiary's probation or parole record, or
    b)  Evidence that the beneficiary completed an alternative sentencing program, suspended sentence or rehabilitative program.

If a final disposition is not available, the beneficiary should obtain a certified letter from the court confirming the lack of court records. All submitted documentation should be original or a certified copy. Certified copies must include a court seal stamp on the document.

Please note, USCIS will consider all credible evidence submitted in support of your Form I-129, but will determine, in its sole discretion, the evidentiary value of all documentation submitted.

You are afforded 30 days from the date of this notice to submit additional information, evidence or arguments to support the petition.  Additionally, when USCIS serves a notice by mail, three days are added to the prescribed period in which to respond. Any such evidence or arguments will be carefully reviewed prior to a final determination in this matter.  Failure to respond, however, will result in adjudication of the petition on the basis of the record, as it is now constituted, including the information referred to above.

**Your response must be received in this office by May 21, 2025.**

**PLACE THE ATTACHED COVERSHEET AND THIS ENTIRE LETTER ON TOP OF YOUR RESPONSE.**

Sincerely,

John M. Allen
SCOPS Deputy Associate Director of Adjudications

USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online

California Service Center
P.O. Box 30113
Tustin CA 92781





**U.S. Citizenship
and Immigration
Services**



66508$2095 C012

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

B K, et. al.,

      Plaintiffs,

v.

Noem, et al.

      Defendants.

Case No. 1:25-cv-419

Hon. Jane M. Beckering

Magistrate Judge Phillip J. Green

I, Brian Childs, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am the Senior Director of the International Student & Scholar Services office of Western Michigan University. Western Michigan University ("WMU") is certified by the Student and Exchange Visitor Program ("SEVP") to enroll nonimmigrant F-1 students at our institution. SEVP uses the Student and Exchange Visitor Information System ("SEVIS") to track and monitor F-1, M-1, and J-1 nonimmigrants.

2. All SEVP-certified schools are required to have a Designated School Official (this includes the Primary DSO, or "DSO" and any other "DSO"). I am one of the DSOs for WMU. The DSO is responsible for the institution's communication with the SEVP program, updating F-1 student records, helping F-1 students maintain their status by providing guidance, and creating the form I-20 for F-1 students. Among other things, I lead our team of twelve DSOs and help advise WMU students on work authorization, applying for a driver's license, transferring to a new school, traveling outside of the United States, and navigating

1

class absences while ensuring students do not violate the terms of their F-1 nonimmigrant status. I have maintained the role of a DSO at WMU since December 7, 2024. I have also been a DSO for over ten years having served at previous institutions (Bowling Green State University, University of California – Santa Cruz, and California State University, Monterey Bay).

3. The SEVIS program collects, maintains, and analyzes information for nonimmigrants in the F, M, and J visa categories. Upon an F-1 student's acceptance into WMU, a DSO is responsible for registering the student in SEVIS and issuing a Form I-20, "Certificate of Eligibility for Nonimmigrant (F-1) Student Status – For Academic and Language Students." This I-20 is submitted and managed through SEVIS, and the form is required for the F-1 student to apply for a visa, enter the United States, and apply for various benefits. As a DSO, I am also responsible for the termination of SEVIS records on behalf of WMU.

4. There are a number of ways a DSO can end programs in SEVIS. They can cancel the SEVIS record in initial status, complete the program, shorten the program, or terminate the record.

5. The SEVIS record may be terminated by WMU for a number of reasons. Many of the reasons a student would be terminated are geared around the student not fulfilling the requirements of being an F-1 student, including failing to enroll, not taking a full course load, participating in unauthorized employment, among others. These terminations all carry significant negative consequences.

6. Depending on the reason for termination, WMU contacts the student to inform them of the SEVIS record termination and the requirement to depart the United States, in accordance with the relevant guidance and regulations. For example, if an F-1 student withdraws from

the program prior to its completion with DSO authorization, we inform the student that they must leave the United States within 15 days of the SEVIS record termination date. However, if the SEVIS record is terminated for a violation of F-1 status, we inform the student that there is no grace period and they are required to leave the United States immediately.

7. It should be noted that there are also benign or informational reasons that a student's status may be terminated in SEVIS. For example, when a student changes or adjusts status from an F-1 to another nonimmigrant visa or Permanent Resident status, the SEVIS record is terminated and the individual is then governed by the rules of the new status. Regardless of the reason for the termination, all SEVIS terminations result in the loss of all benefits by the student associated with their student status.

8. As a DSO, I have personally overseen the termination of F-1 student SEVIS records for a number of reasons, including student authorized early withdrawal, failure to enroll, unauthorized employment, and unauthorized drop below full course.

9. In order to terminate a student's SEVIS record, a DSO is required to select a Termination Reason from a drop-down list within SEVIS.

10. Beginning March 28, 2025, a number of WMU students had their SEVIS record terminated by SEVP. This was first discovered by me on April 3, 2025 when I performed my own check of student SEVIS records. Initially, each of these students' Termination Reason was listed in SEVIS as "Otherwise Failing to Maintain Status."

11. For the students initially terminated by SEVP between March 28, 2025 and April 8, 2025 based on "Otherwise Failing to Maintain Status," the reason was switched to "Other." "Other" is not a Termination Reason that is or has ever been available in the drop-down

menu available to DSOs. All students terminated since April 8, 2025 by SEVP have been terminated with the "Other" Termination Reason.

12. When "Otherwise Failing to Maintain Status" is used as the Termination Reason, an explanation must also be provided. The students being terminated with this reason were all provided one of two explanations, "Student identified in criminal records check. Terminated pursuant to INA 237(a)(1)(C)(i)/ 8 USC 1227(a)(1)(C)(i)" or "Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated." All three of the WMU Plaintiffs here had the second explanation.

13. When the Termination Reason was switched to "Other" on or around April 8, 2025, the explanations were all changed to "Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated." In all my experience as a DSO, I had never seen this Termination Reason or explanation for student terminations before the recent terminations by SEVP.

14. Plaintiff Madan B K is a Western Michigan University student. Plaintiff B K's SEVIS record was terminated on April 4, 2025 with the initial reason of "Otherwise Failing to Maintain Status." The termination explanation field stated, "Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated."

15. Plaintiff Geran "Gloria" Gao is a Western Michigan University student. Plaintiff Gao's SEVIS record was terminated on April 10, 2025. The Termination Reason was "Other." The termination explanation field stated, "Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated."

4

16. Plaintiff Pranil Titare is a Western Michigan University student. Plaintiff Titare's SEVIS record was terminated on April 4, 2025. The Termination Reason was "Otherwise Failing to Maintain Status." The termination explanation field stated, "Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated."

17. WMU received no notice of these students' SEVIS terminations from any federal agency, including SEVP. The terminations were only discovered because of my personal review of WMU's SEVIS account.

18. It was then my office's responsibility to communicate to the WMU Plaintiffs that their SEVIS records had been terminated.

19. WMU has never received guidance from SEVP or any other federal agency pertaining to a student's necessary departure or departure dates for the newly added Termination Reason "Other."

20. As a general matter, a DSO may submit a correction request in SEVIS should an error have occurred on a student's record. There are three correction options available on a Terminated record: "Request Change to Program Dates," "Student Status," and "Request Change to Termination Reason."

21. When the record is terminated, the program dates do not change, thus submitting a "Request Change to Program Dates" is not appropriate and cannot be used to correct the student's SEVIS status. Using "Request Change to Termination Reason" will merely change the Termination Reason and will not change the SEVIS status back to active, so that correction request is not appropriate. This leaves the "Student Status" reason as a possible option. However, instructions in SEVIS clearly indicate to use this option for a

DSO error. SEVIS states (emphasis added), "Use this to change the student's current SEVIS record status to the correct one. **Only use this if the student's record is in an incorrect status due to a DSO error.** Do not use this if the student failed to maintain his immigration status and requires reinstatement." These terminations were not the result of any DSO error so this is not an appropriate request to make. As such, the Corrections request does not provide an available option to properly return a student to Active status in this case.

22. When a SEVIS record is terminated, a DSO can no longer update the record to convey changes in student information such as name, address, enrollment status, or adjustment to the program completion date. However, the school is required by 8 C.F.R. § 214.3 (g)(2) for the school to update this information in SEVIS. As such, if a student was terminated in SEVIS, but still seen to be in F-1 status, it would be impossible for WMU to comply with federal regulatory requirements and thus the student would also be noncompliant with the regulations. In addition, after the termination of a SEVIS record, a DSO cannot print an I-20 for the student.

23. It is and has always been the understanding of WMU that all F-1 international students must maintain a valid I-20 in SEVIS in order to remain in valid F-1 status.

24. Upon enrollment in WMU, F-1 international students are required to review and sign WMU's "Maintaining International Student Status/Enrollment" form. This form is meant to provide an overview of the requirements of F-1 students to remain in valid F-1 status.

25. This form states, among several other requirements, that the student "must maintain a valid, unexpired I-20 or DS-2019 at all times. This includes correct education level, major, current funding, and correct personal data."

26. 8 C.F.R. § 214.2(f)(5)(iv) states that an F-1 student who "otherwise fails to maintain status is not eligible for an additional period for departure."

27. Given WMU's standard practice and the legal requirements of 8 C.F.R. § 214.2(f)(5)(iv) and 8 U.S.C. § 1227(a)(1)(C)(i), it was WMU's understanding and belief that a student terminated under the "Otherwise Failing to Maintain Status" category must immediately depart the United States.

28. However, given the uncertainty of the legal effect of the novel Termination Reason "Other," we immediately advised each of our students in this situation to consult outside immigration counsel to evaluate the consequences of the termination.

29. Over the next two weeks, I discovered several other SEVIS terminations and also advised those students to seek outside legal counsel.

30. Even prior to the March and April 2025 SEVIS terminations, it has always been clear that once an F-1 student's record in SEVIS is terminated, regardless of the reason, that student immediately loses all on- and off-campus employment authorization based on their F-1 nonimmigrant status. This includes employment authorization for on-campus employment, graduate assistant positions, Curricular Practical Training ("CPT"), Post-Completion Optional Practical Training ("OPT"), as well as the STEM OPT extension for those who have completed a degree in science, technology, engineering, or mathematics.

31. The interruption in on-campus employment authorization has a significant impact on student workers and graduate assistants who rely on work authorization positions to pay their tuition. This also has an adverse impact on the institutions that depend on graduate assistants to teach classes and perform critical research.

32. Similarly, termination of employment authorization, including CPT and OPT, not only causes harm to the student, but also the student's employer.

33. The WMU students working on OPT, which includes Plaintiff Titare, whose SEVIS records were terminated by SEVP had their OPT canceled and the end date on their OPT in SEVIS changed by SEVP to match the termination date. It is impossible to argue that such students, including Plaintiff Titare, still have OPT employment authorization.

34. Additionally, students are not able to leave and re-enter the United States on a terminated SEVIS record. The Study in the States guidance also explains that, upon termination, Immigration and Customs Enforcement ("ICE") may investigate to confirm the student has departed.

35. While the Department of Homeland Security ("DHS") has always had the ability to terminate a student's SEVIS records, I have never witnessed or have any knowledge of SEVIS terminations conducted in a manner similar to the March/April 2025 wave of terminations. I have no knowledge of DHS SEVIS record terminations for students who have not clearly violated the relevant international student regulations.

36. Historically, I am aware of only limited circumstances in which DHS has conducted SEVIS terminations for students. For example, they would terminate a student's SEVIS record if they were approved for a Change of Status.

37. There are procedures to correct a student's SEVIS status, but it does not appear that the students in this matter are eligible for this process. SEVIS reinstatement necessitates that the student has failed to maintain the terms of his or her immigration status. Since the students did not fail to maintain the terms of their immigration status, reinstatement would be improper.

38. Even if reinstatement was an option that made sense in this case, for students on post-completion OPT, this would still not be an option. 8 C.F.R.§ (f)(16)(i)(C) requires that someone applying for reinstatement "[i]s currently pursuing, or intending to pursue, a full course of study in the immediate future at the school which issued the Form I-20." These students do not apply to, nor are they admitted to new programs while also pursuing their practical training, because their intention is to engage in practical training.

39. Given the circumstances described in this Declaration and the Complaint, WMU is unaware of any proper mechanism for the impacted students' records in SEVIS to be reactivated. Therefore, it is the understanding of WMU that the affected students, who no longer maintain a valid I-20, are ineligible to continue their time in the United States or retain any employment authorization associated with their F-1 nonimmigrant status.

40. Termination of a student's record in SEVIS is a serious matter that carries with it significant, life-changing consequences for a student, including those that impact a student academically, socially, physically, and emotionally. Accordingly, the termination of a SEVIS record is typically done after a thorough examination of a student's potential infraction in the context of established regulations governing international students and scholars.

41. SEVIS Termination should not be undertaken lightly. It has serious ramifications on a student's ability to study, afford their time in the U.S., ability to travel to see loved ones, and more.

42. The unilateral and abrupt nature of the federal government's termination of SEVIS records over the past three weeks is far outside the ordinary course, is inconsistent with how such

terminations are normally handled, and does not appear, in my opinion and experience, to have been thoughtfully communicated and carried out.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of April 2025.

Brian Childs, Ed.D.
Designated School Official (DSO)
Senior Director
International Student & Scholar Services
Haenicke Institute for Global Education
Western Michigan University
wmich.edu/international
269-387-5873

# EXHIBIT C

<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                         DISTRICT OF COLUMBIA
 2

 3    AKSHAR PATEL                    ) CIVIL NO.:
                                      ) 25-1096-ACR
 4            Plaintiff,              )
           vs.                        )
 5                                    )
      TODD M. LYONS,                  )
 6                                    ) April 16, 2025
               Defendant.             ) Washington, D.C.
 7    _____) 10:45 a.m.

 8
                       Transcript of Motions Hearing
 9                   Before the Honorable Ana C. Reyes
                        United States District Judge
10

11    APPEARANCES:

12    For the Plaintiff:  Steven A. Brown, Esquire
                          Reddy Neumann Brown, P.C.
13                        10333 Richmond Avenue, Ste 1050
                          Houston, TX 77042

14                        Bradley B. Banias, Esquire
                          Banias Law LLC
15                        602 Rutledge Avenue
                          Charleston, SC 29403
16
      For the Defendant:  Joseph F. Carilli , Jr., , Esquire
17                        United States Attorney's Office
                          Civil Division
18                        601 D Street, NW
                          Washington, DC 20001
19
      Also Present:  MacKlin Everly
20                   Andre Watson

21    Reported by:   Christine T. Asif, RPR, FCRR
                      Federal Official Court Reporter
22                    333 Constitution Avenue, NW
                      Washington, D.C. 20001
23                    (202) 354-3247

24
      Proceedings recorded by machine shorthand; transcript produced
25    by computer-aided transcription
</pre>

P R O C E E D I N G S

1

2 THE CLERK:  This is civil action 25-1096, Akshar

3 Patel versus Todd M. Lyons.

4 Will the parties please identify themselves for the

5 record.

6 MR. BROWN:  Good morning, Your Honor.  Steven Brown

7 and Brad Banias for the plaintiffs.

8 THE COURT:  Government counsel.

9 MR. CARILLI:  Joseph F. Carilli for the

10 Government.

11 THE COURT:  In the future gentleman if I or any

12 court orders you to meet and confer, there are two components

13 of a meet and confer meet and confer.  One that you actually

14 meet, which you do not do over email.  And two is that you

15 actually confer.  The second I saw your --

16 Mr. Carilli, could you please look up and not be

17 writing whatever you're writing right now and listen to me.

18 The second I saw your first joint status report I

19 knew immediately that none of you had done either of those two

20 things, which is why I asked for the further report which

21 confirmed everything that I thought.  Now did you all meet and

22 confer by video this morning?

23 MR. BROWN:  Yes, Your Honor.

24 THE COURT:  How long did the meet and confer last?

25 MR. BROWN:  About 40 minutes, Your Honor.

1          THE COURT:  Okay.  Did you guys make any progress?

2          MR. BROWN:  Not towards a resolution, Your Honor,

3     but I think we have a understanding of each -- better

4     understanding of each other's position, Your Honor.

5          THE COURT:  All right.  So Mr. Carilli, can you

6     explain the SEVIS system to me exactly what it is and what it

7     does.

8          MR. CARILLI:  SEVIS is an information system that

9     was established under 8 U.S.C., I'm sorry --

10          THE COURT:  1372.

11          MR. CARILLI:  1372, excuse me.  That was established

12     post 9/11 for the Secretary of Homeland Security to be able to

13     monitor individuals who are in the country in F, M, and J

14     status.  Obviously, the issue here is the portions of SEVIS

15     that are used by F.  Immigration and Customs Enforcement

16     maintains that system under that statute and it is used to,

17     like I said, monitor and then also for individual schools to

18     be able to provide information about F-1 students that are

19     enrolled at their schools.

20          THE COURT:  Okay.  So the purpose of SEVIS is to

21     monitor people who are here in part on F-1 visas?

22          MR. CARILLI:  Yes, Your Honor.

23          THE COURT:  Okay.  So what's the impact of taking

24     someone off of SEVIS, why would we not want to monitor

25     somebody?

1    MR. CARILLI:  Well, to clarify, Your Honor, what

2    occurred here was, in SEVIS there is a drop down menu that

3    allows you to list active -- there's categories about an

4    individual.  So the record wasn't deleted, it's just in SEVIS

5    that it was changed from active to terminated.

6    THE COURT:  Okay.  And what's the consequence of

7    moving someone from active to terminated?

8    MR. CARILLI:  The consequence is exactly as

9    described, that it changed the status of the individual inside

10   SEVIS.  It did not change the individual's immigration

11   status.

12   THE COURT:  So what's the impact of it being changed

13   within SEVIS, why -- what happens when that occurs?

14   MR. CARILLI:  I mean, it's an indication that in

15   system that the individual -- that their record in the system

16   has been -- the status is terminated.  I can't --

17   THE COURT:  No, I understand that.  But what is the

18   impact -- what's the impact of it having been terminated?  If

19   there's no impact, then I'm sure you have no problem moving it

20   back to active and we can all go home; right?

21   MR. CARILLI:  Well, I think that the government

22   has -- ICE has indicated they're not going to change it back.

23   I think that --

24   THE COURT:  That wasn't my question.  I'm not really

25   concerned what ICE thinks they can and can't do, I'm concerned

1    with what I can do.  And my understanding from the plaintiff's

2    argument is that a change of SEVIS from active to terminated

3    either automatically cancels their F-1 visa or is a precursor

4    to canceling their visa.  I'm not quite sure what the argument

5    is, but I think it's the first.  And the government says no,

6    no, no, that has nothing to do with immigration.  So if it has

7    nothing to do with immigration, it must have something to do

8    with something, or else we would all change it back to active

9    and we could all go home.

10           So explain to me please what the consequence is of

11   changing something from active to inactive or terminated.  And

12   do not say it's terminated within the SEVIS system, because

13   that is not an answer to my question.  What is the impact of

14   terminating somebody within SEVIS?

15           MR. CARILLI:  I'm not prepared to answer that --

16           THE COURT:  How are you not prepared to answer --

17   I'm sorry how are you not here prepared to answer that

18   question?  That's the only question in this litigation, Mr.

19   Carilli.

20           MR. CARILLI:  The question here is whether --

21           THE COURT:  No, Mr. Carilli -- Mr. Carilli.  I'm the

22   one who decides what the questions here are, okay, not you.

23   Now, obviously, the first question in this case is what is the

24   practical import of canceling someone within SEVIS.  And if

25   you don't know, we're all going to wait here while you call

1    someone and find out, because I'm not going to get jerked

2    around by you telling me you're not prepared to answer the key

3    question in this case.

4         What is the impact of someone being terminated

5    within SEVIS?

6         MR. CARILLI:  I do not know --

7         THE COURT:  All right.  Mr. Carilli, that's fine --

8    Mr. Carilli, that's totally fine.  We're all going to stay on

9    the phone here.  You're going to go some other phone or you're

10   going to put yourself on mute.  And you're going to call your

11   client and you're going to ask.  And we're going to stay here

12   until you get an answer.

13        MR. CARILLI:  Yes, Your Honor.

14        THE COURT:  So, gentleman, you guys can hang back

15   and we'll hear from Mr. Carilli when he's done.  And I'm going

16   to stay on the bench while you get this done.  And if you

17   can't get someone on the phone.  Get the next person on the

18   phone.  Because I'm going to stay here until you get someone

19   on the phone.  I'm ordering you to get your client on the

20   phone.  So we're all going to stay here while you do that.

21        And you can put yourself on mute and turn yourself

22   off the video if you would like Mr. Carilli.

23        Gentleman, you guys can put yourselves off video if

24   you want to, just stay around in case we get back from him.

25   And Ms. White mute, please.  Turn off my video.

1              (Pause in the proceedings from 10:53 a.m. to 12:06

2      p.m.)

3              THE COURT:  Mr. Carilli, where are we?

4              MR. CARILLI:  Your Honor, I'm still waiting for a

5      response from the Agency, in terms of the practical effects of

6      changing the record in SEVIS to terminated.

7              THE COURT:  Can you explain to me please why it has

8      taken over an hour and I still don't have an answer, to what

9      must be the most obvious simple question that this case

10     presents as to what happens when someone gets taken off of

11     SEVIS?  I mean, you know, why there's a delay, right, Mr.

12     Carilli?  Do you want to tell me why there's a delay or do you

13     want to me to tell you why there's a delay?

14             MR. CARILLI:  Your Honor, I don't know why there's a

15     delay.

16             THE COURT:  Well, I'll tell you why there's a delay,

17     Mr. Carelli, because what happens when you take someone off of

18     SEVIS and you terminate them they lose their status and that's

19     not something you all want to tell the Court.  Now, why you

20     all don't want to tell the Court, I don't know.  But we're

21     going to get an answer to the question.

22             So I want agency counsel to stop whatever

23     conversations she's having or he's having right now and get on

24     the video so I can ask agency counsel what's going on.

25     Because we asked -- apparently agency counsel was on the phone

1    no later than 11:40 having this conversation.  And it's not a

2    25-minute answer.  So get agency counsel on the phone.  And

3    after we get agency counsel on the phone, if I'm not

4    satisfied, we're going to have the declarant Mr. Watson come

5    to my courtroom and testify today.  So get agency counsel on

6    the phone, please.

7              MR. CARILLI:  Yes, Your Honor.  Honor, excuse me,

8    before I go off video may I go off video to --

9              THE COURT:  Yeah.  Sure.  Of course.

10             MR. CARILLI:  Thank you, Your Honor.

11             (Pause in the proceedings from 12:08 p.m. to 12:19

12    p.m.)

13             THE COURT:  Mr. Carilli, what's going on?

14             MR. CARILLI:  Your Honor, I just forwarded the

15    invite to one of the agency counsel.  Agency counsel indicated

16    there was also going to be another individual that was going

17    to join.  So I have been waiting for that second name, but I

18    just forwarded it to the person that told me --

19             THE COURT:  Okay.  While we're waiting for them, is

20    the government's position that Mr. Patel's F-1 visa is in

21    effect or not in effect?

22             MR. CARILLI:  Mr. Patel's F-1 visa is no longer

23    valid.  So -- and I think there's a different genre between a

24    individual who has a valid visa which allows them to seek

25    admission into the United States versus when an individual has

1    lawful status after they have been admitted into the United

2    States.

3            THE COURT:  Okay.  Is he lawfully in the United

4    States right now?

5            MR. CARILLI:  The government's position is that he

6    has not -- ICE has not taken -- has not terminated his F-1

7    status.  And for ICE to be able to terminate his F-1 status,

8    they would have to put him in 1229a removal proceedings.

9            THE COURT:  Is he lawfully in the United States

10   right now, yes or no?

11           MR. CARILLI:  I'm not able to answer that question,

12   Your Honor.

13           THE COURT:  How are you not able to answer that

14   question?  What does that even mean?  He's either here legally

15   or he's not here legally.  You're the government's lawyer.  Is

16   he here legally?  I mean, how is Mr. Patel supposed to know if

17   he's here legally if you don't even know if he is here

18   legally?

19           MR. CARILLI:  He was lawfully admitted to the United

20   States --

21           THE COURT:  No, no, Mr. Carilli, there's a -- no, no

22   Mr. Carilli, there is a yes or no answer here.  We are not --

23   this is not Schrodinger's visa, either he's here legally or

24   he's not here legally.  If you cannot answer the question, you

25   have to explain to me why you cannot answer that question.

1          MR. CARILLI:  I cannot answer that question.  I have

2  talked to ICE as to whether or not they consider at this point

3  in time the individual, whether or not they are maintaining

4  lawful status.

5          THE COURT:  And what does ICE say to that?

6          MR. CARILLI:  I have not received a response, Your

7  Honor.

8          THE COURT:  Do you realize that this is Kafkaesque?

9  I've got two experienced immigration lawyers on behalf of a

10  client who is months away from graduation, who has done

11  nothing wrong, who has been terminated from a system that you

12  all keep telling me has no effect on his immigration status,

13  although that clearly is BS.  And now, his two very

14  experienced lawyers can't even tell him whether or not he's

15  here legally, because the Court can't tell him whether or not

16  he's here legally, because the government's counsel can't tell

17  him if he's here legally.

18          And you know what's going to happen when he gets

19  picked up?  He's going to be accused of being here illegally

20  in the United States because when he is picked up and put

21  through deportation proceedings, everyone's going to say he

22  was here illegally and he was obviously here illegally and he

23  should have known that.  And then some court down there is

24  going to say no, no, no, the Court up in D.C. asked and the

25  government said they didn't know.  And those lawyers, do you

1   know what they are going to do?  They're going to be like, I
2   don't know what that lawyer was thinking.

3        We are not going to do that here, Mr. Carilli.  That
4   is not happening in this courtroom.  We're going to get an
5   answer.  And if the answer somehow contradicts what is in your
6   brief, or what is in God willing no, Mr. Watson's declaration,
7   there are going to be serious consequences.  Where is your
8   agency counsel?

9        MR. CARILLI:  Will you allow me to confer with the
10  agency --

11       THE COURT:  No, you've been conferring with the
12  agency for -- I want the agency counsel on the phone, you sent
13  them the thing; right?

14       MR. CARILLI:  Your Honor, what I meant by confer was
15  please let me try and get them back on the phone to find out
16  why they have not joined the call.

17       THE COURT:  Fine.

18       MR. CARILLI:  That's what I meant by --

19       THE COURT:  Fine.

20       (Pause in the proceedings.)

21       MR. CARILLI:  Your Honor, agency counsel is joining
22  on the line.

23       THE COURT:  Plaintiff's counsel, is your client
24  allowed to go to classes right now?

25       MR. BROWN:  Your Honor, it is our client's position

1    that based off of ICE he cannot be in status and thus cannot

2    attend classes.

3            THE COURT:  Is anyone at the school preventing him

4    from going to classes?

5            MR. BROWN:  I don't think there's anybody physically

6    preventing him, no, Your Honor.

7            THE COURT:  All right.  Government counsel, I assume

8    while this is pending you are okay if he goes to classes?

9            MR. CARILLI:  I would need to confer with the Agency

10   about that, Your Honor.  I asked that specific question before

11   this hearing and did not receive a response.

12           THE COURT:  Is it they just don't respond to you or

13   they just don't give you an answer?

14           MR. CARILLI:  I have received that they don't have a

15   response to my question.  In other words, it's not a -- it is

16   not a they did not respond.  It's -- as the Agency counsel

17   just explained to me, when I asked him to join the link is he

18   indicated that those are operational decisions that are with

19   the client, with their client.

20           THE COURT:  Okay.  Well, then I want someone from

21   the client -- where is agency counsel?  How long does it take

22   to log on to a video?  We've been waiting for the agency

23   counsel now 20 minutes.

24           (Pause in the proceedings.)

25           MR. CARILLI:  Just communicated, Your Honor, that

```
1    he's trying to log in right now.
2              THE COURT:  Mr. Everly, could you please enter your
3    appearance.
4              THE CLERK:  Mr. Everly this is the courtroom deputy,
5    can you hear me, sir?  I can't hear you.
6              MR. EVERLY:  Can you hear me now?
7              THE COURT:  Mr. Everly, can you please enter your
8    appearance.
9              MR. EVERLY:  Yes.  MacKlin Keith Everly, agency
10   counsel for U.S. Immigration and Customs Enforcement.
11             THE COURT:  How long have you been agency counsel,
12   sir.
13             MR. EVERLY:  Little less than two years.
14             THE COURT:  Where were you before then?
15             MR. EVERLY:  I was with Progressive and
16   (indiscernible) company.
17             THE COURT:  All right.  Government counsel asked you
18   some questions today about Mr. Patel, sort of rather obvious
19   questions that I have asked government counsel.  He says he's
20   asked you and you said you can't -- you don't have an answer
21   for him because it was above your pay grade or with some
22   operational people.  So I'm going to ask the two questions and
23   there will be more.  And then we're going to get answers to
24   those questions, Mr. Everly, before we all get off the phone.
25   Am I understood?
```

1    MR. EVERLY:  I understand.  I understand, Your

2    Honor.  I will preface my responses with I won't have any

3    additional information --

4    THE COURT:  We're going to get additional

5    information, Mr. Everly, because you're going to tell me who

6    has that additional information and we're going to get that

7    person on the phone.  And if we have to, I'm going to get them

8    under oath.  All right?

9    MR. EVERLY:  Understood, Your Honor.

10    THE COURT:  The first question is, is Mr. Patel here

11    legally?  Is he lawfully in the United States?

12    MR. EVERLY:  Your Honor, since that's an operational

13    decision by my client, we're actively conferring with the

14    client, I don't have a response to provide at this time.  I

15    believe --

16    THE COURT:  Is Mr. Patel free to go to his classes

17    at Wisconsin?

18    MR. EVERLY:  I have to reiterate the same.  Same

19    response, Your Honor.

20    THE COURT:  Well, what's the effect of terminating

21    someone on SEVIS?  That's just a mechanical question, what's

22    the effect of terminating someone from SEVIS?

23    MR. EVERLY:  Again, Your Honor, that's an

24    operational --

25    THE COURT:  It's not an operational question,

1    Mr. Everly.  That is a mechanical question.  There is a policy

2    somewhere that says what the effect is, so tell me what the

3    effect is of terminating somebody from SEVIS.

4            MR. EVERLY:  Your Honor, I apologize, I do not have

5    the answer to the question.

6            THE COURT:  Okay.  Who has -- Mr. Everly, name me

7    the individual who has the answer to the first two questions

8    and then the third question.

9            MR. EVERLY:  Your Honor, all I can offer at this

10   point is that we have provided a declarant in this case --

11           THE COURT:  Yes, fine.  All right.  That's fine.

12   We're going to get Watson, Mr. Watson here under oath since

13   he's filed a declaration.  And if he doesn't give me the

14   answers that I need then we're going to get somebody else.

15   Because Mr. Watson's declaration doesn't tell me if Mr. Patel

16   is here legally.  It doesn't tell me if Mr. Patel can go to

17   classes.  And it doesn't tell me what the practical effect is

18   of terminating someone from SEVIS, but if we want to start

19   with Mr. Watson under oath subject to penalty of perjury, I'm

20   very happy to do that.  Is there anybody else other than Mr.

21   Watson, who can give me answers to those questions?  Let me

22   put it to you this way, who have you been communicating with

23   at the agency?

24           MR. EVERLY:  I've been communicating with other

25   agency counsel.

```
 1              THE COURT:  Who?  Names, names, Mr. Everly, who?

 2         I am ordering you to tell me who have you been

 3    communicating with.  Now if you want to violate a court order

 4    by stalling --

 5              MR. EVERLY:  Your Honor, I have no desire --

 6              THE COURT:  Okay.  Great.  Then tell me the name of

 7    the person that you've been communicating with.

 8              MR. EVERLY:  I have been communicating with -- and I

 9    will provide names, I'm just prefacing, I've been

10    communicating with individuals from our National Security Law

11    Division, primarily deputy chief Nina Gleiberman and the chief

12    of the division also Kate Briscoe.  And also in communication

13    with my management deputy chief -- excuse me, deputy chief

14    Christa Leash and Chief Henry (indiscernible.)

15              THE COURT:  Okay.  Of those four people who is most

16    likely to have an answer to my questions.

17              MR. EVERLY:  Unfortunately, they are all in the same

18    position as I am.

19              THE COURT:  Who are they communicating with?

20              MR. EVERLY:  They're communicating with the

21    client --

22              THE COURT:  Who is the client?  Who at the client is

23    the person who's making these decisions or can give me an

24    answer?

25              MR. EVERLY:  We've been working with the
```

1    declarant --

2            THE COURT:  All right.  Fine.  Fine.  Get Mr. Watson

3    on the phone right now.  I'm ordering him to appear to this

4    hearing.  And he's going to be put under oath.

5            MR. EVERLY:  Understood, Your Honor.  I will take

6    those steps, if I can go on hold for a moment while I go do

7    that.

8            THE COURT:  Yup.

9            MR. EVERLY:  Thank you.

10           (Pause in the proceedings.)

11           THE COURT:  I'm going to take a ten minute recess

12   I'm going to be back here at 12:45.  Mr. Carelli, Mr. Watson

13   had better be on this phone when we get back, are we

14   understood?

15           MR. CARILLI:  Yes, Your Honor.

16           THE COURT:  All right.

17           (A recess was taken from 12:35 p.m. to 12:45 p.m.)

18           THE COURT:  All right.  Do we have Mr. Watson?

19           MR. EVERLY:  Your Honor, we're in active contact

20   with him and we're working to get him here as soon as we can.

21   If we could just have 10 or 15 more minutes to accomplish

22   that, I would really appreciate that.

23           THE COURT:  All right.  I'm going to give you until

24   1:15.

25           MR. EVERLY:  Thank you, Your Honor.

```
 1              THE COURT:  Have him here by then, all right?

 2              MR. EVERLY:  Yes, Your Honor.

 3              THE COURT:  If something happens and you can't get

 4    him here by 1:15, alert my law clerk we'll all get back on

 5    with the video.  We'll figure out where to go from there, but

 6    it's not going to be pretty.  Okay?

 7              MR. EVERLY:  Yes, Your Honor.  Thank you.

 8              THE COURT:  Thank you.

 9              (A recess was taken from 12:47 p.m. to 1:15 p.m.)

10              THE COURT:  All right.  Mr. Watson, welcome.  You're

11    on mute, sir.

12              MR. WATSON:  My apologies.  Good afternoon, Your

13    Honor.

14              THE COURT:  No worries.  All right.  So you filed a

15    declaration on behalf of the government in this case.  And I

16    have some questions for you about that declaration.  I'm not

17    going to put you under oath at this time, but if I feel like

18    I'm getting the run around, which I hope I will not, I will

19    put you under oath.  Okay?

20              MR. WATSON:  Yes, ma'am.

21              THE COURT:  All right.  So first of all, can you

22    explain to me what the practical effect is of terminating

23    someone on SEVIS?  How do I say that by the way, SEVIS, SEVIS?

24              MR. WATSON:  SEVIS is appropriate.

25              THE COURT:  Okay.  So what happens, what's the
```

1    effect of terminating someone on SEVIS?

2        MR. WATSON:  So it does not terminate their

3    nonimmigrant status, but what it does is it essentially raises

4    a flag as it relates to the student and their participation in

5    the student and exchange visitor program.

6        THE COURT:  Okay.  And so what happens if that flag

7    is raised, what's the effect of the flag raised?  First of

8    all, who does it raise a flag to, ICE?

9        MR. WATSON:  Well, it raises a flag to a designated

10   school official.

11       THE COURT:  Okay.

12       MR. WATSON:  Because they have access to the student

13   and exchange visitor information system.  So a designated

14   school official works with ICE in managing the student and

15   exchange visitor program to ensure compliance with applicable

16   code of federal regulations as it relates to nonimmigrant

17   students studying in the United States.  So it alerts the DSO,

18   the designated school official or the PSO as to that matter.

19       THE COURT:  Okay.  And so that flag tells the

20   official what?  What does the official take from that flag?

21   I'm the school official, I have a flag on Mr. Patel, what do I

22   do now?

23       MR. WATSON:  So it raises a -- it raises a gap, if

24   you will, a question about the student, and compliance as it

25   relates to the terms of their -- as it relates to the terms of

1  their participation in the program.

2          THE COURT:  Okay.  And how does that question get

3  answered?  What question is asked, if they're in compliance?

4          MR. WATSON:  Well, the question can be what

5  happened, what occurred.  So there can be a notation in the

6  record saying what happened, or that someone may or may not be

7  in compliance.

8          THE COURT:  Okay.  So I'm -- so I'm the school

9  official, and I have Mr. Patel's transcripts and he's attended

10  all his classes.  And so far as I, the school official, know

11  he's done everything he's supposed to do.  I see that -- I

12  mean, I don't know if I see this from SEVIS, but I see from

13  somewhere that he got arrested -- or he got pulled over for

14  driving too fast in Texas, but that the charges were

15  dismissed.  And so now am I satisfied that he's in compliance,

16  is everything kosher?  If the answer to that is yes, what do I

17  do next?

18          MR. WATSON:  So great question.  And here's another

19  novelty as well too, designated school officials can also

20  reach out to field representatives.

21          THE COURT:  Field representatives for -- I'm sorry,

22  field representatives for ICE?

23          MR. WATSON:  Yes, ma'am.

24          THE COURT:  Okay.

25          THE WITNESS:  And there's a hand -- there's a

1    working relationship there as to compliance and oversight with

2    the program.  So questions can be raised in that dialogue and

3    discussion.  So like in this instance with the case being

4    dismissed, the question would be then what would the next

5    steps be in terms of in this case the defendant.  So with

6    those charges being dismissed the question then becomes is

7    there a matter there that requires further review.

8                 THE COURT:  Okay.

9                 MR. WATSON:  As it relates to immigration.

10                THE COURT:  All right.  So let's say you're the

11   field representative for Wisconsin, and I'm -- you're the

12   field representative that there was cause for school officials

13   to contact, you and I have a good working relationship.  I'm

14   the school official in Wisconsin.  I get a notice, a flag that

15   Mr. Patel has been terminated on SEVIS.  I call you and I say

16   what's this flag about?  I've looked at his transcript I've

17   talked to his professors, he's in compliance with all our

18   obligations.  Either I know or you tell me that he had been

19   arrested or pulled over for reckless -- for driving too fast

20   in Texas, but the charges were dismissed.  And so then you --

21   so I say, okay, so now you field representative say what to

22   me?

23                MR. WATSON:  The field representative in that

24   instance can say, well, based on this matter, as it relates to

25   the arrest, the question then becomes is there shall I say a

1    continuing requirement or a situation where this can or should

2    be revisited.  So what's interesting to note --

3            THE COURT:  I'm sorry, if what can be revisited?

4    His termination on SEVIS or his --

5            MR. WATSON:  That's correct.

6            THE COURT:  Okay.  All right.

7            MR. WATSON:  Yes, that's correct.  His termination

8    in SEVIS.  So the question then becomes by what means would

9    this person seek to do so, because what's interesting to note

10   about SEVIS is that there's also an ability for, if I'm

11   correct, CIS, Citizenship and Immigration Services to also do

12   the same as well too.

13           So this is a novelty, I'd like to note, in this

14   instance, where it was turned off pursuant to, I think what's

15   in the declaration, collaboration with State as to criminality

16   of nonimmigrant student studying in the United States.  So

17   pursuant to --

18           THE COURT:  Well, to be clear -- to be clear,

19   though, Mr. Watson, he's not a criminal.  He hasn't been

20   charged of anything, much less found guilty of anything, but I

21   understand your point.

22           But so let -- so let me ask you this, right now as

23   of this moment, is Mr. Patel legally in the United States?

24           MR. WATSON:  In terms of his status, this action in

25   itself, it doesn't terminate his nonimmigrant status at this

1    point.  It doesn't.

2          THE COURT:  So he's legally in the U.S.  So the

3    answer to my question is yes, he's legally in the United

4    States, as of this moment?

5          MR. WATSON:  I can't say that he's legally in the

6    United States.

7          THE COURT:  Who can tell me if he's legally in the

8    United States?

9          MR. WATSON:  So I would say right now the Department

10   of State by way of a nonimmigrant visa being issued would be

11   the starting point.  Now, if the visa has been revoked or it

12   has expired, then the question becomes whether or not duration

13   of status would apply.

14         THE COURT:  Okay.  But let me -- well, I'm happy to

15   get someone from State on the phone with us, but before I do

16   that, I have your declaration -- I imagine you filed a lot of

17   these declarations recently, right, because apparently somehow

18   all this has happened, like a lot of dozens of people have

19   been terminated from SEVIS, this isn't the only declaration

20   you've filed; right?

21         MR. WATSON:  Yes, ma'am.

22         THE COURT:  Okay.  All right.  Well, for this one in

23   particular, I don't know if you have it in front of you, but

24   in paragraph 8, and this is for Akshar Patel, if I go to

25   paragraph 8 it says, on April 2nd, 2025, CTLD received

 1    communications from the Department of State indicating that

 2    Patel did not have a valid visa and requesting that the SEVIS

 3    record be terminated.  Was that -- I didn't -- are plaintiff's

 4    counsel aware that his -- that State apparently terminated his

 5    visa?

 6              MR. BROWN:  Your Honor, I don't believe his visa is

 7    the issue we're challenging, because he had a B visa and then

 8    changed his status to F-1.  So he is not on that B visa.  I

 9    can double -- I'm going to double check right now.

10              THE COURT:  But he's on a valid F-1 visa.

11              MR. BROWN:  He has valid F-1 status until this

12    happened, Your Honor.

13              MR. CARILLI:  Your Honor, if I may?

14              THE COURT:  Yeah, sure, please.

15              MR. CARILLI:  Yes, Your Honor.  Plaintiff initially,

16    as I understand from the Department of State, plaintiff

17    initially was issued an H-4 visa based on his -- based on his

18    mother coming in on an H -- I believe an H-1B.

19              THE COURT:  Okay.

20              MR. CARILLI:  And he was admitted into the country

21    on that H-4 visa in an H-4 status.  He then sought an I

22    believe adjusted status to that of an F status, and then is in

23    the country on an F status.

24              THE COURT:  Okay.  So then Mr. -- I'm sorry, sir.

25              MR. CARILLI:  And the H-4 visa validity period has

1   expired, which routinely happens for -- depending on how

2   individuals come into the country with a nonimmigrant

3   category, their visa validity period will be different than

4   the stamp that is provided on their I-94, which is their entry

5   document, which the periods may be different or in a lot of

6   cases individuals will be admitted into the United States in a

7   duration of status.

8           So, for example, Your Honor, if you've seen H-1B

9   case where is an individual says they've been in the United

10  States, they've been working but they had to leave for a

11  family issue or they have to leave and depart the United

12  States to get a new visa so that they can come and go from the

13  United States on that H-1B, that's why there's a different

14  between those two things.  And again the visa is just an

15  admission document, but also I would note that visa

16  revocations can form some basis for deportability under 327.

17          THE COURT:  Okay.  Thank you, sir.

18          So this April 2nd, 2025, communication that you

19  received from the State Department, Mr. Watson, do you have it

20  available to you?  I mean, was that a mistake by the State

21  Department that he was on an H-1 visa and he shouldn't be

22  terminated, but State just didn't pick up he was here validly

23  as a student.  I'm trying to figure out why State communicated

24  with you to have this record terminated?

25          MR. WATSON:  So, Your Honor, I don't have that

1    record in front of me.  And we are actually rescrubbing these

2    lists, because to the point that the gentleman that just spoke

3    pointed out, there are some of those nuances that have come

4    about.  So I don't have the information in front of me.  And I

5    believe State is re-examining various cases in a quality

6    control measure as well.

7        THE COURT:  Okay.  So let me put it to you this way.

8    So far as I can understand this kid has done everything that

9    he's supposed to have done.  And it seems like there's been

10   some miscommunication or something has happened.  And I'm

11   happy for State to do quality control.  I'm happy for you to

12   follow up on this and other individuals.  But what I want

13   coming out of this hearing is to at least either order

14   either -- I want this student to be able to go to class and

15   not get picked up by ICE.

16       Now, we can do that by, Mr. Watson, you agreeing to

17   that, or someone agreeing to that, and the plaintiffs going

18   and talking to Wisconsin people and saying he can go to

19   classes.  And if the Wisconsin person wants to talk to the

20   field representative, that's fine.  And if I need to put this

21   in an order, I will.  And I want him not to be picked up by

22   ICE.

23       Now, we can do this one of two ways.  One, we can

24   all agree that this is what's going to happen and Mr. Patel,

25   his lawyers can tell him legitimately that he can go to class,

1    or I can enter a temporary restraining order saying that he

2    can go to class and that he can't be deported.  And since

3    everything I've heard from you all is that that seems not

4    inconsistent with what you all know as of this moment, not

5    something that you all would challenge.

6              So Mr. Carilli, how should we proceed here?

7              MR. CARILLI:  Your Honor, I would comment that under

8    8 U.S.C. 1252(g), which addresses the jurisdiction of courts

9    to be able to over the decision by the Department of Homeland

10   Security to initiate removal proceedings and stripped that

11   jurisdiction from district courts.  And so for any matters

12   arising from a decision as to whether or not to place an

13   individual in removal proceedings, the Congress has said that

14   there's no jurisdiction for district courts in those

15   decisions.

16             THE COURT:  All right.  Well, let's take the classes

17   first.  We can all agree that I can order him to be allowed to

18   go to class as a TRO for now; right?  Mr. Carilli?

19             MR. CARILLI:  Your Honor, if you just give me a

20   moment to look through the relief that has been sought in the

21   TRO, I just need -- I need a moment to ensure that I -- and I

22   also, I mean, that's a -- you're asking me for potentially

23   something that is beyond the scope of my authority.

24             THE COURT:  Okay.  Here's what we're going to do,

25   Mr. Carilli, because I understand you guys are in a tough

1  spot, because you have a bunch of these cases and you don't

2  want a bunch of bad case law.  I get it.  One way or the other

3  this kid is going back to school today if he has classes,

4  tomorrow if he has classes tomorrow.  And if ICE touches this

5  guy there's going to be repercussions.

6         So now we can do this with you all agreeing that

7  amongst yourselves, and if anything happens you all bring it

8  to my attention, or we can do it through a subsequent hearing

9  this afternoon where I enter a TRO order.  I would rather the

10  former.  And I assume you guys are fine with both of those, at

11  least agreeing with plaintiffs to those because -- or just

12  some agreement that if ICE is going to pick up the guy that,

13  you know, they have 24 hours notice so that they can seek

14  emergency relief, I mean, we can just do that, right.  He can

15  go to class.  And if ICE is going to do anything with him,

16  which I don't suspect they are going to, the plaintiffs get 24

17  hours notice.  All right.

18         You guys come to that agreement, make life easy for

19  everyone, or you can continue to deal with me, Mr. Carilli.

20  And I will not stop with you or Mr. Everly or Mr. Watson,

21  we're going to continue down the road.  All right?

22         MR. CARILLI:  Yes, Your Honor.

23         THE COURT:  All right.  So I'm going to set another

24  hearing for 4:30, but you guys tell me that we don't need it.

25         Mr. Watson, do you have any idea how long State is

1    going to take with this quality review?

2         MR. WATSON:  Ma'am, I can tell you that they are

3    proceeding in earnest to do so, with the level of effort

4    they've made great strides in progress in coordination with my

5    team.

6         THE COURT:  Okay.

7         MR. WATSON:  So ma'am, I can emphasize to you that

8    sooner than better is occurring, ma'am.

9         THE COURT:  Perfect.  All right.  So it seems like,

10   Mr. Carilli, since my hope -- my strong hope is that State is

11   going to realize that this guy was on an F-1 visa and should

12   not have been terminated from SEVIS, my strong hope is that

13   that happens, that this was all an unfortunate mix up, that I

14   don't have to enter a TRO.  So I'm hopeful Mr. Carilli that

15   you and plaintiffs can figure something out amongst

16   yourselves.  Knowing, of course, that if anything happens,

17   plaintiff's lawyers, you can always seek relief from me.

18        Plaintiff's lawyers, do not make Mr. Carilli's life

19   miserable here.  Let's just practically try to get this guy

20   back to class and at least settled in the U.S. until we have

21   final determination of something.  Okay?

22        So I'm setting a hearing for 4:30 tentatively.

23   Hopefully, you all will tell me that we don't need it.

24        Mr. Watson, I understand that you're incredibly

25   busy.  And the last thing that you ever want to hear is

1    lawyers saying I need you on the phone right now with the

2    Court.  So I appreciate you getting on the phone.  And I

3    appreciate you giving me this information.  Thank you,

4    everybody.

5              MR. WATSON:  Thank you, ma'am.

6              MR. BROWN:  Thank you, Your Honor.

7              (The proceedings were concluded.)

8

9              I, Christine Asif, RPR, FCRR, do hereby certify that
     the foregoing is a correct transcript from the stenographic
     record of proceedings in the above-entitled matter.

10

                    _____/s/_____
11                       Christine T. Asif
                      Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

< Dates >.
April 2nd,
  2025, 23:25,
  25:18.
.
.
< 0 >.
06 7:1.
08 8:11.
.
.
< 1 >.
1 17:24, 18:4,
  18:9.
10 7:1,
  17:21.
10333 1:24.
1050 1:24.
10:45 a.m.
  1:13.
11 8:1.
12 7:1, 8:11,
  17:12, 17:17,
  18:9.
1229a 9:8.
1252(g 27:8.
1372 3:10,
  3:11.
15 17:21,
  17:24, 18:4,
  18:9.
19 8:11.
.
.
< 2 >.
20 12:23.
20001 1:36,
  1:44.
202 1:45.
2025 1:11.
24 28:13,
  28:16.
25-1096 2:2.
25-1096-ACR
  1:6.
25-minute
  8:2.
29403 1:30.
.
.

< 3 >.
30 28:24,
  29:22.
327 25:16.
333 1:43.
35 17:17.
354-3247
  1:45.
.
.
< 4 >.
4 28:24,
  29:22.
40 2:25, 8:1.
45 17:12,
  17:21.
47 18:9.
.
.
< 5 >.
53 7:1.
.
.
< 6 >.
601 1:35.
602 1:29.
.
.
< 7 >.
77042 1:25.
.
.
< 8 >.
8 3:9, 23:24,
  23:25,
  27:8.
.
.
< 9 >.
9/11 3:12.
_____/s/____
  _____
  30:13.
.
.
< A >.
A. 1:22.
a.m. 7:1.
ability
  22:10.

able 3:12,
  3:18, 9:7,
  9:11, 9:13,
  26:14,
  27:9.
above 13:21.
above-entitled
  30:11.
access 19:12.
accomplish
  17:21.
accused
  10:19.
action 2:2,
  22:24.
active 4:3,
  4:5, 4:7,
  4:20, 5:2,
  5:8, 5:11,
  17:19.
actively
  14:13.
actually 2:13,
  2:15, 26:1.
additional
  14:3, 14:4,
  14:6.
addresses
  27:8.
adjusted
  24:22.
admission 8:25,
  25:15.
admitted 9:1,
  9:19, 24:20,
  25:6.
afternoon
  18:12,
  28:9.
Agency 7:5,
  7:22, 7:24,
  7:25, 8:2,
  8:3, 8:5,
  8:15, 11:8,
  11:10, 11:12,
  11:21, 12:9,
  12:16, 12:21,
  12:22, 13:9,
  13:11, 15:23,
  15:25.

agree 26:24,
  27:17.
agreeing 26:16,
  26:17, 28:6,
  28:11.
agreement
  28:12,
  28:18.
Akshar 2:2,
  23:24.
AKSHAR PATEL
  1:5.
alert 18:4.
alerts 19:17.
allow 11:9.
allowed 11:24,
  27:17.
allows 4:3,
  8:24.
although
  10:13.
amongst 28:7,
  29:15.
Ana C. Reyes
  1:17.
Andre 1:39.
answer 5:13,
  5:15, 5:16,
  5:17, 6:2,
  6:12, 7:8,
  7:21, 8:2,
  9:11, 9:13,
  9:22, 9:24,
  9:25, 10:1,
  11:5, 12:13,
  13:20, 15:5,
  15:7, 16:16,
  16:24, 20:16,
  23:3.
answered
  20:3.
answers 13:23,
  15:14,
  15:21.
anybody 12:5,
  15:20.
apologies
  18:12.
apologize
  15:4.

apparently
  7:25, 23:17,
  24:4.
appear 17:3.
appearance
  13:3, 13:8.
APPEARANCES
  1:20.
applicable
  19:15.
apply 23:13.
appreciate
  17:22, 30:2,
  30:3.
appropriate
  18:24.
April 16
  1:11.
argument 5:2,
  5:4.
arising
  27:12.
around 6:2,
  6:24,
  18:18.
arrest 21:25.
arrested 20:13,
  21:19.
Asif 1:41,
  30:9,
  30:14.
assume 12:7,
  28:10.
attend 12:2.
attended
  20:9.
attention
  28:8.
Attorney
  1:33.
authority
  27:23.
automatically
  5:3.
available
  25:20.
Avenue 1:24,
  1:29, 1:43.
aware 24:4.
away 10:10.

.
.
< B >.
B. 1:27.
back 4:20,
  4:22, 5:8,
  6:14, 6:24,
  11:15, 17:12,
  17:13, 18:4,
  28:3,
  29:20.
bad 28:2.
Banias 1:27,
  1:28, 2:7.
based 12:1,
  21:24,
  24:17.
basis 25:16.
becomes 21:6,
  21:25, 22:8,
  23:12.
behalf 10:9,
  18:15.
believe 14:15,
  24:6, 24:18,
  24:22,
  26:5.
bench 6:16.
better 3:3,
  17:13,
  29:8.
beyond 27:23.
Brad 2:7.
Bradley 1:27.
brief 11:6.
bring 28:7.
Briscoe
  16:12.
Brown 1:22,
  1:23, 2:6.
BS 10:13.
bunch 28:1,
  28:2.
busy 29:25.
.
.
< C >.
C. 1:12, 1:23,
  1:44, 3:9,
  10:24,

27:8.
call 5:25,
  6:10, 11:16,
  21:15.
canceling 5:4,
  5:24.
cancels 5:3.
Carelli 7:17,
  17:12.
Carilli 1:32,
  2:9, 2:16,
  3:5, 5:19,
  5:21, 6:7,
  6:8, 6:15,
  6:22, 7:3,
  7:12, 8:13,
  9:21, 9:22,
  11:3, 27:6,
  27:18, 27:25,
  28:19, 29:10,
  29:14,
  29:18.
case 5:23, 6:3,
  6:24, 7:9,
  15:10, 18:15,
  21:3, 21:5,
  25:9, 28:2.
cases 25:6,
  26:5, 28:1.
categories
  4:3.
category
  25:3.
cause 21:12.
certify 30:9.
challenge
  27:5.
challenging
  24:7.
change 4:10,
  4:22, 5:2,
  5:8.
changed 4:5,
  4:9, 4:12,
  24:8.
changing 5:11,
  7:6.
charged
  22:20.
charges 20:14,

21:6,
  21:20.
Charleston
  1:30.
check 24:9.
Chief 16:11,
  16:13,
  16:14.
Christa
  16:14.
Christine 1:41,
  30:9,
  30:14.
CIS 22:11.
Citizenship
  22:11.
Civil 1:5,
  1:34, 2:2.
clarify 4:1.
class 26:14,
  26:25, 27:2,
  27:18, 28:15,
  29:20.
classes 11:24,
  12:2, 12:4,
  12:8, 14:16,
  15:17, 20:10,
  26:19, 27:16,
  28:3, 28:4.
clear 22:18.
clearly
  10:13.
CLERK 13:4,
  18:4.
client 6:11,
  6:19, 10:10,
  11:23, 11:25,
  12:19, 12:21,
  14:13, 14:14,
  16:21,
  16:22.
code 19:16.
collaboration
  22:15.
COLUMBIA 1:2.
coming 24:18,
  26:13.
comment 27:7.
communicated
  12:25,

25:23.
communicating
    15:22, 15:24,
    16:3, 16:7,
    16:8, 16:10,
    16:19,
    16:20.
communication
    16:12,
    25:18.
communications
    24:1.
company
    13:16.
compliance
    19:15, 19:24,
    20:3, 20:7,
    20:15, 21:1,
    21:17.
components
    2:12.
computer-aided
    1:49.
concerned
    4:25.
concluded.
    30:7.
confer 2:12,
    2:13, 2:15,
    2:22, 2:24,
    11:9, 11:14,
    12:9.
conferring
    11:11,
    14:13.
confirmed
    2:21.
Congress
    27:13.
consequence
    4:6, 4:8,
    5:10.
consequences
    11:7.
consider
    10:2.
Constitution
    1:43.
contact 17:19,
    21:13.

continue 28:19,
    28:21.
continuing
    22:1.
contradicts
    11:5.
control 26:6,
    26:11.
conversation
    8:1.
conversations
    7:23.
coordination
    29:4.
correct 22:5,
    22:7, 22:11,
    30:10.
counsel 2:8,
    7:22, 7:24,
    7:25, 8:2,
    8:3, 8:5,
    8:15, 10:16,
    11:8, 11:12,
    11:21, 11:23,
    12:7, 12:16,
    12:21, 12:23,
    13:10, 13:11,
    13:17, 13:19,
    15:25,
    24:4.
country 3:13,
    24:20, 24:23,
    25:2.
course 8:9,
    29:16.
courtroom 8:5,
    11:4, 13:4.
courts 27:8,
    27:11,
    27:14.
criminal
    22:19.
criminality
    22:15.
CTLD 23:25.
Customs 3:15,
    13:10.
.
.
< D >.

DC 1:36.
deal 28:19.
decides 5:22.
decision 14:13,
    27:9,
    27:12.
decisions
    12:18, 16:23,
    27:15.
declarant 8:4,
    15:10,
    17:1.
declaration
    11:6, 15:13,
    15:15, 18:15,
    18:16, 22:15,
    23:16,
    23:19.
declarations
    23:17.
Defendant 1:12,
    1:32, 21:5.
delay 7:11,
    7:12, 7:13,
    7:15, 7:16.
deleted 4:4.
depart 25:11.
Department
    23:9, 24:1,
    24:16, 25:19,
    25:21,
    27:9.
depending
    25:1.
deportability
    25:16.
deportation
    10:21.
deported
    27:2.
deputy 13:4,
    16:11,
    16:13.
described
    4:9.
designated
    19:9, 19:13,
    19:18,
    20:19.
desire 16:5.

determination
    29:21.
dialogue
    21:2.
different 8:23,
    25:3, 25:5,
    25:13.
discussion
    21:3.
dismissed
    20:15, 21:4,
    21:6,
    21:20.
District 1:1,
    1:2, 1:18,
    27:11,
    27:14.
Division 1:34,
    16:11,
    16:12.
document 25:5,
    25:15.
done 2:19,
    6:15, 6:16,
    10:10, 20:11,
    26:8, 26:9.
double 24:9.
down 4:2,
    10:23,
    28:21.
dozens 23:18.
driving 20:14,
    21:19.
drop 4:2.
DSO 19:17.
duration 23:12,
    25:7.
.
.
< E >.
earnest 29:3.
easy 28:18.
effect 8:21,
    10:12, 14:20,
    14:22, 15:2,
    15:3, 15:17,
    18:22, 19:1,
    19:7.
effects 7:5.
effort 29:3.

Either 2:19,
  5:3, 9:14,
  9:23, 21:18,
  26:13,
  26:14.
email 2:14.
emergency
  28:14.
emphasize
  29:7.
Enforcement
  3:15,
  13:10.
enrolled
  3:19.
ensure 19:15,
  27:21.
enter 13:2,
  13:7, 27:1,
  28:9,
  29:14.
entry 25:4.
Esquire 1:22,
  1:27, 1:32.
essentially
  19:3.
established
  3:9, 3:11.
Everly 1:38,
  13:2, 13:4,
  13:7, 13:9,
  13:24, 14:5,
  15:1, 15:6,
  16:1,
  28:20.
everybody
  30:4.
everyone 10:21,
  28:19.
everything
  2:21, 20:11,
  20:16, 26:8,
  27:3.
exactly 3:6,
  4:8.
example 25:8.
exchange 19:5,
  19:13,
  19:15.
excuse 3:11,

8:7, 16:13.
experienced
  10:9,
  10:14.
expired 23:12,
  25:1.
explain 3:6,
  5:10, 7:7,
  9:25,
  18:22.
explained
  12:17.
.
.
< F >.
F-1 3:18, 3:21,
  5:3, 8:20,
  8:22, 9:6,
  9:7, 24:8,
  24:10, 24:11,
  29:11.
F. 1:32, 2:9,
  3:15.
family 25:11.
far 20:10,
  26:8.
fast 20:14,
  21:19.
FCRR 1:41,
  30:9.
Federal 1:42,
  19:16.
feel 18:17.
Field 20:20,
  20:21, 20:22,
  21:11, 21:12,
  21:21, 21:23,
  26:20.
figure 18:5,
  25:23,
  29:15.
filed 15:13,
  18:14, 23:16,
  23:20.
final 29:21.
find 6:1,
  11:15.
Fine 6:7, 6:8,
  11:17, 11:19,
  15:11, 17:2,

26:20,
  28:10.
First 2:18,
  5:5, 5:23,
  14:10, 15:7,
  18:21, 19:7,
  27:17.
flag 19:4,
  19:6, 19:7,
  19:8, 19:9,
  19:19, 19:20,
  19:21, 21:14,
  21:16.
follow 26:12.
foregoing
  30:10.
form 25:16.
former 28:10.
forwarded 8:14,
  8:18.
found 22:20.
four 16:15.
free 14:16.
front 23:23,
  26:1, 26:4.
future 2:11.
.
.
< G >.
gap 19:23.
genre 8:23.
Gentleman 2:11,
  6:14, 6:23,
  26:2.
gets 7:10,
  10:18.
getting 18:18,
  30:2.
give 12:13,
  15:13, 15:21,
  16:23, 17:23,
  27:19.
giving 30:3.
Gleiberman
  16:11.
God 11:6.
Government 2:8,
  2:10, 4:21,
  5:5, 8:20,
  9:5, 9:15,

10:16, 10:25,
  12:7, 13:17,
  13:19,
  18:15.
grade 13:21.
graduation
  10:10.
Great 16:6,
  20:18,
  29:4.
guilty 22:20.
guy 28:5,
  28:12, 29:11,
  29:19.
guys 3:1, 6:14,
  6:23, 27:25,
  28:10, 28:18,
  28:24.
.
.
< H >.
H-1 25:21.
H-1B 24:18,
  25:8,
  25:13.
H-4 24:17,
  24:21,
  24:25.
hand 20:25.
hang 6:14.
happen 10:18,
  26:24.
happened 20:5,
  20:6, 23:18,
  24:12,
  26:10.
happening
  11:4.
happens 4:13,
  7:10, 7:17,
  18:3, 18:25,
  19:6, 25:1,
  28:7, 29:13,
  29:16.
happy 15:20,
  23:14,
  26:11.
hear 6:15,
  13:5, 13:6,
  29:25.

heard 27:3.
hearing 12:11,
  17:4, 26:13,
  28:8, 28:24,
  29:22.
Henry 16:14.
hereby 30:9.
hold 17:6.
home 4:20,
  5:9.
Homeland 3:12,
  27:9.
Honorable
  1:17.
hope 18:18,
  29:10,
  29:12.
hopeful
  29:14.
Hopefully
  29:23.
hour 7:8.
hours 28:13,
  28:17.
Houston 1:25.
.
.
< I >.
I-94 25:4.
ICE 4:22, 4:25,
  9:6, 9:7,
  10:2, 10:5,
  12:1, 19:8,
  19:14, 20:22,
  26:15, 26:22,
  28:4, 28:12,
  28:15.
idea 28:25.
identify 2:4.
illegally
  10:19,
  10:22.
imagine
  23:16.
immediately
  2:19.
Immigration
  3:15, 4:10,
  5:6, 5:7,
  10:9, 10:12,

13:10, 21:9,
  22:11.
impact 3:23,
  4:12, 4:18,
  4:19, 5:13,
  6:4.
import 5:24.
inactive
  5:11.
inconsistent
  27:4.
incredibly
  29:24.
indicated 4:22,
  8:15,
  12:18.
indicating
  24:1.
indication
  4:14.
indiscernible
  13:16.
indiscernible.
  16:14.
individual
  3:17, 4:4,
  4:9, 4:10,
  4:15, 8:16,
  8:24, 8:25,
  10:3, 15:7,
  25:9,
  27:13.
individuals
  3:13, 16:10,
  25:2, 25:6,
  26:12.
information
  3:8, 3:18,
  14:3, 14:5,
  14:6, 19:13,
  26:4, 30:3.
initially
  24:15,
  24:17.
initiate
  27:10.
inside 4:9.
instance 21:3,
  21:24,
  22:14.

interesting
  22:2, 22:9.
invite 8:15.
issue 3:14,
  24:7,
  25:11.
issued 23:10,
  24:17.
itself 22:25.
.
.
< J >.
jerked 6:1.
join 8:17,
  12:17.
joined 11:16.
joining
  11:21.
joint 2:18.
Joseph 1:32,
  2:9.
Jr 1:32.
Judge 1:18.
jurisdiction
  27:8, 27:11,
  27:14.
.
.
< K >.
Kafkaesque
  10:8.
Kate 16:12.
keep 10:12.
Keith 13:9.
key 6:2.
kid 26:8,
  28:3.
Knowing
  29:16.
known 10:23.
kosher 20:16.
.
.
< L >.
last 2:24,
  29:25.
later 8:1.
Law 1:28,
  16:10, 18:4,
  28:2.

lawful 9:1,
  10:4.
lawfully 9:3,
  9:9, 9:19,
  14:11.
lawyer 9:15,
  11:2.
lawyers 10:9,
  10:14, 10:25,
  26:25, 29:17,
  29:18,
  30:1.
Leash 16:14.
least 26:13,
  28:11,
  29:20.
leave 25:10,
  25:11.
legally 9:14,
  9:15, 9:16,
  9:17, 9:18,
  9:23, 9:24,
  10:15, 10:16,
  10:17, 14:11,
  15:16, 22:23,
  23:2, 23:3,
  23:5, 23:7.
legitimately
  26:25.
less 13:13,
  22:20.
level 29:3.
life 28:18,
  29:18.
likely 16:16.
line 11:22.
link 12:17.
list 4:3.
listen 2:17.
lists 26:2.
litigation
  5:18.
Little 13:13.
LLC 1:28.
log 12:22,
  13:1.
long 2:24,
  12:21, 13:11,
  28:25.
longer 8:22.

look 2:16,
  27:20.
looked 21:16.
lose 7:18.
lot 23:16,
  23:18,
  25:5.
Lyons 2:3.
.
.
< M >.
M. 2:3.
Ma'am 18:20,
  20:23, 23:21,
  29:2, 29:7,
  29:8, 30:5.
machine 1:48.
Macklin 1:38,
  13:9.
maintaining
  10:3.
maintains
  3:16.
management
  16:13.
managing
  19:14.
matter 19:18,
  21:7, 21:24,
  30:11.
matters
  27:11.
mean 4:14,
  7:11, 9:14,
  9:16, 20:12,
  25:20, 27:22,
  28:14.
means 22:8.
meant 11:14,
  11:18.
measure 26:6.
mechanical
  14:21,
  15:1.
meet 2:12,
  2:13, 2:14,
  2:21, 2:24.
menu 4:2.
minute 17:11.
minutes 2:25,

  12:23,
  17:21.
miscommunicatio
  n 26:10.
miserable
  29:19.
mistake
  25:20.
mix 29:13.
moment 17:6,
  22:23, 23:4,
  27:4, 27:20,
  27:21.
monitor 3:13,
  3:17, 3:21,
  3:24.
months 10:10.
morning 2:6,
  2:22.
mother 24:18.
Motions Hearing
  1:16.
moving 4:7,
  4:19.
MR. BROWN 2:6,
  2:23, 2:25,
  3:2, 11:25,
  12:5, 24:6,
  24:11,
  30:6.
MR. EVERLY
  13:6, 13:9,
  13:13, 13:15,
  14:1, 14:9,
  14:12, 14:18,
  14:23, 15:4,
  15:9, 15:24,
  16:5, 16:8,
  16:17, 16:20,
  16:25, 17:5,
  17:9, 17:19,
  17:25, 18:2,
  18:7.
MR. WATSON
  18:12, 18:20,
  18:24, 19:2,
  19:9, 19:12,
  19:23, 20:4,
  20:18, 20:23,
  21:9, 21:23,

  22:5, 22:7,
  22:24, 23:5,
  23:9, 23:21,
  25:25, 29:2,
  29:7, 30:5.
Ms 6:25.
mute 6:10,
  6:21, 6:25,
  18:11.
.
.
< N >.
name 8:17,
  15:6, 16:6.
Names 16:1,
  16:9.
National
  16:10.
need 12:9,
  15:14, 26:20,
  27:21, 28:24,
  29:23,
  30:1.
Neumann 1:23.
new 25:12.
next 6:17,
  20:17,
  21:4.
Nina 16:11.
NO. 1:5.
none 2:19.
nonimmigrant
  19:3, 19:16,
  22:16, 22:25,
  23:10,
  25:2.
notation
  20:5.
note 22:2,
  22:9, 22:13,
  25:15.
nothing 5:6,
  5:7, 10:11.
notice 21:14,
  28:13,
  28:17.
novelty 20:19,
  22:13.
nuances 26:3.
NW 1:35,

  1:43.
.
.
.
< O >.
oath 14:8,
  15:12, 15:19,
  17:4, 18:17,
  18:19.
obligations
  21:18.
obvious 7:9,
  13:18.
Obviously 3:14,
  5:23,
  10:22.
occurred 4:2,
  20:5.
occurring
  29:8.
occurs 4:13.
offer 15:9.
Office 1:33.
Official 1:42,
  19:10, 19:14,
  19:18, 19:20,
  19:21, 20:9,
  20:10, 21:14,
  30:15.
officials
  20:19,
  21:12.
Okay 3:1, 3:20,
  3:23, 4:6,
  5:22, 8:19,
  9:3, 12:8,
  12:20, 15:6,
  16:6, 16:15,
  18:6, 18:19,
  18:25, 19:6,
  19:11, 19:19,
  20:2, 20:8,
  20:24, 21:8,
  21:21, 22:6,
  23:14, 23:22,
  24:19, 24:24,
  25:17, 26:7,
  27:24, 29:6,
  29:21.
One 2:13, 5:22,
  8:15, 23:22,

26:23,
28:2.
operational
    12:18, 13:22,
    14:12, 14:24,
    14:25.
order 16:3,
    26:13, 26:21,
    27:1, 27:17,
    28:9.
ordering 6:19,
    16:2, 17:3.
orders 2:12.
oversight
    21:1.
.
.
< P >.
p.m. 7:2, 8:11,
    8:12, 17:17,
    18:9.
paragraph
    23:24, 23:25.
part 3:21.
participation
    19:4, 20:1.
particular
    23:23.
parties 2:4.
Patel 2:3,
    8:20, 8:22,
    9:16, 13:18,
    14:10, 14:16,
    15:15, 15:16,
    19:21, 20:9,
    21:15, 22:23,
    23:24, 24:2,
    26:24.
Pause 7:1,
    8:11, 11:20,
    12:24,
    17:10.
pay 13:21.
penalty
    15:19.
pending 12:8.
people 3:21,
    13:22, 16:15,
    23:18,

26:18.
Perfect 29:9.
period 24:25,
    25:3.
periods 25:5.
perjury
    15:19.
person 6:17,
    8:18, 14:7,
    16:7, 16:23,
    22:9,
    26:19.
phone 6:9,
    6:17, 6:18,
    6:19, 6:20,
    7:25, 8:2,
    8:3, 8:6,
    11:12, 11:15,
    13:24, 14:7,
    17:3, 17:13,
    23:15, 30:1,
    30:2.
physically
    12:5.
pick 25:22,
    28:12.
picked 10:19,
    10:20, 26:15,
    26:21.
place 27:12.
Plaintiff 1:7,
    1:22, 5:1,
    11:23, 24:3,
    24:15, 24:16,
    29:17,
    29:18.
plaintiffs 2:7,
    26:17, 28:11,
    28:16,
    29:15.
please 2:4,
    2:16, 5:10,
    6:25, 7:7,
    8:6, 11:15,
    13:2, 13:7,
    24:14.
point 10:2,
    15:10, 22:21,
    23:1, 23:11,
    26:2.

pointed 26:3.
policy 15:1.
portions
    3:14.
position 3:4,
    8:20, 9:5,
    11:25,
    16:18.
post 3:12.
potentially
    27:22.
practical 5:24,
    7:5, 15:17,
    18:22.
practically
    29:19.
precursor
    5:3.
preface 14:2.
prefacing
    16:9.
prepared 5:15,
    5:16, 5:17,
    6:2.
Present 1:38.
presents
    7:10.
pretty 18:6.
preventing
    12:3, 12:6.
primarily
    16:11.
problem 4:19.
proceed 27:6.
proceeding
    29:3.
Proceedings
    1:48, 7:1,
    8:11, 9:8,
    10:21, 27:10,
    27:13, 30:7,
    30:11.
proceedings.
    11:20, 12:24,
    17:10.
produced
    1:48.
professors
    21:17.
program 19:5,

19:15, 20:1,
    21:2.
progress 3:1,
    29:4.
Progressive
    13:15.
provide 3:18,
    14:14,
    16:9.
provided 15:10,
    25:4.
PSO 19:18.
pulled 20:13,
    21:19.
purpose 3:20.
pursuant 22:14,
    22:17.
put 6:10, 6:21,
    6:23, 9:8,
    10:20, 15:22,
    17:4, 18:17,
    18:19, 26:7,
    26:20.
.
.
< Q >.
quality 26:5,
    26:11,
    29:1.
question 4:24,
    5:13, 5:18,
    5:20, 5:23,
    6:3, 7:9,
    7:21, 9:11,
    9:14, 9:24,
    9:25, 10:1,
    12:10, 12:15,
    14:10, 14:21,
    14:25, 15:1,
    15:5, 15:8,
    19:24, 20:2,
    20:3, 20:4,
    20:18, 21:4,
    21:6, 21:25,
    22:8, 23:3,
    23:12.
questions 5:22,
    13:18, 13:19,
    13:22, 13:24,
    15:7, 15:21,

16:16, 18:16,
21:2.
quite 5:4.
.
.
< R >.
raise 19:8.
raised 19:7,
21:2.
raises 19:3,
19:9,
19:23.
rather 13:18,
28:9.
re-examining
26:5.
reach 20:20.
realize 10:8,
29:11.
really 4:24,
17:22.
receive
12:11.
received 10:6,
12:14, 23:25,
25:19.
recently
23:17.
recess 17:11,
17:17,
18:9.
reckless
21:19.
record 2:5,
4:4, 4:15,
7:6, 20:6,
24:3, 25:24,
26:1,
30:11.
recorded
1:48.
Reddy 1:23.
regulations
19:16.
reiterate
14:18.
relates 19:4,
19:16, 19:25,
21:9,
21:24.

relationship
21:1,
21:13.
relief 27:20,
28:14,
29:17.
removal 9:8,
27:10,
27:13.
repercussions
28:5.
report 2:18,
2:20.
Reported
1:41.
Reporter 1:42,
30:15.
representative
21:11, 21:12,
21:21, 21:23,
26:20.
representatives
20:20, 20:21,
20:22.
requesting
24:2.
requirement
22:1.
requires
21:7.
rescrubbing
26:1.
resolution
3:2.
respond 12:12,
12:16.
response 7:5,
10:6, 12:11,
12:15, 14:14,
14:19.
responses
14:2.
restraining
27:1.
review 21:7,
29:1.
revisited 22:2,
22:3.
revocations
25:16.

revoked
23:11.
Richmond
1:24.
road 28:21.
routinely
25:1.
RPR 1:41,
30:9.
run 18:18.
Rutledge
1:29.
.
.
< S >.
S. 13:10, 23:2,
29:20.
satisfied 8:4,
20:15.
saw 2:15,
2:18.
saying 20:6,
26:18, 27:1,
30:1.
says 5:5,
13:19, 15:2,
23:25,
25:9.
SC 1:30.
school 12:3,
19:10, 19:14,
19:18, 19:21,
20:8, 20:10,
20:19, 21:12,
21:14,
28:3.
schools 3:17,
3:19.
Schrodinger
9:23.
scope 27:23.
second 2:15,
2:18, 8:17.
Secretary
3:12.
Security 3:12,
16:10,
27:10.
seek 8:24,
22:9, 28:13,

29:17.
seems 26:9,
27:3, 29:9.
seen 25:8.
sent 11:12.
serious 11:7.
Services
22:11.
set 28:23.
setting
29:22.
settled
29:20.
SEVIS 3:6, 3:8,
3:14, 3:20,
3:24, 4:2,
4:4, 4:10,
4:13, 5:2,
5:12, 5:14,
5:24, 6:5,
7:6, 7:11,
7:18, 14:21,
14:22, 15:3,
15:18, 18:23,
18:24, 19:1,
20:12, 21:15,
22:4, 22:8,
22:10, 23:19,
24:2,
29:12.
shall 21:25.
shorthand
1:48.
shouldn't
25:21.
simple 7:9.
sir 13:5,
13:12, 18:11,
24:24,
25:17.
situation
22:1.
somebody 3:25,
5:14, 15:3,
15:14.
somehow 11:5,
23:17.
someone 3:24,
4:7, 5:24,
6:1, 6:4,

6:17, 6:18,
 7:10, 7:17,
 12:20, 14:21,
 14:22, 15:18,
 18:23, 19:1,
 20:6, 23:15,
 26:17.
somewhere 15:2,
 20:13.
soon 17:20.
sooner 29:8.
sorry 3:9,
 5:17, 20:21,
 22:3,
 24:24.
sort 13:18.
sought 24:21,
 27:20.
specific
 12:10.
spoke 26:2.
spot 28:1.
stalling
 16:4.
stamp 25:4.
start 15:18.
starting
 23:11.
State 22:15,
 23:10, 23:15,
 24:1, 24:4,
 24:16, 25:19,
 25:20, 25:22,
 25:23, 26:5,
 26:11, 28:25,
 29:10.
States 1:1,
 1:18, 1:33,
 8:25, 9:2,
 9:4, 9:9,
 9:20, 10:20,
 14:11, 19:17,
 22:16, 22:23,
 23:4, 23:6,
 23:8, 25:6,
 25:10, 25:12,
 25:13.
status 2:18,
 3:14, 4:9,
 4:11, 4:16,

7:18, 9:1,
 9:7, 10:4,
 10:12, 12:1,
 19:3, 22:24,
 22:25, 23:13,
 24:8, 24:11,
 24:21, 24:22,
 24:23,
 25:7.
statute 3:16.
stay 6:8, 6:11,
 6:16, 6:18,
 6:20, 6:24.
Ste 1:24.
stenographic
 30:10.
steps 17:6,
 21:5.
Steven 1:22,
 2:6.
stop 7:22,
 28:20.
Street 1:35.
strides 29:4.
stripped
 27:10.
strong 29:10,
 29:12.
student 19:4,
 19:5, 19:12,
 19:14, 19:24,
 22:16, 25:23,
 26:14.
students 3:18,
 19:17.
studying 19:17,
 22:16.
subject
 15:19.
subsequent
 28:8.
supposed 9:16,
 20:11,
 26:9.
suspect
 28:16.
system 3:6,
 3:8, 3:16,
 4:15, 5:12,
 10:11,

19:13.
.
.
< T >.
T. 1:41,
 30:14.
talked 10:2,
 21:17.
team 29:5.
tells 19:19.
temporary
 27:1.
ten 17:11.
tentatively
 29:22.
terminate 7:18,
 9:7, 19:2,
 22:25.
terminated 4:5,
 4:7, 4:16,
 4:18, 5:2,
 5:11, 5:12,
 6:4, 7:6,
 9:6, 10:11,
 21:15, 23:19,
 24:3, 24:4,
 25:22, 25:24,
 29:12.
terminating
 5:14, 14:20,
 14:22, 15:3,
 15:18, 18:22,
 19:1.
termination
 22:4, 22:7.
terms 7:5,
 19:25, 21:5,
 22:24.
testify 8:5.
Texas 20:14,
 21:20.
THE CLERK
 2:2.
themselves
 2:4.
they've 25:9,
 25:10,
 29:4.
thinking
 11:2.

thinks 4:25.
third 15:8.
though 22:19.
today 8:5,
 13:18,
 28:3.
Todd 2:3.
TODD M. LYONS
 1:10.
tomorrow
 28:4.
totally 6:8.
touches 28:4.
tough 27:25.
towards 3:2.
Transcript
 1:16, 1:48,
 21:16,
 30:10.
transcription
 1:49.
transcripts
 20:9.
TRO 27:18,
 27:21, 28:9,
 29:14.
try 11:15,
 29:19.
trying 13:1,
 25:23.
Turn 6:21,
 6:25.
turned 22:14.
two 2:12, 2:14,
 2:19, 10:9,
 10:13, 13:13,
 13:22, 15:7,
 25:14,
 26:23.
TX 1:25.
.
.
< U >.
understand
 4:17, 14:1,
 22:21, 24:16,
 26:8, 27:25,
 29:24.
understanding
 3:3, 3:4,

5:1.
Understood
  13:25, 14:9,
  17:5,
  17:14.
unfortunate
  29:13.
Unfortunately
  16:17.
United 1:1,
  1:18, 1:33,
  8:25, 9:1,
  9:3, 9:9,
  9:19, 10:20,
  14:11, 19:17,
  22:16, 22:23,
  23:3, 23:6,
  23:8, 25:6,
  25:9, 25:11,
  25:13.
until 6:12,
  6:18, 17:23,
  24:11,
  29:20.
.
.
< V >.
valid 8:23,
  8:24, 24:2,
  24:10,
  24:11.
validity 24:25,
  25:3.
validly
  25:22.
various 26:5.
versus 2:3,
  8:25.
video 2:22,
  6:22, 6:23,
  6:25, 7:24,
  8:8, 12:22,
  18:5.
violate 16:3.
visa 5:3, 5:4,
  8:20, 8:22,
  8:24, 9:23,
  23:10, 23:11,
  24:2, 24:5,
  24:6, 24:7,

24:8, 24:10,
  24:17, 24:21,
  24:25, 25:3,
  25:12, 25:14,
  25:15, 25:21,
  29:11.
visas 3:21.
visitor 19:5,
  19:13,
  19:15.
vs 1:8.
.
.
< W >.
wait 5:25.
waiting 7:4,
  8:17, 8:19,
  12:22.
wants 26:19.
Washington
  1:12, 1:36,
  1:44.
Watson 1:39,
  8:4, 11:6,
  15:12, 15:15,
  15:19, 15:21,
  17:2, 17:12,
  17:18, 18:10,
  22:19, 25:19,
  26:16, 28:20,
  28:25,
  29:24.
ways 26:23.
welcome
  18:10.
whatever 2:17,
  7:22.
whether 5:20,
  10:2, 10:3,
  10:14, 10:15,
  23:12,
  27:12.
White 6:25.
Will 2:4, 11:9,
  13:23, 14:2,
  16:9, 17:5,
  18:18, 19:24,
  25:3, 25:6,
  26:21, 28:20,
  29:23.

willing 11:6.
Wisconsin
  14:17, 21:11,
  21:14, 26:18,
  26:19.
within 4:13,
  5:12, 5:14,
  5:24, 6:5.
WITNESS
  20:25.
words 12:15.
working 16:25,
  17:20, 21:1,
  21:13,
  25:10.
works 19:14.
worries
  18:14.
writing 2:17.
.
.
< Y >.
years 13:13.
yourself 6:10,
  6:21.
yourselves
  6:23, 28:7,
  29:16.
Yup 17:8.

# EXHIBIT D

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AKSHAR PATEL,

*Plaintiff*,

v.

Civil Action No. 25-cv-01096 (ACR)

TODD M. LYONS,

*Defendant*.

## <u>ORDER</u>

For the reasons stated on the record at the April 16, 2025 hearing, and based on Defendant's representation that it has returned Plaintiff's record in the Student and Exchange Visitor Information System (SEVIS) to the "active" status, the Court **GRANTS** Plaintiff's Application for Temporary Restraining Order, Dkt. 2, insofar as the Court:

**ORDERS** that Defendant may not change or otherwise modify Plaintiff's record in SEVIS solely on the basis of his arrest in November 2018 for a violation of Reckless Driving and subsequent dismissal of charge on February 21, 2019, by the Montgomery County Court. The Court further

**ORDERS** that Plaintiff file a renewed Application for Preliminary Injunction by April 21, 2025, and that Defendant file its Opposition by April 29, 2025. The Court will hold an evidentiary hearing on Plaintiff's renewed Application on April 29, 2025.

This Order will remain in effect until further order from the Court or within 14 days of this Order, whichever comes first.

**SO ORDERED.**

Date: April 17, 2025

_____
ANA C. REYES
United States District Court Judge

# EXHIBIT E

```
 1                  IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3   VISHNU VARDHAN NALI,              )  Case No. 25 C 3969
                                       )
 4                   Plaintiff,        )
                                       )
 5           v.                        )
                                       )
 6   KRISTI NOEM, Secretary,           )
     Department of Homeland Security;  )
 7   TODD LYONS, Acting Director of    )
     the Immigration and Customs       )
 8   Enforcement, each in their        )
     official capacity and not         )
 9   individually; and UNITED STATES   )
     DEPARTMENT OF HOMELAND SECURITY,  )  Chicago, Illinois
10                                     )  April 18, 2025
                     Defendant.        )  10:48 a.m.
11

12               TRANSCRIPT OF PROCEEDINGS - MOTION
                 BEFORE THE HONORABLE MARY M. ROWLAND
13

14   APPEARANCES:

15
     For the Plaintiff:     JEFFREY GRANT BROWN PC
16                          BY:  MR. JEFFREY G. BROWN
                            65 W. Jackson Boulevard, Suite 107
17                          Chicago, Illinois 60604

18
                            LAW OFFICES OF SUSAN FORTINO-BROWN
19                          BY:  MS. SUSAN R. FORTINO-BROWN
                            53 W. Jackson Boulevard, Suite 1160
20                          Chicago, Illinois 60604

21
     For the Defendants:    MR. ANDREW S. BOUTROS
22                          INTERIM UNITED STATES ATTORNEY
                            BY:  MR. CRAIG A. OSWALD
23                          Assistant United States Attorney
                            219 S. Dearborn Street, 5th Floor
24                          Chicago, Illinois 60604

25
```

APPEARANCES (Cont'd):


Also Present:          MR. STEPHEN NAVARRE


Court Reporter:        LAURA RENKE, CSR, RDR, CRR
                       Official Court Reporter
                       219 S. Dearborn Street, Room 1224
                       Chicago, Illinois 60604
                       312.435.6053
                       laura_renke@ilnd.uscourts.gov

```
                        *  *  *  *  *
               PROCEEDINGS REPORTED BY STENOTYPE
     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

 1   (Proceedings heard in open court:)

 2        LAW CLERK:  All rise.  This court is now in session.

 3   (Call to order.)

 4        LAW CLERK:  Calling Case 25 CV 3969, Nali v. Noem.

 5        You may be seated.

 6        THE COURT:  Good morning.

 7        MR. BROWN:  Good morning, Judge.  I am Jeff Brown on

 8   behalf of plaintiff, Vishnu Nali.

 9        And with me is Susan Fortino-Brown.  She is Mr. Nali's

10   immigration counsel.

11        In the way of full disclosure, she is also my spouse.

12   And --

13        THE COURT:  I won't hold that against her.

14        MR. BROWN:  And she picked out my tie this morning,

15   Judge.

16        THE COURT:  Okay.  Well, I won't hold that against her

17   either.

18        MR. BROWN:  Also present is Mr. Steve Navarre, who we

19   would like to call as an expert witness in the matter.  He is

20   an immigration practitioner.

21        THE COURT:  Okay.

22        Can I get your name, though, again?

23        MS. FORTINO-BROWN:  Sure.  Susan Fortino,

24   F-O-R-T-I-N-O, hyphen, Brown, B-R-O-W-N.

25        THE COURT:  Okay.

1    MR. OSWALD:  Good morning, your Honor.  Craig Oswald

2    on behalf of the United States.

3    THE COURT:  Good morning.

4    Okay.  So I wasn't expecting briefing so quickly.  I

5    was going to talk to you about briefing today.  But I

6    appreciate the briefing.  I know I got a response sometime last

7    evening, or maybe it came in yesterday, and then I appreciate

8    your reply.

9    So I have read it this morning.

10   There's a lot of information here.  Whenever people

11   start talking to me about the CFR, I -- I know I'm --

12   MR. BROWN:  It can make one sleepy.

13   THE COURT:  Well, I know I have to pay attention.

14   I'll say that.  I don't know the CFRs, I'm sure, as well as

15   Mr. Oswald does in this particular area.

16   MR. OSWALD:  Thank you, your Honor.  But it's

17   misplaced.

18   THE COURT:  Yeah.

19   Okay.  So where should we begin?

20   MR. OSWALD:  Your Honor, I just had one other thing

21   that we received this morning, which is, you know, I think

22   counsel submitted last night or this morning four cases that

23   went on their side.  This is a case that we just received this

24   morning -- and I gave counsel a copy --

25   THE COURT:  Okay.

1          MR. OSWALD:  -- from the -- from Detroit, the Southern

2     District of Michigan.  And this is denying the TRO --

3          THE COURT:  Okay.

4          MR. OSWALD:  -- in a similar situation.  So I wanted

5     to present it.  And if I could do so.

6          THE COURT:  Yeah.

7          MR. OSWALD:  I've given counsel a copy.

8          THE COURT:  Okay.

9        (Tendered.)

10         THE COURT:  So I knew there was a case pending in

11    Michigan.

12         So you have a witness here, which is interesting.

13         Do you intend to call any witnesses?

14         MR. OSWALD:  No, your Honor.

15         THE COURT:  Even if I set this over for a preliminary

16    injunction hearing?

17         MR. OSWALD:  I'm not sure about that, your Honor.  But

18    I'm not ready with any witnesses this morning.

19         THE COURT:  Uh-huh.  Okay.  Well, no.  That's fair.

20         MR. OSWALD:  Mr. Press, who filed the brief, he's in

21    Atlanta.  His father passed away, and he's down there --

22         THE COURT:  Sorry to hear that.

23         MR. OSWALD:  -- resolving matters for that.  So I --

24    we don't have any witnesses here this morning.

25         THE COURT:  Because -- so, you know, when I think

1    about the irreparable injury prong, I guess my questions

2    arise -- and I'm not an immigration expert by any stretch of

3    the imagination.  But I'm -- the government's brief leaves me

4    confused.  And I -- you know, I need a lot of education in the

5    immigration area.

6           But what I'm understanding is that Mr. Nali -- am I

7    saying that correctly?

8           MR. BROWN:  Yes, your Honor.

9           MS. FORTINO-BROWN:  Yes.

10          THE COURT:  Mr. Nali was terminated -- I'm just going

11   to pull the e-mail here so I have the language correctly.

12          He was terminated in SEVIS.  Now, SEVIS is just a --

13   it's a kind of a collect -- it's a database, basically, so

14   universities and the government can speak to each other.  I can

15   get my head around that.

16          So he was terminated in SEVIS.  And that's basically

17   DHS saying, "We're terminating you."

18          They didn't tell him why.  Okay?  I want to be clear.

19   The government brief says he was terminated because of the

20   criminal records check.  But that's not accurate.  The e-mail

21   says he was terminated, quote, "OTHER - Individual identified

22   in criminal records check and/or has had their VISA revoked."

23   So he wasn't told why.  He was left to wonder.

24          In fact, based on the government brief, his visa was

25   not revoked for another week because the e-mail was sent on

 1   April 8th, and the visa was revoked I think -- I don't know --
 2   I'm going to say April 15th.  I could have that date wrong, but
 3   at some point.
 4          And, of course, that goes to the State Department, so
 5   that would be a different set of defendants.  Okay.  I'm not
 6   inviting that.
 7          So he gets told that his SEVIS is terminated.  He's --
 8   he doesn't know whether or not his visa is revoked.  Since then
 9   his visa has been revoked.  I don't know that he's been told
10   about that, although he knows that through his litigation.  I
11   don't know that he's gotten any formal notification of that.
12          MR. BROWN:  He has not, Judge.  He has not received
13   any communication from the government.
14          THE COURT:  Okay.  So he's wandering around the
15   streets of Chicago without SEVIS, or at least in SEVIS he no
16   longers exists.
17          But what the government is telling me, what I don't
18   understand, is he still has F-1 status.  And so I feel like
19   this goes to irreparable injury mostly because, you know, what
20   you're arguing is, well, he has F-1 status, so he can work and
21   he still exists.  He still is here.  And he -- so there's no
22   irreparable injury.
23          But the thing is DePaul tells him, "You can't work.
24   We're not going to hire you.  We're not going to pay you."  God
25   knows a university in this day and age is not going to do

1   anything to violate any kind of government regulation, and I

2   certainly can't blame them for that.

3           Can you, Mr. Oswald?

4           MR. OSWALD:  I can't blame them for that.

5           THE COURT:  I'm sure they have a lot of regulations

6   relative to their participation in SEVIS, that if somebody is

7   terminated from SEVIS, they better not have a student enrolled

8   for class credits, they better not give them a diploma, and

9   they better not employ them.

10          MR. OSWALD:  As I under --

11          THE COURT:  I don't know what all the SEVIS

12  regulations are, but --

13          MR. OSWALD:  I understand the SEVIS system -- which

14  I'm new to this too -- is that it's a system that was set up --

15  as, you know, some of the briefs show --

16          THE COURT:  Yeah.

17          MR. OSWALD:  -- after 2001 when we had students where

18  we didn't know where they were from and what was going on.

19          THE COURT:  Sure.

20          MR. OSWALD:  So ICE set up the system.

21          THE COURT:  Sure.

22          MR. OSWALD:  So ICE doesn't control, like, work

23  authorization.  They don't control a lot of the stuff with the

24  student stuff.  They're monitoring this, and this is their

25  database.  And the university inputs the stuff.  The e-mail

1    you're referring to is issued by the university based upon

2    their reading of it.

3            And as I understand it from the affidavit that we

4    obtained and talking to people --

5            THE COURT:  Yes.

6            MR. OSWALD:  -- they use the term "prudentially

7    revoked" to say that that doesn't -- that that doesn't take --

8    that it doesn't deal with the F-1 status, that he's still

9    technically in status.

10           As I understand it, he's going to graduate in June.

11   There's nothing that precludes him from graduating in June.

12   He's not been placed in removal proceedings.  He's not --

13   there's nothing there.

14           I think that if he went out of the country and tried

15   to come back in, then he would have an issue with the SEVIS and

16   the revocation of the visa.  But as long as he stays in status,

17   he's -- he's fine to be here.

18           And if he seeks employment authorization -- I think he

19   might have employment authorization already if he's working on

20   some kind of training.  He can seek that from CIS, USCIS,

21   Citizenship and Immigration Services.  They're the ones that

22   would adjudicate that.  So that --

23           THE COURT:  Well, that's not my understanding, so

24   maybe --

25           MR. OSWALD:  But that's --

1          THE COURT:  -- I'm wrong.

2          MR. OSWALD:  Right.  But that's -- as I understand it,

3     that's my client's position is that they -- that he's still in

4     status technically, and he -- if he graduates in June, there's

5     nothing that precludes that from happening and that he's not --

6     he is not -- as the affidavit says, he's not -- they haven't

7     challenged his F-1 status now --

8          THE COURT:  I understand that.

9          MR. OSWALD:  -- that he's a student and that he's --

10    and that this is something that they would -- if they wanted to

11    remove him and say he was out of status, they would have to

12    issue a notice of intent to -- a notice to appear and place him

13    in immigration proceedings.

14         THE COURT:  Oh, well, that's good to hear.  I'm glad

15    to hear that.

16         But here's my problem.  What I understand is he still

17    has F-1 status, but because he's been terminated in SEVIS, he

18    can't work.  And maybe I'm wrong about this.  And this is why I

19    think maybe we need a hearing.  And I understand we have an

20    immigration expert here, who I assume is an immigration lawyer.

21    And I don't know if you want to present a witness or if you

22    just want to rely on this witness.

23         He can't work.  And I would be hard-pressed to think

24    that DePaul would give him a diploma or let him finish his

25    coursework while he is out of SEVIS because if I were the

1   president of DePaul -- and I'm not, I'm grateful -- I would be

2   very concerned about doing anything that would be in violation

3   of any of the SEVIS regulations.  But I don't know what the

4   SEVIS regulations are.  I'm happy to dig in and find out what

5   those are, but I sure don't know them as I sit here today.

6           So I'm looking at the irreparable injury prong, which

7   is what I'm required to do.  And I'm looking at lots of other

8   courts have been concerned about the irreparable injury.  And

9   I'm -- what I understand the government's position in the brief

10  to be -- and I hear you articulating it -- is because he's

11  still here and he has F-1 status, he doesn't have injury.  And

12  I'm disagreeing with you only because to me, it's a little bit

13  of a bogeyman, right?  Like, he has F-1 status, but if you

14  can't -- if you're not in this SEVIS system, you can't be at

15  your university and you can't work.

16          And, in fact, if you're not at the university and

17  working the way that you're -- that you came here to do, you're

18  in trouble because when you come here with your student visa,

19  you better be doing what you came here to do.  I mean, if you

20  come here on a student visa and you just start working as a --

21  I don't know -- as a fry cook, well, you're not in compliance

22  with your student visa --

23          MR. OSWALD:  Right, because we --

24          THE COURT:  -- of course, and we don't want people

25  doing that.

1          MR. OSWALD:  Right.  And that's the qualifications for

2   the student visa are you're supposed to be able --

3          THE COURT:  Right.

4          MR. OSWALD:  -- to support yourself.  You're supposed

5   to have -- it isn't -- it doesn't --

6          THE COURT:  Fair enough.

7          MR. OSWALD:  It doesn't require employment for you to

8   continue on with that, which is --

9          THE COURT:  Fair enough.  So we don't want him going

10  out and getting a job as a fry cook.

11         So my concern is what does the F-1 status really get

12  him.  So while I need to figure all that out and unwrap all

13  that, I'm wondering what to do.

14         Now, your brief has always -- has also raised a number

15  of issues about -- I don't know -- whether I have authority and

16  what the Seventh Circuit says as compared to what the Third

17  Circuit says and likelihood of success.  This is the likelihood

18  of success prong, and there's the APA claim, and then there's

19  the notice and due process claim.

20         And I need a little bit of time on -- to figure all

21  that out.  I mean, it might be news to you, but you're not my

22  only case.  And, in fact, you're not even my only emergency

23  case.

24         So how would you like to proceed?  I mean, I'm going

25  to -- my inclination is that he has some irreparable injury

1    here for a temporary -- some kind of temporary relief, and then

2    we would have a more fulsome hearing that I would definitely do

3    before the end of the month.

4           But if you want to have a hearing today -- just you

5    don't have a witness.  I'm happy to hear from your witness if

6    you'd like to.  That might give me all the information I need.

7    I'm just -- I'm very confused as to how you can be terminated

8    in SEVIS and still have F-1 status.  I just don't understand

9    that.  So I can --

10          MR. BROWN:  And, Judge, that was really the point of

11    this expert witness is to walk your Honor through that --

12          THE COURT:  Okay.

13          MR. BROWN:  -- for the benefit of the Court, the

14    connection between those things.

15          THE COURT:  Okay.  Would you like to proceed?

16          MR. BROWN:  And we're happy to put it on later, and we

17    would prefer to put it on now, Judge.

18          THE COURT:  Would you like to proceed with that?  That

19    might help me a lot, but you might want to also have somebody.

20    I don't know.  I don't expect this person who signed this

21    affidavit -- I'm sure they're giving this affidavit all over

22    the country.  I don't expect them to magically appear in every

23    courtroom, you know, but you could have somebody else from ICE.

24          But I am confused as to how a person in F-1 status can

25    be terminated in SEVIS and still -- what do they do?  If that

1    was me and I woke up this morning, what would I do?

2              MR. OSWALD:  I think that the answer is that -- from

3    our client is that he's still -- he's still in F-1 status.  And

4    if he graduates, he can graduate and receive his degree.  And I

5    don't think there's any impediment to that.

6              And if he goes out of the United States and would try

7    to come back in with that student visa, that's a separate

8    situation --

9              THE COURT:  Okay.

10             MR. OSWALD:  -- than what this is.

11             And I understand.  And I am familiar with -- with the

12   witness and counsel.

13             THE COURT:  Oh, okay.

14             MR. OSWALD:  And they're all very knowledgeable

15   immigration practitioners.  This is basically -- it's -- I

16   mean, he -- counsel is a witness, but he's an immigration

17   practitioner.

18             THE COURT:  Sure.

19             MR. OSWALD:  And he's -- I mean, he's -- he knows more

20   about it, certainly, than I do.

21             THE COURT:  Okay.

22             MR. OSWALD:  But I'm not -- I'm not in a -- you know,

23   I don't have a witness here today.  I mean, we might be able to

24   offer someone.  But that would be something that we would need

25   a few days.  I mean, this isn't, obviously, our only case to do

 1   with it.  We have -- I have two hearings on Monday on similar

 2   cases.  So --

 3             THE COURT:  Sure.

 4             MR. OSWALD:  -- I'm not in a -- in a -- at this point,

 5   you know, we would -- I don't think that they're interested --

 6   my client's not interested in reinstating -- agreeing to

 7   reinstate the case without, you know -- on our own.

 8             THE COURT:  You mean the SEVIS status.

 9             MR. OSWALD:  The SEVIS status.

10             THE COURT:  Yeah.

11             MR. OSWALD:  Reinstate the SEVIS status.

12             And I think that at this point we don't believe that

13   there is irreparable harm because he does -- as the affidavit

14   from -- from -- that we attached to our response says, it was

15   prudentially revoked.  We haven't revoked his status as a

16   student, you know.

17             THE COURT:  So can he work?

18             MR. OSWALD:  I don't believe that he could work right

19   now.

20             THE COURT:  Okay.

21             MR. OSWALD:  But he can apply for employment

22   authorization.

23             MS. FORTINO-BROWN:  Your Honor, I'm going to --

24             MR. OSWALD:  Although he may have employment

25   authorization.  I go to counsel on that --

1           THE COURT:  Okay.  Okay.

2           MR. OSWALD:  -- because he may have employment

3  authorization.

4           THE COURT:  And can he get a -- can he finish his

5  coursework?  Given his status, his F-1 status but visa revoked,

6  out of SEVIS, terminated from SEVIS, can he continue his

7  coursework?

8           MR. OSWALD:  I think he can -- if he's got until --

9  between now and June, he can continue that and graduate.

10          THE COURT:  And he can get a diploma.

11          MR. OSWALD:  I believe so, your Honor.

12          THE COURT:  And there would be no retaliation against

13  DePaul for giving him a diploma.

14          MR. OSWALD:  I do not believe that there's any

15  retaliation.  I don't think this is against DePaul in any way,

16  shape, or form.

17          THE COURT:  Well, I'm asking if they gave a diploma to

18  a student who was terminated in SEVIS and had no visa but was

19  in F-1 status, would the administration guarantee that they

20  wouldn't take any retaliatory action against DePaul?

21          MR. OSWALD:  I would -- I would like to check with my

22  client and confirm that, your Honor.

23          THE COURT:  That would be good.  We'd need that in

24  writing.

25          MR. OSWALD:  Yeah.

1          MS. FORTINO-BROWN:  Your Honor, on the issue of

2     irreparable harm, the F-1 student experience carries with it a

3     whole program through which the F-1 student is entitled to

4     secure on-campus employment, which is what he has done.  And he

5     has been told that he can no longer work on campus because of

6     the SEVIS termination.

7          Separately, he is entitled, as long as he maintains

8     active SEVIS -- or active status in SEVIS, he is entitled to

9     pursue employment authorization under Optional Practical

10     Training.  And there is a very brief window in which he must

11     apply for that.  And that is with -- and we are close to that

12     window.  It is within a 30-day period of his -- of his

13     graduation.

14          And so if he doesn't have an active SEVIS, Mr. Nali

15     will not be eligible to take advantage of the USCIS-issued

16     employment authorization, which is valid for a year.  And then,

17     because he's in a STEM field, he's entitled to an additional

18     two years beyond that.  So three full years of Optional

19     Practical Training that is available to him only by virtue of

20     the fact that his SEVIS remains active.

21          MR. BROWN:  And, Judge, that's a separate employment

22     authorization from the employment authorization that he had

23     been working under as a student at DePaul.

24          THE COURT:  Okay.  So he can only get that -- so

25     that's part of your irreparable injury argument.

1          MR. BROWN:  Yes.

2          MS. FORTINO-BROWN:  Correct.

3          THE COURT:  But he can -- that's part of F-1, which he

4    still is F-1, but you have to be active in SEVIS in order to

5    qualify for those benefits.

6          MS. FORTINO-BROWN:  Your Honor, correct.  And there's

7    a specific citation to this fact in the USCIS Policy Manual at

8    Chapter 5, Section C. -- I've got it up on my computer, your

9    Honor -- C.2.  Eligibility for employment authorization under

10   Optional Practical Training is available only for someone with

11   an active SEVIS registration.

12         THE COURT:  Okay.  Does that come as news to you?  I

13   mean, I wouldn't expect you to know all that.

14         MR. OSWALD:  I would say SEVIS is a system that's

15   maintained by Immigration and Customs Enforcement, a different

16   agency than USCIS.  Even in their response, counsel says they

17   could -- they can apply for employment authorization.  It's a

18   short time window.  I would say they should apply when he is

19   eligible and that that would be a remedy that they could

20   pursue.  And if they don't have that, they can come back and

21   say, "We didn't get it in time" --

22         MS. FORTINO-BROWN:  If it's not --

23         MR. OSWALD:  -- or whatever.

24         MS. FORTINO-BROWN:  I'm sorry, your Honor.

25         MR. OSWALD:  But that's something that is not -- it's

1  not -- I understand what counsel is saying about SEVIS and that

2  some of this is automatic.  But there is a remedy that's

3  available to them at this point.  And my client's view is that

4  they should be pursuing that.

5  MS. FORTINO-BROWN:  That's what Mr. Navarre is

6  eligible -- is able to enlighten you on, your Honor, and to

7  give details about exactly --

8  THE COURT:  Okay.

9  MS. FORTINO-BROWN:  -- what's next --

10  THE COURT:  Okay.

11  MS. FORTINO-BROWN:  -- for this client.

12  THE COURT:  Okay.  So we'll proceed -- if it's okay,

13  we'll proceed with the witness and -- if you're prepared to do

14  that today.

15  MR. OSWALD:  I'm -- I'm really not prepared to handle

16  anything on a witness at this point, your Honor.  But, you

17  know, I'll proceed as the Court wishes to do.

18  THE COURT:  Okay.  Well, I'm offering -- my idea was

19  to enter some kind of temporary relief so that you could be

20  prepared for a hearing.

21  You filed a brief.  I didn't ask for that.

22  MR. OSWALD:  Right.

23  THE COURT:  And I would set this over for probably

24  late next week or early -- but certainly before the end of the

25  month.  But if your client wants to proceed more expeditiously,

1      then we're going to proceed this morning.

2              So I'm trying to accommodate the parties.  I

3      understand there's litigation all over.  This whole thing,

4      which is now on 12, 15 federal judges' dockets, could have been

5      handled differently.  But now there's 15 of us involved in

6      this.  So I would be willing to handle this differently, but

7      there would have to be some kind of interim relief.

8              If you want to work that out with me, I'm always

9      working things out with lawyers, always.  If you want to

10     proceed this morning, we're going to proceed this morning.

11             MR. OSWALD:  I -- I'm not prepared to agree to relief,

12     so --

13             THE COURT:  Call the witness.

14             MR. BROWN:  Thank you, Judge.

15             Your Honor, we're calling to the stand Mr. Steve

16     Navarre.

17             THE COURT:  Okay.

18             MR. BROWN:  Mr. Navarre, you can have a seat here.

19             THE COURT:  Watch your step.  Raise your right hand.

20        (Witness sworn.)

21             THE WITNESS:  I do.

22             THE COURT:  Okay.  Keep your voice up.  Speak into the

23     microphone so we can hear you.

24             THE WITNESS:  Okay.

25             Can I pour some water?

Navarre - direct

1    THE COURT:  You can.  But I would -- I'm not sure how

2    old that --

3    THE WITNESS:  Is it old?

4    THE COURT:  I'm not sure how old that water is, so I

5    would be cautious about it.

6    THE WITNESS:  Okay.

7    THE COURT:  Maybe, Jasmin, if you're hearing me, if

8    you could bring some water into the courtroom for the witness.

9    That would be great.

10   Okay.

11        STEPHEN NAVARRE, PLAINTIFF'S WITNESS, SWORN

12                   DIRECT EXAMINATION

13   BY MR. BROWN:

14   Q.  Could you state your name --

15        THE COURT:  Some water will probably magically appear.

16   BY MR. BROWN:

17   Q.  -- for the record while you're pouring, Mr. Navarre.

18   A.  Yeah.  My name is Stephen Navarre.

19   Q.  Mr. Navarre, you are licensed as an attorney in Illinois,

20   correct?

21   A.  That's correct, yes.

22   Q.  How long have you been licensed?

23   A.  I was licensed in the fourth quarter of 1997.

24   Q.  And what is your area of practice?

25   A.  I practice exclusively since I became an attorney in

Navarre - direct

1    U.S. immigration and nationality law.

2            Prior to becoming an attorney, I worked at an

3    immigration law firm for seven years.  So I've been working in

4    this field for 34-plus years.

5    Q.   Worked in what capacity prior to being an attorney?

6    A.   As a legal assistant for licensed attorneys.

7    Q.   And you've been practicing in the area then for how long?

8    A.   27-plus years.

9    Q.   And what -- do you have a particular focus area within

10   immigration law?

11   A.   I and my firm work on employment-based nonimmigrant visas,

12   and I work with international students primarily who want to

13   stay in the U.S. beyond school but also counsel them on

14   maintaining status in school.

15           I also work with DSOs -- these are designated school

16   officials -- to -- who manage international students.

17   Q.   Do you have familiarity with the SEVIS system that we've

18   been talking about this morning?

19   A.   Yes, I do.

20   Q.   And how do you have that familiarity?  Describe that, if

21   you could, for the Court.

22   A.   My experience with the SEVIS system is in working with

23   questions from DSOs as to their responsibilities, the school

24   officials who have to work in the SEVIS system, and also

25   counseling international students in their obligations.

Navarre - direct

1    Q.  Do you do that on a regular basis?

2    A.  I do that on a regular basis.

3         I also -- every semester, I do seminars for

4    international students at Columbia College.  I've been doing

5    that for 20 years.

6         I actually did one earlier this week.  And the primary

7    topic that international students wanted to talk about at

8    Columbia College was termination of SEVIS records that they

9    have been hearing about.

10   Q.  Do you also have any representation of institutions,

11   universities, colleges?

12   A.  Over the years, I've helped a lot of colleges and

13   universities in various applications to USCIS, work visa

14   applications.

15   Q.  Now, in the course of your practice as an immigration

16   practitioner, tell the Court what your approach to learning and

17   ascertaining applicable immigration law is.  What sources do

18   you look for -- look at in order to counsel clients?

19   A.  Right.  So the primary source of immigration law is known

20   as the Immigration and Nationality Act.  That's a statutory

21   authority that's amended over the time.  It was originally

22   created in 1952 and amended a million times since then.

23        Below that is the Code of Federal Regulations.  That's

24   DHS regulations at 8 CFR, Department of State regulations at

25   22 CFR, and Department of Labor regulations at 20 CFR.

Navarre - direct

1  Q.  And is that reliance typical for immigration practitioners,

2  your colleagues, in your experience?

3  A.  That's very typical.

4       And then also just to mention sort of below the

5  regulatory level then is government agency guidance, some of

6  which is particularly important because it's binding on

7  government employees.

8       So the Department of State has a foreign affairs

9  manual that their consular officers must abide by.  That is a

10  public document mostly.  Some parts are redacted.

11      The USCIS has a policy manual.  Immigration and

12  Customs Enforcement has various memos that they issue from time

13  to time.

14  Q.  Do you have --

15            MR. BROWN:  I'm sorry.

16            MS. FORTINO-BROWN:  May I ask questions of the witness

17  as well, your Honor?  Or would you rather not?

18            THE COURT:  Do you object to there being a

19  double-headed examination?

20            MR. OSWALD:  When they're married, no, your Honor.

21            THE COURT:  Okay.  Is that a marriage exception?  I've

22  not heard of that.

23            MR. BROWN:  Thank you, Judge.

24            THE COURT:  Go ahead.

25  BY MS. FORTINO-BROWN:

Navarre - direct

1  Q.  Mr. Navarre, are you familiar with the facts of the Nali

2  case?

3  A.  Yes.

4  Q.  And have you reviewed the documentation that Mr. Nali

5  received from DePaul University alerting him that his SEVIS

6  status had been terminated?

7  A.  Yes, I've seen that.

8  Q.  What conclusion did you draw after you saw that?

9  A.  Well, I guess the first conclusion is very clear that

10  DePaul University has a different interpretation of the

11  significance of termination in the SEVIS system than the

12  affidavit produced by the official within Department of

13  Homeland Security that the government produced as part of its

14  case.

15  Q.  And how are they different?

16  A.  DePaul University takes a position that, whether

17  termination in the SEVIS system precisely legally terminates

18  one's nonimmigrant visa status and authorization to physically

19  remain in the U.S., that it de facto terminates an

20  international student's participation in that program.

21          Can I continue?

22  Q.  Please.

23          MR. BROWN:  Please.

24          THE COURT:  Could you say that again.

25          THE WITNESS:  Yes.  Whether termination in SEVIS

1  precisely legally terminates an F-1 student's ability to
2  physically remain in the U.S., which I think is in dispute, and
3  the government claims it does not, it -- in DePaul University's
4  position and a position I agree with, that it in effect
5  terminates an international student's ability to continue to
6  participate fully in that program.

7           And if I can explain what I mean by that, your Honor.
8           THE COURT:  Yes.

9           THE WITNESS:  Okay.  I'd like to start off with when
10  someone comes to -- wishes to come to the U.S. to study at a
11  college or university, their first step is to apply to a
12  college or university and be accepted.

13          They then must apply at a U.S. consulate, to the
14  Department of State, for an F-1 visa and their passport.  In
15  order to do that, the school must issue a form called an I-20
16  form.  This is a U.S. government form.  It's been around in
17  various iterations forever.

18          When I first got into this business, the international
19  student offices at schools would pull up a typewriter and grab
20  a blank I-20 form and type it up and fill it out.

21          Ever since SEVIS was created, there is only one way to
22  produce an I-20 form, and that is in the SEVIS system.  The
23  designated school official at the university or college has to
24  create a record, open a record in the SEVIS system for the
25  student and within that system produce an I-20 form.  That form

Navarre - direct

1   is bar-coded and can only be produced technically in that

2   system.

3        The student must have that form when they go to apply

4   for a visa at a U.S. consulate or embassy, and the

5   U.S. Department of State's Foreign Affairs Manual confirms

6   that.  It's absolutely essential.  They will not get a visa.

7        And the Department of State also has access and the

8   ability to check that SEVIS system to make sure that that

9   document is not fraudulent and they really are in that system.

10       The system was created to track student status and to

11   detect violations by the student of that status.  But it's --

12   it's become -- it's become larger than itself.

13       When a student comes to the U.S., based on that

14   program, they can go to school and attend school.  And as long

15   as they continue to go to class and they don't violate their

16   status, they can remain in the U.S.

17       But there's other benefits that international students

18   are accorded in this program.  Counsel mentioned earlier

19   various work authorization programs.  Those work authorization

20   programs require the generation by the school of an updated

21   I-20 form.  And that, again, can only be done in that SEVIS

22   system.

23       In the case of Mr. Nali, assuming for the moment that

24   he can stay in school and graduate in his current status, if he

25   wants to work on Optional Practical Training work

Navarre - direct

1    authorization, this program that is accorded to all

2    international students that grants him up to three years of

3    work authorization in the United States in his field --

4    BY MR. BROWN:

5    Q.   Following his graduation.

6    A.   -- following graduation, the school must generate an I-20

7    form that authorizes that.  And they can only do that if he has

8    an active SEVIS record.

9    Q.   So notwithstanding the government's contention that

10   Mr. Nali is presently in --

11   A.   Government counsel mentioned that Mr. Nali could always

12   apply to USCIS and make his case to USCIS.  That in practice is

13   not true.

14        USCIS will automatically deny any application for a

15   work authorization if it's not accompanied by an I-20 form

16   endorsed by the school authorizing this practical training.

17   And that form can only be done within the SEVIS system with a

18   valid, open student record.  A terminated record prohibits

19   that.

20   Q.   So it's your understanding --

21   A.   And so when -- I'm sorry.  And when -- and I'm sorry.  I

22   apologize.  I don't remember the name of the gentleman from DHS

23   who issued the affidavit.

24        MS. FORTINO-BROWN:  Watson, Watson.

25        THE WITNESS:  Mr. Watson.  This is where Mr. Watson

1   glides over the practical issues here because they are saying

2   that there's no -- that the termination in SEVIS has no effect

3   on this individual's status and ability to participate in the

4   F-1 student program.  And that's simply not true.

5   BY MS. FORTINO-BROWN:

6   Q.  I have a -- can you explain about this -- why we are here

7   today, what this -- what harm is this applicant -- this client

8   going to be suffering, and what is the window in which he's

9   going to have to make that application to DHS for his

10  employment authorization?

11  A.  The application for -- for post-graduation OPT work

12  authorization must be filed within a window.  I believe the end

13  date on that window is 30 days following graduation.

14  BY MR. BROWN:

15  Q.  And that assumes that Mr. Nali indeed could graduate in his

16  current status.

17  A.  That assumes that DePaul issue -- graduate -- that assumes

18  that he graduates from DePaul University.

19  Q.  Do you have an understanding one way or the other as to

20  whether DePaul would actually permit that given the current

21  status that it has explained Mr. Nali has?

22  A.  The letter from DePaul suggests that they're very nervous

23  about this.  And so I can't -- I'm not confident that DePaul is

24  willing to allow him to graduate.  I don't know.  I can't speak

25  for DePaul.

Navarre - direct

1    THE COURT:  Well, is there a letter from DePaul that

2  I'm unaware of?

3    MR. BROWN:  No, Judge.  I'm referring to the exhibit

4  to the complaint, which is the e-mail from DePaul to Mr. Nali.

5    THE COURT:  Okay.

6  BY MS. FORTINO-BROWN:

7  Q.  Any idea -- so just going again to the irreparable harm.

8  Mr. Nali is going to be -- if he's reinstated in SEVIS, he will

9  have potentially three years of employment authorization ahead

10  of him if we can reinstate him.

11  A.  Correct.

12  Q.  He has a degree -- he would have gotten a degree in a month

13  in -- a master's degree in business analytics.  Do you -- I

14  understand that you practice in this field.  You probably see

15  wages.  I don't -- can you give the judge any idea of what sort

16  of salary he might be looking at annually with a master's

17  degree in business analytics?

18  A.  My estimate would be initially starting out somewhere in

19  the 80 to $90,000 range.  I'm not a recruiter, but I do a lot

20  of these types of cases for employers for work visas.

21  BY MR. BROWN:

22  Q.  And in the course of that, you actually look at

23  governmental published sources that refer to ranges of salaries

24  for --

25  A.  Yes.  So it's very common for international students once

Navarre - direct

1   they get this work authorization to find employment with

2   companies who then sponsor them for work visas to stay on in

3   the U.S. and continue their careers beyond that.

4          Those work visas typically have prevailing wage

5   requirements, Department of Labor oversight requirements.  So

6   part of those work visa applications is we have to research and

7   pull information typically from the Department of Labor that

8   includes wage information.  So that's where I'm getting my

9   estimate from.

10  Q.  And right now, is it your understanding that Mr. Nali can

11  or cannot work lawfully?

12  A.  Right now?

13  Q.  Right now.

14  A.  I -- DePaul certainly believes that he cannot.  And I would

15  defer to them on this because it's their program.  He's working

16  on campus.

17         I think that that's -- I think the precise legal

18  question remains to be seen.  I don't think that's known yet.

19  Q.  But you're aware of the fact that DePaul's communicated to

20  Mr. Nali that all employment authorization, on or off campus --

21  A.  Yes.

22  Q.  -- must end immediately.

23  A.  Yes.

24         It seems to me in reading the pleadings in this case

25  and the affidavit that the government's position is that

Case 1:25-cv-03140-JMF Document 29-1 Filed 04/19/25 Page 325 of 75 Page 99 of 308

1   termination in SEVIS is just nothing -- it doesn't really hurt

2   him at all -- and which I guess raises the question as to why

3   it was even done.

4          But that aside, I think it's important to understand

5   how technology has become so integral into -- into what we do.

6          And I guess the best analogy I can give you is that,

7   Judge, if you had a car 40 years ago, you could push-start that

8   car to start it if you had to.  Cars today -- think of the

9   government coming and disconnecting your electronics remotely

10  to your car and then telling you, "We didn't steal your car."

11         The fact that the government didn't steal your car is

12  irrelevant.  This is what the government is saying when they're

13  saying, "Well, he's got valid status.  He's just terminated in

14  SEVIS."

15         You cannot run your car without the electronics.  You

16  cannot participate in this F-1 student program fully without an

17  active SEVIS record.

18  Q.  And DePaul cannot grant Mr. Nali work authorization without

19  the SEVIS system showing him --

20  A.  Correct.

21  Q.  -- in a valid --

22  A.  And DePaul --

23  Q.  -- status.

24  A.  -- cannot independently resurrect that SEVIS record.  It's

25  been terminated by the government.  Only the government can

1  reactivate that.

2       MR. BROWN:  Thank you, Mr. Navarre.  That's all I

3  have.

4       Counsel?

5                        CROSS-EXAMINATION

6  BY MR. OSWALD:

7  Q.  Good morning, Mr. Navarre.

8  A.  Good morning, Counsel.

9  Q.  So good to see you again.

10       Can we -- so you started practicing in 1997.

11  A.  1997.

12  Q.  Just a baby in the field.

13       So when I started in '84, that was the Immigration and

14  Naturalization Service.

15       Can you explain to the judge how the -- that ended and

16  the various component entities that now comprise what INS used

17  to be.

18       And now there's three entities, right?  Can you

19  just --

20  A.  Correct.

21  Q.  -- briefly explain to give an overview of kind of the

22  responsibilities of each of these entities.

23  A.  Absolutely.  So following 9/11, Congress eventually passed

24  the Homeland Security Act, which -- which broke up old INS into

25  predominant -- primarily three entities:

Navarre - cross

1      USCBP, Customs and Border Protection, which is Border

2  Patrol and admission at airports and land -- inland borders;

3  Immigration and Customs Enforcement, whose primary job is to

4  investigate and initiate removal proceedings against people who

5  should not be in the United States; and USCIS, whose primary

6  job is to adjudicate and approve immigration benefits.

7  Q.  And in terms of immigration benefit issues, students would

8  a lot of times come in contact with USCIS -- correct? -- I

9  mean, because that's who's -- this is considered a benefit.

10  They typically are dealing with things in terms of student

11  status, right?

12  A.  Correct.  So I would say that international -- USCIS has

13  very little to do with the process of international students

14  coming to the U.S. and also maintain -- you know, pursuing

15  their course of study.

16  Q.  Right.  And who -- so we're talking about the three

17  component agencies --

18  A.  Right.

19  Q.  -- of DHS.

20      But there's another department that deals with them

21  coming in to begin with, and that's the State Department,

22  right?

23  A.  State Department, correct.

24  Q.  And what's their role in that?

25  A.  State Department's role is to issue visas.  And a visa,

Navarre - cross

1  remember, is a document in the passport that allows someone to

2  seek admission to the U.S.  And so that's the State

3  Department's role is to issue visas.

4  Q.  So they would issue visas and they can revoke visas too,

5  right?

6  A.  Yes, they can.

7  Q.  State Department.

8       And in this case, they apparently at some point

9  prudentially revoked, whatever that means, his student visa.

10       MR. BROWN:  Your Honor, just for the record, I would

11  object to the characterization as prudentially revoked.

12       Go ahead, Counsel.

13       THE COURT:  But that's a term of art, isn't it?

14       MR. OSWALD:  It's a term of art, and it's referred to

15  in the declaration.

16       THE COURT:  Overruled.

17       MR. OSWALD:  And, frankly, your Honor, I didn't

18  understand it until I was going through this.

19       THE COURT:  I agree.

20       THE WITNESS:  And prior to recent events, we have seen

21  that the Department of State would occasionally revoke people's

22  visas for conduct that they deemed was in violation of their

23  status.

24       And that decision by the State Department was simply

25  canceling the visa and their passport.  It had no effect -- the

1  State Department's action had no effect on someone's status in

2  the U.S.  It was only if they left the U.S., they no longer had

3  a valid visa to return to the U.S.

4  BY MR. OSWALD:

5  Q.  Right.  So if it's revoked, he can't -- this -- Mr. Nali

6  can't go out of the United States and come back in using a

7  revoked visa, right?

8  A.  Correct.  He would have to apply for a new visa.

9  Q.  And that's a State Department decision.

10  A.  Correct.

11  Q.  And the decision as to whether he's in status or not, which

12  of these component agencies would make that determination?

13  A.  Well, I -- in my opinion, both U.S. Immigration and Customs

14  Enforcement and USCIS have the ability to make a determination

15  as to whether someone is in or out of status.  How that would

16  come to their attention would vary.

17  Q.  Does Immigration and Customs Enforcement -- do they grant

18  people work authorization?

19  A.  No, they don't.

20  Q.  And who does that?

21  A.  USCIS.

22  Q.  And the system that we're talking about, the SEVIS system,

23  is run by what component?

24  A.  Immigration and Customs Enforcement.

25  Q.  Does USCIS have any -- are they running this database at

1  all?

2  A.  They are not -- to my knowledge, they are not running it.

3  They have access to it.

4  Q.  Right.  And so do the universities, right?

5  A.  Correct.

6  Q.  And so when you were talking about the e-mail that counsel

7  was referring to, that comes from the university --

8  A.  Correct.

9  Q.  -- right?

10       And that's the university's interpretation of the

11  status, right?

12  A.  Correct.

13  Q.  And they may be right, and they may not be right.

14  A.  Correct.

15  Q.  And in terms of -- in terms of work authorization in this

16  case, I think, you know, the filings are that this would be --

17  that there still would be the opportunity -- it's not automatic

18  under the SEVIS system -- but that he could apply to

19  immigration, USCIS, to get work authorization.  Is that

20  correct?

21  A.  Well, I -- so we have to be careful what we're talking

22  about.

23       So anyone can file an application with USCIS for

24  anything, right?  I can be single and file an application on

25  behalf of my fiancée if I want.  But whether or not -- you

Navarre - cross

1    know, whether or not I qualify for that is a whole another

2    question.

3              Now, to file an application for work authorization as

4    an international student, an absolute requirement is the form I

5    had mentioned before issued by the school that must be done

6    within the SEVIS system.

7    Q.   And how do you know that that's an absolute requirement?

8    A.   I'm basing this on my experience doing these applications

9    since before the SEVIS system existed and my experience working

10   with USCIS.

11             It's also on the USCIS website as a requirement.

12   Q.   And the affidavit says that in terms of this being -- that

13   this did not affect his F-1 status.

14             And do you agree with that, or do you disagree with

15   that?

16   A.   I disagree that this action terminating Mr. Nali's record

17   in the SEVIS system does not affect his F-1 status.

18             There's two things going on here.  What I believe the

19   affidavit is saying is a very precise argument that says

20   termination in the SEVIS system does not officially legally

21   terminate one's visa status in the U.S. in the sense that they

22   are immediately removable for being, quote, out of status.

23   Q.   Do you agree with that?

24   A.   That may technically be true.  I think -- I think there are

25   differing opinions on that.

Navarre - cross

1          But what's more -- what I also feel is that it's

2     irrelevant because the important question is whether this

3     affects his ability to be an F-1 student and get the benefits

4     of an F-1 student, and this clearly negatively affects that in

5     a permanent way.

6          Mr. Nali will not -- and I can say this is not an

7     opinion; this is a fact.  If Mr. Nali's SEVIS system status

8     remains terminated, he is positively, absolutely ineligible to

9     be accorded work authorization by USCIS under the OPT program.

10    And that is not my opinion; that is a fact.

11    Q.   And what is that based upon?  Where does that exist?

12    A.   USCIS rules.

13    Q.   And where are those rules?

14    A.   In the USCIS Policy Manual, in the instructions to the

15    USCIS application, which have force of regulation.

16    Q.   And the -- but there is -- or there would be a remedy for

17    employment authorization, right?  I mean, he could apply for

18    that, and he could be -- it talks about in the filing that

19    there is a 30-day window for him to -- with him to apply for

20    that for employment authorization.

21    A.   But only if his SEVIS record is reinstated by the

22    government.

23    Q.   And where does that exist within the -- I don't -- I'm not

24    following where that -- where the SEVIS requirement has

25    anything to do with that -- with the work authorization.

Navarre - cross

1    A.  I understand.  And it goes back to the requirements for

2    issuing the work authorization.  He is not eligible to be

3    granted OPT work authorization unless the OPT work

4    authorization is recommended by the school on Form I-20.

5            And it's on page 2 of Form I-20, and the school puts

6    in there, "Recommended and authorized for OPT postgraduation

7    work authorization for one year."  It's signed by the

8    designated student officer, and it's generated in the SEVIS

9    system.

10           As I said before, they cannot pull out a typewriter

11   and type up this form.  It has to be generated in the system.

12   The form is bar-coded by the system, and it's the only

13   authorized form.  And that form is absolutely required by USCIS

14   as evidence of that application.  And without it, it will not

15   be approved.

16           And I would tell any international student, "You

17   cannot get this.  If you file this application, you're wasting

18   your money.  It will absolutely 100 percent be denied."

19   Q.  What is the term that you use for the training program?  Is

20   it CPT?  What is the --

21   A.  OPT.

22   Q.  OPT?

23   A.  OPT is the postgraduation --

24   Q.  Okay.

25   A.  -- work authorization.

Navarre - cross

1   Q.  Right.

2   A.  It's Optional Practical Training, optional to the student

3   to take or not take if they want.

4           CPT is another training program for -- while students

5   are in school.

6   Q.  But he would want to be an OPT.  Is that correct?

7   A.  Correct, correct.

8   Q.  And does he have an OPT opportunity available already to

9   him that he's going -- that he will miss out on that he's

10  already lined up, as far as you're aware?

11  A.  Assuming that he grad -- oh, you mean a job?  An actual job

12  offering?

13  Q.  Right.

14  A.  I'm not aware.  I don't know.

15  Q.  And at this point he doesn't -- you're not aware that he

16  has any specific job training program set up that he would be

17  denied as a result of this.

18  A.  No, but I'm also not aware that he doesn't.

19  Q.  Right.  But you're assuming that he would -- that this all

20  would follow as a matter of course.  Is that correct?

21  A.  He would -- he -- well, under the program, he would need to

22  find an employer and get work, yes.

23          THE COURT:  Can I just ask as an aside --

24          MR. OSWALD:  Yes.

25          THE COURT:  -- because I'm following your questions.

Navarre - cross

1          These OPTs, are they always on the campus, these

2     Optional --

3          THE WITNESS:  No.

4          THE COURT:  -- Practical Trainings?

5          THE WITNESS:  No.  These --

6          THE COURT:  Because the university signs off on them.

7          THE WITNESS:  The university signs off on it and

8     authorizes the employee to get the work authorization.  But

9     then the work authorization is open work authorization with any

10    employer as long as the student is working in a job that's

11    connected to their field of study.

12         THE COURT:  Right.  But you could go and work for some

13    private company.

14         THE WITNESS:  Correct.

15         THE COURT:  But does the university then have to

16    verify that you actually have that job?

17         THE WITNESS:  The student goes into the SEVIS system

18    and enters the job information.

19         THE COURT:  I see.

20         THE WITNESS:  Okay?  And that's visible to the school

21    as well.

22         There is also an automatic termination of that work

23    authorization if the student does not get employment.  So if a

24    student gets work authorization and does not work for a period

25    of 90 days, then that work authorization and their record in

 1   SEVIS is automatically terminated.  So you have to use it or

 2   you will lose it.

 3              THE COURT:  I'm sorry to interrupt.

 4              MR. OSWALD:  Oh, fine, your Honor.

 5   BY MR. OSWALD:

 6   Q.  The -- there's -- I understand, you know, you're an expert

 7   witness.  You're a legal expert, so this is --

 8              But there are -- there have been a number of courts

 9   that have talked about the SEVIS system, that there's no --

10   that there's no protected interest in a student having SEVIS,

11   being in the SEVIS system and having SEVIS records.

12              Is that -- are you aware of those cases?

13   A.  Can you explain what you mean by protected?

14   Q.  A liberty interest or some other interest that they are

15   entitled to say -- I mean, you have student status, right?  And

16   he's got a visa that gives him student status.

17              And then there's this database that you claim is

18   essential within this to fully enjoy all the benefits of F-1

19   status.

20   A.  Correct.

21   Q.  The interest -- I mean, there have been a number of courts

22   that we've cited that say you don't have a protected -- that

23   the student doesn't have a protected interest in the SEVIS

24   records per se.

25              Are you aware of those cases?

1    A.  Well, I'm not specifically aware of those cases.

2           And I think the question of whether -- so I've -- I've

3    described what, in my opinion, Mr. Nali would be missing out on

4    if this decision were not reversed.  I think it's a question

5    for all of you to argue and for you to decide, Judge, as to

6    whether that opportunity is -- is something that he deserves

7    protection for.  I think that's out of what I'm speaking here

8    today.  I don't think I can speak to that.

9           I can tell you that from a practical level, this

10   employment connection with the higher education that

11   international students come and participate in, on a practical

12   level, is a big part of what makes this country desirable for

13   international students to come to.

14          I think there would be a significant number -- I can't

15   put a percentage on it -- but I think a significant number of

16   students might go somewhere else to school if they did not have

17   this entry into the workforce and ability to work in their

18   field following graduation that they are all certainly aware of

19   when they come to the U.S. and go to school here.

20   Q.  Understood.

21          But in terms of employment, when you get a student

22   visa, you are supposed to be self-sufficient economically,

23   right?

24   A.  Yes.  You have to show that you are able to support

25   yourself, correct.

1  Q.  And so when we're talking about references to the poverty

2  line or, you know, that we're working at the poverty line or

3  whatever in terms of this gentleman, Mr. Nali, he's supposed to

4  have resources available to be able to pay for his tuition and

5  his support -- right? -- when he comes in to meet the visa

6  requirements.

7  A.  Are we talking -- I don't know anything about a discussion

8  on the poverty line.

9  Q.  Well, there was a reference in the filings that we're

10  talking about that this is going to deny him the ability to

11  work, deny him the ability to support himself.

12          That's really not an issue in terms of being able to

13  support yourself.  You're supposed to be -- when you come from

14  a foreign country and you're a student, you're not supposed to

15  have to work in order to support yourself as a student to stay

16  in status, right?

17  A.  Correct, while one is in school.

18          But when one graduates -- when an international

19  student graduates, typically then they need to work.  If

20  they're going to stay in the U.S., they need to work and

21  support themselves.

22  Q.  Yeah, I understand that point.

23  A.  Okay.

24  Q.  But I'm talking about the actual student status.

25  A.  Correct.

1          THE COURT:  Okay.  Thank you.

2          MR. OSWALD:  Thank you, your Honor.

3          THE COURT:  So when they're students, they're not

4     doing work-study?  That's not part of being --

5          THE WITNESS:  They can do work-study, absolutely.

6          But part of the eligibility for an F-1 when someone

7     initially comes to go to school is that they do have to show

8     that they have the ability to, you know, pay tuition and living

9     expenses.  They have to show that, that there's financial

10    support there as a student.

11         But they absolutely can participate in work-study if

12    it's approved under what's called the Curricular Practical

13    Training, or CPT work authorization, which also has to be

14    approved in SEVIS.

15         MR. BROWN:  Judge, if we could, just to follow up.

16         THE COURT:  Yeah.

17                        REDIRECT EXAMINATION

18    BY MS. FORTINO-BROWN:

19    Q.  Mr. Navarre, there's a little bit of confusion, just so

20    that we can state the record, and I'm going to advise the Court

21    of this.

22         Mr. Nali has been working part time on campus under

23    what's called Curricular Practical Training, which is available

24    to students while they're in school, and so he has been

25    supporting himself through that.

Navarre - redirect

1      And to your knowledge, is he -- you mentioned earlier

2   that you don't believe he's working.  Could he go back and work

3   tomorrow under this Curricular Practical Training?

4   A.  Well, I -- I don't think there's a definite answer to that.

5   I think DePaul has made it clear that he cannot.

6      The Curricular Practical Training is also approved on

7   a SEVIS-generated I-20 form.  Now, if he's terminated in SEVIS,

8   is that SEVIS-generated I-20 form also out of date as well?  I

9   don't think the government in their affidavit has gone into

10  that detail of the significance of the termination of SEVIS.

11  But a form generated in SEVIS is probably also defunct since

12  the system is.

13      MS. FORTINO-BROWN:  Your Honor, just, once again, I

14  would refer to the USCIS Policy Manual section that outlines

15  exactly the requirement.  We're talking after graduation and

16  then to apply for postgraduation OPT, which is called Optional

17  Practical Training.  That is in this section.

18      And SEVIS is clearly delineated there as a requirement

19  for the entire F-1 experience, including an application for

20  Optional Practical Training.

21      THE COURT:  Yeah.  And those -- those regulations that

22  you're citing to and that the witness cited to and even the

23  USCIS website, is that what's attached to your reply?

24      MS. FORTINO-BROWN:  No.  This is something new that we

25  just have pulled up, your Honor.

1          MR. BROWN:  We can submit a copy of this to your Honor

2     for the record.

3          MS. FORTINO-BROWN:  Oh, you have a copy, Jeff.

4          MR. BROWN:  Yeah, we have it printed out here.

5          But I can refer you to the citation for the record,

6     Judge.

7          THE COURT:  Okay.  Why don't you do that.

8          MS. FORTINO-BROWN:  It is the U.S. Citizenship and

9     Immigration Service's Policy Manual, Chapter 5, Practical

10    Training.

11         And then the sections that we're referring to are B.

12    for Curricular Practical Training, which is granted while the

13    student remains in school -- and that's what Mr. Nali has --

14    had, I should say.

15         And then Section C. is for student Optional Practical

16    Training.  And within that section, you would go to Section 1,

17    Pre-Completion OPT, for the full outline.  And it refers

18    repeatedly to the SEVIS registration as a required element.

19         THE WITNESS:  Excuse me, Counsel.  This is from

20    memory, so it might not be correct.  But above Chapter 5 in

21    that policy manual, I believe there's a volume number.  And the

22    volume -- I don't remember the number, but it's -- it should be

23    Nonimmigrants.

24         THE COURT:  Mm-hmm.

25         THE WITNESS:  Just if -- for people searching for

Navarre - examination

1   this.  I think there's another level above it.

2           MR. BROWN:  And, Judge, we can submit a copy of this

3   and file it on the record.

4           THE COURT:  Okay.

5           MR. BROWN:  Or deliver it to your Honor.

6           THE COURT:  Okay.  So are you through with your

7   questions?

8           MS. FORTINO-BROWN:  I am.  We are.

9           THE COURT:  Okay.  All right.  So I have some

10  questions because I'm confused about some other things.

11                      EXAMINATION

12  BY THE COURT:

13  Q.  This terminating based on arrest versus conviction, I don't

14  know if we're terminating -- let me get my e-mail again.

15          Where is that?  How do I look up the authority to do

16  that?

17  A.  I think that's a good question, your Honor, because I don't

18  have an answer for that.  Until 2 --

19  Q.  I've seen some language, I think, in the 8 -- in maybe

20  8 CFR about terminating for, you know, a crime of violence or a

21  conviction or over a -- so it's a felony, something,

22  conviction --

23  A.  Right.  My --

24  Q.  -- that carries a sentence.

25  A.  Until recent -- until the last few weeks, I have only heard

1    of termination in SEVIS as something done by Immigration and

2    Customs Enforcement as part of an overall removal proceeding

3    for someone who has committed acts that render them removable

4    from the United States.

5            So a conviction for a violent crime or something like

6    that would -- would typically lead the government to initiate

7    removal proceedings and terminate -- and if they're in F-1 visa

8    status, termination in SEVIS would be part of that process.

9            MR. BROWN:  And, Judge, if I could --

10           THE COURT:  Because I'm going -- I think we've talked

11   a lot about irreparable injury, Counsel, and I'm wondering

12   about likelihood of success on the merits, right?  So it's a

13   different inquiry.

14           MR. BROWN:  Right.

15           THE COURT:  And, of course, we have the APA and we

16   have due process, and I think you've raised in your brief some

17   challenging concepts about the Due Process clause.  But I'm

18   wondering about the APA, and I'm wondering about arbitrary and

19   capricious.

20           And I don't know anything about canceling -- well, I

21   guess we're not worried about canceling a visa here because

22   that's the State Department.

23           And so I'm trying to figure out about terminating in

24   SEVIS.  And, you know, I don't know how often this happens.

25   I'm not going to see much case law on this except this recent

1  stuff, and everybody is rushing on these decisions, which I

2  don't think is the best way to make these decisions,

3  particularly when there are complex administrative rules and

4  regulations underlying them, which frustrates me.

5       So is any -- how do you -- are you -- can the

6  administrative agencies, whether we're talking about ICE or

7  USCIS, terminate you in SEVIS because of an arrest for a

8  misdemeanor?  That is my question.

9       MR. BROWN:  Judge --

10      THE COURT:  If somebody could just tell me the answer

11  to that.

12      MR. BROWN:  If I can just respond briefly.

13      We allege in the -- actually, in the complaint -- it's

14  paragraph 3 -- the -- that Mr. Nali is not guilty of the,

15  quote, "commission of any crime of violence for which a

16  sentence of more than one year imprisonment may be imposed."

17      And that is a quote from the Code of Federal

18  Regulations.  The citation is 8 CFR 214.1(g).

19      THE COURT:  Right.

20      MR. BROWN:  That section sets forth the regulatory

21  grounds for conditions of a student nonimmigrant's admission

22  and continued stay.

23      And, again, we're talking about crimes of violence.

24      THE COURT:  No, no.  I know the difference between a

25  misdemeanor and a felony, and I understand the difference

Navarre - examination

1  between an arrest and a conviction.

2  BY THE COURT:

3  Q.  So given that I have a misdemeanor arrest, no conviction --

4  so I have a presumption of innocence, which I think applies to

5  people who are noncitizens -- what -- what am I supposed to

6  look at in terms of the ability of -- maybe you're not the

7  expert on this.  I don't know.  But you're sitting here, and

8  you're under oath.

9  A.  Well --

10  Q.  So my question is, what do I look at -- because I have to

11  look at likelihood of success for an APA action, which is, is

12  there arbitrary and capricious action here.  And the government

13  doesn't even think I have the authority, probably, to look at

14  that.

15          But if I were to spend my weekend looking at it, what

16  is the authority of USCIS to terminate --

17  A.  Or Immigration and Customs Enforcement to terminate.

18  Q.  Okay.  There you go.

19  A.  In the SEVIS record.

20  Q.  Okay.  So that's -- okay.  So you're correcting me on the

21  agency.  Okay.

22          So to terminate in SEVIS.

23  A.  I don't know of any -- I don't know of any authority.  This

24  is unprecedented, in my opinion.  I have never seen it before.

25          MS. FORTINO-BROWN:  Your Honor, if I could also

Case: 4:25-cv-03369-JSW  Document: 22  Filed: 04/19/25  Page: 28 of 35  PageID #: 206
Case 4:25-cv-03369-JSW  Document 22  Filed 04/08/25  Page 120 of 308

53

Navarre - examination

1  interrupt.

2       It is a ministerial act.  There is no discretion

3  involved in whether or not this individual should be maintained

4  in SEVIS.  He has not been convicted of or engaged in any

5  conduct that would render him in violation of his F-1

6  nonimmigrant status.

7       THE COURT:  Well, let me ask the expert, if you don't

8  mind, because this is testimony.

9  BY THE COURT:

10 Q.  Is it ministerial?  I mean, that doesn't make sense to me.

11 I mean, you must have some discretion that if you -- let's say

12 you're charged with an egregious act and you're not -- you

13 know, you murder the head of a big -- a big --

14 UnitedHealthcare -- right? -- and you're here on an F-1 visa

15 and there is a -- there's going to be a criminal trial, so it's

16 going to go on for a while and you're in custody but you're not

17 convicted because there's, you know, two-year trial schedule or

18 whatever.  I mean, would it be ministerial?

19      I mean, wouldn't the -- ICE have the -- if that's the

20 correct agency.  Wouldn't they have the ability at that point

21 to start removal proceedings?  Or -- I mean, I don't understand

22 that it would be ministerial.

23 A.  Well, I mean, they could -- they could start removal

24 proceedings.  The question of whether or not he's removable

25 would go to the section of the law regarding removal.

1       But this is -- this is completely outside that.

2   The -- the -- an arrest is never a grounds for removability.

3   Q.  Well, what about for canceling --

4   A.  And your example, you know --

5   Q.  Yeah.  Well, I'm just trying to come up with something

6   egregious.

7   A.  I know.

8   Q.  But what about for canceling you in SEVIS, for terminating

9   you in SEVIS?

10  A.  There's -- there's no regulatory authority for ICE to

11  cancel someone in SEVIS that I'm aware of other than their

12  claimed broad authority to -- granted by Congress to keep

13  America safe.  But that -- but that's -- there's nothing in --

14  there's nothing, to my knowledge, in the regulations governing

15  immigration law that authorizes ICE to terminate someone in

16  SEVIS.

17      A colleague of mine said in a communication, an e-mail

18  to a group of us, that, you know, the SEVIS system was created

19  to track students maintaining and in some cases violating their

20  status so that the government could see that.

21      It wasn't created for the government to step in and

22  revoke the students' ability to do this or not.  We have laws

23  for that.  Those laws are called remove -- law is grounds of

24  removability.  And SEVIS has the authority to remove someone if

25  they commit and are convicted of a criminal act that makes them

1    removable.

2    Q.  Well, how would they do that?  Why not just remove them

3    from SEVIS?  You mean they'd go through a removal proceeding?

4    A.  They often go through removal.  It's done every day for

5    people who are removable.

6    Q.  If they're here on an F-1 visa and they're in the SEVIS

7    system.

8    A.  Correct.  If someone in -- if someone in F-1 status commits

9    and is convicted of a removable offense, they will be placed in

10   removal proceedings.

11          Now, an immigration judge may give them voluntary

12   departure and end that and let that -- you know, let that play

13   out quickly.  But that's the procedure the government has for

14   removing people that they don't want in the United States.

15   Q.  So you'd be in a removal proceeding, and then your SEVIS

16   status would be terminated.

17   A.  Probably at the conclusion of that.  I -- I honestly don't

18   know what the government does with regard -- when that's done.

19   But at some point, yes, their SEVIS record would be terminated

20   or would expire.

21          I mean, if someone commits a -- your Honor, if someone

22   commits a criminal -- a violent criminal offense and they're

23   convicted, let's assume for the moment that that person is

24   incarcerated for that offense.

25   Q.  But -- and they're a student.

1  A.  Correct.

2  Q.  Yeah.

3  A.  Well, very shortly thereafter at some point, they're no

4  longer going to be a student.  They're going -- they're not

5  going to continue being enrolled in the school.  They're going

6  to be in prison.  And so their SEVIS record will terminate on

7  its own.  That's probably how that usually happens.

8         ICE stepping in and terminating a SEVIS record without

9  any ground of removability is what is new and unprecedented.

10  And myself and other immigration attorneys do not know where

11  the authority to do that comes from.

12  Q.  So you would -- so it's your opinion or your expert

13  testimony --

14         THE COURT:  And is there any objection to finding him

15  an expert to testify in this area?

16         MR. OSWALD:  I have so many reasons to object to him,

17  but I -- not as an expert, your Honor.

18         THE COURT:  Okay.

19  BY THE COURT:

20  Q.  So it's your testimony as an expert that -- what is your

21  opinion in terms of Mr. Nali being removable with this arrest?

22  A.  He's not removable on the basis of an -- of this arrest.

23  He would first need to be convicted.  And then the conviction

24  would have to be determined to be a crime of moral turpitude.

25  And then it would have to not fit under the petty offense

1   exception to that ground of removability.

2              THE COURT:  Okay.

3              Do you have any other questions?

4              MR. BROWN:  Sorry, Judge?

5              THE COURT:  Do you have any other questions?

6              MR. BROWN:  No, not for the witness, Judge.

7              THE COURT:  Okay.  Thank you.

8              MR. OSWALD:  Your Honor, I have some.

9              THE COURT:  Sure.  Sure, sure, sure.  Please.  Sorry.

10                      RECROSS-EXAMINATION

11  BY MR. OSWALD:

12  Q.  Mr. Navarre, we got your -- as I understand your testimony,

13  that our client in the affidavit says SEVIS separate from

14  student status.

15              So when you're talking about the student status, to

16  revoke the student status, you're reading the student status

17  regulations that apply to that, right?  And it's student status

18  that they would be out of -- out of student status would be

19  reading the F-1 regulations into the SEVIS system.  Is that

20  correct?

21  A.  I'm not sure I understand your question.

22  Q.  Well, in terms of when you're talking about what the

23  steps -- okay.

24              Looking at it from ICE's point of view, they would say

25  it's separate.  There is -- when the judge is looking for

1  guidance on this as to what you can do in SEVIS, there is none.
2  Isn't that really correct?
3  A.  That's correct.
4  Q.  There's not SEVIS regulations.  They're not -- this goes
5  into the -- there's not a regulation that says, "This is what
6  goes in."  We've got policy memoranda, you know.  And what
7  you're talking about is the practical import of how data has
8  kind of taken over and that that data is all part of the same
9  system.
10  A.  Mm-hmm.
11  Q.  But there's no SEVIS regulation that says, "Judge, you
12  know, you'd only take this person" -- "you put this person in
13  the system in this situation.  You take them out in this
14  situation."  There's no restriction on that, SEVIS per se.  Is
15  that accurate?
16  A.  No restriction on what ICE can do in the system?
17  Q.  Right, what ICE could do with the system --
18  A.  Oh, but --
19  Q.  -- or that they would take somebody, to terminate
20  somebody's status and then say, "You may terminate status under
21  this situation."
22  A.  There is no --
23  Q.  In terms of SEVIS.
24  A.  To my knowledge, there is no regulation that authorizes ICE
25  to terminate any status in SEVIS.

Navarre - recross

1   Q.  But there's no -- there's no requirement that they do so --

2   that they put things into SEVIS status, is there?  I mean --

3   A.  No.  ICE --

4   Q.  -- is there regulation on SEVIS?

5   A.  No.  My understanding of the SEVIS system as it was created

6   is that ICE's job was to manage it in the sense that keep it up

7   and functioning.  The government was providing a system for

8   schools and students to report what they are doing.

9           There's no section in SEVIS where ICE reports.  You

10  see what I mean?  ICE is not a user in the system.

11  Q.  But they're maintaining the system.

12  A.  They're maintaining it.  So, you know, they have to pay the

13  bills and make sure it stays up and running.  But there's no

14  authority in the regulations that ICE can step in and

15  arbitrarily, for whatever reason that they feel is appropriate,

16  to terminate a SEVIS record.

17  Q.  But there's no regulation that requires --

18  A.  I guess you're saying there's no regulation that prohibits

19  them from doing that?

20  Q.  Right, right.

21  A.  Well, but regulations usually describe what a government

22  agency does, not what they're --

23  Q.  Is there a regulation that just deals with SEVIS?

24  A.  There are references to SEVIS in the regulations.  But --

25  in 8 CFR 214.2(f), which is the section on international

1    students, it discusses.  But all the regulations discuss what

2    the schools and what the students must do because they are the

3    participants in it.

4    Q.  But the termination of status -- I think it's 214.1 --

5    right? -- (d) or something like that.

6    A.  Right.

7    Q.  And I'm off the top of my head, so I don't have it right

8    here.

9    A.  Right.

10   Q.  But that -- your testimony -- I mean, you're reading in

11   those requirements on what you do to terminate somebody's

12   student status as also regulating what goes in and out of

13   SEVIS?

14   A.  Again, I'm not sure I understand your question.

15   Q.  Well, the argument that ICE makes, this is a separate

16   system from the student status system.

17   A.  Correct.

18   Q.  "We maintain a database.  We have a computer system."

19   Basically, "We can do what we want."

20        You -- that has nothing to -- and their argument is

21   that that has nothing to do with termination of student status.

22   A.  Right, right.

23   Q.  And if you buy that argument -- that's not your testimony.

24   I'm not trying to put words in your mouth.

25   A.  No, no.  I understand.  I understand.

1   Q.  And I'm not saying it.  But if you buy that argument that

2   they're separate, there's no SEVIS regulation that really

3   regulates what goes in and out of SEVIS, right?

4   A.  Correct.

5   Q.  There is a regulation on student status, and that's a

6   separate -- well, you would say it's not --

7   A.  But I would say -- but I think the problem with the

8   government's argument is the idea that these are two separate

9   things.

10  Q.  Right.

11  A.  And that -- and I think -- I hope that that has -- that I

12  made clear from my testimony that I -- instead, I see these as

13  completely intertwined and inseparable.

14  Q.  And that's -- I agree that's your testimony.

15  A.  Okay.

16  Q.  And that's fair, and I'm just asking for the distinction

17  here as to what the judge has to determine.

18  A.  Right.

19          THE COURT:  Right.  And I appreciate your

20  clarification because I think what you're saying, if I can --

21  and you can tell me if I'm wrong -- is it's not like SEVIS has

22  some list that says, "Okay.  This is what" -- for ICE -- "Dear

23  whoever is in charge of ICE.  Here's the reasons you can

24  terminate someone in SEVIS."

25          MR. OSWALD:  Right.

Navarre - recross

1        THE COURT:  "Here's reasons you can't terminate

2    someone in SEVIS."  I mean, SEVIS is kind of this -- I mean, it

3    is a database.

4        MR. OSWALD:  Right.

5        THE COURT:  And ICE has obligations to keep it going.

6        I would imagine that there's rules when you say

7    regulations in SEVIS, that the universities have obligations or

8    rules about what they have to keep track of or how often they

9    have to update or whatever.  I'm sure there are obligations in

10   that regard and obviously obligations on the students.

11       But there's not a regulation that says, "ICE can only

12   terminate for this reason."

13       MR. OSWALD:  That's correct.

14       THE COURT:  Okay.  Do you know, Counsel, is there

15   any -- so there's no regulations.  There's no -- there's

16   nothing I can look at that says, "Okay.  This is ICE's

17   authority with respect to SEVIS for why they can terminate."

18       MR. OSWALD:  I -- I know of none.

19       THE COURT:  Yeah, okay.  And that seems consistent

20   with the testimony.

21       MR. OSWALD:  We agree, you know, on something.

22       THE COURT:  Okay.  Anything else?

23       MR. OSWALD:  I have nothing further.

24       THE COURT:  Anything else?

25       Okay.  Well, I appreciate that because I didn't

1    understand that, so thank you.

2            Anything else?

3            MR. BROWN:  Judge, I think we've already moved

4    admission.  Your Honor has accepted Mr. Navarre's testimony as

5    an expert.  But if I've overlooked that detail, I think

6    counsel's indicated no objection.

7            THE COURT:  Okay.  Yeah, I'll grant that motion.  And

8    I just wanted to clarify that for the record.

9            Okay.  I think you can be excused.  Thank you.

10           THE WITNESS:  Thank you.

11           MR. BROWN:  Thank you.

12           And, Judge, once again, on this issue of Mr. Nali's

13   participation as an F-1 student, his failure to maintain F-1

14   student status under the SEVIS system happens under the

15   regulations when he fails to maintain a full course of study or

16   engage in unauthorized employment or other violations of this

17   regulation we've been talking about, 8 CFR 214.2(f).

18           214.1(e) and (g) outlines the specific circumstances

19   where certain conduct by a nonimmigrant visa holder, like being

20   engaged in unauthorized employment or providing false

21   information to DHS or being convicted of a crime of violence

22   with a potential sentence of more than a year, those things

23   constitute a failure to maintain status.

24           None of those things have transpired here, so none of

25   the grounds under the regulation exist for his termination of

1  status per se.

2           THE COURT:  I understand.

3           MR. BROWN:  You understand.

4           And then separately this issue of whether his status

5  is his status and whether it is properly reflected in SEVIS may

6  be two different things.  But you've heard the testimony about

7  the impact of the failure to keep his status in SEVIS affects

8  him.

9           THE COURT:  Right.  So let me get some clarification

10  on that.

11          So he -- he's lost his employment at DePaul.  I

12  understand that.  I don't think that that's contested.

13          And I would like some clarification as to whether or

14  not he is going to be able to get a diploma in June, which is

15  two months away -- month and a half away.  Is he going to be

16  able to get a diploma?  Do we know that?  Does he have an

17  answer to that?

18          MR. BROWN:  I can't say that we have an answer to

19  that, Judge.  We don't have evidence one way or the other.  My

20  read of DePaul's e-mail to him is that he wouldn't.  But I'm

21  reading the same document as the Court is looking at, and

22  that's the only evidence we have on that score.

23          THE COURT:  Okay.

24          Can I get more on that?  Or is that -- is he not able

25  to get me any more information on that?

1       MR. BROWN:  We can certainly reach out to DePaul and

2   get what their position is, Judge.

3       THE COURT:  And then there is this application, which

4   would be 30 days after whatever the graduation date is.  I

5   don't know.

6       MR. BROWN:  Which is the date in early June, but I

7   don't have it off the top of my head.

8       THE COURT:  Right.  Well, that's a matter of public

9   record.  But there's that date, and then there's 30 days later,

10  so we're talking early July.

11      So I think I have my arms wrapped around the

12  irreparable injury piece.

13      Would anybody like to -- well, first of all, let me

14  ask you, Mr. Oswald.  Given the testimony, would you like an

15  opportunity to present a witness?  Because I had a lot of

16  confusion about that whole thing.  I feel some clarity.

17      I think it's different than what your affidavit said,

18  or at least it clarified for me this sort of being in F-1

19  status versus having a visa versus being in the SEVIS database

20  and the impact of not being in the SEVIS database, which I

21  think there's a big impact to that.  Maybe you disagree.

22      Do you want me to have a hearing next week?  Totally

23  up to you.

24      MR. OSWALD:  Yeah.  I would like to at least talk to

25  my client as to the testimony that's been here this morning --

1          THE COURT:  Okay.

2          MR. OSWALD:  -- and see what they -- how they would

3     like to handle that.

4          THE COURT:  Any objection to that?

5          MR. BROWN:  No objection, Judge, though I don't think

6     it interferes with your ability to enter an order preliminarily

7     and immediately.

8          THE COURT:  Okay.  And then my second question -- so

9     I'm going to get a status report about whether or not we need

10    another hearing.

11         And then my second question -- because you guys did

12    very rushed briefing, which I appreciate, and I imagine that's

13    because there's lots happening in other courts.

14         But is -- would anybody like to address, aside from

15    the briefing -- and I can read the briefing, so you don't need

16    to repeat -- the idea of likelihood of success on the merits?

17    Because you gave me the Third Circuit case.  I've read the

18    Third Circuit case because I had it.

19         The defendant responded with some Seventh Circuit case

20    law.  I read the brief about the Seventh Circuit case law, but

21    I haven't actually read the Seventh Circuit cases because I

22    just read it this morning, so I haven't had a chance.  I will

23    pull those cases, of course, and look at them.  So I --

24    obviously, Seventh Circuit's in the building, so I've got to

25    pay attention to what they say, so I've got to read those and

1    digest those.

2           I don't know if -- I read your reply very quickly.  I

3    don't know if you responded to the Seventh Circuit cases.  I

4    can't recall.

5           MR. BROWN:  I did not, your Honor.  And we'd like an

6    opportunity to supplement it.

7           THE COURT:  So I don't know if -- but do you want to

8    say anything about likelihood of success, or do you want to

9    just let me read stuff?

10          MR. OSWALD:  Well, we -- if you give us, both sides,

11   the opportunity --

12          COURT REPORTER:  Speak in your microphone, please,

13   Mr. Oswald.

14          MR. OSWALD:  If you give us, both sides, the

15   opportunity to file something in writing, you know, a short

16   period of time on the issue of likelihood of success, I think

17   we would take advantage of that opportunity.

18          THE COURT:  Okay.  Why don't I do that.

19          Okay.  So I understand that some judges are entering

20   orders that say things like don't deport him.  Don't arrest him

21   for immigration matters.  Don't remove him from the country,

22   things like that.  I'm going to enter something like that.  I

23   don't expect anything like that to happen to Mr. Nali.

24          I want to really look at this SEVIS thing.  I've heard

25   a lot of testimony.  I understand that there's now a case out

1    of Indiana and a case out of Michigan that are struggling.

2    I've seen the thir -- 20 cases that all entered TROs right

3    away.  And those cases didn't have hearings, which I really

4    appreciate that I got to hear from a witness because I love

5    lawyers, but I feel like witnesses are helpful.

6         And I'm just going to do this as a preliminary

7    injunction and not as a -- not that I'm going to grant a

8    preliminary injunction, but I'm just going to do it and not --

9    all these other judges were, like, doing TROs and then

10   hearings, you know, a week later, which is double -- double the

11   fun, double the work.

12        So I'm going to just do it, either grant the

13   preliminary or not grant it.  And we can go from there.

14        So do you have any objection to -- I know Judge

15   Coleman granted some kind of TRO that said keep your hands off

16   him.

17        MR. OSWALD:  I -- I'm not really in the position -- I

18   mean, I don't think that there's any threat to his removal.

19   I -- I can't really agree to anything, but I don't think that

20   that would be -- you know, that's not going to be -- I don't

21   think that is going to be an issue here.

22        MS. FORTINO-BROWN:  On behalf of our client, your

23   Honor, he is really quite concerned.  He's afraid to even --

24        THE COURT:  Oh, I'm sure.

25        MS. FORTINO-BROWN:  -- walk the streets.

1          THE COURT:  I'm sure he is.

2          MS. FORTINO-BROWN:  So we would ask that your Honor

3    would enter something to protect him.

4          THE COURT:  I'm sure he is.

5          So I know that's not what you're seeking.

6          MS. FORTINO-BROWN:  Exactly.

7          THE COURT:  I mean, I understand you're seeking

8    something much more fulsome.  And I understand he's not

9    working, and I understand the implications of that.  And I

10   don't want to encourage anyone to engage in improper conduct in

11   order to eat.  So that's not a good thing.

12         So I'm going to enter a TRO that will be sort of akin

13   to what Judge Coleman -- I don't know if you're following that

14   case.

15         MR. BROWN:  Judge, I'm sorry.  I haven't.

16         THE COURT:  Yeah, and they did something kind of

17   different because they filed it as a habeas, I think.  So

18   different -- different kind of legal issues presented, although

19   they may be a multi-count thing.  But --

20         MR. OSWALD:  We have a hearing on that on a

21   preliminary injunction, I believe, on Monday morning.

22         THE COURT:  Yeah.

23         MR. OSWALD:  So that's continuing on with that.

24         And I have another hearing with Judge Ellis, I think,

25   in the afternoon.

1    THE COURT:  Okay.  So she entered -- she just set some

2 briefing, and she entered -- Meg, do you have a copy of that

3 handy?

4    LAW CLERK:  I don't have a copy of the order.  I have

5 the case number I can give --

6    THE COURT:  Okay.

7    LAW CLERK:  -- for counsel's purposes.  It's

8 25 CV 4024.  I can print a copy of the order.

9    MR. BROWN:  Thank you.

10    THE COURT:  I'm going to actually pull it up so I can

11 tell you what the -- what it provided.

12    LAW CLERK:  I don't think it ruled on the TRO, but --

13    THE COURT:  I thought she entered some --

14    LAW CLERK:  She did enter a minute order.

15    MR. OSWALD:  There's a variety of ways of telling us

16 not to touch your client and remove him or anything.  I mean,

17 it's probably ten ways of saying it.

18    THE COURT:  I have -- is it 8040?

19    LAW CLERK:  40 -- I can e-mail you the text right now.

20    THE COURT:  So while we figure that out, I'll ask you

21 for a status in terms of whether you want another hearing.

22 When would be convenient for you to file the status?

23    MR. OSWALD:  Could we do that Tuesday?

24    THE COURT:  Sure.  Close of business Tuesday.

25    MR. OSWALD:  Yeah.

1     THE COURT:  And then in terms of further briefing, do

2  you want to do cross briefings on Wednesday?  Would that give

3  every -- I know you have a lot.  Would that give everybody

4  breathing time?  And knowing that then I'm just going -- unless

5  you ask for a hearing, I'm going to then issue an order.  Now,

6  if you ask for a hearing -- if you ask for a hearing, I'll

7  probably strike the briefing --

8     MR. OSWALD:  Right.

9     THE COURT:  -- and say let's come back.  We'll have

10  the hearing, and then we'll set briefing again.

11     MR. OSWALD:  Right.

12     THE COURT:  But assuming if you don't ask for a

13  hearing, would that make sense, or should I just get your

14  status and then set briefing?

15     MR. OSWALD:  It's -- I mean, you can set a status and

16  then we could -- you know, if you want to set Wednesday or

17  Thursday or something in there for us to do cross briefs and

18  then you want to do a preliminary, you know, hearing.

19     THE COURT:  I'll just issue an order.  Yeah, I'll

20  issue an order.

21     MR. BROWN:  Cross briefs without responses to the --

22  yes.

23     THE COURT:  Yes, no.

24     MR. BROWN:  Right.

25     THE COURT:  No, no, no.

1    Okay. So we'll get a status close of business on

2    Tuesday. Talk to each other in the meantime. I don't -- you

3    don't have other witnesses?

4         MR. BROWN: No, not here, Judge.

5         THE COURT: Okay. I mean, that you would want to

6    present again.

7         MR. BROWN: No.

8         THE COURT: Okay. So close of business Tuesday.

9    And then I'll set briefing for Thursday, cross

10   briefings, to sort of supplement. I mean, what I'm struggling

11   with is the likelihood of success, for both of you to

12   understand. But you can brief anything.

13   And -- but if you talk and in the status you say,

14   "Hey, we need a witness. We're coming back. Can we strike the

15   briefing?" you know, I'll read that status report, and I'll pay

16   attention to what you tell me.

17        MS. FORTINO-BROWN: Quick question, your Honor, if you

18   wouldn't mind. If we could also supplement the record with

19   more information from Mr. Nali, perhaps an affidavit, as to

20   some of these holes that we're not knowing about with the

21   facts.

22        THE COURT: Yes. Irreparable injury, yeah.

23        MR. BROWN: And we'll do our best to obtain what

24   information we can from DePaul with respect to --

25        THE COURT: Yes, I understand.

1          MR. OSWALD:  And, your Honor, that would be -- it

2  would be helpful -- I mean, if you can get something from

3  DePaul as to their understanding --

4          THE COURT:  Yeah.

5          MR. OSWALD:  -- as soon as possible so we can respond

6  to that or --

7          THE COURT:  Yeah.

8          MR. OSWALD:  -- clarify or whatever.

9          MR. BROWN:  Sure.

10         THE COURT:  Right.  And if that means another hearing,

11  then that's what that means.  And then we'll take that into

12  account in terms of briefing.

13         Looking at Judge Coleman's hearing.  This is a habeas

14  corpus, declaratory judgment, and injunctive relief.  It's a

15  lot of words.

16         During the pendency of the motion, the Court orders

17  that plaintiff may not be moved anywhere outside the Court's

18  jurisdiction, and plaintiff not be detained for immigration

19  purposes in any way, shape, or form.  That's my neighbor.  I

20  set the status -- set this matter for status.  So that's pretty

21  plainspoken.

22         MR. BROWN:  That would be acceptable.

23         THE COURT:  Okay.  So I'll enter something akin to

24  that.  Okay?

25         MR. BROWN:  Thank you, your Honor.

1          MS. FORTINO-BROWN:  Thank you.

2          THE COURT:  But it doesn't really get to where we're

3     going.

4          MR. BROWN:  Right.

5          THE COURT:  And it doesn't address irreparable -- it

6     doesn't really address irreparable injury, and it doesn't

7     address likelihood of success.

8          MR. OSWALD:  Right.

9          THE COURT:  It's just really saying to the person, you

10    know, be calm.

11         MR. OSWALD:  I understand.  And -- but as is in the

12    affidavit, they're not contesting that he's -- even though

13    they're saying he's in status.  So I don't think there's going

14    to be a problem with dealing with, you know, bringing that

15    order or any problem with it.  But there's -- it doesn't

16    address the major issue.

17         THE COURT:  Yeah.  So I have so much respect for you.

18    And I -- in fact, I think I was at an event where you received

19    an award because of your years of service in this area.

20         The way that your client is conducting this kind of

21    stuff, it's causing fear.  And maybe that's the point.  I don't

22    know.  And now we have all this litigation for courts who are

23    getting hit by budget cuts, you know, every year, so we're all

24    slammed, which is -- no judge should ever complain because we

25    get -- we have the best jobs.  And when judges complained and I

1    was a lawyer, I always thought get a real job.  So I take my

2    own advice.

3            But there's so many different ways to deal with this

4    kind of stuff.  And I just hope, because I have so much respect

5    for you, Mr. Oswald, and I trust that your client has a lot of

6    respect for you, that, you know, you can talk to them about the

7    manner because there's no reason to put this guy into terror.

8    But that's outside my lane.

9            Okay.  I'll hear from you on Tuesday, and we'll either

10   be back here or you'll file briefs.

11           Thanks, everybody for all --

12           MR. BROWN:  Thank you, your Honor.

13           THE COURT:  -- the excellent briefing.

14           MR. OSWALD:  Thank you.

15           MR. BROWN:  We wish you a Good Friday.

16           THE COURT:  Yeah.  Have a good weekend.

17       (Concluded at 12:20 p.m.)

18                        *  *  *  *  *

19       I certify that the foregoing is a correct transcript of the

20   record of proceedings in the above-entitled matter.

21

22   */s/ LAURA RENKE*                        *April 19, 2025*
     LAURA RENKE, CSR, RDR, CRR

23   Official Court Reporter

24

25

1                        I N D E X

2   WITNESS                                          PAGE

3   STEPHEN NAVARRE
        Direct by Mr. Brown ............................... 21
4       Cross by Mr. Oswald ............................... 33
        Redirect by Ms. Fortino-Brown ..................... 46
5       Exam by the Court ................................. 49
        Recross by Mr. Oswald ............................. 57

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT F

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF NextGen 1.8 (rev. 1.8.3)
### Eastern Division

Vishnu Nali

Plaintiff,

v.                                                    Case No.: 1:25−cv−03969

Honorable Mary M. Rowland

Kristi Noem, et al.

Defendant.

---

# NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, April 18, 2025:

   MINUTE entry before the Honorable Mary M. Rowland: Motion hearing held on 4/18/2025. Plaintiff Nali brings suit for violation of his due process rights under the Fifth Amendment and the Administrative Procedure Act arising from Defendants' termination of his Student and Exchange Visitor Information Systems ("SEVIS") record. [3]. Plaintiff Nali moved for a temporary restraining order to (i) enjoin Defendants from terminating his F−1 student status under the SEVIS system, and (ii) require Defendants to set aside their F−1 student status termination determination. [4]; [5]. The motion was presented to the Court on 4/18/25 and expert witness testimony was taken. Defendants to submit a status report by 4/22/25 at 5 pm CST to indicate whether they request a hearing on the motion to present witnesses. Plaintiff granted leave to supplement the record as discussed on the record. The parties to file cross−briefs by 4/24/25 at 5 pm CST. Once fully briefed, the Court will take the motion under advisement. During the pendency of the motion, the Court orders that defendants may not arrest or detain Plaintiff or cause Plaintiff to be arrested or detained based on the revocation of his F−1 visa or the termination of his SEVIS record or for any immigration purpose and may not be remove Plaintiff or cause Plaintiff to be removed from the Northern District of Illinois. Mailed notice. (jg, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

# EXHIBIT G

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

TUCSON DIVISION

| | |
|---|---|
| Arizona Student DOE #1,<br><br>            Plaintiff,<br><br>      v.<br><br>Donald J. TRUMP, in his official capacity,<br>President of the United States of America;<br><br>John CANTU, in his official capacity as ICE<br>Enforcement and Removal Operations Phoenix Field<br>Office Director;<br><br>Todd M. LYONS, in his official capacity, Acting<br>Director, Immigration and Customs Enforcement,<br>U.S. Department of Homeland Security; and<br><br>Kristi NOEM, in her official capacity, Secretary, U.S.<br>Department of Homeland Security;<br><br>            Defendants. | No. CV-25-00174-TUC-JGZ<br><br>**DECLARATION OF<br>R. LINUS CHAN** |

1. My name is R. Linus Chan.

2. I am over eighteen years of age and am competent to testify regarding the matters described below.

3. I have been a licensed attorney since 2002, and I am currently licensed, and in good standing, in Illinois and Minnesota. I have been practicing immigration law since 2004.

4. I am the James H. Binger Clinical Professor of Law and the Director of the Detainee Rights Clinic at the University of Minnesota Law School.

5. In the last month, I have been very involved with personally representing and coordinating the representation of international students whose student visas have been revoked, and whose SEVIS records have been terminated.

Declaration of Linus Chan

6.  In recent weeks, I have also communicated on a daily basis with dozens of other immigration lawyers around the United States who have also been working with international students whose visas have been revoked and SEVIS records have been terminated. I am aware, from my personal involvement with this subject matter, and from tracking reporting on this issue, that there have been thousands of students to whom this has happened in recent weeks.

7.  Based on the cases I have reviewed, it is typical in recent weeks for students to receive notice of their visa revocations from the U.S. consulates that issued their visas, and then to receive notice from their academic institutions that their SEVIS records have been terminated. Normally, the two actions occur within 24 to 48 hours of each other.

8.  However, I am aware that some students to whom this has happened in recent weeks receive their visa revocation notices after the termination of their SEVIS records, and sometimes they do not receive visa revocation notices at all. In fact, in a case involving my student, I have documentation which indicated that the revocation was "silent" and would not be provided to the student before their detention and SEVIS termination.

9.  There can be no doubt, in my opinion, that the U.S. government's actions in these students' cases is the result of a closely coordinated policy and protocol that is executed by the Department of State (which revokes the students' visas), and the Department of Homeland Security (through Immigration and Customs Enforcement (ICE), which terminates the students' SEVIS records).

10. My work with international students in recent weeks has been most intensely concentrated on representing and coordinating with other attorneys representing international students who, after having their visas revoked and their SEVIS records terminated, were detained by ICE and placed into removal proceedings with an immigration court in Minnesota.

11. I am personally aware of a total of four international students in Minnesota who, after having their student visas revoked and their SEVIS records terminated, have been detained and placed in removal proceedings. All of them remain in immigration detention.

12. In my client's case school officials provided screenshots of my client's SEVIS accounts around the time that those accounts were terminated. The screenshots of my client's SEVIS accounts list a citation to INA § 237(a)(1)(C)(i).

13. As part of a group of attorneys representing my client in their removal and bond proceedings, I am in possession of the Notices to Appear—the charging documents—that ICE filed to initiate the deportation cases against him. The NTA charges him with being removable under INA § 237(a)(1)(C)(i).

14. Upon information and belief, after conferring with, Hannah Brown, one of the other detained student's attorney, that student is similarly situated to my clients, and the

Declaration of Linus Chan

majority of students described above in ¶¶ 6-9. I have also been in contact with attorneys representing two other detained students in Minnesota. They were all similarly situated. All of our clients, were detained by ICE between March 25, 2025, and March 28, 2025. All four of them had bond hearings with immigration judges within the last week. All four of them were found by immigration judges to be neither dangers to the community, nor flight risks, and three were granted a bond.

15. However, ICE secured administrative stays that have effectively blocked all four students' ability to either post the bond, or to be released on bond. For that reason, the students will remain detained for the foreseeable future.

I declare under penalty of perjury that the foregoing is true and correct. (U.S. Code, Title 28, USC § 1746.)

April 16, 2025
Dated

R. Linus Chan

Declaration of Linus Chan

# EXHIBIT H

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

TUCSON DIVISION

| | |
|---|---|
| Arizona Student DOE #1, | No. CV-25-00174-TUC-JGZ |
| Plaintiff, | **DECLARATION OF AMI HUTCHINSON** |
| v. | |
| Donald J. TRUMP, in his official capacity, President of the United States of America; | |
| John CANTU, in his official capacity as ICE Enforcement and Removal Operations Phoenix Field Office Director; | |
| Todd M. LYONS, in his official capacity, Acting Director, Immigration and Customs Enforcement, U.S. Department of Homeland Security; and | |
| Kristi NOEM, in her official capacity, Secretary, U.S. Department of Homeland Security; | |
| Defendants. | |

1. My name is Ami Hutchinson.

2. I am over eighteen years of age and am competent to testify regarding the matters described below.

3. I have been a licensed attorney since 2017, and I am currently licensed, and in good standing, in Wisconsin and Arizona. I have been practicing immigration law since 2018, and I am currently an adjunct professor at the University of Arizona College of Law, teaching the law school's immigration course this semester. I have also been employed as an immigration attorney with Green Evans-Schroeder, in Tucson, Arizona, for the past four years.

4. In the last month, I have been very involved with consulting with international students whose student visas have been revoked, and whose SEVIS records have been terminated. Nearly all the students with whom I have consulted attend Arizona State University or the University of Arizona.

Declaration of Ami Hutchinson

5. Based on the cases I have reviewed, it is typical in recent weeks for students to receive notice of their visa revocations from the U.S. consulates that issued their visas, and then to receive notice from their academic institutions that their SEVIS records have been terminated. Normally, the two actions occur within 24 to 48 hours of each other.

6. As part of the consultation process with these students, I have reviewed different documents and information pertaining to their cases. For example, I have reviewed the consular email notifications that the students receive, notifying them that their visas have been revoked. I have also reviewed screen shot images of their SEVIS accounts after their SEVIS records have been revoked. The screenshot images have been provided to us, or to the students, by school officials who have access to the students' SEVIS accounts.

7. As to the screenshot images of students' SEVIS accounts, I can confirm that I am aware of four students whose SEVIS accounts, post-termination, state the following: "TERMINATION REASON: OTHERWISE FAILING TO MAINTAIN STATUS – Student is terminated pursuant to INA 237(a)(1)(C)(i) and 237(a)(4)(C)(i)." I can also avow that, after attorneys in our law firm consulted with these four students, it was determined with a very high degree of certainty that those students had no involvement with any kind of activities or speech that would subject them to being removable under INA § 237(a)(4)(C)(i).

8. As to the consular email messages that at least five of the students received, the format and language are identical, and each email message reads as follows:

> We are writing about an important and serious matter in reference to your nonimmigrant student (F-1) visa.
>
> On behalf of the United States Department of State, the Bureau of Consular Affairs Visa Office hereby informs you that additional information became available after your visa was issued. As a result, your F-1 visa with expiration date [Day-Month-Year] was revoked in accordance with Section 221(i) of the United States Immigration and Nationality Act, as amended.
>
> The Bureau of Consular Affairs Visa Office has alerted the Department of Homeland Security's Immigration and Customs Enforcement, with manages the Student Exchange Visitor Program and is responsible for removal proceedings. They may notify your designated school official about the revocation of your F-1 visa.
>
> Remaining in the United States without lawful immigration status can result in fines, detention, and/or deportation. It may also make you

Declaration of Ami Hutchinson

ineligible for a future U.S. visa.  Please not that deportation can take place at a time that does not allow the person being deported to secure possessions or conclude affairs in the Untied States.  Persons being deported may be sent to countries other than their countries of origin.

Given the gravity of this situation, individuals whose visa was revoked may wish to demonstrate their intent to depart the United States using the CBP Home App at https://www.cbp.gov/about/mobile-apps-directory/cbphome.

As soon as you depart the United States, you must personally present your passport to the U.S. embassy or consulate which issued your visa so your visa can be physically cancelled.

You must not attempt to use your visa as it has been revoked.  If you intend to travel to the United States in the future, you must apply for another U.S. visa and a determination on your eligibility for a visa will be made at that time.

I declare under penalty of perjury that the foregoing is true and correct. (U.S. Code, Title 28, USC § 1746.)



April 16, 2025
Dated

Ami Hutchinson

Declaration of Ami Hutchinson

# EXHIBIT I

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Mohammed H.,

      Petitioner,

v.

Donald J. Trump, *in his official capacity as President of the United States*; Pamela Bondi, *in her official capacity as Attorney General of the United States*; Peter Berg, *in his official capacity as Saint Paul Field Office Director, United States Immigration and Customs Enforcement*; Jamie Holt, *in her official capacity as St. Paul Agent in Charge for Homeland Security Investigations for U.S. Immigration and Customs Enforcement*; Todd Lyons, *in his official capacity as Acting Director, United States Immigration and Customs Enforcement*; Kristi Noem, *in her official capacity as Secretary of the United States Department of Homeland Security*; Marco Rubio, *in his official capacity as Secretary of State*; Ryan Shea, *in his official capacity as Freeborn County Sheriff*; and Mike Stasko, *in his official capacity as Freeborn County Jail Administrator*,

      Respondents.

Civ. No. 25-1576 (JWB/DTS)

**ORDER ON
MOTION FOR TEMPORARY
RESTRAINING ORDER**

---

Amanda S. Mills, Esq., Anupama D. Sreekanth, Esq., and Joseph T. Dixon, III, Esq., Fredrikson & Byron, P.A.; Benjamin Casper, Esq., and Teresa J. Nelson, Esq., American Civil Liberties Union of Minnesota; Hanne Margit Sandison, Esq., The Advocates for Human Rights; and Linus Chan, Esq., University of Minnesota Detainee Rights Clinic, counsel for Petitioner.

Ana H. Voss, Esq., United States Attorney's Office, counsel for Respondents Donald J. Trump, Pamela Bondi, Peter Berg, Jamie Holt, Todd Lyons, Kristi Noem, and Marco Rubio.

David John Walker, Esq., Freeborn County Attorney's Office, counsel for Respondent Ryan Shea.

---

The allegations in this case, if proven, would reflect a grave misuse of immigration authority and a breach of the Constitution's basic principles. Petitioner Mohammed H. claims he is being held by the federal government not for some disqualifying offense or violation of visa terms, but for expressing political views that the Executive Branch disfavors. His allegations, if substantiated, strike at the heart of the First Amendment and challenge fundamental guarantees of due process. This temporary restraining order is issued to preserve jurisdiction and prevent irreparable harm while Petitioner's claims are adjudicated.

## BACKGROUND

Petitioner is a 20-year-old Bangladeshi national studying Management Information Systems at Minnesota State University, Mankato. (Doc. No. 1-1, Petitioner Decl. ¶¶ 2, 5–9.) He lawfully entered the United States in 2021 on an F-1 student visa and was, until his arrest last month, in good standing with his university. (*Id.*) On March 28, 2025, Department of Homeland Security ("DHS") officers detained Petitioner outside his home, purportedly based on a visa revocation and termination of his SEVIS record—the Student and Exchange Visitor Information System, a federal database used to track international students. (*Id.* ¶¶ 42–44, 58; Doc. No. 1 ¶¶ 64–65.) Petitioner remains in Immigration and Customs Enforcement ("ICE") custody at the Freeborn County Jail in Albert Lea, Minnesota. (Petitioner Decl. ¶¶ 47–48; Doc. No. 1 ¶ 7.)

After a bond hearing on April 9, 2025, the Immigration Court found that Petitioner is not a danger to the community and ordered him released on a $7,500 bond. (*See* Doc. No. 1-2, Ex. B at 3–6.) DHS appealed the decision and invoked an automatic stay under 8 C.F.R. § 1003.19(i)(2), blocking Petitioner's release pending the outcome. (*Id.* at 3; Doc. No. 1 ¶ 36.) The government later cited Petitioner's 2023 misdemeanor disorderly conduct conviction as a contributing factor justifying its enforcement action. (*See* Doc. No. 1-8, Ex. H at 3.) But as the Immigration Court noted, that offense resulted in a stayed sentence after which Petitioner completed probation. (Doc. No. 1-2, Ex. B at 3–4.)

Petitioner alleges he was targeted because of his protected speech, including social media posts advocating for Palestinian human rights, and not for any legitimate immigration violation. (Doc. No. 1 ¶ 78; Petitioner Decl. ¶¶ 11–12, 57–59; Doc. No. 9, 2d Petitioner Decl. ¶ 6.) He further alleges that his arrest is part of a broader DHS campaign to silence or chill pro-Palestinian expression among international students. (*See* Doc. No. 1 ¶¶ 17–47; Doc. No. 8 at 2–10.) He claims that his ongoing detention violates his First Amendment free speech rights, his Fifth Amendment due process rights, and the Administrative Procedure Act. (*See* Doc. No. 1 ¶¶ 83–101.) He now seeks a temporary restraining order ("TRO") that either requires his immediate release from custody or bars Respondents from transferring him away from the District of Minnesota. (Doc. No. 6.)

## DISCUSSION

### I.    Legal Standard

A TRO is an extraordinary remedy, which the movant must establish is warranted. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). Courts evaluating TROs

consider (1) the threat of irreparable harm to the movant; (2) the balance between the threatened harm and the injury an injunction will inflict on the opposing parties; (3) the movant's likelihood to succeed on the merits of their claims; and (4) the public interest. *See Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)). Where, as here, the government is the opposing party, the last two factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

No single factor is determinative. *See United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998). The core question is whether justice requires preserving the status quo until the merits are determined. *See Dataphase*, 640 F.2d at 113.

Upon review, Petitioner has made a sufficient showing to warrant emergency relief. The record is not sufficiently developed to award immediate release, and ultimate relief is generally not properly awarded through a TRO. *See Lindell v. United States*, 82 F.4th 614, 618 (8th Cir. 2023). However, precluding Petitioner from being transferred maintains the status quo so the merits of his habeas petition can be fairly decided.

## II.     Analysis

### A.     Likelihood of Success

The likelihood of success factor requires Petitioner to show he has a fair chance of prevailing on his claims. *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1343 (8th Cir. 2024). It is not a decision on whether he will ultimately win. *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007). To obtain relief, he needs to satisfy this factor on

one of his claims. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 742–43

(8th Cir. 2002). Petitioner makes a sufficient showing on all of his claims.

### 1.    First Amendment violations

Petitioner primarily claims an ongoing violation of his First Amendment rights.

The First Amendment generally precludes the government from restricting expression

because of its message, ideas, subject matter, or content. *Ashcroft v. Am. Civ. Liberties

Union*, 535 U.S. 564, 573 (2002). These protections extend to noncitizens residing within

the United States. *Bridges v. Wixon*, 326 U.S. 135, 148 (1945).

Petitioner alleges that DHS acted against him based on his statements regarding

matters of public concern—specifically, the ongoing violence in Palestine. Though there

is no direct evidence of motive, he points to a pattern of enforcement disproportionately

affecting similarly situated international students, public statements by federal officials

linking dissent to disloyalty, and the suddenness of the arrest following his online

expression. These allegations raise substantial First Amendment concerns. *See Ragbir v.

Homan*, 923 F.3d 53, 71 (2d Cir. 2019) (recognizing that retaliatory enforcement

implicates First Amendment protections even in the immigration context).

The record supports a plausible inference that DHS targeted Petitioner based on

his public expression of support for Palestinian human rights and his criticism of violence

in Gaza. This aligns with a broader pattern of surveillance and punitive immigration

enforcement against similarly situated students, as documented by DHS policy

memoranda and public statements by federal officials. (*See* Doc. No. 10, Sreekanth Decl.,

Exs. 2, 11, 13, 16–20; *see also* Doc. No. 1-9.) Petitioner's First Amendment allegations

are enough on their own to satisfy the likelihood of success factor.

## 2. Administrative Procedure Action violations

Petitioner also asserts violations of the Administrative Procedure Act ("APA"), which governs how federal agencies promulgate and enforce regulations. His SEVIS status was terminated without notice or opportunity to respond. And his visa was allegedly revoked under 8 U.S.C. § 1201(i) based on a misdemeanor that had already been disclosed to U.S. officials. Under 8 C.F.R. § 214.1(d), termination of student status is limited to specific grounds such as failure to maintain a full course load, unauthorized employment, or violation of status conditions. *See Jie Fang v. Dir. U.S. Immigr. & Customs Enf't*, 935 F.3d 172, 175–76 (3d Cir. 2019).

Petitioner's disclosed misdemeanor conviction does not fall within any of these regulatory categories. And DHS's termination of his SEVIS record without invoking one of the permissible bases points to a departure from agency rules. (*See* Sreekanth Decl. Ex. 22, ICE Policy Guidance No. 1004-04 (June 7, 2010) (noting that visa revocation alone does not justify SEVIS termination without further process).) Agencies must adhere to their own binding regulations, both substantively and procedurally. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265–68 (1954). In addition, the allegations that Respondents acted against Petitioner because of his speech, if proven, would violate two existing DHS policies against targeting individuals for exercising free speech rights or factoring free speech into an enforcement decision. (*See* Doc. No. 8 at 30.)

After initially charging Petitioner with failure to maintain status under Immigration and Nationality Act § 237(a)(1)(C)(i), DHS introduced a new basis for

removal nearly three weeks later on April 18, 2025: visa revocation under § 237(a)(1)(B).

(Sreekanth Decl. Ex. 15.) Confusingly, the March 28, 2025 Record of

Deportable/Inadmissible Alien form identifies Petitioner's "current charge" as failure to

maintain status under § 237(a)(1)(B), but also states that Petitioner "is amenable to

removal from the United States [sic]section 237(a)(1)(B)." (*See* Doc. No. 1-3, Ex. C at 4.)

The inconsistent and unexplained shift in rationale raises serious concerns about

pretextual enforcement in violation of the APA.

### 3.    Due Process violations

Finally, Petitioner claims that his continued detention violates due process. After

an immigration judge ordered his release, DHS invoked an automatic stay with no

additional showing of danger or flight risk. This results in prolonged detention without an

individualized justification. And it raises serious due process concerns under the Fifth

Amendment, even in the immigration context where judicial deference is high but not

without constitutional safeguards. *See Zadvydas v. Davis,* 533 U.S. 678, 700 (2001)

(Executive Branch has broad latitude in realm of immigration but remains subject to

important constitutional limitations). As alleged, Petitioner raises a sufficient question

over whether Respondents are using detention and removal proceedings—civil

processes—for punishment and retribution, and not to advance the legitimate purposes of

immigration detention. *See id.* at 690 (recognizing that ensuring future appearances and

preventing danger to community are two legitimate reasons for immigration detention).

DHS has not offered any explanation—let alone a lawful one—for why

Petitioner's status was terminated outside of the expressly enumerated regulatory

grounds. That absence of reasoning is itself a legal deficiency that goes to the merits. Taking adverse action without identifying the rule being applied or the rationale behind it lacks both transparency and accountability. The resulting void undermines the fairness that due process requires.

### B.      Irreparable Harm

It is well settled that even minimal loss of First Amendment freedoms constitutes irreparable injury. *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012). Because Petitioner has shown a fair chance of prevailing on his First Amendment claim, there is a sufficient showing of irreparable harm from that alleged violation of his free speech rights. *See id.* (recognizing that establishing likelihood of success on First Amendment claim also establishes irreparable harm as a result of the deprivation).

Even so, additional harms are not speculative and reinforce the need for immediate relief. Petitioner remains detained, unable to attend classes, access timely and apparently needed medical care, or even to consult freely with counsel. His hernia condition has worsened while in custody. (Petitioner Decl. ¶¶ 13–25, 50–53.)

Although Petitioner could very well lose this semester's tuition, the disruption to his education extends beyond financial loss. A sudden removal from academic life mid-semester not only impedes his progress toward a degree but also puts at risk his eligibility for future study and lawful presence. Academic suspension or termination carries long-term reputational and professional consequences—particularly for international students, whose ability to remain in the United States is tied to uninterrupted enrollment.

Furthermore, should DHS transfer Petitioner out of this District—as it has done to detainees in other cases—his habeas petition may become practically unreviewable. Once a petitioner is removed from the jurisdiction of the detaining court, access to counsel may be severed, the custodian may no longer be subject to the Court's authority, and the petitioner's ability to participate meaningfully in litigation may be impaired or lost completely. These are concrete, ongoing and imminent injuries that cannot be remedied after the fact. *See, e.g.*, *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (finding reasonable fear of being subject to unlawful detention absent temporary relief may constitute irreparable harm).

### C. Balance of Harms and Public Interest

The government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Compared to the harms that Petitioner faces, nothing indicates that the government will suffer from not being allowed to transfer Petitioner out of the District. *See Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022) ("[T]he equities strongly favor an injunction considering the irreversible impact [the challenged agency] action would have as compared to the lack of harm an injunction would presently impose.").

An Immigration Judge has already determined that Petitioner is not a danger to the community and ordered his release on a $7,500 bond to address his minimal flight risk. There is no apparent logistical, administrative, or security need to relocate Petitioner. The public interest, by contrast, strongly favors the enforcement of constitutional safeguards.

9

*See, e.g.*, *Phelps-Roper*, 545 F.3d at 690 (recognizing that "it is always in the public interest to protect constitutional rights"); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) ("The public interest is served when administrative agencies comply with their obligations under the APA."). Preserving access to judicial review and preventing unlawful detention are compelling issues of public importance.

### D.    Security Bond

A bond under Fed. R. Civ. P. 65(c) is not necessary here because the TRO seeks to prevent ongoing constitutional violations, the petitioner is detained and unable to post a bond, and the government faces no identifiable risk of monetary loss. A bond is also not warranted given that this matter is closely intertwined with important public interests. *See, e.g.*, *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016).

## CONCLUSION

This Court does not prejudge the ultimate resolution of Petitioner's claims. But the allegations are serious. If the government uses civil detention to suppress lawful viewpoint expression, it risks damaging the legitimacy of both the immigration system and the Executive Branch discretion that undergirds it. The legitimacy of the rule of law depends not just on legal form, but also on *lawful purpose*. The record here warrants emergency relief in favor of restraint.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings in this case, **IT IS HEREBY ORDERED** that:

1.      Petitioner's Motion for Temporary Restraining Order (Doc. No. 6) is

**GRANTED IN PART**.

2.      Respondents, or any person acting in concert with Respondents, shall not

remove, transfer, or otherwise facilitate the removal of Petitioner from the jurisdiction of

this Court (the District of Minnesota) pending further court order.

3.      This Order shall remain in effect for 14 days from the date of entry, unless

extended by further court order under Federal Rule of Civil Procedure 65(b)(2).


Date: April 22, 2025                         *s/ Jerry W. Blackwell*
Time: 4:53 p.m.                              JERRY W. BLACKWELL
                                            United States District Judge

# EXHIBIT J

# Comparative Circumstances of John Doe and Mohammed H.

|  | John Doe | Mohammed H. |
|---|---|---|
| Lawfully admitted in F-1 status prior to visa revocation and SEVIS termination? | Yes | Yes |
| In good standing with university and compliant with terms of student nonimmigrant status prior to visa revocation and SEVIS termination? (8 C.F.R. § 214.1 (d)-(f); 8 C.F.R. § 214.2(f)(1)). | Yes | Yes |
| Convicted of a crime of violence for which a sentence of more than one year imprisonment may be imposed? (8 C.F.R. § 214.2(g)). | No | No |
| Placed into removal proceedings and served with an Notice to Appear (NTA) charging them with removability pursuant to INA § 237(a)(1)(A)(C)(i) [8 U.S.C. § 1227(a)(2)(C)(i)], for failing "to maintain the nonimmigrant status in which the alien was admitted . . . or to comply with the conditions of such status"? | No | Yes[1] |
| Subsequently "arrested and detained pending a decision on whether the alien is to be removed from the United States" pursuant to INA § 236(a) [ 8 U.S.C. § 1226(a)]? | No | Yes |

[1] After initially charging Mohammed H. with failure to maintain status under INA § 237(a)(1)(C)(i), DHS introduced a new basis for removal ***nearly three weeks later*** on April 18, 2025: visa revocation under § 237(a)(1)(B).

# EXHIBIT K

DEPARTMENT OF HOMELAND SECURITY
## NOTICE TO APPEAR

DOB: ▮▮▮▮▮

Event No: ▮▮▮▮▮

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: ▮▮▮▮▮          FINS: ▮▮▮▮▮          File No: ▮▮▮▮▮

In the Matter of:

Respondent: RUMEYSA OZTURK _____ currently residing at:

See Continuation Page Made a Part Hereof
_____
(Number, street, city, state and ZIP code)                    (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of TURKIYE and a citizen of TURKIYE;

3. You were admitted to the United States at Boston, MA on or about June 28, 2024 as a nonimmigrant Student (F-1);

4. On March 21, 2025, your nonimmigrant visa was revoked by the United States Department of State.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(B) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, your nonimmigrant visa was revoked under section 221(i) of the Act.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:        ☐ 8CFR 208.30        ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

3843 E STAGG AVE, BASILE, LOUISIANA 70515. SOUTH LOUISIANA CORR CENTER
_____
(Complete Address of Immigration Court, including Room Number, if any)

on ___April 7, 2025___ at ___8:30 am___ to show why you should not be removed from the United States based on the
       (Date)                (Time)

charge(s) set forth above.        _____
                                  D. 4448 JOHNSTON - SDDO
                                  (Signature and Title of Issuing Officer)

Date: ___March 25, 2025___        _____St Albans, VT_____
                                  (City and State)

DHS Form I-862 (6/22)                                                    Page 1 of 4

### Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at **www.uscis.gov/i-589.** Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at **http://www.ice.gov/contact/ero,** as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

### Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____

_____
*(Signature of Respondent)*

Date: _____

_____
*(Signature and Title of Immigration Officer)*

### Certificate of Service

This Notice To Appear was served on the respondent by me on **March 25, 2025**, in the following manner and in compliance with section 239(a)(1) of the Act.

[X] in person      [ ] by certified mail, returned receipt # _____ requested      [ ] by regular mail
[ ] Attached is a credible fear worksheet.
[ ] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the **ENGLISH** language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

M 11272 MUSCARELLA - Deportation
Officer

_____          _____
*(Signature of Respondent if Personally Served)*          *(Signature and Title of officer)*

DHS Form I-862 (6/22)                                                                 Page 2 of 4

## Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

**U.S. Department of Homeland Security**                    Continuation Page for Form I-862

| Alien's Name | File Number | Date |
|---|---|---|
| OZTURK, RUMEYSA | 241 074 396<br>Event No: XBO2503000017 | 03/25/2025 |

CURRENTLY RESIDING AT:
--------------------------------------------------------------------------------

South Louisiana Imm Center 3843 W Stagg Ave Basile, LOUISIANA 70515

| Signature | Title |
|---|---|
| D. 4448 JOHNSTON | SDDO |

_____4_____ of _____4_____ Pages

Form I-831 Continuation Page (Rev. 08/01/07)

# EXHIBIT L



## I-797A | NOTICE OF ACTION | DEPARTMENT OF HOMELAND SECURITY
U.S. CITIZENSHIP AND IMMIGRATION SERVICES



| Receipt Number | | Case Type |
|---|---|---|
| | | I129 - PETITION FOR A NONIMMIGRANT WORKER |
| **Received Date** 01/28/2025 | **Priority Date** | **Petitioner** |
| **Notice Date** 03/25/2025 | **Page** 1 of 2 | **Beneficiary** |

**Notice Type:** Approval Notice
Class: H1B
Valid from 06/28/2025 to 08/07/2027

The above petition and accompanying request for a change of status have been approved. The status of the named beneficiary(ies) in this classification is valid as indicated on the I-94 attached below. The beneficiary(ies) can work for the petitioner pursuant to this approval notice, but only as detailed in the petition and during the petition validity period indicated above, unless otherwise authorized by law. Changes in employment or training may require you to file a new Form I-129, Petition for a Nonimmigrant Worker.

The dates in the I-94 attached below might not be for the same dates as the petition validity dates above because the I-94 below may contain a grace period of up to 10 days before and up to 10 days after the petition validity period for the following classifications: CW-1, E-1, E-2, E-3, H-1B, H-2B, H-3, L-1A, L-1B, O-1, O-2, P-1, P-1S, P-2, P-2S, P-3, P-3S, TN-1, and TN-2. An I-94 for H-2A nonimmigrants may contain a grace period of up to one week before and 30 days after the petition validity period. However, the beneficiary(ies) may not work during such grace periods, unless otherwise authorized by law. The decision to grant a grace period and the length of the granted grace period is discretionary, final, and cannot be contested on motion or appeal. Please contact the IRS with any questions about tax withholding.

The petitioner should keep the upper portion of this notice. The lower portion should be given to the beneficiary(ies). The beneficiary(ies) should keep the right part (the I-94 portion) with their other Forms I-94, Arrival-Departure Record. The I-94 portion should be given to the U.S. Customs and Border Protection when they leave the United States. The left part is for their records. A person granted a change of status who leaves the U.S. and is not visa-exempt must normally obtain a visa in the new classification before returning. The left part can be used when applying for the new visa. If a visa is not required, they should present it, along with any other required documentation, when applying for reentry based on this approval notice at a port of entry or pre-flight inspection station. The petitioner may also file Form I-824, Application for Action on an Approved Application or Petition, to request that we notify a consulate, port of entry, or pre-flight inspection office of this approval.

The approval of this petition does not guarantee that the beneficiary(ies) will be found to be eligible for a visa, for admission to the United States (if traveling abroad and seeking re-admission), or for a subsequent extension of stay, change of status, or adjustment of status.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.

California Service Center
U.S. CITIZENSHIP & IMMIGRATION SVC
PO Box 30113
Tustin CA 92781

USCIS Contact Center: www.uscis.gov/contactcenter

PLEASE TEAR OFF FORM I-94 PRINTED BELOW AND STAPLE TO ORIGINAL I-94 IF AVAILABLE

---

Detach This Half for Personal Records

**Receipt#**
**I-94#**
**NAME**
**CLASS** H1B
**VALID FROM** 06/28/2025 **UNTIL** 08/17/2027

**PETITIONER**

---

148493337 A2

**Receipt Number**
**US Citizenship and Immigration Services**

**I94 Departure Record**
**Petitioner:**

| 14. Family Name | |
|---|---|
| 15. First (Given) Name | 16. Date of Birth |
| 17. Country of Citizenship | |

FORM I-797A [REV. 08/01/16]





## I-797A | NOTICE OF ACTION | DEPARTMENT OF HOMELAND SECURITY U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| Receipt Number | | Case Type |
| --- | --- | --- |
| | | I129 - PETITION FOR A NONIMMIGRANT WORKER |
| **Received Date** 01/28/2025 | **Priority Date** | **Petitioner** |
| **Notice Date** 03/25/2025 | **Page** 2 of 2 | **Beneficiary** |

### THIS NOTICE IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA.

The Small Business Regulatory Enforcement and Fairness Act established the Office of the National Ombudsman (ONO) at the Small Business Administration. The ONO assists small businesses with issues related to federal regulations. If you are a small business with a comment or complaint about regulatory enforcement, you may contact the ONO at www.sba.gov/ombudsman or phone 202-205-2417 or fax 202-481-5719.

**NOTICE:** Although this application or petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.

California Service Center
U.S. CITIZENSHIP & IMMIGRATION SVC
PO Box 30113
Tustin CA 92781



USCIS Contact Center: www.uscis.gov/contactcenter

PLEASE TEAR OFF FORM I-94 PRINTED BELOW AND STAPLE TO ORIGINAL I-94 IF AVAILABLE

Detach This Half for Personal Records

INTENTIONALLY LEFT BLANK

Receipt# INTENTIONALLY LEFT BLANK
I-94#
NAME INTENTIONALLY LEFT BLANK
CLASS
VALID FROM UNTIL INTENTIONALLY LEFT BLANK

PETITIONER INTENTIONALLY LEFT BLANK

INTENTIONALLY LEFT BLANK

---

INTENTIONALLY LEFT BLANK

Receipt Number INTENTIONALLY LEFT BLANK
US Citizenship and Immigration Services
INTENTIONALLY LEFT BLANK
I94 Departure Record
Petitioner INTENTIONALLY LEFT BLANK

14. Family Name
INTENTIONALLY LEFT BLANK

15. First (Given) Name | 16. Date of Birth
INTENTIONALLY LEFT BLANK | INTENTIONALLY LEFT BLANK

17. Country of Citizenship

**FORM I-797A [REV. 08/01/16]**

# THE UNITED STATES OF AMERICA



## I-797B | NOTICE OF ACTION | DEPARTMENT OF HOMELAND SECURITY
U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| Receipt Number ███████ | | Case Type I129 - PETITION FOR A NONIMMIGRANT WORKER | |
|---|---|---|---|
| Received Date 06/20/2024 | Priority Date | Petitioner ██████████ | |
| Notice Date 01/10/2025 | Page 1 of 2 | Beneficiary ████████████ | |

| ██████████ ████████████ ████████████ | Notice Type: Approval Notice<br>Class: H1B<br>Valid from 01/10/2025 to 08/07/2027 |
|---|---|

The above petition has been approved, and notification has been sent to the listed consulate. You may also send the tear-off bottom part of this notice to the worker(s) to show the approval. Please contact the consulate with any questions about visa issuance. **THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA.**

Petition approval does not authorize employment or training. When the workers are granted status upon admission to the United States, they can then work for the petitioner, but only as detailed in the petition and for the period authorized. When seeking admission to the United States, the following classifications may be eligible for a grace period of up to 10 days before, and up to 10 days after the petition validity period: CW-1, E-1, E-2, E-3, H-1B, H-2B, H-3, L-1A, L-1B, O-1, O-2, P-1, P-2, P-3, TN-1, and TN-2. H-2A nonimmigrants may be eligible for a grace period of up to one week before and 30 days after the petition validity period. If provided at admission, this grace period will be annotated on the beneficiary's I-94 by Customs and Border Protection (CBP). The grace period is a period of authorized stay but does not provide the beneficiary authorization to work beyond the petition validity period. Please contact the IRS with any questions about tax withholding.

If circumstances change, the petitioner can file Form I-824 to have us notify another consulate of this approval. If any of the workers are already in the U.S. the petitioner can file a new Form I-129 to seek to change or extend their status based on this petition. Changes in employment or training may also require a new petition. Include a copy of this notice with any other required documentation.

The approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status.

Number of workers: 1

Please see the additional information on the back. You will be notified separately about any other cases you filed.
**USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.**

Texas Service Center
U.S. CITIZENSHIP & IMMIGRATION SVC
6046 N Belt Line Rd., STE 110
Irving TX 75038-0012
**USCIS Contact Center: www.uscis.gov/contactcenter**

Please tear off portion below and forward it to the alien worker.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The alien may use this portion when applying for a visa at an American consulate abroad, or if no visa is required, when applying for admission to the U.S.

Receipt#: ████████    Case Type: I129
  Notice Date: January 10, 2025    Petitioner: ███████████
Petitioner Validity Dates: Valid from 01/10/2025 to 08/07/2027    Number of Workers: 1

| Name | | DOB | COB | Class | Consulate/POE | OCC |
|---|---|---|---|---|---|---|
| ██████████████ | | ███ | ███ | H1B | BERN | 030 |

FORM I-797B [REV. 08/01/16]



**THE UNITED STATES OF AMERICA**

## I-797B | NOTICE OF ACTION | DEPARTMENT OF HOMELAND SECURITY U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| Receipt Number | | Case Type |
|---|---|---|
| ▮▮▮▮▮▮ | | I129 - PETITION FOR A NONIMMIGRANT WORKER |

| Received Date 06/20/2024 | Priority Date | Petitioner ▮▮▮▮▮▮ |
|---|---|---|

| Notice Date 01/10/2025 | Page 2 of 2 | ▮ ▮▮▮▮▮▮ |
|---|---|---|

| Name ▮▮▮▮▮▮ | DOB    COB ▮▮▮▮▮ | Class H1B | Consulate/POE BERN | OCC 030 |
|---|---|---|---|---|

The Small Business Regulatory Enforcement and Fairness Act established the Office of the National Ombudsman (ONO) at the Small Business Administration. The ONO assists small businesses with issues related to federal regulations. If you are a small business with a comment or complaint about regulatory enforcement, you may contact the ONO at www.sba.gov/ombudsman or phone 202-205-2417 or fax 202-481-5719.

**NOTICE:** Although this application or petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

Please see the additional information on the back. You will be notified separately about any other cases you filed.
**USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.**

Texas Service Center
U.S. CITIZENSHIP & IMMIGRATION SVC
6046 N Belt Line Rd., STE 110
Irving TX 75038-0012
**USCIS Contact Center: www.uscis.gov/contactcenter**

Please tear off portion below and forward it to the alien worker.

The alien may use this portion when applying for a visa at an American consulate abroad, or if no visa is required, when applying for admission to the U.S.

| INTENTIONALLY LEFT BLANK | INTENTIONALLY LEFT BLANK |
|---|---|
| INTENTIONALLY LEFT BLANK | INTENTIONALLY LEFT BLANK |
| INTENTIONALLY LEFT BLANK | INTENTIONALLY LEFT BLANK |
| INTENTIONALLY LEFT BLANK | INTENTIONALLY LEFT BLANK |
| INTENTIONALLY LEFT BLANK | INTENTIONALLY LEFT BLANK |
| INTENTIONALLY LEFT BLANK | INTENTIONALLY LEFT BLANK |
| INTENTIONALLY LEFT BLANK | INTENTIONALLY LEFT BLANK |
| INTENTIONALLY LEFT BLANK | INTENTIONALLY LEFT BLANK |

 February 10, 2025

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
California Service Center
2642 Michelle Drive
Tustin, CA 92780

 **U.S. Citizenship
and Immigration
Services**





Form I-129,
Petition for a Nonimmigrant Worker

<u>**PREMIUM PROCESSING**</u>

<u>**REQUEST FOR EVIDENCE**</u>

**IMPORTANT: THIS NOTICE CONTAINS YOUR UNIQUE NUMBER. THE ORIGINAL
NOTICE MUST BE SUBMITTED WITH THE REQUESTED EVIDENCE.**

You are receiving this notice because U.S. Citizenship and Immigration Services (USCIS) requires
additional evidence to process your form. Please provide the evidence requested below.

**Your response must be received in this office by May 8, 2025.**

Please note that you have been allotted the maximum period allowed for responding to a Request for
Evidence (RFE). The time period for responding cannot be extended. Title 8, Code of Federal
Regulations (8 CFR) § 103.2(b)(8)(iv). Because many immigration benefits are time sensitive, you are
encouraged to respond to this request as early as possible, but no later than the deadline provided
above. If you do not respond to this notice within the allotted time, your case may be denied. The
regulations do not provide for an extension of time to submit the requested evidence.

You must submit all requested evidence at the same time. If you submit only some of the requested
evidence, USCIS will consider your response a request for a decision on the record. 8 CFR
§ 103.2(b)(11).

If you submit a document in any language other than English, the document must be accompanied by a
full and **complete** English translation. The translator must certify that the translation is accurate and he
or she is competent to translate from that language to English. **If you submit a foreign language
translation in response to this request for evidence, you must also include a copy of the foreign
language document.**

Processing of your Form I-129 will resume upon receipt of your response. If you have not heard from
USCIS within **60 days of responding**, you may contact the USCIS Contact Center at **1-800-375-5283**.
If you are hearing impaired, please call the USCIS Contact Center TDD at **1-800-767-1833**.

## Introduction

On January 28, 2025, your organization, ▮▮▮▮▮▮▮ petitioner, petitioning organization, or you), filed a Form I-129, Petition for a Nonimmigrant Worker (Form I-129) with U.S. Citizenship and Immigration Services (USCIS), seeking to classify ▮▮▮▮▮▮▮▮▮▮ (beneficiary) as an H-1B specialty occupation worker.

The H-1B classification applies to individuals who will perform services in a specialty occupation. A specialty occupation is one that requires theoretical and practical application of a body of highly specialized knowledge, and attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States.

You seek new employment for the beneficiary and requested that USCIS change the beneficiary's status.

You stated on the petition that you are a technology firm with 96,858 employees. You seek to employ the beneficiary as a Software Engineer.

To process your petition and determine if you and the beneficiary are eligible, additional information is required. This request provides suggested evidence that you may submit to satisfy each eligibility criteria described below. You may:

- Submit one, some, or all of these items;
- Submit none of the suggested items and instead submit other evidence to satisfy the request;
- Explain how the evidence in the record already establishes eligibility; and/or
- Request a decision based on the record.

Note, however, that as the petitioner, you are responsible for providing evidence that demonstrates that you and the beneficiary meet all requirements. Evidence must show that all parties were eligible for the requested benefit when you filed the petition by a preponderance of the evidence.

Do not include with your response copies of documentation previously submitted.

If you are submitting evidence in response to this request, USCIS recommends that you submit:

- An index of the evidence.
- Clear and legible copies of the evidence. If legible copies are not possible, you may submit the original documents. Original documents, however, will be returned only if requested.

USCIS checks all petitions filed for this classification in its Validation Instrument for Business Enterprises (VIBE) system. VIBE uses commercially available data to validate basic information about organizations petitioning to employ foreign workers. For more information about this program, visit the USCIS website at www.uscis.gov/VIBE.

**Did Not Provide Consular Post, Port-of-Entry, or Pre-Flight Inspection:** On the petition, you did not state a consular post, port-of-entry, or pre-flight inspection where the beneficiary will apply for a nonimmigrant visa (if necessary) if USCIS is unable to grant the extension of stay or change of status request. Provide a consular post, port-of-entry, or pre-flight inspection where the beneficiary will apply for a nonimmigrant visa if USCIS is unable to grant the beneficiary an extension of stay or change of status request.

**Disposition of Charges:** Law enforcement records show that the beneficiary was arrested and charged with the following crime(s):

1. █████████████████████████

If there are other arrests not listed above, provide the additional charge(s) and date(s).

For all arrests, submit copies of court documents showing the disposition. Provide the relevant excerpts of law from each jurisdiction where the arrest took place showing the maximum possible penalty for each arrest/charge.

## PLACE THE ATTACHED COVERSHEET AND THIS ENTIRE LETTER ON TOP OF YOUR RESPONSE.

Sincerely,

John M. Allen
SCOPS Deputy Associate Director of Adjudications
Officer: XW1155

October 10, 2024

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Texas Service Center



## U.S. Citizenship and Immigration Services





I-129, Petition for a Nonimmigrant Worker

## REQUEST FOR EVIDENCE

### IMPORTANT: THIS NOTICE CONTAINS YOUR UNIQUE NUMBER. THE ORIGINAL NOTICE MUST BE SUBMITTED WITH THE REQUESTED EVIDENCE.

You are receiving this notice because U.S. Citizenship and Immigration Services (USCIS) requires additional evidence to process your form. Please provide the evidence requested below.

### Your response must be received in this office by January 6, 2025.

Please note that you have been allotted the maximum period allowed for responding to a Request for Evidence (RFE). The time period for responding cannot be extended. 8 Code of Federal Regulations (8 CFR 103.2(b)(8)(iv). Because many immigration benefits are time sensitive, you are encouraged to respond to this request as early as possible, but no later than the deadline provided above. If you do not respond to this notice within the allotted time, your case may be denied. The regulations do not provide for an extension of time to submit the requested evidence.

You must submit all requested evidence at the same time. If you submit only some of the requested evidence, USCIS will consider your response a request for a decision on the record. 8 CFR 103.2(b)(11).

If you submit a document in any language other than English, the document must be accompanied by a full and complete English translation. The translator must certify that the translation is accurate and he or she is competent to translate from that language to English. If you submit a foreign language translation in response to this request for evidence, you must also include a copy of the foreign language document.

Processing of your I-129 will resume upon receipt of your response. If you have not heard from USCIS within 60 days of responding, you may contact the USCIS Contact Center (NCSC) at 1-800-375-5283. If you are hearing impaired, please call the NCSC TDD at 1-800-767-1833.

## H-1B Specialty Occupation Worker - Introduction

On June 20, 2024, your organization, [redacted] petitioner, petitioning organization, or you), filed a Form I-129, Petition for a Nonimmigrant Worker (Form I-129) with U.S. Citizenship and Immigration Services (USCIS), seeking to classify [redacted] (beneficiary) as an H-1B specialty occupation worker.

The H-1B classification applies to individuals who will perform services in a specialty occupation. A specialty occupation is one that requires theoretical and practical application of a body of highly specialized knowledge, and attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States.

You seek new employment for the beneficiary and requested that USCIS notify the consulate.

You stated on the petition that you are technology business with 96,358 employees. You seek to employ the beneficiary as a Software Engineer.

To process your petition and determine if you and the beneficiary are eligible, additional information is required. This request provides suggested evidence that you may submit to satisfy each eligibility criteria described below. You may:

- Submit one, some, or all of these items;
- Submit none of the suggested items and instead submit other evidence to satisfy the request;
- Explain how the evidence in the record already establishes eligibility; and/or
- Request a decision based on the record.

Note, however, that as the petitioner, you are responsible for providing evidence that demonstrates that you and the beneficiary meet all requirements. Evidence must show that all parties were eligible for the requested benefit when you filed the petition by a preponderance of the evidence.

Do not include with your response copies of documentation previously submitted.

If you are submitting evidence in response to this request, USCIS recommends that you submit:

- An index of the evidence.
- Clear and legible copies of the evidence. If legible copies are not possible, you may submit the original documents. Original documents, however, will be returned only if requested.

USCIS checks all petitions filed for this classification in its Validation Instrument for Business Enterprises (VIBE) system. VIBE uses commercially available data to validate basic information about organizations petitioning to employ foreign workers. For more information about this program, visit the USCIS website at www.uscis.gov/VIBE.

**Disposition of Charges**



Law enforcement records show that the beneficiary was arrested and charged with the following crime(s):

1. The beneficiary was arrested on September 11, 2023, in ▓▓▓▓▓▓▓▓▓▓

If there are other arrests not listed above, provide the additional charge(s) and date(s).

For all arrests, submit copies of court documents showing the disposition. Provide the relevant excerpts of law from each jurisdiction where the arrest took place showing the maximum possible penalty for each arrest/charge.

**Labor Condition Application**

As explained in *Matter of Simeio Solutions, LLC*, 26 I&N Dec. 542 (AAO 2015), USCIS must determine whether the attestations and content of the Form ETA 9035/9035E Labor Condition Application for Nonimmigrant Workers (LCA) properly correspond to and support the H-1B petition.

Additionally, Title 20, Code of Federal Regulations (20 CFR) section 655.705(b) states in pertinent part:

> For H-1B visas, the following agencies are involved: [Department of Homeland Security (DHS)] DHS accepts the employer's petition (DHS Form I-129) with the DOL-certified LCA attached. In doing so, the DHS determines whether the petition is supported by an LCA which corresponds with the petition...

Finally, Title 8, Code of Federal Regulations (8 CFR) section 214.2(h)(4)(i)(B)(1) states:

> Before filing a petition for H-1B classification in a specialty occupation, the petitioner shall obtain a certification from the Department of Labor that it has filed a labor condition application in the occupational specialty in which the alien(s) will be employed.

Accordingly, you must establish that your petition is supported by an LCA that properly corresponds with the proffered position.

To satisfy this requirement, you submitted:

- A description of the beneficiary's duties; and
- A certified LCA.

You have provided an LCA that is certified for the occupational classification of a Software Engineer and have designated the prevailing wage source for the occupation as the 2024 Radford Global Technology Survey.

The prevailing wage source listed above appears to be an independent authoritative source; however, the evidence of the record is insufficient to establish that the occupation listed in the independent authoritative source is comparable to the proffered position.

As such, you have not demonstrated that LCA corresponds with the proffered position.

You may submit additional evidence to establish that the LCA properly corresponds with the proffered position. Evidence may include, but is not limited to:

- A copy of the wage survey for the occupation, as published by the authoritative source utilized for your LCA, covering the area of intended employment. The prevailing wage survey must provide an explanation of the occupational taxonomy and must represent the occupation across the entire industry;
- Documentation to establish that the educational and experience requirements of the proffered position correspond to the educational and experience requirements of the wage level/strata within the prevailing wage survey, such as job offers, official position descriptions, and job announcements. The documentation should detail the tasks, knowledge, and skills of the proffered position. Additionally, the documentation should describe the experience and education requirements for the proffered position;
- Documentation, as published by the independent authoritative source, which lists details such as the duties, position qualification requirements, and work supervision requirements of the occupation certified on the LCA, or any other details which factored into the selection of the occupation certified on the LCA;
- If available for the survey used, copies of the prevailing wage survey(s) for all lower and/or higher level positions within the occupation certified on the LCA, such as "entry," "senior," "lead," or "supervisory" positions. In the alternative, provide evidence, as published by the independent authoritative source, to establish that no lower and/or higher level positions exist within the occupation certified on the LCA; and/or
- Any other documentation that establishes that the LCA properly corresponds with the proffered position.

PLACE THE ATTACHED COVERSHEET AND THIS ENTIRE LETTER ON TOP OF YOUR RESPONSE. SUBMISSION OF EVIDENCE WITHOUT THE COVERSHEET AND THIS LETTER WILL DELAY PROCESSING OF YOUR CASE AND MAY RESULT IN A DENIAL.

Sincerely,

Mary Elizabeth Brennan Seng
Director, Texas Service Center
Officer: XM2046

EXHIBIT M

An official website of the U.S. government   Skip Navigation



Student & Exchange Visitor          1-800-892-4829          Josephine Vitta  Logout
Information System                  SEVIS Help Desk         ROLES: PDSO, RO

                                                            Get Plug-Ins

Main  Listing of Schools  Listing of Programs  Message Board  Change Password          Enter SEVIS ID

# Event History



F-1 Student

Start Date: 08/21/2017    End Date: 06/10/2022

Status: **TERMINATED**

SEVIS ID:

GENDER
DOB
PREFERRED NAME

PASSPORT NAME
COUNTRY OF BIRTH
CITIZENSHIP

EMAIL

U.S. ADDRESS

Return

**Enter the date range and click the button to filter by event date**

| Expand All | Search: [            ] |
| From: [            ] To: [            ] [Filter] |

| | Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|---|
| | **Portal Updated with SEVIS Changes** | 03/28/2025 10:03:30 | TERMINATED | PORTAL |
| | **Manual Data Change** | 03/28/2025 08:51:18 | TERMINATED | SEVIS Maintenance |
| ⊖ | **OPT Actual End Date Updated** | 03/28/2025 08:51:18 | TERMINATED | SEVIS Maintenance |

| Field Changed | Old Value | New Value |
|---|---|---|
| Actual End Date | 27-JUN-25 | 28-MAR-25 |

| | Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|---|
| ⊖ | **Terminate - User Termination** | 03/28/2025 08:51:18 | TERMINATED | SEVIS Maintenance |

| Field Changed | Old Value | New Value |
|---|---|---|
| Termination Reason | | OTHERWISE FAILING TO MAINTAIN STATUS |
| Explanation | | Student identified in criminal records check. Terminated pursuant to INA 237(a)(1)(C)(i)/ 8 USC 1227(a)(1)(C)(i). |
| Remarks | A 24-Month Extension of Optional Practical Training related to the course of study is recommended pursuant to 8CFR274a.12(C)(3)(C) | |

| | Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|---|
| | **Change of Status Approved** | 03/26/2025 09:02:19 | ACTIVE | System Interface |
| | **Change of Status Pending** | 01/31/2025 09:00:15 | ACTIVE | System Interface |
| | **Portal Updated with SEVIS Changes** | 01/16/2025 16:04:13 | ACTIVE | PORTAL |
| | **STEM OPT 18 Month Participation Reported** | 01/16/2025 15:23:28 | ACTIVE | Tyeisha Lee |
| | **Portal Updated with SEVIS Changes** | 07/17/2024 13:05:22 | ACTIVE | PORTAL |
| | **STEM OPT 12 Month Participation Reported** | 07/17/2024 12:02:02 | ACTIVE | Ashley Molina |
| ⊕ | **Employment - STEM OPT -?Form I-983 Upload Status - Employer ID 10852773** | 07/17/2024 12:01:43 | ACTIVE | Ashley Molina |
| ⊕ | **Employment - STEM OPT -?Form I-983 Uploaded - Employer ID 10852773** | 07/17/2024 12:01:42 | ACTIVE | Ashley Molina |
| | **Portal Updated with SEVIS Changes** | 05/10/2024 16:03:32 | ACTIVE | PORTAL |
| ⊕ | **OPT Employer Information Update 10297566 Epsilon Data Management LLC** | 05/10/2024 14:51:19 | ACTIVE | Srijana Joshi Paudel |
| | **Portal Updated with SEVIS Changes** | 05/07/2024 17:05:54 | ACTIVE | PORTAL |
| ⊕ | **Employment - STEM OPT -?Form I-983 Upload Status - Employer ID 10852773** | 05/07/2024 16:22:54 | ACTIVE | Mario Villegas |

| | Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|---|
| ➕ | **Employment - STEM OPT -?Form I-983 Uploaded - Employer ID 10852773** | 05/07/2024 16:22:54 | ACTIVE | Mario Villegas |
| | **OPT Employer Added 10852773 Google LLC** | 05/07/2024 16:22:11 | ACTIVE | Mario Villegas |
| ➕ | **Employment - STEM OPT -?Form I-983 Upload Status - Employer ID 10297566** | 05/07/2024 16:17:54 | ACTIVE | Mario Villegas |
| ➕ | **Employment - STEM OPT -?Form I-983 Uploaded - Employer ID 10297566** | 05/07/2024 16:17:54 | ACTIVE | Mario Villegas |
| ➕ | **OPT Employer Information Update 10297566 Epsilon Data Management LLC** | 05/07/2024 16:17:10 | ACTIVE | Mario Villegas |
| | **Portal Updated with SEVIS Changes** | 03/06/2024 02:21:47 | ACTIVE | PORTAL |
| | **Personal Information Updated** | 03/06/2024 01:30:02 | ACTIVE | Maria Weber |
| ➕ | **Telephone Information Updated** | 03/06/2024 01:30:02 | ACTIVE | Maria Weber |
| | **Portal Updated with SEVIS Changes** | 03/01/2024 01:03:44 | ACTIVE | PORTAL |
| ➕ | **Address Update - Physical** | 02/29/2024 23:27:34 | ACTIVE | Khushali Shah |
| | **Personal Information Updated** | 02/29/2024 23:27:34 | ACTIVE | Khushali Shah |
| ➕ | **Telephone Information Updated** | 02/29/2024 23:27:34 | ACTIVE | Khushali Shah |
| | **Portal Updated with SEVIS Changes** | 01/31/2024 02:27:10 | ACTIVE | PORTAL |
| | **Portal Updated with SEVIS Changes** | 01/25/2024 01:22:28 | ACTIVE | PORTAL |
| | **Portal Updated with SEVIS Changes** | 01/18/2024 17:07:41 | ACTIVE | PORTAL |
| | **STEM OPT 6 Month Participation Reported** | 01/18/2024 16:14:23 | ACTIVE | Khushali Shah |
| | **Portal Updated with SEVIS Changes** | 12/09/2023 00:46:09 | ACTIVE | PORTAL |
| | **Portal Updated with SEVIS Changes** | 12/05/2023 23:34:02 | ACTIVE | PORTAL |
| | **Portal Updated with SEVIS Changes** | 09/22/2023 10:56:40 | ACTIVE | PORTAL |
| | **OPT USCIS Update for STEM** | 09/22/2023 09:01:51 | ACTIVE | System Interface |
| | **Portal Updated with SEVIS Changes** | 09/12/2023 10:09:01 | ACTIVE | PORTAL |
| | **OPT USCIS Update for STEM** | 09/12/2023 09:01:06 | ACTIVE | System Interface |
| | **Portal Updated with SEVIS Changes** | 09/10/2023 10:06:14 | ACTIVE | PORTAL |
| | **OPT USCIS Update for STEM** | 09/10/2023 09:01:00 | ACTIVE | System Interface |
| | **Portal Updated with SEVIS Changes** | 08/07/2023 17:38:24 | ACTIVE | PORTAL |

| | Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|---|
| | **Portal Updated with SEVIS Changes** | 08/01/2023 01:08:09 | ACTIVE | PORTAL |
| | **Portal Updated with SEVIS Changes** | 05/13/2023 10:05:29 | ACTIVE | PORTAL |
| | **OPT Extension Pending** | 05/13/2023 09:38:40 | ACTIVE | System Interface |
| | **Portal Updated with SEVIS Changes** | 04/27/2023 14:07:05 | ACTIVE | PORTAL |
| ➕ | **Employment - STEM OPT -?Form I-983 Upload Status - Employer ID 10297566** | 04/27/2023 13:39:03 | ACTIVE | Larke Galyan |
| ➕ | **Employment - STEM OPT -?Form I-983 Uploaded - Employer ID 10297566** | 04/27/2023 13:39:03 | ACTIVE | Larke Galyan |
| | **OPT Employer Added 10297566 Epsilon Data Management LLC** | 04/27/2023 13:37:48 | ACTIVE | Larke Galyan |
| | **OPT Recommendation for STEM OPT** | 04/27/2023 13:37:48 | ACTIVE | Larke Galyan |
| | **Program Information Updated** | 04/27/2023 13:36:14 | ACTIVE | Larke Galyan |
| | **Interface Repush** | 04/15/2023 21:23:39 | ACTIVE | SEVIS Maintenance |
| | **Portal Updated with SEVIS Changes** | 03/21/2023 17:03:51 | ACTIVE | PORTAL |
| | **OPT Employer Added 10243830 Epsilon Data Management, LLC** | 03/21/2023 15:56:29 | ACTIVE | Taylor Volzer |
| | **Portal Updated with SEVIS Changes** | 08/04/2022 02:26:26 | ACTIVE | PORTAL |
| ➕ | **Address Update - Physical** | 08/04/2022 01:31:20 | ACTIVE | Maria Weber |
| | **Personal Information Updated** | 08/04/2022 01:31:20 | ACTIVE | Maria Weber |
| | **Interface Repush** | 07/20/2022 17:31:27 | ACTIVE | System Interface |
| | **Portal Updated with SEVIS Changes** | 07/02/2022 11:27:45 | ACTIVE | PORTAL |
| | **OPT Approve for Post-Completion OPT** | 07/02/2022 10:23:54 | ACTIVE | System Interface |
| | **Portal Updated with SEVIS Changes** | 06/29/2022 14:10:21 | ACTIVE | PORTAL |
| ➕ | **Portal Status: Student Notified To Create Account** | 06/29/2022 14:10:21 | ACTIVE | PORTAL |
| | **OPT Approve for Post-Completion OPT** | 06/29/2022 11:56:01 | ACTIVE | System Interface |
| | **OPT Employment Pending** | 05/04/2022 10:21:33 | ACTIVE | System Interface |
| | **OPT Recommendation for Post-Completion OPT** | 05/03/2022 10:57:29 | ACTIVE | Mallory Moser |
| ➕ | **Program Shortened** | 05/03/2022 10:57:13 | ACTIVE | Mallory Moser |
| | **Personal Information Updated** | 02/07/2022 01:03:49 | ACTIVE | Sarah Ku |

| Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|
| Personal Information Updated | 02/06/2022 01:07:39 | ACTIVE | Sarah Ku |
| Personal Information Updated | 02/06/2022 01:06:06 | ACTIVE | Sarah Ku |
| ✚ Address Update - Physical | 02/06/2022 01:04:34 | ACTIVE | Sarah Ku |
| ✚ Registration - Continuing | 02/06/2022 01:04:34 | ACTIVE | Sarah Ku |
| ✚ Registration - Continuing | 09/16/2021 08:14:32 | ACTIVE | Maria Weber |
| Financial Information Updated | 08/11/2021 16:30:09 | ACTIVE | Maria Weber |
| ✚ Program Extension | 08/11/2021 16:29:31 | ACTIVE | Maria Weber |
| CPT Employment | 04/21/2021 17:30:48 | ACTIVE | Larke Galyan |
| ✚ Registration - Continuing | 01/23/2021 01:39:26 | ACTIVE | Maria Weber |
| Personal Information Updated | 10/29/2020 01:17:21 | ACTIVE | Maria Weber |
| ✚ Registration - Continuing | 08/24/2020 01:03:12 | ACTIVE | Maria Weber |
| Personal Information Updated | 08/08/2020 01:19:21 | ACTIVE | Maria Weber |
| ✚ Telephone Information Updated | 08/08/2020 01:19:21 | ACTIVE | Maria Weber |
| I-20 Reprinted | 08/04/2020 16:36:18 | ACTIVE | Derek Wu |
| Personal Information Updated | 08/04/2020 16:36:05 | ACTIVE | Derek Wu |
| ✚ Birth City Update | 08/04/2020 16:36:05 | ACTIVE | Derek Wu |
| ✚ Telephone Information Updated | 08/04/2020 16:36:05 | ACTIVE | Derek Wu |
| ✚ Registration - Continuing | 02/02/2020 01:04:01 | ACTIVE | Maria Weber |
| ✚ Registration - Continuing | 08/31/2019 02:18:26 | ACTIVE | Maria Weber |
| ✚ ADIS Arrival | 08/17/2019 21:13:00 | ACTIVE | System Interface |
| ✚ NIV Interface | 07/18/2019 23:21:38 | ACTIVE | System Interface |
| ADIS Departure | 05/28/2019 13:22:58 | ACTIVE | System Interface |
| ✚ ADIS Departure | 05/22/2019 06:09:25 | ACTIVE | System Interface |
| Personal Information Updated | 05/11/2019 02:40:22 | ACTIVE | Maria Weber |
| I-20 Reprinted | 05/06/2019 17:39:56 | ACTIVE | Zachary Tyler Brown |

Case 4:25-cv-03140-JSW     Document 39-1     Filed 04/23/25     Page 192 of 308

| | Event Name | Event Date | Resulting Status | Performed By |
|---|---|---|---|---|
| ➕ | **Registration - Continuing** | 01/25/2019 20:56:59 | ACTIVE | Maria Weber |
| | **Personal Information Updated** | 01/12/2019 04:32:43 | ACTIVE | Maria Weber |
| | **Personal Information Updated** | 01/11/2019 04:43:24 | ACTIVE | Maria Weber |
| ➕ | **Telephone Information Updated** | 01/11/2019 04:43:24 | ACTIVE | Maria Weber |
| ➕ | **Registration - Continuing** | 09/15/2018 01:13:24 | ACTIVE | Josephine Vitta |
| ➕ | **Registration - Continuing** | 06/15/2018 02:52:44 | ACTIVE | Henry Stewart |
| ➕ | **ADIS Arrival** | 01/23/2018 00:47:46 | ACTIVE | System Interface |
| ➕ | **Registration - Continuing** | 01/11/2018 03:40:32 | ACTIVE | Sarah Ku |
| | **ADIS Departure** | 01/02/2018 08:51:51 | ACTIVE | System Interface |
| ➕ | **ADIS Departure** | 01/01/2018 16:19:25 | ACTIVE | System Interface |
| ➕ | **Address Update - Physical** | 09/19/2017 00:58:15 | ACTIVE | Sarah Ku |
| | **Personal Information Updated** | 09/19/2017 00:58:15 | ACTIVE | Sarah Ku |
| ➕ | **ADIS Arrival** | 09/03/2017 18:01:01 | ACTIVE | System Interface |
| ➕ | **Registration - Initial** | 09/01/2017 00:46:51 | ACTIVE | Sarah Ku |
| ➕ | **Address Add - Physical** | 08/29/2017 00:55:58 | INITIAL | Maria Weber |
| | **Personal Information Updated** | 08/29/2017 00:55:58 | INITIAL | Maria Weber |
| ➕ | **Telephone Information Updated** | 08/29/2017 00:55:58 | INITIAL | Maria Weber |
| ➕ | **NIV Interface** | 08/15/2017 23:04:57 | INITIAL | System Interface |
| | **I-901 Payment** | 06/30/2017 21:23:52 | INITIAL | System Interface |
| | **Record Created** | 06/06/2017 00:37:41 | INITIAL | Travis Parker |

Return

An official website of the U.S. government   Skip Navigation



Student & Exchange Visitor
Information System

Josephine Vitta **Logout**
1-800-892-4829    ROLES: PDSO, RO
SEVIS Help Desk

**Get Plug-Ins**

**Main**   **Listing of Schools**   **Listing of Programs**   **Message Board**   **Change Password**     [Enter SEVIS ID]

<< Return to **Terminated Status Students (past 18 months)**

**View:**
Event History

# Student Information

**Request/Authorization
Details**

**Employment Information**

**Actions:**
Corrections

Request Reinstatement

Transfer Out

F-1 STUDENT



Start Date: **August 21, 2017**   End
Date: **June 10, 2022**

I-901 Fee
Paid

Status: **TERMINATED**
Status Change Date: **March
28, 2025**

SEVIS ID: N

**I-20 ISSUE REASON: CONTINUED
ATTENDANCE**
TERMINATION REASON: **OTHERWISE
FAILING TO MAINTAIN STATUS - Student
identified in criminal records check.
Terminated pursuant to INA 237(a)(1)(C)(i)/ 8
USC 1227(a)(1)(C)(i).**

## Personal / Contact

Gender
**MALE**
Date of Birth

City of Birth
S
Country of Birth

Country of Citizenship

U.S. Telephone

Foreign Telephone
9
Email Address

U.S. Address

Address Status
**Valid S - Mailbox at a street address**
Foreign Address

## Overall Remarks

## Program

Education Level
**DOCTORATE**
Major 1 and Name
**11.0101 - Computer and Information
Sciences, General**
Major 2 and Name
**00.0000 - None**
Minor and Name
**00.0000 - None**
Program Start Date
**August 21, 2017**
Program End Date
**June 10, 2022**

## English Proficiency

School Requires English Proficiency for This

## Registration

Initial Session Start Date
**August 21, 2017**
Current Session End Date
**May 13, 2022**
Next Session Start Date
**August 22, 2022**
Length of Next Break/Vacation
**100**
Last Session

Study/Research Abroad

Thesis/Dissertation

## I-901 SEVIS Fee Payment

Transaction Type

School Requires English Proficiency for This Program
**Yes**
Student Has English Proficiency
**Yes**

Transaction Type
**Payment**
Transaction Date
**June 30, 2017**
Transaction Amount
**$200.00**
Fee Payment / Cancellation Receipt Number
**CCC1727394847**

## Additional Names

Passport Name
Preferred Name
████████████████████
SEVIS Legacy Name

## School

School Name
████████████████████
School Code
████████████████**0**
Campus Name
████████████████████
School Status
**APPROVED**

## Travel

Port of Entry
**DALLAS, TX  ( DAL )**
Date of Entry
**August 1, 2019**
I-94 Admission Number
Port of Departure
**DALLAS, TX  (DAL)**
Date of Departure
**May 12, 2019**

## Visa

Visa Number
████████████
Visa Issuance Date
**July 18, 2019**
Visa Expiration Date
**July 15, 2021**
Visa Issuance Post
**DUBAI  ( DUB )**

## Passport

Passport Number
████████████
Passport Expiration Date
**March 14, 2021**
Country of Issuance
**UNKNOWN**

## Financial

| Expenses | | | Funding | | |
|---|---|---|---|---|---|
| Estimated Average Cost for | .................. | **09 months** | Student Funding for | .................. | **09 months** |
| Tuition and Fees | .................. | **$15,874.00** | Student's Personal Funds | .................. | **$2,035.00** |
| Living Expenses | .................. | **$17,696.00** | Funds From This School | .................. | **$34,324.00** |
| Dependents Expenses | .................. | **$0.00** | School Fund Type | ................**UTD Scholarship/ Assistantship** | |
| Other Costs | .................. | **$2,789.00** | Funds From Other Sources | .................. | |
| Other Costs Comment | ..............**req..med. insurance** | | Source Type | .................. | |
| | | | On-Campus Employment | .................. | |
| **Total Expense** | .................. | **$36,359.00** | **Total Funding** | .................. | **$36,359.00** |

## Dependents

## Student Requests

| Request Type | Request Status | Receipt Number |
|---|---|---|
| **Change of Status** | **APPROVED** | ████████████ |
| **Extension** | **APPROVED** | |
| **OPT Extension** | **APPROVED** | |
| **OPT** | **APPROVED** | ████████████ |
| **CPT** | **APPROVED** | |



Mon Mar 31 11:37:53 EDT 2025                    U.S. Immigration and Customs
                                                Enforcement

# EXHIBIT N

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| PRASANNA ORUGANTI, | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:25-cv-00409-ALM-EPD** |
| | : | |
| **v.** | : | **Judge Algenon L. Marbley** |
| | : | |
| **KRISTI NOEM,** in her official capacity as | : | **Magistrate Judge Elizabeth Preston Deavers** |
| as Secretary of Homeland Security; | : | |
| the **DEPARTMENT OF HOMELAND** | : | |
| **SECURITY**; and **TODD LYONS**, in his | : | |
| official capacity as Acting Director of U.S. | : | |
| Immigration and Customs Enforcement, | : | |
| | : | |
| **Defendants.** | : | |

## OPINION AND ORDER

This matter comes before this Court on Plaintiff Prasanna Oruganti's Motion for a Temporary Restraining Order ("TRO") against Defendants Kristi Noem, in her official capacity as Secretary of the Department of Homeland Security ("DHS"), DHS, and Todd Lyons, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement ("ICE") (collectively, "Defendants"). A conference on Plaintiff's Motion for a TRO pursuant to S.D. Ohio Civ. R. 65.1 was held on Thursday, April 17, 2025. For the reasons set forth below, this Court **GRANTS** Plaintiff's Motion for a TRO (ECF No. 2).

## I. BACKGROUND

Plaintiff Prasanna Oruganti, a citizen of India, is an international student pursuing a Ph.D. in agricultural engineering at The Ohio State University ("OSU") in Columbus, Ohio. (ECF No. 2-1 ¶¶ 2, 11). Ms. Oruganti first entered the United States in 2018 upon obtaining an F-1 visa while she was in India. (*Id.* ¶¶ 4–5). An F-1 visa provides foreign national students valid immigration status for the duration of a full course of study at an approved academic institution in the United

States.  *See* 8 U.S.C. S 1101(a)(15)(F)(i).  Plaintiff's Form I-20, officially known as the "Certificate of Eligibility for Nonimmigrant Student Status," states that she is authorized until December of 2029 to complete her Ph.D. program at OSU.  (*See* ECF No. 2-3).

Ms. Oruganti is one of hundreds, if not more, of students nationwide whose record and F-1 status in the Student and Exchange Visitor Information Systems (SEVIS) database[1] was abruptly terminated by ICE the week of April 7, 2025.  (ECF No. 1-1).  Specifically, on April 8, 2025, Ms. Oruganti received an email from OSU's Office of International Affairs notifying her that her SEVIS record had been terminated, and that the reason given for the termination was "Other - Individual identified in criminal records check and/or has their VISA revoked."  (ECF No. 2-2).  The email further stated: "Since your SEVIS record has been terminated by [the Student and Exchange Visitor Program], this indicates the U.S. government believes you have violated your F-1 status."  (*Id.*).

Ms. Oruganti, however, has not received any communication from the U.S. Department of State that her F-1 visa was officially revoked.  She maintains that she is unaware of the factual basis for the termination of her SEVIS status, noting that her only criminal history is a June 2020 conviction for a defective equipment charge in Missouri.  (ECF No. 2-1 ¶ 18).  She explains that, at the time, she was trying to turn left from the front side of a store when she "misjudged the distance while turning," resulting in the front side of her car hitting some decorative bricks.  (*Id.*).  Shortly after the incident, Ms. Oruganti was instructed to appear in court and pleaded guilty to a defective equipment charge under Mo. Ann. Stat. § 307.170, paying a $300 fine.  (*Id.*; ECF No. 2-5).  The offense to which she pled guilty was a minor misdemeanor.  "The public prosecutor

---

[1] SEVIS is an electronic system maintained by DHS that tracks and monitors schools, Student Exchange Visitor Programs ("SEVP"), and F-1 students who have come to the United States to participate in the education system here.  F-1 visa holders have no access to or visibility into the system.  The SEVIS system shows whether a student, like Plaintiff here, is in compliance with her F-1 status.

clarified that it was a minor traffic violation and assured [her] that no points would be deducted from [her] driver's license."  (ECF No. 2-1 ¶ 18).

On April 17, 2025, Plaintiff filed this action under the Administrative Procedure Act (APA), the Fifth Amendment to the U.S. Constitution, and the Declaratory Judgment Act, to challenge the termination of her SEVIS record.  (ECF No. 1).  Specifically, Ms. Oruganti alleges that Defendants' termination of her record in the SEVIS system—and thus termination of her F-1 status—is arbitrary and capricious under the APA, 5 U.S.C. § 706, and lacks the procedural safeguards required by both the APA and the Fifth Amendment.  To be clear, Plaintiff challenges only Defendants' termination of her F-1 student status in the SEVIS system, *not* the revocation of her F-1 visa, which does not appear to have happened.  (*See* ECF No. 1 ¶ 7 ("Plaintiff does not challenge the revocation of her visa in this action. Rather, Plaintiff brings this action . . . to challenge ICE's illegal termination of her SEVIS record."); ECF No. 2 at 1–2 (seeking a TRO that, among other things, enjoins Defendants from "causing Ms. Oruganti's visa to be revoked"); ECF No. 2 at 4 ("Plaintiff does *not* challenge the revocation of any visa in this case. Instead, Plaintiff brings this lawsuit to challenge Defendants' unlawful termination of her F-1 student *status* in the SEVIS system.")).

Ms. Oruganti simultaneously moved for a TRO that: (1) requires Defendants to restore Plaintiff's SEVIS record and F-1 status so that she can continue attending school and working as a graduate research associate; and (2) enjoins Defendants from "directly or indirectly enforcing, implementing, or otherwise taking any action or imposing any legal consequences—including causing Ms. Oruganti's visa to be revoked or detaining or removing Ms. Oruganti—as a result of th[e] decision" to terminate her SEVIS record and F-1 status.  (*See* ECF No. 2 at 1–2; ECF No. 1

at 16).  On April 17, 2025, the parties appeared before this Court for a Rule 65.1 conference, and

this Court issued a TRO.  This Opinion and Order supplements that oral ruling.

## II.   STANDARD OF REVIEW

A TRO is an emergency measure meant "to prevent immediate and irreparable harm to the

complaining party during the period necessary to conduct a hearing on a preliminary injunction."

*Hartman v. Acton*, 613 F. Supp. 3d 1015, 1021 (S.D. Ohio 2020) (quoting *Dow Chemical Co. v.

Blum*, 469 F. Supp. 892, 901 (E.D. Mich. 1979)).  Federal Rule of Civil Procedure 65(b) requires

a Court to examine on application for a TRO, whether "specific facts in an affidavit or a verified

complaint clearly show that immediate and irreparable injury, loss, or damage will result to the

movant."  Fed. R. Civ. P. 65(b)(1)(A).

Given that the "the purpose of a temporary restraining order is to maintain the status quo,"

it is of paramount importance that the party seeking the TRO establish immediacy and

irreparability of injury.  *See Doe v. Univ. of Cincinnati*, 2015 WL 5729328, at *1 (S.D. Ohio Sept.

30, 2015) (citing *Motor Vehicle Bd. of Calif. v. Fox*, 434 U.S. 1345, 1347 n.2 (1977)).  The "status

quo," for purposes of injunctive relief, is "the last actual, peaceable, noncontested status which

preceded the pending controversy." *See Sunbeam Corp. v. Econ. Distrib. Co.*, 131 F. Supp. 791,

793 (E.D. Mich. 1955); *Lapeer Cnty. Med. Care Facility v. State of Mich. Through Dep't of Soc.

Servs.*, 765 F. Supp. 1291, 1300 (W.D. Mich. 1991) ("When the status quo causes continuing

irreparable harm to plaintiffs, the status quo is the 'last uncontested status which preceded the

pending controversy.'" (quoting *Crowley v. Local No. 82, Furniture & Piano Moving*, 679 F.2d 978, 995 (1st Cir. 1982)).[2]

While immediacy and irreparability of harm are threshold considerations, the Sixth Circuit has explained that courts may also consider the traditional preliminary injunction factors: "whether the movant has a strong likelihood of success on the merits; . . . . whether issuance of the injunction would cause substantial harm to others; and . . . whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam) (en banc).

On an application for a TRO, a court may accept as true "well-pleaded allegations [in the complaint] and uncontroverted affidavits." *Elrod v. Burns*, 427 U.S. 347, 350, n.1 (1976); *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014). The court may also rely on otherwise inadmissible evidence, including hearsay, "if the evidence is appropriate given the character and objectives of the preliminary injunctive proceeding." *Doe #11 v. Lee*, 609 F. Supp. 3d 578, 592 (M.D. Tenn. 2022). The "burden of proving that the circumstances 'clearly demand' such an extraordinary remedy is a heavy one," since the party seeking "the injunction must establish its case by clear and convincing evidence.'" *Id.* (citing *Overstreet v. Lexington-Fayette*

---

[2] As a number of federal courts of appeal have recognized, "it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but such an injunction restores, rather than disturbs, the status quo *ante*." *See League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (cleaned up) (quoting *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012)); *see also O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (en banc) (per curiam) ("requir[ing] a party who has recently disturbed the status quo to reverse its actions . . . restores, rather than disturbs, the status quo ante, and is thus not an exception" to the ordinary standard for preliminary injunctions); *Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 90 (2d Cir. 1983) (referring to reinstatement of benefits as "restoration of the *status quo ante*").

*UrbanCnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Honeywell, Inc. v. Brewer-Garrett Co.*, 145 F.3d 1331 (6th Cir. 1998)).

### III.    LAW & ANALYSIS

#### A.  Immediacy and Irreparability of Harm

This Court first considers the immediacy and irreparability of harm that Plaintiff faces absent injunctive relief.  Fed. R. Civ. P. 65(b)(1)(A).  To establish irreparable harm, Plaintiff must show that she will suffer "actual and imminent" harm, "rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).  Further, the harm must be irreparable, meaning that it "cannot be prevented or fully rectified by [a] final judgment after trial[.]" *Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756, 764 (E.D. Tenn. 2024) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)).  Generally, irreparable harm is harm that cannot be remedied by money damages.  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007).  But economic damages may constitute irreparable harm if such damages "cannot be prevented or fully rectified by [a] final judgment after trial[.]" *Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d at 764 (quoting *Roland Mach. Co.*, 749 F.2d at 386)).

Ms. Oruganti argues that she will suffer irreparable and immediate injury absent a TRO because, first and most alarmingly, she faces possible detention and removal from the country for being out of status.  *See* 8 U.S.C. § 1227(a)(1)(C)(i) ("Any alien who was admitted as a [F-1] nonimmigrant and who has failed to maintain the [F-1] nonimmigrant status in which the alien was admitted . . . or to comply with the conditions of any such status, is deportable.").  At the Rule 65.1 conference, Defendants argued that terminating a SEVIS record is distinct from revoking an F-1 status, and that OSU likely misinterpreted the significance of the SEVIS record termination.  But

DHS's own website makes clear that "[w]hen an F-1 . . . SEVIS record is terminated, the following happens":

- "Student loses all on- and/or off-campus employment authorization."

- "Student cannot re-enter the United States on the terminated SEVIS record."

- "Immigration and Customs Enforcement (ICE) agents may investigate to confirm the departure of the student."[3]

Defendants ultimately conceded, as they must, that termination of the SEVIS record could lead to the revocation of the F-1 status, which could ultimately lead to deportation—an outcome that the Supreme Court has recognized as "a drastic measure, often amounting to lifelong banishment or exile." *Sessions v. Dimaya*, 584 U.S. 148, 157 (2018) (internal quotation marks omitted). Given the significant time and money Plaintiff has already invested in her agricultural engineering education and career trajectory (ECF No. 2-1 ¶ 12), Plaintiff persuasively argues that the termination of her student status and SEVIS record, and any subsequent deportation, will result "in the loss 'of all that makes [her] life worth living.'" *Bridges v. Wixon*, 326 U.S. 135, 147 (1945) ("[D]eportation may result in the loss 'of all that makes life worth living'.").

Plaintiff further explains that, as a result of the SEVIS termination, she is no longer authorized to engage in on-campus employment or to receive her monthly Ph.D. stipend, which make up Plaintiff's only source of income. This is so because, as an F-1 visa holder, Plaintiff

---

[3] *See Effects of SEVIS Termination*, U.S. Dep't of Homeland Security, https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student. This Court may take judicial notice of information contained on federal government websites. *See Broom v. Shoop*, 963 F.3d 500, 509 (6th Cir. 2020).

generally cannot work off-campus.[4]  She has signed a lease for this year and next year too, which she maintains she will not be able to pay without work authorization.  Although this harm is economic in nature, it is irreparable because money damages are likely not available when this litigation concludes.  *See* 5 U.S.C. § 702; *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) ("The APA generally waives the Federal Government's immunity from a suit 'seeking relief *other than money damages* . . . .'" (emphasis added) (quoting 5 U.S.C § 702)); *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 479 (6th Cir. 2004) ("The APA's waiver of sovereign immunity applies to 'an action in a court of the United States seeking relief *other than money damages*.'" (emphasis added) (quoting 5 U.S.C § 702)); *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 115–16 (D.D.C. 2022) (explaining that unavailability of money damages for APA claims counsels in favor of a finding of irreparable harm).

Beyond the monetary harm, Plaintiff's on-campus employment in the Department of Food, Agriculture and Biomedical Engineering forms an integral part of her doctoral training, the loss of which has already interrupted her academic plans and the research projects on which she is working.  At the Rule 65.1 conference, Ms. Oruganti also noted that OSU had instructed her to hold off on taking her exams, presumably to ensure that OSU is in compliance with federal law. Plaintiff also contends that the SEVIS termination will result in Plaintiff accruing unlawful presence daily, which may render her ineligible for reinstatement of her F-1 student status in the future.  *See Fang v. Dir., U.S. Immigr. & Customs Enf't*, 935 F.3d 172, 176 (3d Cir. 2019) (noting that F-1 student status may be reinstated if, among other things, the student has *not* been out of a

---

[4] *See Students and Employment,* U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/working-in-the-united-states/students-and-exchange-visitors/students-and-employment.

valid F-1 student status for over five months).  Being out of status also renders Plaintiff ineligible to apply for any type of nonimmigrant visa while she is here; she would have to go back to India first.  And if she takes this route of "self-deporting," she would be barred for five (5) years from returning to the U.S. because a ground of inadmissibility would attach to her based on an F-1 status violation.  *See* 8 U.S.C. 1182(a)(6)(G) ("An alien who obtains the status of a [F-1] nonimmigrant . . . and who violates a term or condition of such status . . . of this title is inadmissible until the alien has been outside the United States for a continuous period of 5 years after the date of the violation.").

Opposing the TRO, Defendants at the hearing alluded to a vague administrative process that Plaintiff could have pursued to restore her SEVIS record, including by contacting ICE directly. But in this Court's view, that would amount to letting the proverbial fox guard the chicken house. The record is replete with instances of international students subject to visa revocations or SEVIS terminations being arrested and detained by ICE without warning.  *See e.g.*, *Ozturk v. Trump*, ___ F.Supp.3d ___, ___, 2025 WL 1009445, at *1 (D. Mass. Apr. 4, 2025) ("[O]n March 25, 2025, at approximately 5:25 p.m. without prior notice of the revocation of her student visa or the grounds asserted for same, . . . a [Turkish] graduate student . . . at Tufts University, was approached and surrounded by six officers (several wearing masks and/or hoods), stripped of her cellphone and backpack, handcuffed, and taken into custody in an unmarked vehicle."); *see also* ECF No. 2-9, Kate Selig & Halina Bennet*, The Trump Administration Revoked 800 Student Visas. Here is What To Know*, N.Y. Times (Apr. 11, 2025), https://www.nytimes.com/2025/03/27/us/students-trump-ice-detention.html.

To summarize, the loss of Plaintiff's F-1 status places her education, research, financial stability, and career trajectories at imminent risk of irreparable harm, and puts her at risk of

detention or deportation.  At least four district courts have issued TROs in similar cases, finding that students on F-1 visas whose SEVIS status or record had been terminated by DHS or ICE face irreparable harm.  *See Liu v. Noem, et al.*, No. 1:25-cv-00133-SE-TSM, at *3–4 (D.N.H. April 10, 2025) (slip op.) (finding that doctoral student at Dartmouth College established irreparable harm where, "[b]ecause DHS terminated Liu's F-1 student status in the SEVIS system, he is no longer authorized to work as a research assistant or participate in any research, and he is no longer eligible to receive any stipend from his Ph.D. program at Dartmouth College"; "due to his inability to participate in research, Dartmouth must require him to disenroll from his current courses so that Dartmouth can remain in compliance with federal law"; "[t]hese circumstances will derail Liu's academic trajectory and ability to complete his Ph.D. program in a timely fashion"; and "the change in Liu's status in the SEVIS system may expose him to a risk of detention or deportation"); *Roe, et al., v. Noem, et al.*, No. CV 25-40-BU-DLC, 2025 WL 1114694, at *3–4 (D. Mont. Apr. 15, 2025) (finding that F-1 students "have successfully shown that, absent the relief provided for by a TRO, they will suffer irreparable harm," because "[l]osing F-1 status places Plaintiffs' education, research, financial stability, and career trajectories at imminent risk of irreparable harm," and "Plaintiffs also face the risk of immediate detention or removal from the United States"); *Isserdasani, et al., v. Noem, et al.,* No. 25-cv-283-wmc, at *10 (W.D. Wis. April 15, 2025) (slip op.) ("Isserdasani faces possible devastating irreparable harm due to the termination of his F-1 student record in SEVIS . . . . Given the amount of Isserdasani's educational expenses and potential losses from having to leave the United States without obtaining his degree, the court concludes that Isserdasani credibly demonstrates that he faces irreparable harm for which he has no adequate remedy at law in the absence of injunctive relief."); *Ratsantiboon v. Noem, et al.,* No. 25-CV-01315 (JMB/JFD), 2025 WL 1118645  (D. Minn. Apr. 15, 2025) ("The termination of

Ratsantiboon's F-1 student status in the SEVIS system renders him immediately ineligible to attend classes and sit for his final examinations. Ratsantiboon thus faces the imminent prospect of losing credit for the coursework he has thus far performed . . . . In addition, the termination of [his] SEVIS record forces him to live in uncertain legal status while he pursues this matter . . . which can constitute a separate irreparable harm.").

Accordingly, this Court finds that Plaintiff has shown that, without a TRO, she will suffer immediate, irreparable harm for which an award of monetary damages would not be sufficient.

## B. Other Factors

Although the immediacy and irreparability of harm are the most important at this juncture, this Court briefly addresses the other traditional preliminary injunction factors, as the Sixth Circuit has opined approvingly that those factors can be considered at the TRO stage. *See Stein v. Thomas*, 672 F. App'x 565, 569 (6th Cir. 2016). As to Plaintiff's likelihood of success on the merits, this Court finds Plaintiff is likely to succeed on her APA claims.[5] Federal regulations provide that "the nonimmigrant status of an alien shall be terminated by the revocation of a waiver authorized on his or her behalf under section 212(d)(3) or (4) of the Act; by the introduction of a private bill to confer permanent resident status on such alien; or, pursuant to notification in the Federal Register,

---

[5] Because there is likelihood of success on the merits of one or more of Plaintiff's APA claims, this Court "need not consider in detail the merits of each and every claim." *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, & Kentucky, Inc. v. Cameron*, 599 F. Supp. 3d 497, 507 (W.D. Ky. 2022); *see Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005) ("Plaintiffs have asserted five constitutional and statutory claims. To obtain temporary injunctive relief, they must show a substantial likelihood of success on at least one claim. "); *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) ("Plaintiff need not demonstrate a likelihood of success on the merits of every claim—rather, they need only 'show a likelihood of success on the merits of at least one of [their] claims.'"); *see also Liu*, No. 1:25-cv-00133-SE-TSM, at *3 n.2 ("Because the court finds that Liu has shown a likelihood of success on the merits of his APA claim in Count 2, it does not address at this time his claim in Count 1 that DHS violated his due process rights under the Fifth Amendment when it terminated his F-1 status in the SEVIS system."); *Roe*, 2025 WL 1114694, at *6 ("Because Plaintiffs are likely to succeed on their APA cause of action, the issue of due process need not be addressed at this time.").

on the basis of national security, diplomatic, or public safety reasons." 8 C.F.R. § 214.1(d). Defendants have not argued that any of these mechanisms were employed here. *See Fang*, 935 F.3d at 185 n.100 ("[I]t is easy to see why the students desire review—DHS appears to have terminated their F-1 visas without the statutory authority to do so. As discussed above, the ability to terminate an F-1 visa is limited by § 214.1(d)."). And "[w]hile the scope of review under the 'arbitrary and capricious' standard [under the APA] is narrow and a court is not to substitute its judgment for that of the agency, the agency nevertheless must examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983); *Securities & Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("The orderly function of the process of review requires that the grounds upon which the administrative agency acted are clearly disclosed and adequately sustained."); *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 476 (6th Cir. 2004) ("[D]eferential judicial review under the APA does not relieve the agency of its obligation to develop an evidentiary basis for its findings. To the contrary, the APA reinforces this obligation.").

Based on the record before this Court, Plaintiff has shown a likelihood to succeed on the merits of her claim that Defendants' termination of her SEVIS record and F-1 student status was not in compliance with the applicable statutory regulations and was therefore arbitrary, capricious, an abuse of discretion, not in accordance with the law, or otherwise without observance of procedure required by law. *See* 5 U.S.C. § 706(2). Other courts have held the same in cases involving similar facts. *See Liu,* No. 1:25-cv-00133-SE-TSM, at *3 (finding that F-1 student plaintiff is likely to succeed on APA claim and issuing TRO); *Roe*, 2025 WL 1114694, at *3 (same); *Ratsantiboon,* 2025 WL 1118645 (same), *Isserdasani*, No. 25-cv-283-wmc, at *10 (same).

The last two factors in the balancing test—balance of hardships and public interest—merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, there is a substantial public interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994); *see also N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA.").

## C. Bond

Rule 65 of the Federal Rules of Civil Procedure states in relevant part: "The court may issue a . . . temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The purpose of the rule is to "protect[] the enjoined party from any pecuniary injury that may accrue [while] a wrongfully issued equitable order remains in effect." *Brown v. City of Upper Arlington*, 637 F.3d 668, 674 (6th Cir. 2011) (internal quotation marks and citations omitted). The district court possesses discretion over the posting of security under Rule 65(c), *Moltan Co. v. Eagle–Picher Industries, Inc*., 55 F.3d 1171, 1176 (6th Cir. 1995), and the amount ordinarily depends on the gravity of the potential harm to the enjoined party. *See Bookfriends, Inc. v. Taft*, 223 F. Supp. 2d 932, 953 (S.D. Ohio 2002) (waiving bond requirement where "Defendants will not suffer [] damages[] if it is ultimately determined that they were wrongfully restrained from enforcement of the legislation at issue").

For good cause shown, Plaintiff shall post a bond with the Clerk of the Court in the nominal amount of $1.00. *See Moltan Co.,* 55 F.3d at 1176 (finding no bond is required when strong public interest is involved); *see also Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 713 (S.D. Ohio 2016) (setting Rule 65 bond in the nominal amount of $1), *aff'd*, 872 F.3d 393 (6th Cir. 2017).

13

## IV. CONCLUSION

For the reasons set forth above, and to maintain the status quo pending the preliminary injunction hearing, this Court **GRANTS** Plaintiff's Motion for a TRO (ECF No. 2) and issues the following interim relief:

1.  Defendants Kristi Noem, in her official capacity as Secretary of the U.S. Department of Homeland Security; the U.S. Department of Homeland Security; and Todd Lyons, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement (collectively, "Defendants") are **ORDERED** to reinstate Plaintiff Prasanna Oruganti's F-1 student status and record in the Student and Exchange Visitor System ("SEVIS");[6] and

2.  Defendants are **ENJOINED** from enforcing, implementing, or otherwise taking any action or imposing any legal consequences as the result of terminating Plaintiff's F-1 student status or SEVIS record, including revoking her F-1 visa, detaining her, or placing her in removal proceedings.

Plaintiff shall post a bond with the Clerk of the Court in the nominal amount of $1.00. The parties are further ordered to appear before this Court for a preliminary injunction hearing on **May 8, 2025, at 9:30 a.m.** An appendix outlining the expedited briefing schedule and procedures to be followed at the Preliminary Injunction hearing follows this Order.

**IT IS SO ORDERED.**

DATED: April 18, 2025

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

---

[6] At the Rule 65.1 conference, this Court also ordered Defendants to pay Plaintiff for the time that she missed as a graduate research associate through no fault of her own. Upon reflection and a close review of the applicable statutory framework, this Court *sua sponte* reconsiders that earlier ruling and vacates it. The parties are free to brief this particular issue in their papers, and this Court will take up the issue at the preliminary injunction stage if they do so.

**BRIEFING SCHEDULE & PRELIMINARY INJUNCTION HEARING**

Consistent with this Court's order at the Rule 65.1 conference, the parties will observe the following briefing schedule. The parties are to submit simultaneous opening and responsive briefs, addressing specifically why Plaintiff does or does not satisfy the following four requirements for the issuance of a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *See Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 590-91 (6th Cir. 2012). Opening briefs are due on **April 25, 2025**. Responsive briefs are due on **May 1, 2025**.

Plaintiff will pay her nominal bond of $1.00 to the Clerk of Court by **April 21, 2025, at 4:00 p.m.**

The Preliminary Injunction hearing will be held on **Thursday, May 8, 2025 at 9:30 a.m.** before the Honorable Algenon L. Marbley, United States District Court, 85 Marconi Boulevard, Columbus, Ohio, Court Room 1, Third Floor. If the hearing is not complete in one day, the hearing will resume on **Friday, May 9, 2025, at 8:30 a.m.** The Court will not continue the hearing date(s) except upon written motion supported by an affidavit demonstrating exceptional circumstances, made immediately upon the party's or counsel's receipt of notice of the existence of the exceptional circumstances.

The Court expects the evidence presented at the Preliminary Injunction hearing to be focused solely on the four-prong test for preliminary injunctions.

The parties shall engage in expedited discovery and agree upon an expedited discovery schedule that includes provisions for expert discovery.

15

The Court shall handle all discovery disputes for the purposes of the Preliminary Injunction.

The parties, or a party, in its opening Preliminary Injunction brief, may move to consolidate the Preliminary Injunction hearing with the trial on the merits. If the motion to consolidate is not raised in a party's opening brief, it will be considered waived.

An appendix outlining the trial procedures to be followed at the Preliminary Injunction hearing follows.

## APPENDIX

## I.  TRIAL PROCEDURES

### Counsel Tables

Plaintiff will occupy counsel table next to the jury box. Defendant will occupy counsel table across from Plaintiff and, to the extent necessary, the pews in the gallery.

### Appearances

Counsel will enter their appearance with the Court Reporter and the Courtroom Deputy Clerk before the start of the opening session of the hearing.

### Addresses By Counsel

Counsel will address the Court in the following manner:

(a)     All addresses to the Court will be made from the lectern facing the Court.

(b)     Counsel shall stand when addressing the Court for any reason.

### Objections

Counsel will stand when making an objection and will make the objection directly and only to the Court.

When objecting, state only that you are objecting and the succinct legal basis for your objection. Objections shall not be used for the purpose of making speeches, repeating testimony, or to attempt to guide a witness.

Argument upon an objection will not be heard unless permission is given or argument is requested by the Court. Either counsel may request a bench conference.

### Decorum

Colloquy, or argument between counsel will not be permitted. All remarks shall be addressed to the Court.

Counsel shall maintain a professional and dignified atmosphere throughout the hearing.

During the hearing, counsel shall not exhibit familiarity with witnesses or opposing counsel and shall avoid the use of first names.

During opening statements and final arguments, all persons at counsel table shall remain seated and be respectful so as not to divert the attention of the Court.

Do not ask the Court Reporter to mark testimony. All requests for re-reading of questions or answers shall be addressed to the Court.

### Demonstrative Evidence

If any sketches, models, diagrams, or other demonstrative evidence of any kind will be used during the proceeding, they must be exhibited to opposing counsel two days prior to the hearing. Objections to the same must be submitted to the Court prior to the commencement of the hearing. Demonstrative evidence prepared solely for the purpose of final argument shall be

displayed to opposing counsel at the earliest possible time but in no event later than one-half hour before the commencement of the arguments.

Counsel must supply his/her own easel, flip charts, etc. for the hearing.

### Exhibits

Counsel will assemble and mark all exhibits and deliver them to the courtroom deputy prior to the commencement of the hearing. Plaintiff's exhibits will bear the letter prefix P followed by Arabic numerals and Defendant's exhibits will bear the prefix D followed by Arabic numerals.

Counsel should keep a list of all exhibits and should supply the Court, courtroom deputy and opposing counsel with a copy of the same.

Each counsel is responsible for any exhibits secured from the courtroom deputy. At the end of each hearing session, all exhibits shall be returned to the courtroom deputy.

The parties shall use three-ring tabbed notebooks for their exhibits which will be submitted two (2) days before the hearing. The parties shall provide one (1) copy of their tabbed exhibit notebook(s) to opposing counsel, and three (3) copies to the Court—one each for the Judge, the law clerk, and the courtroom deputy (for use at the witness stand).

Exhibits which are produced for the first time during the hearing, as in the case of exhibits used for impeachment, shall be tendered to the courtroom deputy for marking and then displayed to opposing counsel.

### Sanctions

The parties and counsel shall comply fully and literally with this pre-hearing order. The Court will consider the imposition of appropriate sanctions in the event of non-compliance, including monetary sanctions, the dismissal of claims or defenses, or the exclusion of evidence. Fed. R. Civ. P. 16(f).

**Questions**

This order supersedes all previous orders in this case to the extent previous orders are inconsistent with this order.

The parties shall address questions about this Order to the Court's Law Clerk, Diala Alqadi, at (614) 719-3276, by way of a telephone conference with counsel for all parties participating, or with fewer than all counsel participating with express permission of non-participating counsel. Or, the parties may contact Ms. Alqadi at diala_alqadi@ohsd.uscourts.gov, by way of email with counsel for all parties carbon-copied, or with fewer than all counsel carbon-copied with express permission of non-participating counsel.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Xiaotian Liu

      v.                                          Case No. 25-cv-133-SE

Kristi Noem et al.

# **O R D E R**

On April 7, 2025, Plaintiff Xiaotian Liu brought suit against Kristi Noem, the Secretary of the Department of Homeland Security, and Todd Lyons, the Acting Director of Immigration and Customs Enforcement, alleging that DHS unlawfully terminated his F-1 student status in the Student and Exchange Visitor ("SEVIS")[1] system. He alleges, among other things, that DHS violated his due process rights under the Fifth Amendment and violated the Administrative Procedure Act when it terminated his status in the system. Liu filed a motion for a temporary restraining order with his complaint, requesting a TRO "(i) enjoining Defendants from terminating Plaintiff's F-1 student status under the Student and Exchange Visitor (SEVIS) system and (ii) requiring Defendants to set aside their termination determination." Doc. no. 2 at 1.

The court held a brief video hearing on April 7. Although Liu filed a motion for a TRO, his attorneys communicated with the defendants' attorney, who was able to attend the hearing. The parties agreed that the court should not consider the motion for a TRO at that hearing and that they would confer regarding a potential briefing schedule and provide the court with a status update on or before April 9.

---

[1] SEVIS is "the web-based system that [DHS] uses to maintain information regarding: . . . F-1 . . . students studying in the United States[.]" About SEVIS, Department of Homeland Security, https://studyinthestates.dhs.gov/site/about-sevis (last visited April 10, 2025).

On the evening of April 8 and the early morning of April 9, Liu filed two addenda to his motion for a TRO. See doc. nos. 7 and 8. In the latter addendum, Liu stated that because of the "potential immigration detention and deportation in light of the F-1 student status termination, on April 7, 2025, Plaintiff's counsel attempted to receive assurance from Defendants' counsel that Defendants would not arrest, detain, or place him in removal proceedings during the pendency of [litigation regarding the] temporary restraining order and preliminary injunction." Doc no. 8 at 3. Liu added that his "counsel could not receive such assurances from Defendants' counsel." Id. He therefore notified the defendants' counsel that he would pursue his motion for a TRO immediately and he requested an emergency hearing. The court held that hearing on April 9, and counsel for both Liu and the defendants appeared.

As explained at the hearing, although the defendants were given notice and an opportunity to be heard, the court does not convert the motion for a TRO into a motion for a preliminary injunction. The defendants' counsel acknowledged at the hearing that he had not had adequate time to investigate certain of Liu's factual allegations or evaluate properly the legal bases on which Liu's motion rests. Therefore, the court construes Liu's motion as a request for the provisional remedy of a TRO with notice, which essentially seeks to avoid irreparable harm until the defendants are able to review the factual record and develop their legal arguments sufficiently to address the request for preliminary relief.

In evaluating a motion for a TRO, the court considers the same four factors that apply to a motion for a preliminary injunction. Karlsen v. Town of Hebron, Civ. No. 18-cv-794-LM, 2018 WL 11273651, at *1 (D.N.H. Sept. 28, 2018). Those four factors include "(i) the likelihood that the movant will succeed on the merits; (ii) the possibility that, without an injunction, the movant will suffer irreparable harm; (iii) the balance of relevant hardships as between the parties; and

(iv) the effect of the court's ruling on the public interest." Coquico, Inc. v. Rodríguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009). "The first of these four factors normally weighs heaviest in the decisional scales." Id. When, as here, the defendants are government officials sued in their official capacities, the balance of the hardships and the public interest factors merge. Does 1-6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021).

After considering Liu's motion for a TRO, the exhibits attached thereto, and the addenda, as well as the parties' oral argument during the April 9 hearing, the court granted Liu's motion for a TRO on the record at the hearing.

Liu has shown a likelihood of success on the merits of his claim in Count 2, that DHS violated the APA when it terminated his F-1 student status in the SEVIS system. Based on the record before the court, Liu is likely to show that DHS's termination of his F-1 student status was not in compliance with 8 C.F.R. § 214.1(d) and was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. See 5 U.S.C. § 706(2)(A). The defendants did not offer any legal or factual argument contradicting Liu's likelihood of success on the merits of Count 2 during the hearing.[2]

Because DHS terminated Liu's F-1 student status in the SEVIS system, he is no longer authorized to work as a research assistant or participate in any research, and he is no longer eligible to receive any stipend from his Ph.D. program at Dartmouth College. There is uncontroverted evidence that due to his inability to participate in research, Dartmouth must require him to disenroll from his current courses so that Dartmouth can remain in compliance

---

[2] Because the court finds that Liu has shown a likelihood of success on the merits of his APA claim in Count 2, it does not address at this time his claim in Count 1 that DHS violated his due process rights under the Fifth Amendment when it terminated his F-1 status in the SEVIS system.

with federal law. Additionally, it may be too late to forestall this requirement by the time the defendants are prepared to be heard on the preliminary injunction. These circumstances will derail Liu's academic trajectory and ability to complete his Ph.D. program in a timely fashion. This loss of timely academic progress alone is sufficient to establish irreparable harm. Further, the change in Liu's status in the SEVIS system may expose him to a risk of detention or deportation. The defendants' inability to agree that he would not be detained or deported as a result of his status change before the defendants could be prepared to be heard on Liu's request for preliminary relief is an acknowledgement of the existence of this risk. The evidence before the court further establishes that the uncertain link between Liu's SEVIS status and the possibility of detention and deportation is causing him emotional harm. Liu has shown that, without a TRO, he will suffer irreparable harm for which an award of monetary damages would not be sufficient.

The balance of the hardships and whether injunctive relief is in the public interest both weigh in Liu's favor. The only argument that the defendants offered on these factors was a concern that a TRO in this case may interfere with ICE's ability to carry out its duties. Though the defendants did not challenge for the purposes of the April 9 hearing the allegation that Liu's SEVIS status had changed, they could not confirm that his status had changed, or if it had, whether it had been changed intentionally or as the result of an error. Nor could the defendants confirm that ICE had included Liu in any priority. At best, the defendants ask the court to avoid unintentionally interfering with ICE's ability to carry out some unstated duty. For his part, Liu points to the irreparable injury that he contends supports his request for immediate relief, as well as Congress's expressed intent to allow foreign students to pursue educational opportunities in

the United States without interference. The court finds that these two factors weigh in Liu's favor.

A TRO is necessary to avoid irreparable harm in this case. It is made more appropriate given its anticipated short duration, which is only long enough to afford the defendants the time they have requested to prepare their factual and legal responses to Liu's requests for preliminary relief.

After considering the relevant factors, the court exercises its discretion to waive the bond requirement embedded in Rule 65(c) of the Federal Rules of Civil Procedure. See Crowley v. Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers, 679 F.2d 978, 1001 (1st Cir. 1982), rev'd on other grounds, 467 U.S. 526 (1984).

Conclusion

For the foregoing reasons, the plaintiff's motion for a temporary restraining order (doc. no. 2) is granted. The parties shall meet and confer regarding an appropriate briefing and argument schedule for the preliminary injunction hearing, with the hearing scheduled no later than April 23, 2025.

All defendants are (i) enjoined from terminating Mr. Liu's F-1 student status under the SEVIS [Student and Exchange Visitor] system, and (ii) required to set aside their termination determination. This order shall remain in effect until further order of the court.

SO ORDERED.

_____
Samantha D. Elliott
United States District Judge

April 10, 2025
cc: Counsel of Record.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

Chengkai Zhou a/k/a Edward Zhou,

               Plaintiff,

        v.

Todd M. Lyons, Acting Director, U.S.
Immigration and Customs Enforcement,

               Defendant.

Case No. 2:25-cv-02994-CV(SKx)

**ORDER GRANTING PLAINTIFF'S
APPLICATION FOR TEMPORARY
RESTRAINING ORDER**

On April 7, 2025, Plaintiff Chengkai Zhou, a/k/a Edward Zhou ("Plaintiff") filed a complaint (Doc. # 1, "Compl.") and an Application for Temporary Restraining Order or in the Alternative Preliminary Injunction ("Application") (Doc. #11, "App.") against Defendant Todd M. Lyons, the acting director of the U.S. Immigration and Customs Enforcement ("ICE") (the "Government"). On April 10, 2025, Plaintiff filed a Supplement to its Application ("Supplement"). (Doc # 15, "Suppl."). On April 11, 2025, the Government filed its opposition brief to Plaintiff's Application ("Opposition"). (Doc # 17, "Opp'n).

The Application was heard on April 15, 2025. Having considered the briefing and the parties' oral arguments, and for the reasons discussed below, the Court GRANTS the Application.

## **INTRODUCTION**

Plaintiff alleges that ICE terminated Plaintiff's Student and Exchange Visitor Information System ("SEVIS") record and F-1 student status, and that the termination violated the Administrative Procedure Act and Plaintiff's due process rights under the Fifth Amendment. Compl. ¶ 47–50. Plaintiff asks the Court to "enjoin the effects of [ICE's] termination of Plaintiff's SEVIS record and F-1 status." App. at 15.

## **FACTUAL BACKGROUND**

The present dispute arises from the Government's termination of Plaintiff's F-1 status in SEVIS, an online database that stores information regarding international students. Compl. at p. 1–2. Such information includes the student's start date, academic progress, and graduation date, which schools must enter into SEVIS. *Id.* ¶ 18. The Student Exchange Visitor Program ("SEVP"), which ICE operates, monitors SEVIS to determine whether students are maintaining their student status. *Id.* ¶¶ 16, 19. If a student does not maintain their status, ICE (through SEVP) can terminate the student's SEVIS record and, along with it, the student's F-1 status. Consequently, the student would be barred from continued studies in the United States. *See Id.* ¶¶ 21–27.[1] According to the Complaint, ICE considers students who have their SEVIS records terminated as nonimmigrants without status, and such students are expected to leave the United States. *Id.* ¶ 22. Moreover, a student's F-1 status in the SEVIS system is distinguishable from an F-1 visa—F-1 status allows a student to seek education in the United States, *see* 8 C.F.R. § 214.2(f)(5)(i) (permitting students to seek a full course of study during the time period the student is "maintaining status"), while an F-1 visa permits a student to enter the United States based on having F-1 status. *See* 8 U.S.C. § 1101(a)(15)(F). A student

---

[1] At the hearing, the Government argued that a termination of a student's SEVIS record does not constitute a termination of the student's F-1 status. However, the Government did not make this argument in the Opposition and there is currently no such evidence in the record. Accordingly, the Court declines to consider this argument at this time.

cannot have an F-1 visa without having F-1 status; accordingly, if a student's F-1 status is terminated in the SEVIS system, so is the student's F-1 visa. *See* Compl. ¶ 38.

Plaintiff, a citizen and national of the People's Republic of China, has been a student at the University of California, Los Angeles ("UCLA") since 2021. Doc. #1–2 ¶¶ 3–4, "Zhou Decl." On June 25, 2021, after accepting an offer to attend UCLA, Plaintiff received an F-1 student visa. *Id.* ¶ 5. On September 17, 2021, Plaintiff was admitted through the port of entry at the Los Angeles International Airport as an F-1 student. *Id.* ¶ 6. Plaintiff has since been attending classes at UCLA and expects to graduate in a few months. *Id.* ¶ 7. Plaintiff has been paying an annual tuition of $15,154 plus an annual "nonresident supplemental tuition" of $34,200. *Id.* ¶ 10. Plaintiff approximates his annual cost to attend UCLA, including room and board, at $75,000. *Id.* As a result of losing his F-1 status, Plaintiff cannot attend classes and finish his degree. *Id.* ¶ 24.

On April 3, 2025, Plaintiff received an email from UCLA's international student office explaining that his SEVIS record had been terminated. *Id.* ¶ 15, Ex. B. The email cited to a notation made by the Department of Homeland Security ("DHS") in SEVIS, which stated in relevant part: "TERMINATION REASON: OTHERWISE FAILING TO MAINTAIN STATUS – Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated." *Id.* ¶ 16, Ex. B. Plaintiff was not provided with any notice or opportunity to respond. *Id.* Ex. 17. Since Plaintiff's F-1 visa was revoked two days later on April 5, 2025, Plaintiff presumes that his SEVIS record was terminated due to a prior brush with the law, but he does not know for certain since ICE never provided an explanation. *Id.* ¶¶ 11-15. Plaintiff was never charged with a crime and has no criminal record. *Id.* ¶¶ 12-14, Ex. A.

## LEGAL STANDARD

Courts analyze motions for TROs and motions for preliminary injunctions in substantially the same manner. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A TRO or a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to

such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a TRO or preliminary injunction must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. 7, 20. The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**DISCUSSION**

**I.    Jurisdiction**

As a preliminary matter, the Government challenges the Court's jurisdiction to review this matter on the basis that ICE's termination of Plaintiff's SEVIS record is not "final." The Government argues that the termination is not final because (1) Plaintiff has not exhausted administrative processes identified on the DHS website, and (2) Plaintiff is subject to removal proceedings, during which Plaintiff can challenge the termination in an immigration court. Opp'n at 4–5. The Court disagrees. With regards to the Government's first point, "the exhaustion of administrative remedies [is] 'a prerequisite to judicial review only when [1] expressly required by statute or [2] when an administrative rule requires appeal before review and the administrative action is made inoperative pending that review.'" *Jie Fang v. Dir. United States Immigr. & Customs Enf't*, 935 F.3d 172, 181 (3d Cir. 2019) (quoting *Darby v. Cisneros*, 509 U.S. 137, 154, (1993)). The Government has not pointed to any statute or administrative rule requiring Plaintiff to pursue the administrative processes described in the Opposition. With regards to the Government's second point, "the finality of an order cannot be conditioned on something that may never happen." *Fang*, 935 F.3d at 184. Here, there is no guarantee that the government will initiate removal proceedings against Plaintiff, and the mere possibility of removal proceedings does not negate the finality of the termination.

Accordingly, for purposes of the Application, the Court finds that it has jurisdiction to review this case. However, the Court acknowledges that any party may, at any time, challenge a court's subject-matter jurisdiction.

## II.    Application for TRO

After considering the Application, the exhibits attached thereto, the Opposition, and the parties' oral argument during the April 15 hearing, the Court finds that Plaintiff has met each of the elements required for a TRO. [2]

*First*, Plaintiff has shown a likelihood of success on the merits of his claim that the Government violated the APA when it terminated Plaintiff's SEVIS record and, in effect, his F-1 status. Based on the record before the Court, Plaintiff is likely to show that ICE exceeded its legal authority in terminating Plaintiff's SEVIS record by failing to comply with 8 C.F.R. § 214.1(d), and that the termination was arbitrary, capricious, an abuse of discretion, or otherwise unlawful.[3] *See* 5 U.S.C. § 706(2)(A). The Government did not address Plaintiff's arguments that ICE exceeded its authority, nor did the Government provide any information to the contrary at the hearing.

*Second*, Plaintiff established that he would suffer irreparable harm absent a TRO. The record shows that Plaintiff lost his F-1 status and, in turn, his ability to attend classes, effectively denying Plaintiff the ability to complete his degree. "The loss of timely academic progress alone is sufficient to establish irreparable harm." *Liu v. Noem*, 1:25-cv-00133-SE-TSM, slip op. at 4. The record also shows that, without F-1 status, Plaintiff is subject to arrest, deportation, and accruing unlawful presence. Finally, the evidence indicates that the possibility of deportation and not being able to complete his education is causing Plaintiff emotional harm. Monetary damages alone would not be sufficient to compensate Plaintiff for these harms.

---

[2] The Government was given notice and an opportunity to be heard, however, Government's counsel asked the Court to treat the Application as a request for a TRO and not a preliminary injunction given the condensed briefing schedule. The Court agrees and will limit its consideration to the issue of a temporary restraining order at this time. *See Midkiff v. US Bancorp*, No. CV 12-3262-VBF (Ex), 2012 WL 12882431, at *2 (C.D. Cal. May 14, 2012) ("[I]nformal notice and hearing does not [automatically] convert the temporary restraining order into a preliminary injunction of unlimited duration," which would require "a meaningful opportunity to prepare for the hearing[.]")

[3] Since Plaintiff has established a likelihood of success on the merits on these grounds, the Court declines to address Plaintiff's due process arguments at this time.

*Third*, Plaintiff has established that both the balance of hardships and the public interest weigh in favor of injunctive relief. The Government's only argument on these factors was that "[t]he public interest lies in the Executive's ability to enforce U.S. immigration laws" and that "control over immigration is a sovereign prerogative." Opp'n at 9. But the record suggests that the Government's termination of Plaintiff's SEVIS record exceeded the Government's legal authority. And the Government has made no showing that the requested relief of temporarily restoring Plaintiff's F-1 status while the Court considers whether the termination was proper would interfere with the Government's ability to lawfully enforce immigration laws. On the other hand, Plaintiff has shown that he will suffer irreparable harm from a potentially unlawful agency action. Accordingly, the Court finds that these two factors weigh in Plaintiff's favor.

Finally, the Court denies the Government's request that Plaintiff provide security pursuant to Fed. R. Civ. P. 65(c). The Court exercises its discretion to waive the bond requirement. *See Diaz v. Brewer,* 656 F.3d 1008, 1015 (9th Cir. 2011).

## CONCLUSION

For the foregoing reasons, Plaintiff's application for a TRO is GRANTED. The parties shall meet and confer regarding an appropriate briefing and argument schedule for a preliminary injunction hearing.

The Government's decision to terminate Plaintiff's F-1 student status in SEVIS is hereby set aside pending further order from the Court. The Government is enjoined from terminating Plaintiff's F-1 status in SEVIS pending further order from the Court.


IT IS SO ORDERED


DATED: 4/15/25

*Cynthia Valenzuela*

HON. CYNTHIA VALENZUELA
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

W. B.,

               Plaintiff,

       v.

KRISIT NOEM, et al.,

               Defendants.

Case No.  25-cv-03407-EMC

**ORDER GRANTING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

Docket Nos. 4, 8

## I.  INTRODUCTION

Now before the Court is Plaintiff W.B.'s[1] motion pursuant to Federal Rule of Civil Procedure 65(b) for a temporary restraining order ("TRO").  Defendants are Kristi Noem, in her official capacity as the Secretary of the U.S. Department of Homeland Security ("DHS") and Todd M. Lyons, in his official capacity as the Acting Director of Immigration and Customs Enforcement ("ICE") (collectively, "the Government"). Plaintiff asks the Court to temporarily enjoin Defendants from taking any enforcement action against her arising directly or indirectly from the termination of Plaintiff's Student and Exchange Visitor Information Systems ("SEVIS") records.

There are at least five other cases that have been filed in this district by F-1 students.  Case Nos. 4:25-cv-03140-JSW, 5:25-cv-03244-NW, 3:25-cv-03292-SI, 3:25-cv-03323-AGT, 5:25-cv-

---

[1] Plaintiff W.B. also has pending a motion to proceed under a pseudonym. Dkt. No. 4. Given the sensitivity of this matter, and the real fear of retaliation, the Court **GRANTS** Plaintiff's motion. Plaintiff shall be referred to as W.B. in all public filings, with any identifying information redacted. Defendants, upon receiving Plaintiff's real name and other personal identifiers, must refrain from disclosing such information to any third party or in the public record, except as required to carry out their official duties, and only under seal if filed with the Court.

United States District Court
Northern District of California

03383-SVK.  The lowest-numbered case has been assigned to Judge Jeffrey White.  Under the Northern District's Civil Local Rules, Judge White is considering whether to relate the cases; if deemed related, this case would be reassigned to him.  *See* Civil L.R. 3-12; Docket No. 14 (This Court's "Referral for Purpose of Determining Relationship").

The Court **GRANTS** Plaintiff's motion for a TRO to preserve the status quo pending further briefing and a hearing on this matter.  The Court notes TROs have been granted in at least three of the potentially related cases. *See* Case Nos. 4:25-cv-03140-JSW, Dkt. No. 16; 5:25-cv-03244-NW, Dkt. No. 13; 3:25-cv-03292-SI, Dkt. No. 18.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

The limited record before the Court indicates that Plaintiff is a former international student currently working pursuant to post-graduate employment authorization in this District. Compl. ¶ 3.  She has been present in the United States on an F-1 visa.[2] *Id.* ¶ 16.  Plaintiff is a native and citizen of the People's Republic of China who currently resides in San Francisco, California.  *Id.* She has resided in the U.S. since 2013 when she entered as a F-1 nonimmigrant student to pursue a bachelor's degree at the University of Missouri.  *Id.*  After obtaining a Bachelor of Science degree, she continued her studies going on to earn a master's degree and then a PhD in Mathematics from the University of Florida.  *Id.*  The University of Florida issued her PhD in August of 2022. *Id.*  Plaintiff was employed, pursuant to valid Post-graduate STEM OPT[3] employment authorization, and working on machine learning model optimization in the context of medical image processing for a San Francisco based medical technology company at the time of the SEVIS termination in this case.  *Id.*

---

[2] Each academic institution must obtain formal approval from DHS before it can sponsor a student's F-1 status. Compl. ¶ 20. An institution must first file an application for School Certification through the Student and Exchange Visitor Information (SEVIS) system, a SEVP-managed Internet-based system to track and monitor schools and noncitizen students in the United States.  8 C.F.R. § 214.3.

[3] "Optional Practical Training ('OPT')" "consists of temporary employment that is 'directly related to the student's major area of study.'" *Jie Fang v. Dir. United States Immigr. & Customs Enf't,* 935 F.3d 172, 175 (3d Cir. 2019) (quoting 8 C.F.R. § 214.2(f) (1)(ii)). OPT usually occurs at the end of the completion of studies. Compl. ¶ 23.

2

On April 5, 2025, Plaintiff was notified by email from the University of Florida International Center that her SEVIS record was terminated on April 4, 2025. *Id.* ¶ 4. She was not notified by Defendants of the termination or the basis for the termination beyond the information relayed to her from the University of Florida which indicated that her registration had been terminated because she was "otherwise failing to maintain status-- Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated." *Id;* Mot. Exhibit D. No citation to any specific facts or provision of law was offered and, Plaintiffs allege, no violation of status or other valid basis for termination of SEVIS registration occurred. Compl. ¶ 4. The University of Florida's F-1 International Student Services Center told Plaintiff:

> "It was brought to our attention that your SEVIS record was terminated on April 04, 2025, by SEVP. The termination reason gives is as follows: "OTHERWISE FAILING TO MAINTAIN STATUS- Individual identified in criminal records check and/or has their VISA revoked. SEVIS record has been terminated."
> Please note that your current I-20 (as well as any employment eligibility) and your F1 status are no longer valid, and you should make plans to depart the U.S. as soon as possible. Additionally, if you have any dependents in F-2 status, their SEVIS record is also no longer valid.
> Finally, we strongly recommend that you consult your own personal immigration attorney for guidance on next steps."

Mot., Exhibit D, at 1-2.

The termination of her SEVIS record has resulted in Plaintiff's inability to continue her employment. *Id.* While W.B.'s current employment authorization was set to expire on May 15, 2025, her employer had entered W.B. in the H-1B nonimmigrant visa lottery and had received notification of selection by USCIS in that lottery of W.B.'s registration. Mot. Exhibit C. The company is in the process of preparing an H-1B nonimmigrant visa petition seeking change of status on behalf of W.B. to H-1B nonimmigrant status. *Id.* The timely filing of an H-1B nonimmigrant visa petition would serve to extend W.B.'s OPT-based work authorization through October 1, 2025 (or until the petition is denied), the date on which she would be eligible to change to H1B nonimmigrant status.[4] However, termination of W.B.'s SEVIS registration makes her

---

[4] A OPT-employment authorized student may receive a 'cap-gap' extension of OPT-based employment authorization to allow the student to remain in the United States and be eligible to continue to work and then to change from F-1 to H-1B nonimmigrant status where the student has been selected in the H-1B nonimmigrant visa lottery and has had an H-1B nonimmigrant visa

United States District Court
Northern District of California

3

ineligible for this extension and for any change of status in the United States. 8 CFR

214.2(f)(5)(vi)(A), (B).  Thus, because of Defendants' actions, Plaintiff's continued employment

in the United States has been made impossible.  Compl. ¶ 4.

Plaintiff acknowledges a minor misdemeanor charge that was dismissed pursuant to

California Penal Code § 1001.95 (misdemeanor diversion).  *Id.* ¶ 62-63.[5]

The Government stated at the hearing that only a student's school or ICE can update the

status to "terminated," and that here, ICE did this unilateral action.

## III.    LEGAL STANDARD

Though Plaintiff brought this motion as an *ex parte* motion, the Court ordered Defendants

to file an opposition, and they did. Dkt. No. 15. Defendants also appeared at the hearing on this

motion.  Thus, the Court treats this motion as a regular TRO.

A plaintiff seeking a TRO "must establish that [plaintiff] is likely to succeed on the merits,

that [plaintiff] is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in [plaintiff's] favor, and that an injunction is in the public interest."

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008); *see also Alliance for the Wild Rockies v.

Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (holding that, in the Ninth Circuit, "serious

questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can

support issuance of an injunction, assuming the other two elements of the Winter test are also

met").  Where, as here, the Government is a party, the last two factors merge.  *See Drakes Bay*

---

petition with request for change of status filed on their behalf. 8 CFR 214.2(f)(5)(vi)(A), (B). The
cap-gap extension provides a temporary bridge between F-1 and H-1B status, allowing students to
remain in the United States between the end of their academic program and the beginning of the
fiscal year, when the student's H-1B visa status commences. Mot. at 8.
[5] According to Plaintiff, Plaintiff W.B. was arrested on one occasion in San Francisco, California
on suspicion of shoplifting in December of 2023. The case was resolved in San Francisco Superior
Court pursuant to California Penal Code § 1001.95 (misdemeanor diversion).  Diversion was
successfully completed and the case was dismissed and later sealed pursuant to California Penal
Code § 851.87 (" In any case where a person is arrested and successfully completes a prefiling
diversion program administered by a prosecuting attorney in lieu of filing an accusatory pleading,
the person may petition the superior court that would have had jurisdiction over the matter to issue
an order to seal the records pertaining to an arrest and the court may order those records sealed as
described in Section 851.92.")

United States District Court
Northern District of California

4

1    *Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

3    **IV.      ANALYSIS**

4    A.      Irreparable Harm

5           In Defendants' papers and at the hearing, Defendants argue this SEVIS termination serves

6    merely as a "flag" to other agencies to further investigate a student's file; this argument strains

7    credulity.  The SEVIS termination notice states the action in the absolute; it does not say that the

8    termination of F-1 status is under investigation or that W.B. may lose her F-1 status.  Instead, it

9    says that her status is terminated.  Moreover, the SEVIS termination has real-world legal

10   consequences as the letter from the University of Florida demonstrates.  In a number of contexts,

11   such termination notice has been treated as having a legal effect upon Plaintiff's F-1 status, F-1

12   visa, I-20 status, and her ability to apply for an H-1B visa.  *See* Case Nos. 4:25-cv-03140-JSW,

13   Dkt. No. 16; 5:25-cv-03244-NW, Dkt. No. 13; 3:25-cv-03292-SI, Dkt. No. 18; *see also*

14   Declaration at Docket No. 16, Exhibit I at 6 (Administrator for student affairs noting that if a

15   student's SEVIS record is terminated, the school can no longer print the student's I-20, the school

16   can no longer comply with federal regulations, and the student will, thus, fall out of status).[6]

17          Tellingly, the DHS itself has so assumed.  In *Fang*, the DHS sent a letter to students who

18   had their status revoked stating: "*Since your SEVIS record has been Terminated* you no longer

19   have valid F-1 nonimmigrant status and must either file for reinstatement of your nonimmigrant

20   student status with U.S. Citizenship and Immigration Services (USCIS) or depart the United States

21   immediately."  935 F.3d 172, 177 (3rd Cir. 2019) (emphasis added).  This understanding is

22   consistent with the University of Florida's statement in their email to Plaintiff, wherein Plaintiff

23   was told she could no longer work, that her F-1 status was terminated, and that she should leave

24   the United States immediately.  Defendants at the hearing attempted to argue that the students'

_____

[6] The Court considers the Declaration of Brian Childs in Case No. 1:25-cv-419, filed here at
Docket No. 16, though it may not be admissible as evidence in its present form in this case much
in the same way such evidence may be considered under Rule 56(c)(2).  The Government did not
object to the contents of this declaration at the hearing.  The Government could not state whether it
was true that changes to SEVIS status affect the school's ability to maintain compliance with
federal regulations, thus making the student fall out of legal status.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    situation in *Fang* was distinguishable from here because in *Fang* the *school* made the

2    determination that student's SEVIS record was terminated.  It hardly makes sense that a *school's*

3    termination has greater legal operative effect than ICE's determination here.  Critically,

4    notwithstanding the government's assertion that the University got it wrong, at the hearing on this

5    motion, the Government would not commit to reaching out to schools who have sent these types

6    of messages to their international students to clarify that there is no legally operative effect from

7    this termination notice.  The Government also did not have a response to the Plaintiff's

8    representation that the SEVIS termination affects Plaintiff's school's ability to maintain Plaintiff's

9    compliance with federal immigration regulations and Plaintiff's I-20.

10        Accordingly, the Court concludes Plaintiff has shown the likelihood of irreparable harm

11    absent relief.  Plaintiff has studied for almost 10 years to obtain her PhD and gain her current

12    employment and career trajectory.  Mot. at 10.  Plaintiff has had to cease employment and is

13    experiencing the resulting loss of income and financial stability as a result.  *Id.*  While a loss of

14    employment does not necessarily constitute irreparable harm if "the temporary loss of income"

15    can ultimately be recovered, *Sampson v. Murray*, 415 U.S. 61, 90 (1974), here, Plaintiff's loss of

16    employment involved more than a mere loss of income.  It also affected Plaintiff's future ability to

17    remain in the United States and to obtain H-1B nonimmigrant status.  Mot. at 10.

18        Plaintiff also faces a risk of immediate detention or removal from the United States, and

19    the psychological harm that comes from this fear.  In other cases, with similarly situated

20    individuals, the Government has refused to provide assurances that the plaintiffs will not be

21    arrested while their litigation proceeds, which only bolsters this point.  *See, e.g.*, Case No. 5:25-

22    cv-03244-NW (N.D. Cal.), Dkt. No. 10-1; Case No. 1:25-cv-00133-SETSM (D. N.H.), Dkt. No.

23    8-1.

24        And finally, as noted below, there are serious questions whether Plaintiff's Fifth

25    Amendment right to due process has been violated as a result of the stigmatizing denotation that

26    her F-1 status has been terminated.  "[T]he deprivation of constitutional rights 'unquestionably

27    constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting

28    *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

1    Plaintiff have shown a likelihood of irreparable injury.

2

3    B.    Likelihood of Success on the Merits

4         1.    APA Claim

5    Plaintiff has shown a likelihood of success and at the very least has shown serious

6    questions going to the merits of her claim under the Administrative Procedure Act.

7    The threshold issue on the merits is whether there is "final" agency action which opens to

8    door for redress under the APA. To be final the action must mark the "consummation" of the

9    agency's decision-making process, and the action must determine a "right[ ] or obligation[ ],"

10   "from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Plaintiff

11   argues the termination is a final agency action for purposes of the APA. *See, e.g., Fang v.*

12   *Director U.S. Immigration & Customs Enforcement*, 935 F.3d 172, 185 (3rd Cir. 2019) (holding

13   that order terminating SEVIS and F-1 visa status was final agency action for jurisdictional

14   purposes). Defendant argues this is not a final agency action and is merely a "data entry" change

15   and that "Plaintiff's SEVIS record is not the same thing as her F-1 nonimmigrant status." Opp. at

16   8; *see also Chandraprakash Hinge v. Lyons*, Civil Action No. 25-1097 (RBW), 2025 U.S. Dist.

17   LEXIS 71594, at *11 (D.D.C. Apr. 15, 2025) (Defendants in similar actions across the country

18   announcing their position that termination of SEVIS registration may have no impact on a

19   student's nonimmigrant status in the United States). Plaintiff notes, and the Court agrees, this

20   "position appears novel and is contrary to the settled understanding of the academic and legal

21   community," Mot. at 2, n.1, as noted above.

22   As to the propriety of the termination notice, neither of the grounds Defendants offered—

23   "Individual identified in criminal records check and/or has their VISA revoked"— to revoke her

24   SEVIS status comport with 8 C.F.R. § 214.1(d).[7] *See, e.g., Roe v. Noem*, No. CV 2540-BU-DLC,

25   _____

26   [7] For failure to maintain F-1 student status under the SEVIS system, students fail to maintain their
     status when they do not comply with the regulatory requirement, such as failing to maintain a full

27   course of study, engaging in unauthorized employment, or other violations of their requirements
     under 8 C.F.R. § 214.2(f). In addition, 8 C.F.R. § 214.1(e)-(g) outlines specific circumstances

28   where certain conduct by any nonimmigrant visa holder, such as engaging in unauthorized
     employment, providing false information to DHS, or being convicted of a crime of violence with a

7

United States District Court
Northern District of California

United States District Court
Northern District of California

2025 WL 1114694, at *3 (D. Mont. April 15, 2025) (granting TRO on APA claim on similar facts: student alleged DHS unlawfully terminated F1-status in SEVIS system and cited reasons did not comport with statutory or regulatory requirements); *Isserdasani v. Noem*, No. 25cv-283-WMC, 2025 WL 1118626 (W.D. Wis. April 15, 2025) (same).  There is no evidence Plaintiff has had her VISA revoked.  There is no evidence that Plaintiff has committed a "crime of violence."  *Borden v. United States*, 593 U.S. 420, 427 (2021) (defining a crime of violence as 'an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another.'")

Plaintiff has demonstrated, at the very least, serious questions regarding the legality of DHS's termination of her SEVIS registration.  There is substantial evidence that the agency's decision was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A), (C-D).

2.    Fifth Amendment Due Process Claim

Though Plaintiff did not fully brief this claim in her motion, Defendants argue Plaintiff is unlikely to succeed on her Due Process Claim because she does not have a property interest in her SEVIS registration.  However, the Court finds a colorable claim for a violation of Plaintiff's liberty interest in her SEVIS registration.  The termination notice that Plaintiff has engaged in conduct warranting termination of her F-1 status.  As the record suggests this negative insulation is false.  And it has resulted in concrete harm – loss of employment. *Cf. Humphries v. Cnty. of Los Angeles*, 554 F.3d 1170 (9th Cir. 2008), *rev'd and rem'd on other grounds* by *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29 (2010) (explaining the "stigma-plus" doctrine, whereby a "liberty interest may be implicated 'where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to [them]' when 'a right or status previously recognized by state law was distinctly altered or extinguished.') (citing *Paul v. Davis*, 424 U.S. 693, 711 (1976)).

_____

potential sentence of more than a year, "constitute a failure to maintain status."

8

United States District Court
Northern District of California

Plaintiff has effectively been placed on a list of students with "terminated" SEVIS status. Neither of Defendants' reasons for SEVIS termination on Plaintiff's records comports with the record.  Thus, the SEVIS termination appears to be inaccurate.  The inaccurate public record has now, at minimum, created stigma to Plaintiff's personhood and legal status, and has resulted in the loss of the ability to maintain employment and legal status.  Plaintiff has thus been wrongly classified and suffered a concrete harm as a result. There is thus at least a serious question whether her due process rights have been violated.

C.    Balance of Equities and Public Interest

The final two factors—merged together here because the Government is the Defendant—favor Plaintiff.  As noted above, the harm threated to Plaintiff is substantial – loss of employment and living under the threat of deportation.

On the other hand, the government has failed to identify and real harm from the TRO sought by Plaintiff.  According to the government, the notice does not affect Plaintiff's immigration status and visa.  It is only a flag which indicates that her status might change.  Hence the proposed TRO would not impair any governmental operation.  At most, the government suggests that the "flag" of the termination notice serves to alert other enforcement agencies that investigation into the Plaintiff's status might be warranted.  But nothing prevents the USCIS or ICE from communicating the need for investigation to other enforcement agencies through other more traditional means.  It seems odd that these agencies would rely on a public registration record to communicate with another agency.

It is true that "[t]he public interest is served by compliance with the APA."  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 678 (9th Cir. 2021) (internal citation omitted). But on the current record, Plaintiff has maintained compliance with the statutory regulations that govern F-1 nonimmigrant status.  Restraining the Government from further action against her would not endanger public safety.  And while there is a public interest in the Government being able to maintain accurate records as they relate to immigration laws, there is no governmental interest in maintaining *inaccurate* records.  Under the government's own theory of the case, wherein

Plaintiff's F-1 status remain intact, but the SEVIS termination notice says otherwise, the SEVIS notice is inaccurate.

D.    <u>Waiver of Security</u>

Finally, under the circumstances of this case and because the TRO should not result in any financial damage to Defendants, the Court waives the requirement that Plaintiff give an amount of security.

//

//

//

United States District Court
Northern District of California

10

## V.   **CONCLUSION**

Accordingly, the Court **GRANTS** Plaintiff's motion for a TRO to preserve the status quo pending further briefing and a further hearing on this matter as follows:

(1) Defendants are enjoined for twenty-eight days from arresting and incarcerating Plaintiff W.B. pending resolution of this proceeding; and

(2) Defendants are enjoined for twenty-eight days from transferring Plaintiff W.B. outside the jurisdiction of this District pending the resolution of this proceeding; and

(3) Defendants are enjoined for twenty-eight days from imposing any legal effect that otherwise may be caused by the termination of Plaintiffs' SEVIS status or the potential unlawful revocation of her F-1 visa; and

(4) Defendants are enjoined from taking any action to retaliate against Plaintiff W.B. for the filing of this case; and

(5) Defendants, upon receiving Plaintiff's real name and other personal identifiers, must refrain from disclosing such information to any third party or in the public record, except as required to carry out their official duties, and only under seal if filed with the Court.

The Court set a hearing on a preliminary injunction to Tuesday, May 20, 2025, at 9AM. Defendants' Opposition is due May 2, 2025. Plaintiff's Reply is due May 9, 2025. This is subject to change pending any referral order.

**IT IS SO ORDERED**.

Dated: April 23, 2025

_____
EDWARD M. CHEN
United States District Judge

11

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

ZILIANG J.,                                           Case No. 25-CV-1391 (PJS/DLM)

            Plaintiff,

v.                                                                    ORDER

KRISTI NOEM, Secretary of Department of
Homeland Security, in her official capacity;
TODD LYONS, Acting Director of
Immigration and Customs Enforcement, in
his official capacity; and U.S.
IMMIGRATION & CUSTOMS
ENFORCEMENT,

            Defendants.

---

Cameron Lane Youngs Giebink, David L. Wilson, Gabriela Sophia
Anderson, and Katherine Lourdes Santamaria Mendez, WILSON LAW
GROUP, for plaintiff.

This matter is before the Court on plaintiff's emergency motion for a temporary
restraining order ("TRO") against defendants Kristi Noem, Todd Lyons, and U.S.
Immigration & Customs Enforcement ("ICE") (together "defendants"). For the reasons
that follow, the Court grants the motion.

## I. BACKGROUND

Plaintiff is a citizen of the People's Republic of China who has lawfully resided in
the United States since August 25, 2019, when he was admitted pursuant to an F-1 visa.
ECF Nos. 1 ¶ 8, 7 ¶ 2. Plaintiff is currently enrolled as a full-time student in a master's

degree program in geographic information science and cartography at the University of Minnesota's Twin Cities campus.  ECF No. 7 ¶ 2.

ICE is responsible for administering the student visa program and tracking information on students in F-1 status through the Student and Exchange Visitor Program.  ECF No. 1 ¶ 13.  Under 8 U.S.C. § 1372, such students are tracked in an electronic record system known as the Student Exchange Visitor Information System ("SEVIS").  Plaintiff alleges that ICE takes the position that termination of a student's SEVIS account requires the student to immediately depart the United States.  ECF No. 1 ¶ 87.

During his time in the United States, plaintiff has twice received parking tickets and once been cited for speeding.  ECF No. 7 ¶¶ 6–7.  He has also been cited for driving with a suspended license, but that case was dismissed.  *Id.* ¶ 6.  Plaintiff paid all of the fines that were imposed as a result of these offenses, and he has never been subject to academic discipline.  *Id.* ¶¶ 7–8.

On April 8, 2025, ICE terminated plaintiff's student status in the SEVIS system. ECF No. 8-4.  ICE identified the reason for the termination of his status as follows: "Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated."  *Id.*  ICE did not inform plaintiff that his status had been terminated.  ECF No. 7 ¶ 9.  Instead, he learned about the termination of his SEVIS

-2-

status when the University of Minnesota sent him an email on April 8, 2025, notifying

him of the change. *Id.* ¶ 9.

Plaintiff filed this action on April 14, 2025.[1]  ECF No. 1.  He brings three claims

under the Administrative Procedure Act ("APA") and a claim for a declaratory

judgment, contending that terminating his SEVIS status was contrary to the

Immigration and Nationality Act and its implementing regulations, violated the Due

Process Clause of the Fifth Amendment, and was arbitrary and capricious.  Plaintiff

seeks injunctive as well as declaratory relief.

Plaintiff now moves for a TRO to temporarily enjoin defendants from

terminating his status in the SEVIS system and to require defendants to set aside their

termination decision.

## II. ANALYSIS

In considering a motion for a TRO, courts consider four factors:  "(1) the threat of

irreparable harm to the movant; (2) the state of balance between this harm and the

injury that granting the injunction will inflict on other parties litigant; (3) the probability

that movant will succeed on the merits; and (4) the public interest."  *Dataphase Sys., Inc.*

*v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981); *see also Tumey v. Mycroft AI, Inc.*, 27

---

[1]The Court notes that, just as this order was about to be docketed, plaintiff filed
an amended complaint.  The allegations underlying the Court's conclusions, however,
remain the same.

F.4th 657, 665 (8th Cir. 2022) ("[T]he standard for analyzing a motion for a temporary

restraining order is the same as a motion for preliminary injunction.").  No one factor is

determinative, and the court should "weigh the case's particular circumstances to

determine whether the balance of equities so favors the movant that justice requires the

court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601

(8th Cir. 1999) (internal quotation marks omitted).  The moving party bears the burden

to establish that these factors weigh in favor of granting temporary relief.  *See, e.g.*,

*Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

 Here, based on the record now before the Court, the Court concludes that all four

factors weigh in favor of granting plaintiff's requested TRO.

 As to the first factor, the Court finds that plaintiff plainly faces irreparable harm.

plaintiff is in the middle of the semester, for which he has already paid $17,739.23 in

tuition.  ECF No. 7 ¶¶ 1, 18; ECF No. 8-2.  He is at imminent risk of being forced to drop

his courses for this semester, and he is at risk of being prevented from registering for

classes for next semester, as the University cannot allow him to proceed with his studies

without an active student status on the SEVIS system.  ECF No. 7 ¶¶ 16–17.  More

broadly, plaintiff faces the loss of the many years and many thousands of dollars he has

invested in pursuing his degree.  *Id.* ¶ 14.  Because both the United States and the

University of Minnesota enjoy sovereign immunity, plaintiff may be unable to recover his financial losses.

In addition, plaintiff is now present in the United States with his legal status uncertain. This confusion about his legal status threatens imminent harm in at least two ways. First, it may subject him to immediate detention and deportation. *Id.* ¶ 10. Second, it causes him to accumulate unlawful presence in the United States, which is likely to impede or prevent him from becoming a permanent resident in the future. *Id.* ¶¶ 12, 13.

As to the second factor, the only apparent basis for defendants' action is plaintiff's history of minor traffic violations, the most recent of which took place in December 2023. ECF No. 7 ¶ 7. Enabling plaintiff to remain in status and continue his studies while the Court sorts through the legal issues in this case poses no plausible risk of injury to defendants.

As to the third factor, the Court finds on the basis of the current record that plaintiff is likely to succeed on the merits. Government agencies are generally required to follow their own regulations. *See, e.g.*, *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265 (1954); *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020). Plaintiff alleges that, when defendants terminated his status in the SEVIS system, they violated their own regulations and thereby violated the APA. *See* 8 C.F.R.

§ 214.1(d) (providing that termination of a non-citizen's nonimmigrant status may be accomplished by (1) revoking a waiver authorized on the non-citizen's behalf, (2) the introduction of a private bill to confer permanent-resident status on the non-citizen, or (3) a notification in the Federal Register on the basis of national security, diplomatic, or public-safety reasons). Defendants do not appear to have terminated plaintiff's status pursuant to any of these three courses of action. The record does not indicate that there was any relevant waiver to revoke. Nor does the record reflect that a private bill for permanent residence has been introduced, or that any notification in the Federal Register has been published.

Finally, as to the fourth factor, the Court finds that there is a substantial public interest in ensuring that government agencies comply with federal law. Indeed, the Court cannot imagine how the public interest might be served by permitting federal officials to flaunt the very laws that they have sworn to enforce.

For these reasons, the Court grants plaintiff's request for temporary relief and, in its discretion, the Court waives the bond requirement under Fed. R. Civ. P. 65(c). The Court also finds good cause to issue this order without notice, as defendants took the challenged action without notice, giving rise to a real risk that plaintiff might be detained or deported without notice and before he can serve defendants.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.  Plaintiff's motion for a temporary restraining order [ECF No. 4] is

    GRANTED.

    a.  Defendants are ORDERED to temporarily set aside their

        determination to classify plaintiff's F-1 student status as

        terminated.

    b.  Defendants are ORDERED to reinstate plaintiff's student status in

        the SEVIS system, backdated to April 8, 2025.

    c.  Defendants are temporarily ENJOINED from taking any further

        action to terminate plaintiff's student status.

    d.  Defendants are ENJOINED from directly or indirectly enforcing,

        implementing, or otherwise taking any action or imposing any

        legal consequences as the result of the decision to terminate

        plaintiff's SEVIS records, including revoking plaintiff's visa,

        detaining him, or deporting him.

2.  Plaintiff is ORDERED to serve defendants with the summons, complaint,

    motion papers, and a copy of this order as soon as possible.

-7-

3.      The Court will hold a hearing on Thursday, April 24, 2025, at 2:30 pm to consider whether to convert the TRO into a preliminary injunction. Defendants' brief in response to plaintiff's motion is due no later than Monday, April 21, 2025.  Plaintiff may file a reply no later than Wednesday, April 23, 2025.

4.      Pursuant to Fed. R. Civ. P. 65(b)(2), this order will expire 14 days from the date of entry unless the Court extends it for good cause shown or defendants consent to an extension.

Dated:  April 17, 2025, at 9:15 a.m.       <u>s/Patrick J. Schiltz</u>
                                        Patrick J. Schiltz, Chief Judge
                                        United States District Court

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JOHN DOE,

                      Plaintiff,

      v.

KRISTI NOEM et al.,

                      Defendant.

CASE NO. 2:25-cv-00633-DGE

ORDER ON MOTION FOR
TEMPORARY RESTRAINING
ORDER (DKT. NO. 3)

## I      INTRODUCTION

Plaintiff Doe[1] is a doctoral student at the University of Washington, in good academic

standing, and scheduled to graduate in December of 2025.  (Dkt. No. 7 at 3.)  On April 7, 2025,

the University of Washington informed Plaintiff his record within the Student and Exchange

Visitor Information System ("SEVIS") maintained by Immigration and Customs Enforcement

---

[1] A motion for Plaintiff to proceed pseudonymously remains pending.  (Dkt. No. 4.)  By referring to Plaintiff as Doe at this stage, the Court expresses no view on that motion.  During a TRO hearing held on April 17, 2025, the Parties confirmed that Defendants are aware of Doe's identity and that Plaintiff has disclosed that information to them, and as such, referring to him as Doe in the TRO order would not be an obstacle to compliance.

1    (ICE) had been terminated and was no longer in an active status.  (*Id.*)  The purported reason for

2    termination was Plaintiff's alleged failure to maintain his nonimmigrant status based on a

3    "criminal records check" and/or a visa revocation.  (Dkt. No. 7-2 at 1.)

4         Plaintiff brings claims under the Administrative Procedures Act ("APA") and the Fifth

5    Amendment against the Secretary of Homeland Security and the Department, the ICE Acting

6    Director, and other officials (collectively, "Defendants").  Plaintiff moves for a Temporary

7    Restraining Order ("TRO") requiring Defendants to restore his SEVIS record and status, and to

8    prevent the Defendants from initiating removal proceedings based on the termination of his

9    SEVIS record.  (*See* Dkt. No. 3.)  Because Plaintiff is likely to succeed in his argument that

10   Defendants' actions were arbitrary and capricious, and not in accordance with law, the Court will

11   grant the TRO.  *See* 5 U.S.C. § 706(2)(A).

12                              **II       BACKGROUND**

13   **A.  The F-1 Visa Program and SEVIS**

14        Pursuant to the Immigration and Nationality Act ("INA"), a foreign student may enter the

15   United States in a nonimmigrant status to complete a course of study at an approved educational

16   institution.  8 U.S.C. § 1101(a)(15)(F)(i); 8 C.F.R. § 214.2(f).  If approved, the State Department

17   will issue a visa allowing the student admission to the United States to pursue their course of

18   study.  *See* 22 C.F.R. § 41.61(b)(1).  If admitted, DHS may administratively designate the

19   student as an F-1 nonimmigrant classification.  8 C.F.R. § 214.1(a)(2).  A key component to

20   admission as an F-1 nonimmigrant student is the presentment of Form I-20, which is "issued in

21   the student's name by a school certified by the Student and Exchange Visitor Program (SEVP)

22   for attendance by F-1 foreign students."  8 C.F.R. § 214.2(f)(1)(i)(A).  The F-1 student's Form I-

23   20 is endorsed at the time of entry into the United States and the F-1 student is responsible for

24

1  "retain[ing] for safekeeping the initial form I-20 or successor form bearing the admission number

2  and any subsequent form I-20 issued to them."  8 C.F.R. § 214.2(f)(1)(ii), (f) (2).

3        An F-1 student may remain in the United States for the duration of their studies so long

4  as they continue to meet the requirements outlined in the regulations.  8 C.F.R. § 214.2(f)(5)(i)

5  ("Duration of status is defined as the time during which an F–1 student is pursuing a full course

6  of study at an educational institution certified by SEVP for attendance by foreign students").  If a

7  student "fails to maintain a full course of study without the approval of a [Designated School

8  Official ("DSO")] or otherwise fails to maintain status," they must depart the United States

9  immediately or seek reinstatement.[2]  8 C.F.R. § 214.2(f)(5)(iv); *see also* 8 U.S.C. § 1184(a)(1).

10       A nonimmigrant student's legal status is governed by the F-1 visa system, which is

11  administered by ICE through its Student and Exchange Visitor Program (SEVP).  *Jie Fang v.*

12  *Dir. U.S. Immigr. & Customs Enf't*, 935 F.3d 172, 175 (3d Cir. 2019).  In turn, SEVIS is an

13  SEVP-managed internet system that tracks and maintains information on nonimmigrant students.

14  *See* 8 C.F.R. § 214.3(a)(l).  To implement the F-1 visa program, SEVP certifies participating

15  educational institutions, allowing those institutions to issue a Form I-20 in the student's name in

16

17  _____

    [2] A student may seek reinstatement by submitting an I-539, Application to Extend/Change
18  Nonimmigrant status to United States Citizenship & Immigration Service ("USCIS") and a Form
    I-20 or a successor form indicating a DSO's recommendation for reinstatement.  8 C.F.R.
19  § 214.2(f)(16)(i).  Pursuant to the regulations, a district director "may consider" reinstatement if:
    (1) student has not been out of status for more than five months at the time of filing or the failure
20  to seek reinstatement within five months was due to exceptional circumstances; (2) student
    "[d]oes not have a record of repeated or willful violations of DHS regulations; (3) student is
21  pursuing or intending to pursue a full course of study at the school that issued the Form I-20 or
    successor form; (4) student has not engaged in unauthorized unemployment; (5) student is not
22  deportable pursuant to § 237 of the INA; and (6) USCIS is satisfied the violation of status was
    beyond the student's control, or the "violation relates to a reduction in the student's course load
23  that would have been within a DSO's power to authorize, and that failure to approve
    reinstatement would result in extreme hardship to the student."  8 C.F.R.§ 214.2(f)(16)(i)(A)–(F).
    USCIS's decision to deny reinstatement is unreviewable.  *See* 8 C.F.R. § 214.2(f)(16)(ii).

24

SEVIS.[3]  SEVP regulations also govern the termination of F-1 student status in SEVIS.  8 C.F.R.

§ 214.2(f).  A student may fall out of F-1 status by: (1) failing to meet the regulatory

requirements for F-1 student status or (2) via an agency related termination of status.  8 C.F.R.

§§ 214.1(d), 214.2(f)(5)(iv).[4]  DHS can terminate an F-1 student's status in three ways: 1) by

revoking a previously authorized waiver under 8 U.S.C. § 1182(d)(3) or §1182(d)(4); 2) through

the introduction of a private bill in Congress to confer permanent resident status; or 3) if DHS

publishes a notification in the Federal Register, on the basis of national security, diplomatic, or

public safety reasons.  8 C.F.R. § 214.1(d).  DHS's ability to terminate an F-1 student's status is

limited to the three ways enumerated in § 214.1(d).  *See Jie Fang*, 935 F.3d at 185 n.100.

## B. Defendants Terminate Plaintiff's Record in SEVIS

Plaintiff is a Chinese national who entered the United States lawfully on an F-1 visa on

May 22, 2021.  (Dkt. No. 7 at 3.)  Plaintiff has been continuously enrolled in his doctoral

program.  (*Id.*)  Although Plaintiff's F-1 visa expired on May 9, 2022, the most recent Form I-20

issued on his behalf by the University of Washington was valid through December 12, 2025.

(*Id.*; Dkt. No. 1 at 5.)

In September 2023, Plaintiff was arrested and charged with, but not convicted of, driving

under the influence (DUI) under Washington Revised Code § 46.61.502,a misdemeanor.  (Dkt.

Nos. 1 at 5; 7 at 4.)  Plaintiff's criminal defense lawyer, Robert J. Ault, submitted a declaration

attesting that Doe was charged under § 46.61.502 in October 2023 and entered a plea of Not

Guilty at an arraignment that month.  (Dkt. No. 5 at 1.)  Further, "[a]s of today's date [April 10,

---

[3] *Study in the States*, Dep't of Homeland Sec. (last accessed Apr. 16, 2025),
https://studyinthestates.dhs.gov/site/about-sevis; 8 C.F.R. § 214.2(f)(1)(i)–(iii).

[4] The regulations detail circumstances under which the visa holder may be considered to fail to
maintain status, including unauthorized employment, willful failure to provide truthful
information to DHS, or certain qualifying criminal convictions.  8 C.F.R § 214.1(e)–(g).

2025], [Doe's] case is still pending and he has not been convicted of any offense."  (*Id.*)  The

maximum penalty for a misdemeanor DUI under that section is 364 days imprisonment, plus

fines.  *See* Wash. Rev. Code §§ 46.61.502(5); 46.61.5055.  Under DHS regulations, "[a]

nonimmigrant's conviction in a jurisdiction in the United States for a crime of violence for which

a sentence of more than one year imprisonment may be imposed (regardless of whether such

sentence is in fact imposed) constitutes a failure to maintain status."  8 C.F.R. § 214.1(g).

Plaintiff learned via email from the University of Washington that his "SEVIS record and

I-20 were marked as 'terminated'" by SEVP as of April 7, 2025.  (Dkt. No. 7-2 at 1.)  The only

information provided regarding the termination was that it related to: "Otherwise failing to

maintain status - individual identified in criminal records check and/or has had their VISA

revoked."  (*Id.*)  He has not received any notice or contact from Defendants directly regarding his

termination, nor any opportunity to contest the determination.  (*See* Dkt. No. 7 at 3.)  Plaintiff

fears that termination of his SEVIS record will cause him reputational damage, because "[m]y

academic peers, colleagues, and future employers will inevitably suspect me of having

committed a crime of violence, well beyond my pending misdemeanor DUI charge."  (*Id.* at 4.)

Plaintiff initiated this action on April 9, 2025, arguing that "[t]his arbitrary termination

abruptly stripped Doe of his lawful immigration status, endangers his ability to complete his

doctoral program at the University of Washington, and subjects him to immediate risk of

detention and removal."  (Dkt. No. 1 at 2.)  He alleges three causes of action under the APA:

arbitrary and capricious agency action, action in excess of statutory and regulatory authority, and

action without observance of procedure required by law.  5 U.S.C. §§ 706(2)(A), 706(2)(C),

706(2)(D).  (Dkt. No. 1 at 6–7.)  He further alleges a Fifth Amendment Procedural Due Process

violation.  (*Id.* at 8.)  He seeks a TRO and subsequently a Preliminary Injunction (PI) "requiring

1   Defendants to restore and maintain Plaintiff's SEVIS record in active status pending final

2   resolution of this case" and "enjoining Defendants DHS and ICE from initiating removal

3   proceedings, detaining Plaintiff, or otherwise interfering with Plaintiff's lawful presence and

4   ability to pursue his academic program, solely based on the claims raised in this Complaint."

5   (*Id.* at 9.)  He seeks declaratory relief, vacatur of the termination of the SEVIS record, damages

6   pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and costs.  (*Id.*)

7                              **III      LEGAL STANDARD**

8         Federal Rule of Civil Procedure 65(b) governs the issuance of a TRO.  "The legal

9   standard for a TRO is substantially identical to the standard for a preliminary injunction."

10  *Facebook, Inc. v. BrandTotal Ltd.*, 499 F. Supp. 3d 720, 732 (N.D. Cal. 2020).  To obtain

11  injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a

12  likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that

13  the balance of equities tips in favor of the moving party; and (4) that an injunction is in the

14  public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Generally, a TRO

15  is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is

16  entitled to such relief."  *Id.* at 22.  The moving party has the burden of persuasion.  *Hill v.*

17  *McDonough*, 547 U.S. 573, 584 (2006).  "The third and fourth factors, harm to the opposing

18  party and the public interest, merge when the Government is the opposing party."  *Nken v.*

19  *Holder*, 556 U.S. 418 (2009).

20        The Ninth Circuit has also articulated an alternative "sliding scale" approach pursuant to

21  which the first and third *Winter* factors are analyzed on a continuum; under such standard, a

22  weaker showing on the merits, combined with a stronger demonstration on the balancing test,

23  might warrant preliminary injunctive relief, assuming the second and fourth *Winter* elements are

24

1    met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–1135 (9th Cir. 2011).

2    Under this "sliding scale" method, the movant need only raise "serious questions going to the

3    merits," but the balance of hardships must tip "sharply" in the movant's favor. *Id.* at 1131–1132;

4    *see also Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012).

## IV    JURISDICTION

6        "Section 704 of the APA provides for judicial review of '[a]gency action made

7    reviewable by statute and final agency action for which there is no other adequate remedy in a

8    court.'" *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 952 (9th Cir. 2017)

9    (quoting 5 U.S.C. § 704). As no statute authorizes judicial review over the termination of SEVIS

10   records, the singular issue here is whether Defendants' termination of Plaintiff's SEVIS record

11   was "final" agency action for which there was no other "adequate remedy." 5 U.S.C. § 704. *C.f.*

12   *Cabaccang v. U.S. Citizenship & Immigr. Servs.*, 627 F.3d 1313, 1316 (9th Cir. 2010). For

13   agency action to be deemed final, it must "mark the consummation of the agency's decision-

14   making process" and "the action must be one by which rights or obligations have been

15   determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–

16   178 (1997) (internal quotation marks omitted).

17       As an initial matter, it is apparent that the termination of Plaintiff's SEVIS record is an

18   agency action that implicates "rights and obligations" and may well result in "legal

19   consequences." *Id.*; *see also Jie Fang*, 935 F.3d at 180. Next, the action appears to constitute

20   the consummation of the agency's decimating process for two reasons. First, "there is no

21   statutory or regulatory requirement that a student seek reinstatement" of student status in SEVIS,

22   and even if a student attempts to pursue the administrative procedure for SEVIS reinstatement,

23   there is no "mechanism to review the propriety" of the original termination. *Jie Fang*, 935 F.3d

24

at 182; *see* 8 C.F.R § 214.2(f)(16)(ii) ("The adjudicating officer will update SEVIS to reflect USCIS' decision. If USCIS does not reinstate the student, the student may not appeal the decision.").  Second, since neither immigration judges nor the BIA have the authority to review SEVIS termination or a USCIS denial of reinstatement, there is no proceeding in which a student can contest the agency action at issue here.  *Jie Fang*, 935 F.3d at 185.; *Ghorbani v. I.N.S.*, 686 F.2d 784, 791 (9th Cir.1982); *Tooloee v. I.N.S.*, 722 F.2d 1434, 1438–1439 (9th Cir. 1983). Thus, the termination of Plaintiff's F-1 student status in SEVIS was not "of a merely tentative or interlocutory nature," but rather a unilateral determination with immediate legal consequences over which Plaintiff has no ability to seek administrative review.  *Bennett*, 520 U.S. at 177–178. Accordingly, the Court finds it has jurisdiction to proceed.  *C.f. Jie Fang*, 935 F.3d at 182 ("[t]he order terminating these students' F-1 visas marked the consummation of the agency's decisionmaking process, and is therefore a final order").

## V      ANALYSIS

### A.  Plaintiff is Likely to Succeed in the Argument that Termination of His SEVIS Record was Unlawful

Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Here, based on the limited record before the Court, Plaintiff has demonstrated a likelihood of success on two independent grounds under § 706(2)(A): that Defendants' termination of his SEVIS record was not in accordance with law, and that it was arbitrary and capricious.[5]

    1.  <u>Not In Accordance with Law</u>

---

[5] Because the Court finds that Plaintiff has established likelihood of success on his APA claim, the Court does not reach his Fifth Amendment Due Process claim at this time.

                   *i.*       *Agencies Must Follow Their Own Regulations*

It is contrary to law for an agency to disregard its own regulations and policies.  *See Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003); *Wallace v. Christensen*, 802 F.2d 1539, 1552 n.8 (9th Cir. 1986) (an agency is "bound by its own regulations so long as they remain in force.").  As the District of Columbia Circuit has explained:

> In a series of decisions, the Supreme Court has entertained challenges to agency actions that failed to conform to agency regulations. In *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943), the Court held that an agency is bound to the standards by which it professes its action to be judged. In *Accardi,* a case involving a habeas challenge to the denial of suspension of deportation, the Court objected to the agency's 'alleged failure to exercise its own discretion contrary to existing valid regulations.'

*Lopez v. Fed. Aviation Admin.*, 318 F.3d 242, 246 (D.C. Cir. 2003), *as amended* (Feb. 11, 2003) (quoting *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268, (1954)) (parallel citation omitted).  Moreover, "'a court's duty to enforce an agency regulation, while most evident when compliance with the regulation is mandated by the Constitution or federal law,' embraces as well agency regulations that are not so required."  *Id.* at 247 (alterations omitted) (quoting *United States v. Caceres*, 440 U.S. 741, 749 (1979)).

The Ninth Circuit has affirmed that "[p]ursuant to the *Accardi* doctrine, an administrative agency is required to adhere to its own internal operating procedures."  *Church of Scientology of California v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990); *see also United States v. Nixon*, 418 U.S. 683, 696 (1974)*; Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co.*, 284 U.S. 370, 389 (1932).  Courts have framed the obligation for an agency to follow its own regulations as deriving from § 706(2)(A) or other APA provisions.  *See, e.g., Suncor Energy (U.S.A.), Inc. v. United States Env't Prot. Agency*, 50 F.4th 1339, 1352 (10th Cir. 2022) (holding that EPA action violated § 706(2)(A) because it ignored the agency's regulatory definition of "facility"); *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 983–984 (C.D. Cal. 2024) (ICE policy of warrantless "knock

and talk" violated agency's regulations and thus § 706(2)(A)). Agencies must also adhere to internal procedures designed to provide protections to individuals. *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."); *see also Lopez*, 318 F.3d at 247; *Beshir v. Holder*, 853 F.Supp.2d 1, 11 (D.D.C. 2011) (DHS Secretary's discretion to issue procedural rule pausing processing of adjustment of status applications limited by regulation requiring adjudication in certain timeframe).

Accordingly, Defendants are bound to follow their own rules and regulations governing the proper termination of an F-1 student's record in SEVIS.

### ii. Defendants Failed to Follow Their Own Regulations and Procedures

On April 17, 2025, the Court held a hearing on the pending TRO motion, during which counsel for Defendants confirmed that Plaintiff's DUI arrest was the sole reason for his SEVIS record termination. That confirmed action was likely unlawful. As discussed *supra*, a student's record in the SEVIS system can be terminated either because the student fails to maintain status, or when the agency initiates a termination of status. 8 CFR §§ 214.1(d); 214.2(f). In this instance, Plaintiff states that he maintains full-time enrollment in his doctoral program at the University of Washington (Dkt. No. 1 at 5), and Defendants have introduced no evidence to the contrary. Agency-initiated termination is governed by 8 CFR § 214.1(d), which enumerates circumstances that result in termination:

> Within the period of initial admission or extension of stay, the nonimmigrant status of an alien shall be terminated by the revocation of a waiver authorized on his or her behalf under section 212(d)(3) or (4) of the Act; by the introduction of a private bill to confer permanent resident status on such alien; or, pursuant to notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons.

Defendants do not argue that any of these criteria are present here.

1    Additionally, Plaintiff's DUI arrest is not a qualifying crime that could lawfully result in

2    SEVIS termination.  DHS's regulations specifically explain what criminal activity results in

3    failure to maintain status for a nonimmigrant:

4          A condition of a nonimmigrant's admission and continued stay in the United States is
           obedience to all laws of United States jurisdictions which prohibit the commission of
5          crimes of violence and for which a sentence of more than one year imprisonment may be
           imposed. A nonimmigrant's conviction in a jurisdiction in the United States for a crime
6          of violence for which a sentence of more than one year imprisonment may be imposed
           (regardless of whether such sentence is in fact imposed) constitutes a failure to maintain
7          status under section 241(a)(1)(C)(i) of the Act.

8    8 CFR § 214.1(g).  Plaintiff's DUI arrest fails to meet these criteria in at least two ways.  One,

9    Plaintiff has not been convicted of any crime, he has only an arrest and charge.  (Dkt. No. 1 at 5.)

10   Two, the maximum penalty for a misdemeanor DUI in Washington is 364 days, which is just

11   short of a year imprisonment.  *See* Wash. Rev. Code §§ 46.61.502(5); 46.61.5055.  Additionally,

12   the DUI likely does not qualify as a "crime of violence."  *See Leocal v. Ashcroft*, 543 U.S. 1, 11–

13   13 (2004) (holding that a Florida DUI was not a "crime of violence" under 18 USC § 16, because

14   it does not involve a "substantial risk" of "using physical force against another person.").  To the

15   extent that Defendants terminated Plaintiff's SEVIS record merely because his name appeared in

16   a criminal records check, that is inconsistent with their own regulation, which renders the

17   decision invalid under § 706(2)(A).  *See supra*.

18         During the April 17 hearing, counsel for Defendants stated that the Government was not

19   relying on 8 CFR § 214.1(d) as granting authority for the termination but rather invoked 8 U.S.C.

20   § 1372.  That statute confers authority to *create* the SEVIS system but says nothing about

21   termination of a student's record in the system.  Contrastingly, 8 C.F.R. § 214.1(d) enumerates

22   the sole grounds under which DHS may initiate the termination of F-1 student's record in

23   SEVIS.  *See Jie Fang*, 935 F.3d at 185 n.100.  When one section of a statutory scheme passes

24

specifically upon the question at hand and the other section is silent, Courts understand the

specific to govern the general. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566

U.S. 639, 645 (2012). Here, 8 CFR § 214.1(d) speaks specifically to when a SEVIS record may

be terminated, 8 U.S.C. § 1372 does not.[6]

      Accordingly, termination of the SEVIS record because of the DUI arrest is inconsistent

with agency regulations, which renders the decision invalid. *Nat'l Ass'n of Home Builders*, 340

F.3d at 852; *Wallace*, 802 F.2d at 1552 n.8. Because Defendants' termination of Plaintiff's

SEVIS record was—based on the limited information currently available—not authorized by and

violated their own regulations, Plaintiff is likely to succeed in the argument that the agency

action is not in accordance with law under § 706(2)(A).

      2. <u>Arbitrary and Capricious for Lack of Explanation</u>

      Agency action is considered arbitrary and capricious if "the agency has relied on factors

which Congress has not intended it to consider, entirely failed to consider an important aspect of

the problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 43 (1983). As the Ninth Circuit has explained, the "critical factor in *Motor Vehicle*

was that the agency 'submitted no reasons at all' for its decision." *McFarland v. Kempthorne*,

545 F.3d 1106, 1113 (9th Cir. 2008) (citing *Motor Vehicle*, 463 U.S. at 50). The *Motor Vehicle*

standard has been applied to review individualized agency decisions as well as agency rules.

---

[6] When asked during the hearing if there is a specific provision in 8 U.S.C. § 1372 that provides authority for the termination of a student's SEVIS record, Defendants were unable to provide one.

*See, e.g.*, *Does 1 through 16 v. U.S. Dep't of Homeland Sec.*, 843 F. App'x 849, 852 (9th Cir. 2021); *McNeely v. United States Dep't of Lab.*, 720 F. App'x 825, 827 (9th Cir. 2017).

In this instance, Defendant has failed to meet "the general administrative-law requirement that an agency 'articulate a satisfactory explanation for its action.'" *Hernandez v. Garland*, 52 F.4th 757, 768 (9th Cir. 2022) (quoting *State Farm*, 463 U.S. at 43). Indeed, Defendant has failed to suggest any lawful grounds as to why its action here is lawful under the APA. *Motor Vehicle*, 463 U.S. at 50. Defendants' submission that they "do not concede that Doe has demonstrated a likelihood of success on the merits on his APA claim" but cannot defend it because "DHS and from the Department of State, and Defendants have not completed [factfinding] efforts in time to respond to Doe's motion" is inadequate under governing law. (Dkt. No. 12 at 9.) *C.f. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020).[7] The Court declines to "deny Doe's motion even in the absence of this factual information related to the APA claim." (Dkt. No. 12 at 9.) Indeed, Defendant's failure to provide a single plausibly lawful explanation for its action—an explanation reasonably grounded somewhere in the statutory scheme—is the exact circumstance contemplated by the arbitrary and capricious standard. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015) (en banc) ("[*Motor Vehicle*] teaches that even when reversing a policy after an election, an agency may not simply [change courses] without a reasoned explanation.").

Accordingly, Plaintiff is also likely to prevail on the claim that the agency action is arbitrary and capricious for failing to "articulate a satisfactory explanation for its action

---

[7] An agency need not consider every conceivable alternative, but when it is "not writing on a blank slate" it must consider the impact of its actions on vested reliance interests, especially in the immigration context, where individuals make "time-bounded commitment[s], to allow them to, say, graduate from their course of study." *Regents*, 591 U.S. at 32–33.

including a rational connection between the facts found and the choice made." *Motor Vehicle*, 463 U.S. at 43.

### B. Remaining TRO Factors Favor Plaintiff

As discussed *supra*, Plaintiff has established likelihood of success on the merits of his APA claim. The other injunctive relief factors favor Plaintiff as well. He faces multiple forms of irreparable harm as a result of termination of his SEVIS record, and the balance of equities weigh in his favor.

### 1. Plaintiff Faces Irreparable Harm

Plaintiff faces several forms of irreparable harm as a result of the termination of his SEVIS record. First, he cannot carry out research on his grant-funded doctoral program without an active SEVIS record. (Dkt. No. 3 at 5.) Accordingly, his research is stalled. Ultimately, if he is unable to complete the research and his doctoral program, he will lose four years' worth of full-time work, face diminished career prospects, and suffer reputational harm. (*Id.* at 12.) Second, while Defendants have not yet placed Plaintiff in removal proceedings, he faces the prospect of detention, removal proceedings, and ultimately deportation because termination of his SEVIS record indicates that he is not maintaining status in his program. *See* 8 U.S.C. § 1227(a)(1)(B) (a person who is not lawfully present is removable). And so long as Plaintiff is out of status, he may be accruing unlawful presence time, which acts as a future bar to admission and reentry to the United States. *See* 8 U.S.C. § 1182(a)(9)(B). Plaintiff's fears are not speculative, as DHS's own public-facing guidance states that a person whose SEVIS record is terminated faces the following consequences:

- Student loses all on- and/or off-campus employment authorization.

- Student cannot re-enter the United States on the terminated SEVIS record.

- Immigration and Customs Enforcement (ICE) agents may investigate to confirm the departure of the student.

- Any associated F-2 or M-2 dependent records are terminated. [8]

Turning now to examine each irreparable harm in more detail, the Court begins by considering the matter of employment authorization.  Multiple courts have held that loss of or delay in obtaining employment authorization is an irreparable harm.  *See Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 968 (D. Md. 2020), *order dissolved sub nom. Casa de Maryland, Inc. v. Mayorkas*, No. 8:20-CV-2118-PX, 2023 WL 3547497 (D. Md. May 18, 2023) (a delay in an asylum seeker obtaining work authorization is an irreparable harm because "every additional day these individuals wait will visit[] on them crippling dependence on the charity and good will of others"); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 434 (E.D.N.Y. 2018), *vacated and remanded sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) (finding that if the DACA program were terminated, resulting loss of work authorization for DACA recipients would be an irreparable harm).  Under these unique circumstances where Plaintiff's continued work and lawful immigration status are interlinked, the prospect of Plaintiff losing his grant-funded work as a doctoral candidate is likewise irreparable.  *See e.g., Karakozova v. Univ. of Pittsburgh*, No. 09CV0458, 2009 WL 1652469, at *4 (W.D. Pa. June 11, 2009) (holding that plaintiff, a research assistant who alleged her position was terminated on a discriminatory basis, could show irreparable harm from loss of position because she could lose her H-1B visa and have to leave the country voluntarily or by removal, with no certainty of alternative relief).

---

[8] *See* Dep't Homeland Security*, SEVIS Help Hub: Terminate A Student* (Nov. 7, 2024.) https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student.

Likewise, courts have held that interruption of educational programs or progress can be an irreparable harm. For instance, in *Tully v. Orr*, the court held that disenrolling a cadet from the United States Air Force Academy "just prior to his examinations and graduation" would be an irreparable harm where the cadet would face the prospect of having to repeat courses, "delay[] in both his graduation and commissioning," and a "deleterious effect" on his future in the force. 608 F. Supp. 1222, 1225, 1226 (E.D.N.Y. 1985). Some courts have specifically held that loss of opportunity to participate in post-secondary education programs is an irreparable harm. *See Maria v. Loyola Univ. of Chicago Stritch Sch. of Med.*, No. 24 C 1698, 2025 WL 96482, at *8 (N.D. Ill. Jan. 14, 2025) (accepting that loss of opportunity to participate in psychiatry residency is an irreparable harm, though denying injunction on other grounds); *Lujan v. United States Dep't of Educ.*, 664 F. Supp. 3d 701, 721 (W.D. Tex. 2023) (finding that erroneous loss of even one point on Fulbright scholarship application grading would be an irreparable harm, due to loss of opportunity to obtain scholarship). Here, as discussed, Plaintiff is currently unable to continue in his academic work,[9] and should that condition persist, he faces loss of grants and an inability to complete his degree—which is especially harmful where Plaintiff is just months away from graduation.

Next, the Court considers the threat of removal. Removal is not by itself an irreparable harm, in part because removal is (in at least some instances) reversible. *See Nken*, 556 U.S. at 430. However, in this case, the ordinary harms of removal would compound the other harms Plaintiff faces by effectively eliminating his ability to complete his degree program, causing him

---

[9] At the hearing, Plaintiff's counsel identified Plaintiff's grant is federally funded, which presumably means Plaintiff must maintain lawful status and that termination of Plaintiff's work authorization prevents Plaintiff from engaging in the grant funded work. The record though is not complete on this issue. Nonetheless, the Court concludes irreparable harm has been established based on the other harms identified.

economic and reputational loss wherever he ultimately resides.  Even if a removal order could be reversed and Plaintiff ultimately repatriated to the United States if he were wrongfully removed, it is unclear if Plaintiff's educational loss could be reversed (e.g., needing to reapply for admission, repeating incomplete coursework, and/or competing for funding to replace lost grants).  *See e.g.*, *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (in case challenging removal conditions during pandemic, finding that deportation was an irreparable harm because plaintiffs could not challenge deportation conditions and get effective relief after removal).  As counsel for Plaintiff explained at the April 17 hearing, doctoral programs typically involve supervision of the doctoral candidate by an adviser with specialized knowledge and reputation in the field, so the inability to complete a doctoral program due to status termination and removal cannot necessarily be remedied with re-starting another program at a different time and place.

Finally, as Plaintiff points out, he may also be accruing unlawful presence as a result of the SEVIS revocation, which other courts have held is irreparable.  In *Guilford College v. McAleenan*, the court set aside a USCIS policy memorandum purporting to redefine how accrual of unlawful presence is calculated for students deemed to be out-of-status on F or J visas.  389 F. Supp. 3d 377, 384 (M.D.N.C. 2019).  With respect to injunctive relief, the Court found that unlawful or unknowing accrual of unlawful presence would be irreparable because it could expose plaintiffs to three- or ten-year reentry bars, which are not judicially reviewable.  *Id.* at 394.  Other courts, including in this district, are in accord.  *See Garcia v. United States Customs & Border Prot.*, No. CV215468DMGJEMX, 2021 WL 4815945, at *4 (C.D. Cal. Aug. 20, 2021) (granting motion for preliminary injunction to prevent accrual of unlawful presence, and rejecting arguments that discretionary waiver or possibility of voluntary removal would render the harm not irreparable); *Ruiz-Diaz v. United States*, No. C07-1881RSL, 2008 WL 3928016, at

*2 (W.D. Wash. Aug. 21, 2008) ("The Court finds that halting the accrual of unlawful presence time and/or unauthorized employment for all class members during the pendency of this litigation will continue the *status quo ante litem,* will prevent irreparable harm to class members and their families, and will not cause defendants any undue hardship.").  During the April 17 hearing, Defendants could not confirm or deny if they consider Plaintiff to currently be out of status.  This places Plaintiff in a Catch-22: the University has advised him not to engage in any employment for risk of making him ineligible for reinstatement (*see* Dkt. No. 7-2 at 2), but Defendants suggest his failure to continue his grant-funded research may make him ineligible going forward.

>    2.  There is a Public Interest in Enforcement of Valid Regulations, and Balance of Equities Favor Plaintiff

"When the government is a party, the balance of equities and the public interest factors merge."  *Nken*, 556 U.S. at 435.  The public has a vested interest in a federal government that follows its own regulations.  As one court framed it: "the public has a strong interest in having a [government] that conducts itself fairly and according to its stated regulations and policies." *Cooney v. Dalton*, 877 F. Supp. 508, 515 (D. Haw. 1995); *see also Eight N. Indian Pueblos Council, Inc. v. Kempthorne*, No. CV 06-745 WJ/ACT, 2006 WL 8443876, *5 (D.N.M. Sept. 15, 2006) ("It is in the public interest that federal agencies comply with their own policies and with federal statutes.").  Here, Defendants assert that the public interest factors tip in their favor because the "public interest lies in the Executive's ability to enforce U.S. immigration laws." (Dkt. No. 12 at 9.)  However, Defendants have provided *no indication* that they complied with the relevant statutory scheme in "enforcing immigration laws" in this case.  (Dkt. No. 12 at 9.) Accordingly, this is a set of circumstances where the government and its decision-making processes will be best served by judicial review of a decision—and maintenance of the status quo

during that review—that appears both unlawful and likely to cause Plaintiff irreparable harm. Moreover, Defendants have not put forth evidence of how a TRO would cause them injury or harm. For these reasons, the Court determines that the balance of the equities and public interest factors tip sharply in Plaintiff's favor.

Finally, the Court addresses Defendant's argument that Plaintiff is "not only seeking to preserve the status quo on a temporary basis" but is rather requesting "an order compelling the defendants to change the status quo" because "he seeks emergency restoration of a record that has already been marked as terminated." (Dkt. No. 12 at 6.) Courts have long held that the "status quo ante litem" for the purposes of considering a temporary restraining order or preliminary injunction "refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy.'" *GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 809 (9th Cir. 1963). An interpretation of "status quo as the moment before filing a lawsuit but after alleged misconduct began "would lead to absurd situations, in which plaintiffs could never bring suit once infringing conduct had begun." *Id.*

This standard has been applied to government action as well as private disputes. *See, e.g., Doe #1 v. Trump*, 957 F.3d 1050, 1068–1069 (9th Cir. 2020); *S.A. v. Trump*, No. 18-CV-03539-LB, 2019 WL 990680, *13 (N.D. Cal. Mar. 1, 2019). For example, in *S.A.*, the court concluded that the status quo ante litem was the point before DHS stopped processing conditionally approved beneficiaries under a dual refugee/parole program. *See S.A.*, 2019 WL 990680, at *13. Accordingly, the court vacated DHS's decision to mass-rescind conditional approvals for 2,714 beneficiaries pending a final determination on the merits because that maintained the status quo ante litem. *Id*. at *17. Similarly, in this case, the "legally relevant

relationship between the parties before the controversy arose," describes the state of affairs *prior* to the termination of Plaintiff's SEVIS record. *Ariz. Dream Act Coalition v. Brewer*, 757 F. 3d 1053, 1060–1061 (9th Cir. 2014). Accordingly, Defendant's argument that "the relief Doe seeks is not a prohibitory injunction to maintain the status quo" is frustrated by decades of Ninth Circuit caselaw. (Dkt. No. 12 at 2.)

Finally, Defendant advances a confused argument that posits Plaintiff seeks "a final judgement on the merits" because a TRO is part of the final relief outlined in his complaint. (Dkt. No. 12 at 2.) Defendants are correct that "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). But what the *Camenisch* court was communicating was that findings of fact and conclusions of law made by a court in a preliminary injunction or TRO posture are preliminary and do not bind the court at the trial on the merits. *Id*. at 395–398. Thus, it is not appropriate to enter a *final judgement* at a TRO stage. *Id*. That is not what the Court is doing here. As the *S.A.* court emphasized, "nothing in *Camenisch* holds that the scope of a preliminary injunction cannot overlap with the relief requested for an eventual final judgment." *S.A*, 2019 WL 990680, at *16 n.59. Here, as in *S.A*., the order makes no final findings on the merits and merely returns the parties to the status quo ante litem.

### C. The Court Will Not Require a Bond

Under Federal Rule of Civil Procedure 65(c), in granting a PI or TRO, the court must require a movant to pay security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Ninth Circuit has held that "[d]espite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, *if any.*" *Johnson v. Couturier*,

572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)) (cleaned up). "In particular, '[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.'" *Id.* (quoting *Jorgensen,* 320 F.3d at 919). Here, Defendants request that the Court impose a bond "in an amount the Court determines to be appropriate." (Dkt. No. 12 at 10.) Defendants do not account for any costs they allege they will face if the TRO is issued erroneously, and the Court perceives none. Here, Defendants will face no cost from Plaintiff continuing his studies as he did before his SEVIS was terminated, and negligible or zero cost from restoring his SEVIS status to active. Plaintiff's only criminal history is the misdemeanor DUI for which he has been charged but not convicted, and he poses little if any risk to the public. The Court therefore exercises its discretion to waive the bond requirement.

## VI    CONCLUSION

Accordingly, it is ORDERED that Plaintiff's Motion for a Temporary Restraining Order (Dkt. No. 3) is GRANTED. Defendants are ENJOINED for a period of fourteen days from the date of this order, as follows:

1) Defendants shall restore Plaintiff's F-1 student record and I-20 in the Student and Exchange Visitor Information System (SEVIS);

2) Defendants shall set aside the April 7, 2025 F-1 student record and I-20 termination as to Plaintiff;

3) Defendants shall not terminate Plaintiff's student record and I-20 in SEVIS absent a valid ground as set forth in 8 C.F.R. §§ 214.1(d)–(g); 214.2(f).

4) Defendants are prohibited from detaining or transferring Plaintiff out of this Court's jurisdiction, or ordering the detention or transfer of Plaintiff out of this

Court's jurisdiction, as a result of the termination of his F-1 student record or I-20 in SEVIS on April 7, 2025; and

5) Defendants are prohibited from initiating removal proceedings against or deporting Plaintiff on the basis of the April 7, 2025 termination of his F-1 student record or I-20 in SEVIS.

It is furthered ORDERED that the security requirement of Rule 65(c) is waived.

Dated this 17th day of April, 2025.



David G. Estudillo
United States District Judge

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   STUDENT DOE,                              No.  2:25-cv-01103-DAD-AC

12              Plaintiff,

13        v.                                   ORDER GRANTING PLAINTIFF'S
                                               MOTIONS TO PROCEED UNDER
14   KRISTI NOEM, et al.,                      PSEUDONYM, FOR A PROTECTIVE
                                               ORDER AND FOR TEMPORARY
15              Defendants.                     RESTRAINING ORDER

16                                             (Doc. No. 5)

17

18
          This matter came before the court on April 17, 2025 for hearing on plaintiff's motion to
19
     proceed under pseudonym and for protective order and plaintiff's motion for temporary
20
     restraining order.  (Doc. Nos. 2, 5.)  Attorney Joye Wiley appeared in person on behalf of
21
     plaintiff.  Assistant United States Attorney Shelley D. Weger appeared in person on behalf of
22
     defendants.  For the reasons explained below, plaintiff's motions to proceed under pseudonym,
23
     for a protective order and for a temporary restraining order will be granted.
24
                                       **BACKGROUND**
25
          On April 14, 2025, plaintiff Student Doe filed his complaint against defendants Kristi
26
     Noem, Todd Lyons, and Department of Homeland Security ("DHS") for terminating plaintiff's
27
     Student and Exchange Visitor Information System ("SEVIS") record, which had the effect of
28

                                              1

terminating plaintiff's F-1 visa status. (Doc. No. 1.) In support of the pending motions, plaintiff presents evidence of the following.

Plaintiff, an international student with an F-1 visa, received an email on April 8, 2025 from his university notifying plaintiff that "SEVIS has terminated your record" and that the "[e]xplanation" provided by the government was that plaintiff had been "[i]dentified in" a "criminal records check and/or had their VISA revoked." (Doc. Nos. 2-2 at 2; 5-6 at 2.) The email also stated that ICE "agents may investigate to confirm the departure of the student[,]" "[n]o grace period is allowed[,]" and "[r]emaining in the United States on a terminated status may have serious consequences." (Doc. Nos. 2-2 at 3–4; 5-6 at 3–4.) There has been a recent surge in hate crimes, and the White House and DHS have communicated anti-immigrant sentiment. (Doc. No. 2 at 4–5.)

Plaintiff has "never been convicted of any crime[,]" and has "never had criminal charges filed against" him. (Doc. No. 5-5 at 2.) He "was detained two times by law enforcement in 2024, but no charges were filed and [he] received correspondence from law enforcement that no charges would be filed for lack of evidence." (*Id.*)

Based upon the allegations of his complaint, plaintiff asserts the following claims against defendants: (1) unauthorized SEVIS termination in violation of the Administrative Procedure Act ("APA"); (2) deprivation of procedural due process rights in violation of the Fifth Amendment; (3) unlawful detention in violation of the Fifth Amendment; (4) deprivation of procedural due process in violation of the APA; and (5) arbitrary and capricious SEVIS termination in violation of the APA. (Doc. No. 1 at ¶¶ 37–55.)

On April 14, 2025, plaintiff filed a motion to proceed under pseudonym and for protective order. (Doc. No. 2.) On April 15, 2025, plaintiff filed a motion for temporary restraining order. (Doc. No. 5.) That same day, the court required plaintiff to serve defendants with a copy of the complaint, the motion to proceed under pseudonym, the emergency motion for temporary restraining order, and accompanying papers. (Doc. No. 6.) The court also set the deadline for defendants to file any opposition to the pending motions on April 16, 2025 at 4:00 p.m., and set a hearing on the motions for April 17, 2025 at 10:00 a.m. (*Id.*.) The court further ordered that

1  defendants not take any action to remove plaintiff from the United States or out of this District

2  pending the scheduled hearing and unless and until the court ordered otherwise.  (*Id.*)  Also on

3  April 15, 2025, defendants filed designation of counsel for service.  (Doc. No. 7.)  On April 16,

4  2025, plaintiff filed proof of service of the required documents.  (Doc. Nos. 8, 9.)

5  **LEGAL STANDARD**

6  The standard governing the issuing of a temporary restraining order is "substantially

7  identical" to the standard for issuing a preliminary injunction.  *See Stuhlbarg Int'l Sales Co. v.*

8  *John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  "The proper legal standard for

9  preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the

10  merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

11  balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Stormans,*

12  *Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council,*

13  *Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th

14  Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just

15  possible, in order to obtain a preliminary injunction.'"); *Am. Trucking Ass'n, Inc. v. City of Los*

16  *Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  A plaintiff seeking a preliminary injunction must

17  make a showing on all four of these prongs.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

18  1135 (9th Cir. 2011).  The Ninth Circuit has also held that "[a] preliminary injunction is

19  appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were

20  raised and the balance of hardships tips sharply in the plaintiff's favor."  *Id.* at 1134–35 (citation

21  omitted).  The party seeking the injunction bears the burden of proving these elements.  *Klein v.*

22  *City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co.*

23  *v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted) ("A plaintiff must do more than

24  merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate*

25  immediate threatened injury as a prerequisite to preliminary injunctive relief.").  Finally, an

26  injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the

27  plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

28  /////

The likelihood of success on the merits is the most important *Winter* factor.  *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).  Plaintiff bears the burden of demonstrating that he is likely to succeed on the merits of his claims or, at the very least, that "serious questions going to the merits were raised." *All. for Wild Rockies*, 632 F.3d at 1131.

## ANALYSIS

### A.     Motion to Proceed Under Pseudonym and for Protective Order

Plaintiff moves to proceed under pseudonym with respect to the public and for a protective order that would:  (1) require the parties to redact or file any information identifying plaintiff under seal; (2) limit sharing by defendants' counsel of any information about plaintiff's identity or related personal information beyond what is reasonably necessary for this litigation and to comply with this court's orders; (3) prohibit the use of the information for any purpose outside of this litigation; and (4) prohibit disclosing the identity of plaintiff for purposes of detention or removal during the pendency of this litigation or until further order of the court. (Doc. No. 2 at 7–8.)  Defendants filed no opposition to plaintiff's motion to proceed under pseudonym but stated at the hearing that they opposed the motion on the grounds that it was unnecessary.

"The normal presumption in litigation is that parties must use their real names." *Doe v. Kamehameha Schs./Bernice Pauahi Bishop Est.*, 596 F.3d 1036, 1042 (9th Cir. 2010).  However, the court may "conceal[] parties' identities in order to protect them from retaliation by third parties and also to protect nonparties from reprisals." *Does I thru XXIII v. Advanced Textile*, 214 F.3d 1058, 1067 (9th Cir. 2000).  "[A] party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity." *Id.* at 1068.  Where "pseudonyms are used to shield the anonymous party from retaliation, the district court should determine need for anonymity by evaluating the following factors:  (1) the severity of the threatened harm; (2) the reasonableness of the anonymous party's fears; and (3) the anonymous party's vulnerability to such retaliation." *Id.* (citations omitted).

/////

4

Here, plaintiff presents evidence that the threatened harm includes "public shame, potential vigilante justice by community members with anti-immigrant sentiment, reputational harm, and possible detention and removal." (Doc. No. 2 at 3–6.) Plaintiff has provided evidence regarding surging hate crimes, anti-immigrant messaging from the White House and DHS, and the email plaintiff received warning that ICE "agents may investigate to confirm the departure of the student[,]" "[n]o grace period is allowed[,]" and "[r]emaining in the United States on a terminated status may have serious consequences." (Doc. Nos. 2 at 4–5; 2-2 at 3.) This evidence is sufficient to show that the threatened harm is severe, plaintiff's fears are reasonable, and plaintiff is vulnerable to retaliation. *See Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, at \*7 (E.D. Cal. Mar. 3, 2025) ("Given Petitioner is still at risk of removal should his asylum application be denied, he is also acutely vulnerable to retaliation."). Because defendants' counsel will have access to plaintiff's identity and be permitted to share that information as necessary for purposes of this litigation, the court identifies no prejudice to defendants, and the public's interest in knowing plaintiff's identity is minimal. *Doe*, 2025 WL 691664, at \*7 ("There is no prejudice to Respondents here — Petitioner's identity is fully known to the Court and Respondents — and the public interest in knowing Petitioner's identity is minimal and outweighed by Petitioner's need for anonymity.").

Federal Rule of Civil Procedure 5.2(e) provides that a court may require redaction of private information from court filings "for good cause." To show "good cause," the party seeking redaction must show that "specific harm or prejudice will result" if the protective order is not granted. *In re Roman Catholic Archbishop of Portland in Or.*, 661 F.3d 417, 424 (9th Cir. 2011). For the same reasons discussed previously, the court concludes plaintiff has shown good cause for requiring redaction of information identifying plaintiff. *Beilarus1 v. Mayorkas*, No. 2:24-cv-01925-MJP, 2025 WL 104387, at \*2 (W.D. Wash. Jan. 15, 2025) (finding good cause to redact information regarding immigration status).

"[O]rdinarily a party must show 'compelling reasons' to keep a court document under seal." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1095 (9th Cir. 2016). For the reasons discussed above, the court finds compelling reasons to require filing under seal of any

1    information identifying plaintiff.  *Doe*, 2025 WL 691664, at *7 ("While there is a strong

2    presumption in favor of access to public records, for the same reasons stated above [regarding

3    risk of removal], Petitioner has articulated compelling reasons that outweigh the general history

4    of access and the public policies favoring disclosure.").  Accordingly, plaintiff's motion to

5    proceed under pseudonym with respect to the public and for a protective order will be granted.

6    **B.    Motion for Temporary Restraining Order**

7        Plaintiff moves for a temporary restraining order stating that defendants are:  (1) enjoined

8    from terminating plaintiff's SEVIS record; (2) required to set aside their termination

9    determination; (3) prohibited from detaining, initiating removal proceedings, or removing

10   plaintiff based on the SEVIS termination; and (4) enjoined from directly or indirectly enforcing,

11   implementing, or otherwise taking any action or imposing any legal consequences as a result of

12   the termination of his SEVIS record.  (Doc. No. 5 at 17–18.)  As noted, defendants oppose

13   plaintiff's motion.  (Doc. No. 11.)

14       1.    <u>Likelihood of Success on the Merits</u>

15       Plaintiff brings two types of claims in his complaint—claims brought under the APA and

16   claims alleging violations of the Fifth Amendment.  The court first addresses plaintiff's first and

17   fifth claims for unauthorized SEVIS termination in violation of the APA and arbitrary and

18   capricious SEVIS termination in violation of the APA, respectively.  (Doc. No. 1 at ¶¶ 37–40,

19   52–55.)

20       a.    *Status Quo Ante Litem*

21       Defendants first argue plaintiff's requested injunction seeks to alter the status quo by

22   issuing an expedited order that would grant him the ultimate relief he seeks.  (Doc. No. 11 at 5.)

23   The court is not persuaded by this argument.  Instead, plaintiff properly seeks to restore the status

24   quo *ante litem*.  "The status quo ante litem refers not simply to any situation before the filing of a

25   lawsuit, but instead to the last uncontested status which preceded the pending controversy[.]"

26   *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (citation omitted).  The

27   last uncontested status existed before defendants terminated plaintiff's SEVIS record, placing

28   plaintiff at risk of detention and removal on that basis.  *See id.* ("In this case, the status quo ante

1    litem existed before Disney began using its allegedly infringing logo.  The interpretation of this

2    concept that Disney advocates would lead to absurd situations, in which plaintiffs could never

3    bring suit once infringing conduct had begun.").

4                    b.      *APA Legal Framework*

5            "The APA sets forth the procedures by which federal agencies are accountable to the

6    public and their actions subject to review by the courts."  *Dep't of Homeland Sec. v. Regents of*

7    *Univ. of Cal.*, 591 U.S. 1, 16 (2020) (internal quotation marks and citation omitted).  Only "final

8    agency actions are reviewable under the APA."  5 U.S.C. § 704; *see also* 5 U.S.C. § 701 (for

9    purposes of the APA's judicial review provisions, "agency action" has "the meaning[] given" by

10   5 U.S.C. § 551).  An "'agency action' includes the whole or a part of an agency rule, order,

11   license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).

12   Under § 706 of the APA, the court is "to assess only whether the decision was based on a

13   consideration of the relevant factors and whether there has been a clear error of judg[]ment."

14   *Regents*, 591 U.S. at 16 (internal quotation marks and citation omitted); *see also Transp. Div. of*

15   *the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. Fed. R.R. Admin.*, 988 F.3d 1170,

16   1178 (9th Cir. 2021).

17           The APA "requires agencies to engage in reasoned decisionmaking, and directs that

18   agency actions be set aside if they are arbitrary or capricious."  *Regents*, 591 U.S. at 16. (internal

19   citations and quotation marks omitted).  The district court's role "is simply to ensure that the

20   [agency] made no 'clear error of judgment' that would render its action 'arbitrary and

21   capricious.'"  *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (citing *Marsh v. Or.*

22   *Nat. Res. Council*, 490 U.S. 360, 378 (1989)).  "Factual determinations must be supported by

23   substantial evidence," and "[t]he arbitrary and capricious standard requires 'a rational connection

24   between facts found and conclusions made.'"  *League of Wilderness Defs./Blue Mountains*

25   *Biodiversity Project v. Connaughton*, 752 F.3d 755, 759–60 (9th Cir. 2014) (internal citations

26   omitted).  This requires the court to ensure that the agency has not, for instance:

27                   relied on factors which Congress has not intended it to consider,
                     entirely failed to consider an important aspect of the problem, offered
28                   an explanation for its decision that runs counter to the evidence

                                              7

1
2

before the agency, or [an explanation that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

3

*McNair*, 537 F.3d at 993 (quoting *Motor Vehicle Mfrs. Assn., Inc. v. State Farm Mut. Auto. Ins.*

4

*Co.*, 463 U.S. 29, 43 (1983)); *see also All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 492 (9th

5

Cir. 2023) (articulating the same arbitrary or capricious standard).

6

       c.     *Whether Privacy Act Bars Plaintiff from Seeking Relief Under APA*

7

      In their opposition, defendants note that plaintiff "frames several of his claims as arising

8

under the APA," and they argue that "though the APA generally waives the government's

9

immunity," such waiver is not applicable here.  (Doc. No. 11 at 6.)

10

      The APA waives sovereign immunity for actions in federal district court by "person[s]

11

suffering legal wrong because of agency action."  5 U.S.C. § 702.  That waiver, however, is

12

subject to three limitations:  (1) the plaintiff must "seek[ ] relief other than money damages";

13

(2) the plaintiff must have "no other adequate remedy"; and (3) the plaintiff's action must not be

14

"expressly or impliedly forbid[den]" by "any other statute."  *United Aeronautical Corp. v. United*

15

*States Air Force*, 80 F.4th 1017, 1022 (9th Cir. 2023) (citing 5 U.S.C. §§ 702, 704).  Here,

16

defendants argue that plaintiff's claims are subject to the second limitation, namely that "[t]he

17

Privacy Act provides an alternative, adequate remedy to the APA."  (Doc. No. 11 at 7.)

18

      To be adequate, however, an alternative remedy must at a minimum provide the plaintiff

19

"specific procedures" by which the agency action can receive judicial review or some equivalent.

20

*Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).  The adequacy of the relief available need not

21

provide review identical to that which the APA would provide, so long as the alternative remedy

22

offers the "same genre" of relief.  *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of*

23

*Justice*, 846 F.3d 1235, 1245 (D.C. Cir. 2017).  Nonetheless, an alternative remedy will not be

24

adequate "if the remedy offers only 'doubtful and limited relief.'"  *Garcia v. Vilsack*, 563 F.3d

25

519, 522 (D.C. Cir. 2009) (quoting *Bowen*, 487 U.S. at 901).

26

      The court concludes that the Privacy Act clearly does not provide plaintiff another

27

adequate remedy, as plaintiff's ability to seek relief under the Privacy Act is not even "doubtful,"

28

but nonexistent.  As defendants concede, the Privacy Act provides that an "individual" is "a

1    citizen of the United States or an alien lawfully admitted for permanent residence," (Doc. No. 11

2    at 7) (citing 5 U.S.C.A. § 552a(a)(2)), but plaintiff "is a national of an undisclosed African

3    country," (Doc. No. 11 at 7).  Accordingly, as defendants also concede, "the Privacy Act

4    precludes judicial review of Plaintiff's claims."  (*Id.* at 8.)  Because plaintiff would not qualify for

5    relief under the Privacy Act, the court concludes that he clearly does not have an alternative,

6    adequate remedy that limits the APA's waiver of the government's immunity.  *See Stenson*

7    *Tamaddon, LLC v. United States Internal Revenue Serv.*, 742 F. Supp. 3d 966, 988 (D. Ariz.

8    2024) (rejecting the IRS's argument that the plaintiff tax advisory firm is precluded from APA

9    review because the "plaintiff's clients can file a refund suit," noting that "it is immaterial whether

10   Plaintiff's clients possess an alternative remedy, as Plaintiff does not"); *Wagafe v. Biden*, No. 17-

11   cv-00094-LK, 2024 WL 2274349, at *5, 7 (W.D. Wash. May 20, 2024) (rejecting the defendants'

12   argument that "the INA provides an adequate alternative remedy for the [plaintiffs'] APA claims"

13   where "precluding district court jurisdiction could foreclose meaningful judicial review of the

14   [plaintiffs'] claims"); *Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 681 (N.D. Cal. 2020) (finding that

15   the "plaintiffs have no adequate alternative remedy to the APA," noting that courts have rejected

16   alternative remedy arguments where the process to seek alternative relief would be "arduous,

17   expensive, and long"); *see also Kashkool v. Chertoff*, 553 F. Supp. 2d 1131, 1142 (D. Ariz. 2008)

18   ("District courts have consistently found that there is no adequate alternative remedy available to

19   aliens seeking adjudication of adjustment of status applications. . . . This Court cannot discern a

20   reasonable alternative and, thus, concludes that Plaintiff has no adequate alternative remedy.").

21   /////

22   /////

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

### d. *Application of APA*

Plaintiff has provided the court with evidence that defendants terminated plaintiff's SEVIS record, effectively terminating plaintiff's F-1 status.[1] (Doc. No. 5-6 at 2–4.) This action constitutes a final decision reviewable under the APA. *See Jie Fang v. Dir. United States Immigr. & Customs Enf't*, 935 F.3d 172, 182 (3d Cir. 2019) ("The order terminating these students' F-1 visas marked the consummation of the agency's decisionmaking process, and is therefore a final order[.]"); *Yerrapareddypeddireddy v. Albence*, No. 20-cv-01476-PHX-DWL, 2021 WL 5324894, at *7 n.10 (D. Ariz. Nov. 16, 2021) ("Defendants contend this Court lacks jurisdiction because Yerrapareddypeddireddy has applied for reinstatement and is facing removal proceedings, both of which render the SEVIS termination non-final. However, the Third Circuit rejected similar arguments in *Fang v. Director U.S. Immigration & Customs Enforcement*, 935 F.3d 172 (3d Cir. 2019).") (citation omitted), *aff'd*, No. 21-17070, 2022 WL 17484323 (9th Cir. Dec. 7, 2022).

Therefore, pursuant to the APA, the court shall "hold unlawful and set aside" this "agency action" if it is "found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Here, plaintiff has presented evidence regarding the official explanation for the termination of plaintiff's SEVIS record. (Doc. No. 5-6.) According to this official explanation, plaintiff was "[i]dentified in" a "criminal records check and/or has had their VISA revoked." (*Id.* at 2.)

"A nonimmigrant's conviction in a jurisdiction in the United States for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed) constitutes a failure to maintain status." 8 C.F.R. § 214.1(g).

---

[1] Defendants argue termination of the SEVIS record does not equate to termination of plaintiff's F-1 visa status and in fact has no legal consequences. (Doc. No. 11 at 9.) However, defendants cite no authority for this proposition, and district courts addressing terminated SEVIS records have found that such an action necessarily involves terminating the plaintiff's F-1 status. *See, e.g.*, *John Roe, et al.*, 2025 WL 1114694, at *3 (finding that regulations limiting the circumstances in which F-1 student status may be terminated apply to "termination of Plaintiffs' F-1 student status under the SEVIS"). Furthermore, the notification plaintiff received warned that "[r]emaining in the United States on a terminated status may have serious consequences." (Doc. No. 5-6 at 4) (emphasis added).

1    However, plaintiff's declaration states that plaintiff has "never been convicted of any crime[,]"

2    and indeed has "never had criminal charges filed against" him.  (Doc. No. 5-5 at 2.)  He "was

3    detained two times by law enforcement in 2024, but no charges were filed and [he] received

4    correspondence from law enforcement that no charges would be filed for lack of evidence."  (*Id.*)

5    According to this evidence, plaintiff is likely to establish that he did not fail to maintain status

6    because he has not been convicted of a crime, much less a crime of violence for which a sentence

7    of more than one year imprisonment may be imposed.  8 C.F.R. § 214.1(g).  Furthermore, no

8    other ground for failure to maintain status is at issue here.  *See* 8 C.F.R. §§ 214.1(e)–(g).

9        "[T]he Code of Federal Regulations permits termination of a student's F-1 visa status in

10    three ways:  1) by revoking a waiver that the Attorney General had previously authorized under

11    § 212(d)(3) or (4) of the Immigration and Nationality Act; 2) 'by the introduction of a private bill

12    to confer permanent resident status,' or 3) 'pursuant to notification in the Federal Register, on the

13    basis of national security, diplomatic, or public safety reasons.'"  *Jie Fang*, 935 F.3d at 176

14    (quoting 8 C.F.R. § 214.1(d)).  Revocation of plaintiff's F-1 visa is not among the permitted

15    reasons for terminating his F-1 visa status in the SEVIS system.  *John Roe, et al. v. Noem, et al.*,

16    No. 25-cv-00040-BU-DLC, 2025 WL 1114694, at *3 (D. Mont. Apr. 15, 2025) ("8 C.F.R. §

17    214.1(d) does not provide statutory or regulatory authority to terminate F-1 student status in

18    SEVIS based upon revocation of a visa.").

19        Because plaintiff offers evidence supporting the conclusion that neither reason given for

20    termination is permitted by the applicable regulations, plaintiff will also likely show that

21    defendants' decision to terminate his SEVIS record, effectively terminating his F-1 status, was

22    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law in

23    violation of the APA.[2]  *See Liu v. Noem et al.*, No. 1:25-cv-00133-SE-TSM, Doc. No. 13 at 3

24    (D.N.H., Apr. 10, 2025) ("Based on the record before the court, Liu is likely to show that DHS's

---

[2]  Because plaintiff is likely to succeed on the merits of at least one of his claims brought under
the APA, the court need not address plaintiff's remaining claims. *Liu v. Noem et al.*, No. 1:25-cv-
00133-SE-TSM, Doc. No. 13 at 3 n.2 (Dist. N.H., Apr. 10, 2025) ("Because the court finds that
Liu has shown a likelihood of success on the merits of his APA claim in Count 2, it does not
address at this time his claim in Count 1 that DHS violated his due process rights under the Fifth
Amendment when it terminated his F-1 status in the SEVIS system.").

1    termination of his F-1 student status was not in compliance with 8 C.F.R. § 214.1(d) and was

2    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.");

3    *Isserdasani, et al. v. Noem, et al.*, No. 25-cv-00283-WMC, 2025 WL 1118626, at *5 (W.D. Wis.

4    Apr. 15, 2025) ("Specifically, based on the record currently before the court, Isserdasani is likely

5    to show that DHS's termination of his F-1 student status was not in compliance with 8 C.F.R. §

6    214.1(d) and was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

7    law under 5 U.S.C. § 706(2)(A)."); *John Roe, et al.*, 2025 WL 1114694, at *3 ("Therefore, the

8    Court finds that Plaintiffs are likely to succeed on the allegation that Defendants' termination of

9    Plaintiffs' F-1 student status under the SEVIS is arbitrary and capricious, an abuse of discretion,

10   contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction."); *cf.*

11   *Orlando Language Sch., Inc. v. Holder*, No. 6:13-cv-00703-ORL-37-GJK, 2013 WL 12141400,

12   at *3 (M.D. Fla. May 24, 2013) (finding termination of the plaintiff's SEVIS access was contrary

13   to law under the APA because the applicable statute did not provide for this option as a response

14   to the school's failure to apply for accreditation within one year).

15          e.      *The Court's Authority to Prohibit Removal and Detention*

16          One of the forms of relief plaintiff requests is a temporary stay preventing defendants

17   from removing plaintiff on the basis of his terminated SEVIS record or consequently terminated

18   F-1 visa status.  (Doc. No. 5 at 17–18.)  Defendants argue that 8 U.S.C. § 1252(g) prohibits

19   district courts from hearing challenges to decisions and actions about whether, when, and where

20   to commence removal proceedings, and that § 1226(e) bars relief that would impact where and

21   when to detain a noncitizen.  (Doc. No. 11 at 9–10.)

22          Title 8 U.S.C. § 1252(g) states as follows:

23               Except as provided in this section and notwithstanding any other
                 provision of law (statutory or nonstatutory), including section 2241
24               of Title 28, or any other habeas corpus provision, and sections 1361
                 and 1651 of such title, no court shall have jurisdiction to hear any
25               cause or claim by or on behalf of any alien arising from the decision
                 or action by the Attorney General to commence proceedings,
26               adjudicate cases, or execute removal orders against any alien under
                 this chapter.

27

28   /////

                                         12

1    Title 8 U.S.C. § 1226(e) states as follows:

2         The Attorney General's discretionary judgment regarding the
          application of this section shall not be subject to review. No court
3         may set aside any action or decision by the Attorney General under
          this section regarding the detention of any alien or the revocation or
4         denial of bond or parole.

5    "The Ninth Circuit has held consistently that Section 1252(g) should be interpreted

6    narrowly." *Sied v. Nielsen*, No. 17-cv-06785-LB, 2018 WL 1142202, at *21 (N.D. Cal. Mar. 2,

7    2018) (citing *United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (en banc)). "The

8    focus of Section 1252(g) is to limit 'judicial constraints upon prosecutorial discretion.'" *Id.* "By

9    contrast, Section 1252(g) does not divest courts of jurisdiction over cases that do not address

10   prosecutorial discretion and address 'a purely legal question, which does not challenge the

11   Attorney General's discretionary authority[.]'" *Id.* The Supreme Court has "indicated that the

12   reference to 'execut[ing] removal orders' appearing in that provision should be interpreted

13   narrowly, and not as referring to the underlying merits of the removal decision." *Maharaj v.

14   Ashcroft*, 295 F.3d 963, 965 (9th Cir. 2002) (citing *Reno v. Am.-Arab Anti-Discrimination

15   Comm.*, 525 U.S. 471, 482–87 (1999)). "The district court may consider a purely legal question

16   that does not challenge the Attorney General's discretionary authority, even if the answer to that

17   legal question—a description of the relevant law—forms the backdrop against which the Attorney

18   General later will exercise discretionary authority." *Hovsepian*, 359 F.3d at 1155.

19        "District courts have reached different conclusions regarding the scope of § 1252(g) when

20   a party requests a stay of removal." *Fatty v. Nielsen*, No. 17-cv-1535-MJP-BAT, 2018 WL

21   2244713, at *5 (W.D. Wash. Apr. 5, 2018) (collecting cases). This court is persuaded that

22   § 1252(g) addresses challenges predicated on purported improper use of discretionary authority to

23   commence removal proceedings, which is not at issue here. 8 U.S.C. § 1252(g). Instead, here,

24   plaintiff seeks a temporary stay preventing removal, which is permitted under 8 U.S.C. § 1252(g)

25   where the basis for the stay is distinct from how the government's prosecutorial discretion was

26   deployed. *See Dhillon v. Mayorkas*, No. 10-cv-00723-EMC, 2010 WL 1338132, at *9 (N.D. Cal.

27   Apr. 5, 2010) ("[T]he Court rejects the government's position that § 1252(g) is a jurisdictional bar

28   to the relief requested by the Dhillons-*i.e.,* a stay of removal. As those authorities indicate, the

13

1    stay sought on the removal order is not based on the Attorney General's decision to commence,

2    adjudicate, or execute a remand order within the meaning of § 1252(g).  Indeed, the Dhillons'

3    claim challenging the I-130 petition denial is fully collateral to the removal proceedings[.]");

4    *Chhoeun v. Marin*, 306 F. Supp. 3d 1147, 1159 (C.D. Cal. 2018) ("Contrary to the Government's

5    assertion, the Court has jurisdiction to hear Petitioners' claims regarding due process violations

6    and to order adequate injunctive relief."); *Ilyabaev v. Kane*, 847 F. Supp. 2d 1168, 1174 (D. Ariz.

7    2012) ("Respondents also argue that under 8 U.S.C. § 1252(g), as amended by the REAL ID Act,

8    the Court lacks jurisdiction to stay Petitioners' removal from the United States. . . .  Petitioners

9    are not challenging the Attorney General's discretionary decision to remove them.  Rather they

10   claim that it would be unlawful to remove them before they have had the opportunity to exercise

11   their legal right to challenge CIS's basis for revoking the I–140 Petition.  Because this is a legal

12   claim, not a challenge to the Attorney General's exercise of prosecutorial discretion, § 1252(g)

13   does not deprive the Court of jurisdiction."); *see also Arce v. United States*, 899 F.3d 796, 801

14   (9th Cir. 2018) ("[W]e are guided here, as elsewhere, by the general rule to resolve any

15   ambiguities in a jurisdiction-stripping statute in favor of the narrower interpretation, and by the

16   strong presumption in favor of judicial review[.]") (citations omitted).  Here the basis for the

17   requested stay preventing removal is the arbitrary and capricious or unlawful termination of

18   plaintiff's SEVIS record, which is distinct from any potential decision to initiate proceedings.[3]

19   *Id.*  The same reasoning applies to § 1226(e) regarding detention.  *See Jennings v. Rodriguez*, 583

20   U.S. 281, 295 (2018) ("As we have previously explained, § 1226(e) precludes an alien from

21   'challeng[ing] a "discretionary judgment" by the Attorney General or a "decision" that the

22   Attorney General has made regarding his detention or release.'  But § 1226(e) does not preclude

23   'challenges [to] the statutory framework that permits [the alien's] detention without bail.'").

24           Therefore, plaintiff's request to temporarily stay detention and removal on the basis of the

25   SEVIS termination is proper.  *John Roe, et al.*, 2025 WL 1114694, at *3 ("Defendants are

26   _____

27   [3]  Another provision does specifically regulate whether and when injunctions preventing removal
     are allowed, but that provision, 8 U.S.C. § 1252(f), limits "only permanent injunctions, not stays
     for temporary relief."  *Singh v. United States Citizenship & Immigr. Servs.*, No. 17-cv-01538-

28   JVS-JCG, 2018 WL 6265006, at *2 (C.D. Cal. Mar. 8, 2018) (citing *Maharaj*, 295 F.3d at 965).

1  prohibited from initiating removal proceedings against or deporting either Plaintiff on the basis of

2  the termination of their F-1 student status."); *Zheng v. Lyons*, No. 25-cv-10893-FDS, Doc. No. 8

3  at 1 (D. Mass. April 11, 2025) ("Defendant Todd Lyons, Acting Director, United States

4  Immigration and Customs Enforcement, and any agents acting under his authority or control, are

5  temporarily restrained . . . from arresting or detaining plaintiff Huadan Zheng, a/k/a Carrie Zheng,

6  under 8 U.S.C. § 1226(a), or otherwise for being unlawfully present in the United States without

7  legal permission or authority, based on the termination or revocation of her F-1 student visa.");

8  *Arizona Student Doe #2 v. Trump, et al.*, No. 4:25-cv-00175-AMM, Doc No. 7 at 2 (D. Ariz.

9  April 15, 2025) ("Defendants are temporarily enjoined for fourteen days from arresting and

10  detaining Plaintiff pending these proceedings, transferring Plaintiff away from the jurisdiction of

11  this District pending these proceedings, or removing Plaintiff from the United States pending

12  these proceedings").

13       2.       Likelihood of Irreparable Harm, Balance of Equities & the Public Interest

14       Here, plaintiff received an email from his school stating that as a result of the termination

15  of his SEVIS record, ICE agents may investigate to confirm his departure, no grace period is

16  allowed, and "remaining in the United States on a terminated status may have serious

17  consequences." (Doc. No. 5-6 at 3–4.) In the absence of a temporary restraining order, plaintiff

18  may experience detention and deportation, including to a third country, and this risk has left

19  plaintiff "very distressed[.]" (Doc. No. 5-5 at 2–3.) These current and threatened consequences

20  constitute risk of irreparable harm for which an award of monetary damages would not be

21  sufficient. *Liu*, No. 1:25-cv-00133-SE-TSM, Doc. No. 13 at 4. They also outweigh any minimal

22  hardship defendants may experience. *Id.*

23       Plaintiff argues the public interest is served by granting the temporary restraining order

24  because it "avoids undermining the missions of U.S. universities, preserves the substantial

25  benefits of international research and collaboration, and prevents potential chilling of

26  international student enrollment." (Doc. No. 5 at 16.) Additionally, based upon the evidence

27  now before the court, public safety is not jeopardized because plaintiff has no criminal

28  convictions and has never even been charged with a crime. (*Id.*) Defendants argue control over

1    immigration is a sovereign prerogative.  (Doc. No. 11 at 11.)  The court is persuaded that the

2    public interest favors plaintiff in this case.  *See Liu*, No. 1:25-cv-00133-SE-TSM, Doc. No. 13 at

3    4 ("The balance of the hardships and whether injunctive relief is in the public interest both weigh

4    in Liu's favor.  The only argument that the defendants offered on these factors was a concern that

5    a TRO in this case may interfere with ICE's ability to carry out its duties.").

6                                              **CONCLUSION**

7           For the reasons explained above,

8       1.    Plaintiff's motion to proceed under pseudonym and for protective order is

9             GRANTED;

10      2.    The court orders that:

11            a.  Plaintiff has permission to proceed pseudonymously with respect to the public;

12            b.  The parties are required to redact or file any information identifying plaintiff

13                under seal;

14            c.  Defendants' counsel may not share any information about plaintiff's identity

15                beyond what is reasonably necessary for the litigation and to comply with this

16                court's orders;

17            d.  The parties are prohibited from using the protected information for any

18                purpose outside of this litigation; and

19            e.  The parties are prohibited from disclosing the identity of plaintiff for purposes

20                of detention or removal for the pendency of this litigation or until further order

21                of the court;

22      3.    Plaintiff's motion for a temporary restraining order (Doc. No. 5) is GRANTED;

23      4.    The court orders that, pending the hearing and determination of the motion for

24            preliminary injunction, defendants are:

25            a.  Enjoined from terminating plaintiff's SEVIS record;

26            b.  Required to set aside their SEVIS record termination determination;

27            c.  Prohibited from detaining or removing plaintiff based on the SEVIS

28                termination; and

           d.   Enjoined from directly or indirectly enforcing, implementing, or otherwise taking any action or imposing any legal consequences as a result of the termination of his SEVIS record; and

5.    The court sets the following schedule with respect to plaintiff's motion for preliminary injunction:

    a.   Plaintiff shall file his motion for preliminary injunction by June 2, 2025;

    b.   Defendant shall file its opposition to the motion by June 16, 2025;

    c.   Plaintiff shall file any reply to the opposition by June 23, 2025;

    d.   The motion for preliminary injunction will be heard by the court on July 7, 2025 at 1:30 PM in Courtroom 4;

6.    No bond shall be required to be posted by plaintiff pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

Dated:  __**April 17, 2025**__        _____

DALE A. DROZD
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| YUNWEI CHEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cv-00733-TWP-MG |
| | ) | |
| KRISTI NOEM, | ) | |
| TODD LYONS, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER GRANTING TEMPORARY RESTRAINING ORDER</u>

This matter is before the Court on Plaintiff Yunwei Chen's ("Chen") Motion for Temporary Restraining Order and Preliminary Injunction (Filing No. 2) filed pursuant to Federal Rule of Civil Procedure 65. Chen seeks a Temporary Restraining Order ("TRO") and Preliminary Injunction against Defendants Kristi Noem, Secretary of the United States Department of Homeland Security ("DHS"), and Todd Lyons, Acting Director of United States Immigration and Customs Enforcement ("ICE") (together, "Defendants"). Chen, a Chinese citizen, is a PhD student at Indiana University ("IU"). He was recently notified by IU that his record in the Student and Exchange Visitor Information System ("SEVIS") and his F-1 student status were terminated. He seeks a temporary restraining order directing Defendants to set aside the termination of his SEVIS record and F-1 status and enjoining Defendants from "enforcing, implementing, or otherwise taking any action or imposing any legal consequences," including detention or removal of Chen, as a result of that termination. Although Defendants have appeared, filed a response, and attended a telephonic hearing, this Order addresses Chen's request for a TRO pursuant to Federal Rule of Civil Procedure 65(b). Chen's request for a Preliminary Injunction remains pending and will be ruled on in due course in a separate entry (*see* Filing No. 5). For the reasons discussed below, the

Court concludes that Chen has met his burden of demonstrating entitlement to entry of a TRO against Defendants. Therefore, Chen's request for a TRO is **granted**.

<h1 style="text-align:center">I.     <u>BACKGROUND</u></h1>

**A.**     <u>Statutory and Regulatory Background</u>

The Immigration and Nationality Act allows for the entry of international students into the United States to engage in a full course of study. (Filing No. 1 at 3); 8 U.S.C. § 1101(a)(15)(F)(i); (Filing No. 14 at 2). The State Department is responsible for issuing visas, including student visas that are often called "F-1 visas." (Filing No. 1 at 3). Issuance of an F-1 visa controls a student's lawful entry into the United States, and once admitted, a student may stay in the country as long as he continues to meet the requirements of his visa classification and maintains his F-1 status. 8 C.F.R. § 214.2(f). SEVIS is a centralized government database that tracks international students' compliance with their F-1 status. *About SEVIS*, Dep't of Homeland Sec., https://studyinthestates.dhs.gov/site/about-sevis (last visited Apr. 20, 2025). ICE uses SEVIS to monitor student status and track compliance with the terms of the student's status. Only schools and ICE may access SEVIS records (Filing No. 1 ¶ 15).

To maintain lawful status, a nonimmigrant, including F-1 visa students, may not engage in certain specified activity, including engaging in unauthorized employment, providing false information to DHS, or engaging in "criminal activity." 8 C.F.R. § 214.2(e)–(g). "Criminal activity" is narrowly defined to mean a "conviction . . . for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed)." 8 C.F.R. § 214.1(g). These actions may result in the termination of a student's SEVIS record, which could end that student's F-1 status, although the ultimate authority to issue or revoke F-1 visas lies with the State Department (Filing No. 14 at 4).

Absent conduct causing a status violation, ICE can terminate SEVIS records under only three circumstances: (1) a previously-granted waiver under 8 U.S.C. § 1182(d)(3) or (4) is revoked; (2) a private bill to confer lawful permanent residence is introduced in Congress; or (3) DHS publishes a notification in the Federal Register identifying national security, diplomatic, or public safety reasons for termination. 8 C.F.R. § 214.1(d). DHS cannot otherwise unilaterally terminate nonimmigrant status. *See Jie Fang v. Dir. U.S. Immigr. & Customs Enf't*, 935 F.3d 172, 185 n. 100 (3d Cir. 2019). The revocation of a visa by the State Department does not constitute a failure to maintain status and visa revocation is not, by itself, cause for termination of a student's SEVIS record (Filing No. 1 ¶ 19).

**B.    Factual Background**

Chen is a Chinese citizen and a current PhD student at IU (Filing No. 1-2). He came to the United States in 2013 to start his undergraduate studies. He obtained his undergraduate degree in 2017, obtained a master's degree from IU in 2019, and started his PhD program in 2020. *Id.* Chen is now five years into his PhD program and expects to graduate in 2027. *Id.* Chen has always abided by the terms of his F-1 status (Filing No. 1 ¶ 27).

On April 8, 2025, Chen received an email from IU stating his "SEVIS record and lawful F-1 status in the United States was terminated." (Filing No. 1-1). According to the email, "[t]he reason for the termination listed in SEVIS is, 'OTHER - Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated.'" *Id.* The email further stated, "[i]f you are currently working on-campus, you are advised to cease employment immediately." *Id.* Chen has a conviction for reckless driving in 2019, which is a misdemeanor under Indiana law and is not punishable by a sentence of more than one year (Filing No. 1 ¶ 29).

To date, Chen has invested over $800,000.00 in his education, which includes tuition and living expenses over the last twelve years (Filing No. 1-2). Defendants' sudden termination of

Chen's SEVIS record and F-1 status has interrupted his doctoral studies and caused him to lose his employment and income, "placing a significant financial burden on [him] and [his] family." *Id.* Chen also stands to lose $4,500.00 in tuition for the current semester and his rental payments for the rest of the year despite having his lawful status terminated (Filing No. 1 ¶ 30). Further, Chen had accepted job offers for the upcoming year "that would have helped build [his] professional experience" but has since lost those jobs, which has "set back [his] career development and damaged [his] professional reputation with potential employers." (Filing No. 1-2). On top of educational and financial concerns, Chen lives in "constant fear about [his] ability to remain in the country legally, which has made it difficult to focus or make any concrete plans." *Id.* " The sudden nature of the termination has left [him] feeling isolated and helpless." *Id.*

On April 17, 2025, Chen became one of the many students across the United States to file a Petition for Declaratory Judgment and Injunctive Relief seeking reinstatement of SEVIS records and F-1 student status (Filing No. 1). That same day he filed the instant Motion for Temporary Restraining Order and Preliminary Injunction (Filing No. 2). On the evening of April 17, 2025, the Court ordered Chen's counsel to provide any information regarding efforts to notify Defendants of his request for a TRO and set the TRO for a telephonic hearing at 11:00 a.m. EST on Friday, April 18, 2025 (the "Hearing") (Filing No. 6). Chen's counsel filed an Attorney Certificate later that evening (Filing No. 8). Shortly before the Hearing began, Defendants filed an appearance and their response to the request for a TRO (Filing No. 13; Filing No. 14). Counsel for both parties appeared at the Hearing and presented argument. The Court then gave the parties' leave to file supplements to their briefs (Filing No. 15). Later that evening, Chen filed a short reply brief (Filing No. 16). Defendants did not file any supplements.

## II.    LEGAL STANDARD

A court may grant a TRO under Federal Rule of Civil Procedure 65(b) only in extremely limited circumstances, and the TRO may only last up to fourteen days, unless before that time expires, it is extended for another fourteen days for good cause. *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 321 (7th Cir. 1984). The Seventh Circuit uses a two-step analysis to assess whether preliminary injunctive relief is warranted. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc.*, 549 F.3d 1079, 1085–86 (7th Cir. 2008), *abrogated on other grounds by Nken v. Holder*, 556 U.S. 418, 434 (2009). This analysis is the same to determine if a TRO is warranted. *Gray v. Orr*, 4 F. Supp. 3d 984, 989 n.2 (N.D. Ill. 2013). To warrant a TRO, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) plaintiff will suffer irreparable harm if the TRO is not granted. *See Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005). If these elements are satisfied, the Court must then balance the harm to the plaintiff if the restraining order is denied against the harm to the defendant if the restraining order is granted. *Id.* The greater the movant's likelihood of success on the merits, "the less strong a showing" the movant "must make that the balance of harm is in its favor." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003).

## III.    DISCUSSION

In his Petition, Chen asserts six claims against Defendants: (1) unauthorized SEVIS termination in violation of the Administrative Procedure Act ("APA"); (2) arbitrary and capricious SEVIS termination in violation of the APA; (3) violation of procedural due process under the Fifth Amendment; (4) violation of procedural due process under the APA; (5) unlawful SEVIS termination under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); and (6) unlawful detention in violation of the due process clause of the Fifth Amendment. He moves for a TRO to (1) enjoin Defendants' decision to terminate Plaintiff's SEVIS records and their F-1

5

student status, and (2) enjoin Defendants from directly or indirectly enforcing, implementing, or otherwise taking any action or imposing any legal consequences—including detaining or removing Plaintiff—as a result of that decision pending the instant case. (Filing No. 3 at 12).

Defendants oppose the Court granting a TRO. (Filing No. 14).

A.    **Status Quo**

As a preliminary matter, Defendants argue that a TRO is meant to "preserve the status quo," but Chen seeks to alter the status quo by "request[ing] that the Court order DHS to reinstate his SEVIS record." (Filing No. 14 at 6). However, "[t]he status quo is the last uncontested status which preceded the pending controversy." *Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*, 256 F.2d 806, 808 (7th Cir. 1958); *see Local 180 of Int'l Union, United Auto. Aircraft & Agr. Workers of Am., AFL-CIO v. J.I. Case Co.*, 281 F.2d 773, 775 n.1 (7th Cir. 1960) ("We have defined the status quo as the last uncontested status which preceded the pending controversy."); *Seagram-Distillers Corp. v. New Cut Rate Liquors*, 221 F.2d 815, 82 (7th Cir. 1955); *Student Doe v. Noem*, No. 25-cv-1103, 2025 WL 1134977, at *3 (E.D. Cal. Apr. 17, 2025) ("[P]laintiff properly seeks to restore the status quo *ante litem*. . . . The last uncontested status existed before defendants terminated plaintiff's SEVIS record, placing plaintiff at risk of detention and removal on that basis."). In this case, an order preserving the "status quo" would be one requiring Defendants to reinstate Chen's SEVIS record and F-1 status.

B.    **Likelihood of Success on the Merits**

The Court begins with Counts 1 and 2 of Chen's Petition, which assert claims under the APA. The APA governs judicial review of agency actions and waives federal sovereign immunity in some circumstances to allow for equitable relief from agency action or inaction. 5 U.S.C. § 702. Under the APA, a court may "hold unlawful and set aside agency action" that is "arbitrary,

capricious, an abuse of discretion," "short of statutory right," or "without observance of procedure required by law." *Id.* § 706(2)(A), (C)–(D).

Chen alleges the Defendants terminated his SEVIS record and F-1 status without any statutory or regulatory authority and without articulating their basis for the termination decision. He alleges the decision was therefore arbitrary, capricious, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law (Filing No. 1 at 7–8). Defendants respond that Chen is not likely to succeed on the merits of his APA claims because the Privacy Act bars APA review, Defendants' action is not a "final" agency action under the APA, and because this Court cannot enjoin a removal action. The Court will address each of the Defendants' arguments before discussing Chen's arguments.

### 1.  **The Privacy Act**

The APA waives sovereign immunity for actions in federal court by "person[s] suffering legal wrong because of agency action." 5 U.S.C. § 702. "That waiver, however, is subject to three limitations: (1) the plaintiff must 'seek[] relief other than money damages'; (2) the plaintiff must have 'no other adequate remedy'; and (3) the plaintiff's action must not be 'expressly or impliedly forbid[den]' by 'any other statute.'" *Student Doe*, 2025 WL 1134977, at *4 (alterations in original) (quoting *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1022 (9th Cir. 2023) (citing 5 U.S.C. §§ 702, 704)). Defendants argue that the third limitation applies, and the APA does not waive the United States' sovereign immunity as to Chen's APA claims because the Privacy Act provides the exclusive means for challenging the termination of SEVIS records.

"Where a statute vest exclusive jurisdiction over a category of claims in a specialized court . . . , it 'impliedly forbids' an APA action brought in federal district court." *United Aeronautical Corp.*, 80 F.4th at 1022; *see Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 (2012). Defendants contend that the Privacy Act "allows individuals to

challenge data contained in a government system of records in federal court and establishes a comprehensive scheme for such claims," but because noncitizens may not sue under the Privacy Act, Chen cannot (and does not[1]) assert a Privacy Act claim. (Filing No. 14 at 9); *United Aeronautical Corp.*, 80 F.4th at 1022 (rejecting argument that the Privacy Act provided similar plaintiffs an "other adequate remedy" because noncitizens may not sue under the Privacy Act).

The District Court for the District of Columbia recently rejected the Defendants' argument in *Alliance for Retired Americans v. Bessent*, -- F. Supp. 3d --, 2025 WL 740401, at *18 (D.D.C. Mar. 7, 2025). In that case, three organizations sued the Department of Treasury and Treasury Secretary, among others, after government personnel were given access to Treasury records containing the sensitive and personal information of plaintiffs' members. The defendants, like Defendants here, argued that the APA did not waive sovereign immunity as to the plaintiffs' claims because "Congress intended the remedies in the Privacy Act to be exclusive, impliedly forbidding related forms of relief under the APA." *Id.* at *18. The District of Columbia disagreed, stating that "the Supreme Court's more recent decision in *Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42 (2024), suggests that the Privacy Act is not the kind of comprehensive and 'exclusive' remedial statute that impliedly displaces related remedies under other statutes." *Id.* at *19. In *Kirtz*, the Supreme Court found that the Privacy Act did not foreclose a plaintiff's claims under the Fair Credit Reporting Act. The District of Columbia therefore found that "Congress did not intend for the Privacy Act to be an 'exclusive' source of claims or remedies for alleged mishandling of records about individuals that impliedly forbids other relief under the APA," and the defendants did not have sovereign immunity to the plaintiff-organizations' claims. *Id.*; *see Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Dep't of Labor*, -- F. Supp. 3d --, 2025 WL

---

[1] Because Chen does not assert a Privacy Act claim, the Court need not address the Defendants' argument that he has failed to exhaust his administrative remedies under the Privacy Act (Filing No. 14 at 9–10).

8

1129227, at *15 (D.D.C. Apr. 16, 2025) ("It appears, then, that the Supreme Court reads the Privacy Act to show no 'clear and convincing evidence' that Congress wanted to preclude review outside of the Act's confines, including through the APA. Hence, plaintiffs' reliance on the Privacy Act does not rob them of an APA cause of action." (citing *Alliance*, 2025 WL 740401, at *19; *Doe v. Chao*, 540 U.S. 614, 619, n.1 (2004))).

This Court is persuaded by the District of Columbia's analysis. The Supreme Court has held that the Privacy Act is not the exclusive means of challenging the mishandling of federal records, so the Privacy Act does not forbid Chen's APA claims. *Kirtz*, 601 U.S. at 63.

Defendants cite one decision in support of their argument that the Privacy Act impliedly forbids Chen's APA claims.[2] In *El Badrawi v. Department of Homeland Security*, the District of Connecticut, in dicta in a footnote, stated that because the Privacy Act applies only to U.S. citizens and lawful permanent residents, it "implicitly (if not explicitly) forbids nonresident aliens . . . from suing federal agencies to correct their records." 579 F. Supp. 2d 249, 279 n.35 (D. Conn. 2008). This non-precedential dicta is unpersuasive for several reasons. First, it predates the Supreme Court's decision in *Kirtz*. Second, this portion of *El Badrawi* has been cited only one other time, in 2010, also by the District of Connecticut. *Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106, 119 (D. Conn. 2010). Third, the District of Connecticut's reading of the APA appears to conflict with the Seventh Circuit's less restrictive reading. In *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765 (7th Cir. 2011), the Seventh Circuit held that the FTCA did not "implicitly prohibit injunctive

---

[2] Defendants cite three other cases that are inapplicable, since none of them discusses the APA or sovereign immunity. (Filing No. 14 at 9); *Durrani v. U.S. Citizenship & Immigr. Servs.*, 596 F. Supp. 2d 24, 28 (D.D.C. 2009) (dismissing *pro se* plaintiff's Privacy Act claim seeking to correct citizenship records to reflect his status as naturalized citizen because undisputed evidence did not show that plaintiff was ever naturalized); *Cudzich v. U.S. Immigr. & Naturalization Serv.*, 886 F. Supp. 101, 105 (D.D.C. 1995) (dismissing *pro se* plaintiff's Privacy Act claim because plaintiff was not a citizen or lawful permanent resident); *Raven v. Panama Canal Co.*, 583 F.2d 169, 171 (5th Cir. 1978) (dismissing Privacy Act claim because plaintiff was not a citizen or lawful permanent resident).

relief in tort suits against the United States" simply because the FTCA only refers to monetary relief and is silent as to injunctive relief. *Id.* at 776. The Seventh Circuit explained:

> There is nothing in the statute suggesting that Congress meant to forbid all actions that were not expressly authorized. To the contrary, section 702(2) requires evidence, in the form of either express language or fair implication, that Congress meant to forbid the relief that is sought. The [government's] effort to transform silence into implicit prohibition would seriously undermine Congress's effort in the APA to authorize specific relief against the United States. When Congress amended the APA in 1976 it gave every indication that it intended to provide specific relief for all nonstatutory claims against the government.

*Id.* at 775–76. The Seventh Circuit continued that because the type of claim asserted by plaintiffs "would not be cognizable under the FTCA in the first place," there is "no reason to think that it implicitly forbids a particular type of relief for a claim outside its scope." *Id.* at 776.

Here, Defendants attempt to seize upon a similar silence in the Privacy Act, but there is nothing in the Privacy Act suggesting that Congress meant to forbid all actions that were not expressly authorized, particularly because, as Defendants assert, a Privacy Act claim by Chen "would not be cognizable . . . in the first place." *Id.* at 776; ([Filing No. 14 at 9](#)).

The Supreme Court has also indicated that the Privacy Act does not impliedly forbid claims or remedies that are not expressly authorized. *Doe v. Chao*, 540 U.S. at 619 n.1 ("The Privacy Act says nothing about standards of proof governing equitable relief that may be open to victims of adverse determinations or effects, although it may be that this inattention is explained by the general provisions for equitable relief within the Administrative Procedure Act . . . ."); *accord Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 204 (5th Cir. 2024) (discussing FTCA claims); *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Office of Personnel Mgmt.*, -- F. Supp. 3d --, 2025 WL 996542, at *18–19 (S.D.N.Y. Apr. 3, 2025) ("[T]he Privacy Act explicitly provides for injunctive relief in two circumstances, while being silent regarding other circumstances. That is not 'fairly discernable' evidence that Congress intended to preclude judicial review of APA claims alleging

10

violations of the Privacy Act's substantive provisions or arbitrary and capricious actions by OPM that strike at the privacy concerns that drove the enactment of the Privacy Act. . . . [M]ore notably, the defendants have not identified any comparable cases in which injunctive relief which was ruled to be unavailable under the Privacy Act was not also available under the APA. Instead, the Supreme Court has suggested that injunctive relief is available under the APA in such circumstances.") (citing Supreme Court cases).

In sum, the Court is not persuaded by the dicta in *El Badrawi* and instead follows the reasoned analysis of the District of Columbia in *Allied*, which is well supported by, and consistent with, Supreme Court and Seventh Circuit precedent. Because the Supreme Court has held that the Privacy Act does not provide the exclusive remedy for mishandling of federal records, and because the Seventh Circuit does not read mere silence as a statutory prohibition against claims, the Court concludes that the Privacy Act does not explicitly or implicitly forbid Chen's claims, and the APA waives sovereign immunity against those claims.

## 2. **Finality of Agency Action**

Defendants next argue that Chen cannot succeed on his APA claims because "the agency's action is not final because no decision has been made on [Chen's] nonimmigrant status" and because Chen "could administratively challenge the relevant agency decision." (Filing No. 14 at 10). The APA "allow[s] any person 'adversely affected or aggrieved' by agency action to obtain judicial review thereof, so long as the decision challenged represents a 'final agency action' for which there is no other adequate remedy in a court." *Webster v. Doe*, 486 U.S. 592, 599 (1988) (quoting 5 U.S.C. §§ 701–06). For an "agency action" to be "final," 5 U.S.C. § 704, two conditions must be satisfied. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences

11

will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted). In other words, the

final agency action requirement "asks whether a 'terminal event' has occurred." *Driftless Area Land*

*Conservancy v. Rural Utis. Serv.*, 74 F.4th 489, 493 (7th Cir. 2023) (quoting *Salinas v. R.R. Ret.*

*Bd.*, 141 S. Ct. 691, 697 (2021)); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590,

597 (2016) (quoting *Bennett*, 520 U.S. at 178).

As to their first reason, Defendants argue Chen "cannot establish that the change in [his]

SEVIS record determines his rights or obligations as to his nonimmigrant status or that any legal

consequences have flowed from the change of [his] SEVIS record to set the status as terminated."

(Filing No. 14 at 10). In support, Defendants refile the Declaration of Andre Watson, the Senior

Official in the National Security Division for Homeland Security Investigations (Filing No. 14-2)

from another action pending in this Court, *Jelena Liu v. Noem*, No. 1:25-cv-00716-JPH-TAB (S.D.

Ind. Apr. 15, 2025), and a recent decision from the Eastern District of Michigan, *Deore v. Secretary*

*of U.S. Department of Homeland Security*, No. 25-cv-11038 (E.D. Mich. Apr. 17, 2025). Mr.

Watson's Declaration mostly relates to the facts of *Jelena Liu* but states, in relevant part:

> Terminating a record in SEVIS does not terminate an individual's nonimmigrant
> status in the United States. The statute and regulations do not provide SEVP the
> authority to terminate a nonimmigrant status by terminating a SEVIS record, and
> SEVP has never claimed that it terminated [the *Jelena Liu*] plaintiffs' nonimmigrant
> status. Furthermore, the authority to issue or revoke visas for nonimmigrant
> students like the [*Jelena Liu*] plaintiffs' lies with the Department of State, not
> SEVP. Terminating a record within SEVIS does not effectuate a visa revocation.

(Filing No. 14-2 ¶ 35). In *Deore*, the court denied the plaintiff's request for a TRO because "it

[was] not clear that the Plaintiffs' F-1 status were terminated alongside their SEVIS records," and

there was "substantial uncertainty over the effect of SEVIS record terminations" and whether that

termination alone "carries any legal consequences." (Filing No. 14-5 at 10).

In *Jelena Liu* and *Deore*, the defendants had submitted evidence (including a similar

declaration from Mr. Watson) or made representations that there had been no status change for the

plaintiffs in those cases. *Id.* at 7 ("At the motion hearing, the Government also represented that it does not currently believe that there has been any status change for any of the students, even considering the termination of the SEVIS records."); (Filing No. 14-2 ¶ 35 (relating to plaintiffs in the *Jelena Liu* case)). At the Hearing in this case, Defendants were unable to tell the Court "exactly what happened" with Chen, so there is no evidence contradicting Chen's evidence that both his SEVIS record *and* his F-1 status were terminated. (Filing No. 1-1 at 2 (telling Chen his "SEVIS record and lawful F-1 status in the United States was terminated"); *J.P. Morgan Secs. LLC v. Weiss*, 19-cv-4163, 2019 WL 6050176, at *4 (S.D. Ind. Nov. 15, 2019) ("[H]earsay can be considered in entering a preliminary injunction.") (quotation marks omitted); *Chandraprakash Hinge v. Lyons*, No. 25-1097, 2025 WL 1134966, at *4 & n.10 (D.D.C. Apr. 15, 2025) (granting TRO; "[D]efendant cited the . . . Declaration of Andre Watson . . . . However, even if this is true, in the . . . hearing, government counsel was unable to confirm that ICE would not interpret its SEVIS record termination and the subsequent action taken by the plaintiff's university in response to that termination, as effectively terminating the plaintiff's F-1 status and providing grounds for the plaintiff to be subject to arrest, deportation, and accruing unlawful presence."). At this stage, Chen has shown that his F-1 status was also terminated, so the Court need not reach the question of whether the SEVIS record termination, absent a termination of F-1 status, is a final agency action.

Chen argues that the termination of his F-1 student status is a final agency action. Defendants do not address this argument in their response. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (concluding that "failure to respond to an argument—as [is the case] here—results in waiver"). The Court agrees with Chen. In *Jie Fang v. Director U.S. Immigration & Customs Enforcement*, 935 F.3d 172 (3d Cir. 2019), the Third Circuit held that the defendants' termination of the plaintiffs' lawful F-1 status was a final agency action. *Id.* at 179–85. The Third

Circuit found that the termination of the students' F-1 status marked the consummation of the agency's decision-making process, and that the termination order determines a right or obligation because it "end[s] the student's legal status in the United States." *Id.* at 180; *See Doe v. Noem*, -- F. Supp. 3d --, 2025 WL 1141279, at *3 (W.D. Wash. Apr. 17, 2025) (holding that termination of SEVIS record and student status was a final agency action).

Defendants next argue that the termination of Chen's F-1 status is not "final" because Chen "could administratively challenge the relevant agency decision." (Filing No. 14 at 10). Defendants do not elaborate on this argument, aside from citing two regulations: 8 C.F.R. § 214.2(f)(16), regarding the reinstatement of student status; and 22 C.F.R. § 41.122(b), regarding provisional revocation of visas. The Third Circuit also rejected this argument in *Jie Fang*:

> First, there is no statutory or regulatory requirement that a student seek reinstatement after his or her F-1 visa [status] has been terminated. Moreover, even if the students attempt to pursue the administrative procedures for reinstatement, there is no mechanism to review the propriety of the original termination order. Second, the students need not wait for removal proceedings to be instituted. . . . [A]n order's finality cannot depend on the institution of removal procedures which may never occur. And in any event, immigration judges cannot review the original denial of reinstatement. They do not have that authority.

935 F.3d at 182; *see Young Dong Kim v. Holder*, 737 F.3d 1181 (7th Cir. 2013) ("[N]either the [immigration judge] nor the [Board of Immigration Appeals] may review the USCIS's discretionary denial of a motion to reinstate student status."). At the Hearing, Chen echoed the Third Circuit's reasoning, noting that during deportation proceedings, an immigration judge considers the termination of a lawful status but not the reason for that termination.

At this initial stage, the Court finds Chen is reasonably likely to show that Defendants' decision to terminate his F-1 status is a reviewable final agency action. *See Chandraprakash Hinge*, 2025 WL 1134966, at *5 ("If the plaintiff's lawful status in the United States has been revoked, whether directly by ICE or indirectly by his university's correct interpretation of the

action it is required to take in response to ICE's actions, that revocation will affect the plaintiff's 'rights or obligations . . . from which legal consequences will flow.' Thus, the Court concludes that it must grant the plaintiff's request for a temporary restraining order until a further status conference is held in order to allow government counsel to address these ambiguities after conferring with the agency he represents." (omission in original) (quoting *Bennett*, 520 U.S. at 177–78)).

### 3. **Authority to Enjoin Removal Proceedings**

Defendants lastly argue that Chen "seeks an injunction barring the government from initiating removal proceedings," but "the Court lacks jurisdiction or authority to entertain such a claim" because 8 U.S.C. § 1252(g) forecloses judicial review of decisions to commence removal proceedings and because the decision to commence removal proceedings is committed to agency discretion. (Filing No. 14 at 10); 5 U.S.C. § 701(a)(1)–(2). Section 1252(g) provides, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings . . . against any alien under this chapter." In *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999), the Supreme Court instructed courts to read § 1252(g) narrowly. *Id.* at 486; *see Fornalik v. Perryman*, 223 F.3d 523, 531 (7th Cir. 2000) ("[A]lmost every alien who brings a claim to federal court . . . does so because she is threatened with removal from the United States. . . . As the INS would have it here, the alien not only would be barred from raising virtually all claims *prior* to removal proceedings (because of exhaustion requirements), but then § 1252(g) would preclude jurisdiction of all claims brought *after* removal is threatened. Such a sweeping reading would be inconsistent with the narrow interpretation of § 1252(g) that *AADC* commands." (emphases in original)).

The Seventh Circuit has explained that § 1252(g) applies only to "judicial review 'arising from'" the enumerated actions, including commencing removal proceedings. *Sharif ex rel. Sharif*

15

*v. Ashcroft*, 280 F.3d 786, 787 (7th Cir. 2002). The cases cited by Defendants involve claims arising from a discretionary decision to commence removal proceedings. (Filing No. 14 at 11); *Kightlinger v. Napolitano*, 500 F. App'x 511, 514–15 (7th Cir. 2013) (dismissing APA claim challenging removal order under § 1252(a)(5), which precludes district court review of final removal orders); *Albarran v. Wong*, 157 F. Supp. 3d 779, 785 (N.D. Ill. 2016) (dismissing APA case under § 1252(g) because the claim "arises from" the defendants' decision to execute a reinstated removal order); *Garcia v. Dep't of Homeland Sec.*, No. 19-cv-1265, 2019 WL 7290556, at *3 (N.D. Ill. Dec. 30, 2019) (dismissing APA claim challenging DHS's denial of request for a stay of removal proceedings because it "arises from" a decision to execute a removal order).

This case is more analogous to the Seventh Circuit case *Fornalik v. Perrman*. In *Fornalik*, the plaintiff challenged the Attorney General's denial of his application for adjustment of status, but by the time the plaintiff filed a habeas petition, the government had threatened to commence removal proceedings, so the plaintiff requested a stay of his removal. 223 F.3d at 532. The Seventh Circuit "reject[ed] the [government's] argument that the district court properly invoked § 1252(g) to reject [the plaintiff's] claim" because "[h]is claim is not that the Attorney General is unfairly executing a removal order, but rather that a prior, unrelated error makes his removal improper. This makes our case entirely different from other decisions of this circuit that have applied *AADC*." *Id.* at 553. The *Fornalik* court accordingly exercised jurisdiction over the plaintiff's habeas action and stayed the execution of his removal order. *Id.* at 533. Here, Chen does not challenge a decision to commence removal proceedings and instead challenges Defendants' termination of his SEVIS record and F-1 status. Chen's request that the Court enjoin removal proceedings, as in *Fornalik*, "comes into the case only incidentally." *Fornalik*, 223 F.3d at 532.

At least two other district courts have reached this same conclusion in very similar cases. In *Student Doe v. Noem*, the plaintiff student sued Defendants "for terminating plaintiff's [SEVIS] record, which had the effect of terminating plaintiff's F-1 visa status." 2025 WL 1134977, at *1. The plaintiff sought the same injunctive relief that Chen seeks, and the Defendants argued that § 1252(g) barred that relief. The Eastern District of California noted that under Ninth Circuit precedent, like Seventh Circuit precedent, § 1252(g) "'does not divest courts of jurisdiction over cases that do not address prosecutorial discretion and address "a purely legal question, which does not challenge the Attorney General's discretionary authority."'" *Id.* at *7 (quoting *Sied v. Nielsen*, No. 17-cv-6785, 2018 WL 1142202, at *21 (N.D. Cal. Mar. 2, 2018) (quoting *United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (en banc))). The *Student Doe* court therefore held that § 1252(g) "addresses challenges predicated on purported improper use of discretionary authority to commence removal proceedings, which is not at issue," so "plaintiff's request to temporarily stay detention and removal on the basis of the SEVIS termination is proper." *Id.* at *7–8 ("The same reasoning applies to § 1226(e) regarding detention."). In *Osturk v. Trump*, -- F. Supp. 3d --, 2025 WL 1145250, at *12 (D. Vt. Apr. 18, 2025), the District of Vermont noted that the Second Circuit, also like the Seventh Circuit, has held that "a suit brought against immigration authorities is not *per se* a challenge to a removal order; whether the district court has jurisdiction will turn on the substance of the relief that a plaintiff is seeking." *Id.* at *12 (quoting *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011) (citing *Kellici v. Gonzales*, 472 F.3d 416, 420 (6th Cir. 2006) (exercising jurisdiction over action where plaintiff "challenged only the constitutionality of the arrest and detention, not the underlying administrative order of removal")). The *Orturk* court held that the plaintiff's claims challenging her "apprehension, detention, and the termination of her SEVIS" did not "raise challenges to the removal process," so § 1252 did not apply. *Id.*

17

The Court additionally notes that other district courts in this Circuit have entered the same type of injunction that Chen request. *Nali v. Noem*, No. 25-cv-3969, Doc. No. 21 (N.D. Ill. Apr. 18, 2025); *Isserdasani v. Noem*, No. 25-cv-283, 2025 WL 1118626, at *6 (W.D. Wis. Apr. 15, 2025). And several other district courts throughout the country have as well. *Prasanna Oruganti v. Noem*, No. 25-cv-409, 2025 WL 1144560, at *8 (S.D. Ohio Apr. 18, 2025); *Zeel M. Patel v. Bondi*, No. 25-CV-101, 2025 WL 1134875, at *3 (W.D. Pa. Apr. 17, 2025); *Doe v. Noem*, 2025 WL 1141279, at *10; *Student Doe*, 2025 WL 1134977, at *8; *Arizona Student Doe #2 v. Trump*, No. 4:25-cv-00175, Doc 7 at 2 (D. Ariz. Apr. 15, 2025); *C.S. v. Noem*, No. 25-cv-477, Doc. No. 22 (W.D. Pa. Apr. 15, 2025); *Roe v. Noem*, No. CV 25-40, 2025 WL 1114694, at *4 (D. Mon. Apr. 15, 2025); *Zheng v. Lyons*, No. 25-cv-10893, Doc. No. 8 at 1 (D. Mass. Apr. 11, 2025). The Court concludes, at least at this stage, that it may enjoin Defendants from imposing any consequences, including detention and removal, of the termination of Chen's SEVIS record and F-1 status.

### 4. **Chen's Likelihood of Success on the Merits**

Chen argues he is likely to succeed on the merits of his APA claims because he has committed none of the violations that would trigger the lawful termination of his F-1 student status, and Defendants did not terminate his SEVIS record in compliance with 8 C.F.R. § 214.1(d) (Filing No. 3 at 8). Chen suspects that Defendants terminated his SEVIS record and F-1 status because of his 2019 conviction for reckless driving, which is a misdemeanor not punishable by a sentence of more than one year and is thus not "criminal activity" under 8 C.F.R. § 214.1(g). *See* Judgment and Order Re: Sentencing, *Indiana v. Chen*, No. 55D02-1810-F5-1717 (Morgan Sup. Ct. No. 2 Aug. 15, 2019); Ind. Code § 9-21-8-52(a)(1) (offense levels); Ind. Code §§ 35-50-3-2 & -4 (potential sentences). During the Hearing, Defendants conceded that based on Chen's allegations, this is likely what happened. "Accordingly, plaintiff [Chen] has shown a substantial, if not overwhelming, likelihood of success on the merits of his claim . . . that DHS violated the APA

when it summarily terminated his F-1 student status in SEVIS without cause." *Isserdasani*, 2025 WL 1118626, at *5. Specifically, based on the pleadings and evidence before the Court, Chen is likely to show that Defendants' termination of his SEVIS record and F-1 status was not in compliance with 8 C.F.R. 214.1(d) and was arbitrary, capricious, an abuse of discretion, and not in accordance with law under 5 U.S.C. § 706(2)(A).

To obtain preliminary injunctive relief, Chen must only show a reasonable likelihood of success on at least one of his claims, not all of them. *See, e.g.*, *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1096. The Court need not, and therefore does not, address Chen's likelihood of success on his due process claims or claim under the *Accardi* doctrine. *See Liu*, No. 25-cv-133, Doc. No. 13 at 3 n.2 (declining to address likelihood of success on due process claim); *Roe*, 2025 WL 1114694, at *3 (same); *Prasanna Oruganti*, 2025 WL 1144560, at *6 n.5 (same) (citing cases); *Doe v. Noem*, 2025 WL 1141279, at *4 n.5 (same).

## C.  Irreparable Harm and Inadequate Remedy at Law

Chen argues that absent an injunction, he will suffer irreparable harm in the form of potential detention and removal, "catastrophic financial hardship," and the interruption and potential loss of his education. DHS responds that Chen has not shown a likelihood of irreparable harm because DHS has not yet initiated removal proceedings and Chen is not being detained, and that his alleged monetary injuries alone generally do not constitute irreparable harm (Filing No. 14 at 13). Defendants also note that this Court recently denied a request for a TRO in another case, *Jelena Liu*, due to an insufficient showing of irreparable harm (Filing No. 14-1). On reply, Chen asserts that without an injunction, "[h]e cannot continue his PhD program, which includes stalling all research associated with that program," and "if he is unable to complete his research and his doctoral program, he will lose the past 5 years' worth of work, face diminished career prospects, and suffer reputational harm," on top of his concerns regarding removal (Filing No. 16 at 5).

19

In *Jelena Liu*, the seven plaintiffs, who are students from universities throughout Indiana,[3] challenged the termination of their SEVIS record and student status and seeking a temporary restraining order. 2025 WL 1141023, at *1. All of the plaintiffs alleged concerns about possible removal, and each plaintiff generally alleged that they "may never be able to complete [their] studies," with a few plaintiffs identifying lost income from jobs at their universities, and one PhD student alleging the risk of losing a fellowship. The Court denied the request for a temporary restraining order because "'some possibility' of deportation is not enough to show irreparable harm," and each plaintiff's "conclusory statement that they will not be able to complete their studies," without evidence "that they would not be able to resume and complete their academic programs if they prevail," were not enough to demonstrate irreparable harm. *Id.* at *3.

Chen offers more specific evidence of irreparable harm. Chen does not merely allege that he is worried he will not be able to continue his education as planned. He explains that he has invested twelve years and $800,000.00 in his education to date, and he is already five years into his doctoral research and program. Chen also describes how he has lost previously accepted jobs, which has "set back [his] career development and damaged his reputation with potential employers." (Filing No. 1-2 at 2). These allegations provide more context to Chen's alleged irreparable harm than the plaintiffs' conclusory allegations in *Jelena Liu*.

Further, Chen's doctoral program is not the type that could simply be resumed if Chen ultimately prevails. Unlike undergraduate or even masters programs, which typically have more standardized curricula and take fewer years to complete, doctoral programs are highly specialized and time intensive and cannot easily be put down and picked back up. *See Doe v. Noem*, 2025 WL

---

[3] Most of the plaintiffs in *Jelena Liu* do not reside in the Southern District of Indiana, and the Court in *Jelena Liu* expressed concern as to whether this this district is the proper venue for those plaintiffs' claims. 2025 WL 1141023, at *4. In this case, Defendants do not dispute that venue is proper in this Court.

1141279, at *8 ("[D]octoral programs typically involve supervision of the doctoral candidate by an adviser with specialized knowledge and reputation in the field, so the inability to complete a doctoral program due to status termination and removal cannot necessarily be remedied with re-starting another program at a different time and place."). Chen's status as a noncitizen may compound these concerns, since it may be more difficult for him to be readmitted to a similar doctoral program, especially if he is removed from the country. *Zeel M. Patel*, 2025 WL 1134875, at *2 n.3 ("While delays in education alone have generally been found not to amount to irreparable harm, the circumstances here are unique in that Patel is at risk of accruing days that could accumulate to prevent future reinstatement of F-1 status." (quotation marks and citations omitted)). Chen's situation is therefore distinguishable from other cases in this Circuit finding that "a potential gap" in education, by itself, is "generally not irreparable harm." *Jelena Liu*, 2025 WL 1141023, at *3 (citing *Medlock v. Tr. of Ind. Univ.*, No. 11-cv-977, 2011 WL 4068453, at *9 (S.D. Ind. Sept. 13, 2011) (finding that plaintiff, an undergraduate student at IU, would be eligible for reinstatement at IU, considering that plaintiff had already been admitted into George Mason University for the upcoming academic year); *Doe v. Bd. of Trs. of Univ. of Ill.*, No. 17-CV-2180, 2017 WL 11593304, at *2 (C.D. Ill. Dec. 18, 2017) (finding "no indication" that plaintiff could not attend another university or that plaintiff could not apply for readmission at the conclusion of his suspension)).

The Court finds that these considerations regarding Chen's specific degree path and progress, coupled with his allegations regarding financial harm, loss of present and future employment opportunities, and potential removal, place Chen's claims within the realm of irreparable harm with no adequate remedy at law. *See Isserdasani*, 2025 WL 1118626, at *5 ("Given the amount of Isserdasani's educational expenses and potential losses from having to leave the United States without obtaining his degree, the court concludes that Isserdasani credibly

demonstrates that he faces irreparable harm for which he has no adequate remedy at law in the absence of injunctive relief."); *Prasanna Oruganti*, 2025 WL 1144560, at *5 (citing *Isserdasani* and four other similar cases finding irreparable harm; granting TRO); *Doe v. Noem*, 2025 WL 1141279, at *8 ("[I]n this case, the ordinary harms of removal would compound the other harms Plaintiff faces by effectively eliminating his ability to complete his degree program, causing him economic and reputational loss wherever he ultimately resides.").

**D.    Balance of Equities and Public Interest**

The final two questions are whether the balance of harms weigh in favor of preliminary relief and whether the public will benefit from the proposed injunction. "When the government is a party, the balance of equities and the public interest factors merge." *Nken*, 556 U.S. at 435. The Court "weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).

Chen asserts that while he is suffering "significant and devastating harm in the absence of injunctive relief," Defendants "have no substantial interest in terminating the status of one diligent, hard-working student." (Filing No. 11 at 3). He also contends that "'[t]he public interest is served when administrative agencies comply with their obligations under the APA" and "can only be served by the halting of ongoing unconstitutional government action." *Id.* (quoting *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009)) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Defendants do not respond to these arguments. The Court agrees with Chen that the balance of equities weighs strongly in his favor, considering the lack of potential harm to Defendants and Chen's very strong likelihood of success on the merits of his claims. The Court also agrees that the public interest would be served by ensuring that SEVIS record and F-1 student

status terminations occur only pursuant to applicable law. *See Zeel M. Patel*, 2025 WL 1134875, at *3; *Prasanna Oruganti*, 2025 WL 1144560, at *7; *Student Doe*, 2025 WL 1134977, at *9.

**E.**    <u>**Bond**</u>

According to Rule 65(c), "[t]he court may issue a . . . temporary restraining order . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Nevertheless, a district court may "waive the requirement of an injunction bond" when "the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction." *Habitat Educ. Ctr. v. United States Forest Serv.*, 607 F.3d 453, 458 (7th Cir.2010) ("There is no reason to require a bond in such a case."). In this case, the court is satisfied that Defendants will not suffer any damages if their termination of Chen's SEVIS record and F-1 student status, and any consequences of that termination, are enjoined. Defendants make no argument to the contrary, so Chen shall not be required to post a bond.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Chen's request for a TRO (Filing No. 2) is **GRANTED**.

IT IS, THEREFORE, **ORDERED** that:

1.    A temporary restraining order is issued immediately.

2.    Defendants are **ordered** to set aside the termination of Chen's SEVIS record and F-1 status.

3.    Defendants are **enjoined** from directly or indirectly enforcing, implementing, or otherwise taking any action or imposing any legal consequences as a result of the termination of Chen's SEVIS record and F-1 status.

4.    This Order shall remain in full force and effect for a period of **fourteen (14) days** pursuant to Federal Rule of Civil Procedure 65.

5.      No bond shall be required to be posted by Chen pursuant to Federal Rule of Civil Procedure 65(c).

Chen's Motion (Filing No. 2) **REMAINS PENDING** as to his request for a Preliminary Injunction. Pursuant to the Court's April 17, 2025 Order (Filing No. 5), the parties are **DIRECTED** to meet with the Magistrate Judge to discuss a discovery plan, briefing schedule, and the hearing on Chen's request for preliminary injunctive relief.

**SO ORDERED**.

Date:   4/21/2025

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Matthew Scott Kriezelman
Kriezelman Burton & Associates LLC
mkriezel@krilaw.com

Lauren McClure
KRIEZELMAN BURTON & ASSOCIATES, LLC
lmcclure@krilaw.com

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
shelese.woods@usdoj.gov