Marc Van Der Hout (CA Bar #80778)
Johnny Sinodis (CA Bar #290402)
Van Der Hout LLP
360 Post St., Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Attorneys for Plaintiff
John Doe

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| John Doe,<br><br>    Plaintiff,<br><br>    v.<br><br>Donald J. TRUMP, in his official capacity, President of the United States of America, et al.<br><br>    Defendants. | Case Nos. 4:25-cv-03140-JSW<br><br>**DECLARATION OF JOHNNY SINODIS**<br><br><u>Request for Declaratory and Injunctive Relief</u><br><br>Judge: Hon. Jeffrey White<br>Hearing Date: May 14, 2025<br>Hearing Time: 10:00 a.m. |
| Zhuoer Chen, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>Kristi NOEM, in her official capacity, Secretary of the U.S. Department of Homeland Security, et al.<br><br>    Defendants. | Case Nos. 4:25-cv-03292-JSW<br><br>**DECLARATION OF JOHNNY SINODIS**<br><br><u>Request for Declaratory and Injunctive Relief</u><br><br>Judge: Hon. Jeffrey White<br>Hearing Date: May 14, 2025<br>Hearing Time: 10:00 a.m. |

|  |  |
|---|---|
| S.Y., et al.,<br><br>      Plaintiffs,<br><br>      v.<br><br>Kristi NOEM, in her official capacity, Secretary of the U.S. Department of Homeland Security, et al.<br><br>      Defendants. | Case Nos. 4:25-cv-03244-JSW<br><br>**DECLARATION OF JOHNNY SINODIS**<br><br><u>Request for Declaratory and Injunctive Relief</u><br><br>Judge: Hon. Jeffrey White<br>Hearing Date: May 14, 2025<br>Hearing Time: 10:00 a.m. |
| J.C., et al.,<br><br>      Plaintiffs,<br><br>      v.<br><br>Kristi NOEM, in her official capacity, Secretary of the U.S. Department of Homeland Security, et al.<br><br>      Defendants. | Case Nos. 4:25-cv-03502-JSW<br><br>**DECLARATION OF JOHNNY SINODIS**<br><br><u>Request for Declaratory and Injunctive Relief</u><br><br>Judge: Hon. Jeffrey White<br>Hearing Date: May 14, 2025<br>Hearing Time: 10:00 a.m. |
| W.B.,<br><br>      Plaintiff,<br><br>      v.<br><br>Kristi NOEM, in her official capacity, Secretary of the U.S. Department of Homeland Security, et al.<br><br>      Defendants. | Case No. 4:25-cv-03407-JSW<br><br>**DECLARATION OF JOHNNY SINODIS**<br><br><u>Request for Declaratory and Injunctive Relief</u><br><br>Judge: Hon. Jeffrey White<br>Hearing Date: May 14, 2025<br>Hearing Time: 10:00 a.m. |

*Doe v. Trump et al.,* No. 4:25-cv-03140-JSW
DECLARATION OF JOHNNY SINODIS

I, Johnny Sinodis, hereby declare as follows:

1.  I am a partner at Van Der Hout LLP, which is located at 360 Post Street, Suite 800, San Francisco, California 94108. I have personal knowledge of the matters stated herein because I am Plaintiffs' attorney in the instant matter. I make this declaration to provide the Court with information and materials requested at the hearing on May 14, 2025.

2.  Attached as <u>Exhibit A</u> is the preliminary injunction issued on May 14, 2025, in *Doe v. Noem*, 3:25-cv-00023-JHY-JCH (W.D.Va. May 14, 2025).

3.  Attached as <u>Exhibit B</u> is the transcript from the hearing on April 29, 2025, before the Honorable Judge Reyes in *Patel v. Lyons*, 1:25-cv-01096-ACR (D.D.C. Apr. 29, 2025). Undersigned Counsel referred to this transcript during argument at the hearing on today's date. The relevant portions referred to are found at pages 3 to 26 of the enclosed transcript.

4.  Additionally, the following plaintiffs in these related lawsuits were employed pursuant to OPT or STEM OPT at the time their SEVIS record was terminated and were unable to work during the period of termination: John Doe, W.X., A.O., W.W., H.L., E.S., Z.D., V.A., Y.Z., T.W., and W.B.

I declare under penalty of perjury that the foregoing statement is true and correct to the best of my own personal knowledge. Executed this 14th day of May 2025 at San Francisco, California.

/s/ Johnny Sinodis
Johnny Sinodis
Declarant

# EXHIBIT A

CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

May 14, 2025

LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| John Doe, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:25-cv-00023 |
| | ) | |
| Kristi Noem, in her official capacity as | ) | |
| Secretary of Homeland Security, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

    John Doe[1] is a full-time international student currently enrolled in a graduate program at the University of Virginia. He has filed a complaint for declaratory and injunctive relief against Kristi Noem, in her official capacity as Secretary of Homeland Security, the Department of Homeland Security ("DHS"), and Todd Lyons, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement ("ICE"), alleging that Defendants unlawfully terminated records of his F-1 nonimmigrant student status in the Student and Exchange Visitor Information System ("SEVIS"). On April 17, 2025, this court entered an *ex parte* temporary restraining order, which (1) enjoined Defendants from terminating Doe's F-1 status under SEVIS, (2) ordered that Defendants' prior termination of his F-1 status and SEVIS record shall have no legal effect, and (3) enjoined Defendants from arresting or detaining Doe, transferring him out of this court's jurisdiction, removing him from the United

---

[1] On April 17, 2025, the court granted Doe's motion for leave to proceed under a pseudonym in all public filings in this matter, as well as his motion to file certain exhibits under seal. (Dkt. 7.) Doe later filed sealed, unredacted versions of those exhibits that disclose his name, date of birth, and country of origin.

States, or taking any other action as the result of the decision to terminate records of his F-1 status under SEVIS.

This matter is now before the court on Doe's motion for a preliminary injunction (Dkt. 5). The parties have fully briefed the motion, and the court held a preliminary injunction hearing on May 1, 2025. That same day, the court extended the temporary restraining order for a period of fourteen days. For the reasons stated below, the court will grant a preliminary injunction.

## I.    Background and Findings of Fact[2]

### A. Nonimmigrant F-1 Status and SEVIS

Under the Immigration and Nationality Act ("INA"), an international student may obtain an F-1 visa to enter the United States for the purpose of pursuing a full course of study at an approved academic institution. 8 U.S.C. § 1101(a)(15)(F)(i). To gain admission to the United States, the student must present a Form I-20 issued by a school certified by DHS's Student and Exchange Visitor Program ("SEVP"). 8 C.F.R. § 214.2(f)(1)(i).

Schools must issue the Form I-20 via SEVIS, which is a centralized database that DHS uses to monitor students with F-1 status. *See id.* § 214.2(f)(1)(iii); DHS, *About SEVIS*, Study in the States, https://perma.cc/49RX-SHX5. SEVP updates, maintains, and terminates student information in SEVIS "to carry out the purposes of the [F-1] program." (Decl. of Andre Watson ¶ 4 (Dkt. 16-1).) Schools certified by SEVP must maintain records for students

---

[2] In addition to summarizing the relevant statutory and regulatory framework, this section contains findings of fact the court has relied on to resolve Doe's motion for a preliminary injunction. The findings of fact are derived from Doe's complaint, the declarations and exhibits Doe attached to his motion for a preliminary injunction, the declaration and exhibits Defendants have filed in response to Doe's motion, and the supplemental filings the parties have submitted at the court's direction.

with F-1 status and use SEVIS to report certain changes in information that affect students' status.  8 C.F.R. § 214.3(g).  While designated school officials ("DSOs") can access student records on SEVIS, *see id.*, students do not have direct access to SEVIS or any other database that allows them to confirm their status.  (*See* Defs.' Suppl. Filing in Resp. to the Ct.'s Questions at the Hr'g on the Mot. for Prelim. Inj. at 1 (Dkt. 28) [hereinafter "Defs.' Suppl. Filing"].)

An international student who is granted F-1 status may remain in the country for their "[d]uration of status"—that is, as long as they meet the conditions established by the regulations governing the F-1 classification.  8 C.F.R. § 214.2(f)(5)(i).  First and foremost, the student must maintain a full course of study or receive authorization to participate in "practical training" after completing their studies.  *Id.*  When a student completes their course of study and any authorized practical training, they generally have 60 days to prepare to depart the United States or transfer to another approved school.  *Id.* § 214.2(f)(5)(iv).

A student may fail to maintain their F-1 status by engaging in certain prohibited activities specified by regulation, which include unauthorized employment, willfully failing to provide full and truthful information to DHS, and "[c]riminal activity."  *Id.* § 214.1(e)–(g). "Criminal activity" constitutes a failure to maintain lawful status only when it results in a "conviction in a jurisdiction in the United States for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed)."  *Id.* § 214.1(g).  The revocation of an F-1 visa does not constitute a failure to maintain status under these regulations.  *See* ICE Policy Guidance 1004-04 – Visa Revocations (June 7, 2010), https://perma.cc/ZM2S-R6Z6 ("Some circumstances require

revocation of a nonimmigrant student's visa while the nonimmigrant is in the United States and in status. Visa revocation is not, in itself, a cause for termination of the student's SEVIS record."). In other words, once a student is lawfully present in the United States, their F-1 status is not dependent on their F-1 visa.

If a student does not engage in conduct that constitutes a failure to maintain status, DHS may terminate the student's status in three specific circumstances: (1) a waiver previously authorized on the student's behalf under 8 U.S.C. § 1182(d)(3) or (4) is revoked; (2) a private bill is introduced in Congress to confer lawful permanent residence status; or (3) a notification is published in the Federal Register that identifies national security, diplomatic, or public safety reasons for terminating F-1 status. 8 C.F.R. § 214.1(d). "DHS cannot otherwise unilaterally terminate nonimmigrant status." *Isserdasani v. Noem*, No. 25-cv-283, 2025 WL 1118626, at *2 (W.D. Wis. Apr. 15, 2025) (citing *Jie Fang v. Dir. U.S. Immigr. & Customs Enf't*, 935 F.3d 172, 185 n.100 (3d Cir. 2019)).

A student who fails to maintain F-1 status is not afforded any period to prepare for departure from the United States. *See* 8 C.F.R. § 214.2(f)(5)(iv). In some limited circumstances, a student who fails to maintain status may submit a request for reinstatement of status. *Id.* § 214.2(f)(16)(i). A decision denying a student's reinstatement request is not appealable. *Id.* § 214.2(f)(16)(ii).

Case 3:25-cv-00384-HSV-CH Document 32 Filed 05/24/25 Page 5 of 34
Case 3:25-cv-00384-JSW-CH Document 67-3 Filed 05/14/25 Page 9 of 95
Pageid#: 335

**B. Termination of Doe's SEVIS Record**

Doe is a citizen and national of a country in Latin America.[3] (Compl. ¶ 25 (Dkt. 1).) Since the fall of 2024, he has been enrolled as a full-time student in a graduate program at the University of Virginia. (Decl. of Doe ¶¶ 3, 12 (Dkt. 5-3).) Beginning in 2009, Doe has lawfully visited the United States several times. (*See id.* ¶¶ 6–9.) He first visited the United States in June 2009 on a tourist visa. (*Id.* ¶ 6.) In the summer of 2010, he attended an English language course in Massachusetts on an F-1 student visa. (*Id.* ¶ 7.) In January 2014, Doe entered the United States with an F-1 student visa to attend an undergraduate program at a public university in the Midwest. (*Id.* ¶ 8; Compl. ¶ 25.) He graduated from that program in December 2015 with a Bachelor of Arts in Economics. (Decl. of Doe ¶ 9.) Doe's most recent F-1 visa was issued in 2017. (*Id.* ¶ 11.) It was set to expire in July 2029. (Pl.'s Ex. C at 2 (Dkt. 5-5).)

On April 4, 2025, the University of Virginia notified Doe that his status in SEVIS had been changed to "TERMINATED" as of that same date. (Decl. of Doe ¶ 14; *see* Decl. of Seth Hall ¶¶ 3–5 (Dkt. 5-4).) The "TERMINATION REASON" provided in SEVIS read: "OTHERWISE FAILING TO MAINTAIN STATUS – Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated." (Decl. of Seth Hall ¶ 3.)

SEVP made this update to Doe's SEVIS record based on information from a criminal history database showing that Doe had a charge for battery in August 2015, which was

---

[3] Doe's public filings in this case do not identify his country of citizenship but state that it is not El Salvador. (Compl. ¶ 25.)

ultimately expunged in 2024. (Decl. of Andre Watson ¶¶ 7–8.) Doe explains that the charge arose from an incident that occurred while he was an undergraduate student in the United States. (Decl. of Doe ¶ 4.) He reports that he was arrested on suspicion of violating a municipal battery ordinance, which carried a maximum 180-day jail term, after he was assaulted at a college bar. (*Id.*; Compl. ¶ 33.) Doe asserts that he acted in self-defense, he pled not guilty, and the charges were dismissed. (Decl. of Doe ¶ 4.) A local judge signed an expungement order on April 16, 2024. (*Id.*) Aside from that expunged charge, Doe has no criminal history. (Compl. ¶ 33.) He states that he has truthfully disclosed the 2015 incident in every one of his interactions with immigration officials and that the government knew about the incident when it issued his most recent F-1 visa in 2017. (*Id.* ¶ 34; Decl. of Doe ¶¶ 10–11.)

As of April 4, 2025, no government official had informed Doe that his visa had been revoked. (Decl. of Doe ¶ 16.) Doe had travelled internationally as recently as March 2025 and re-entered the United States without incident on March 13, 2025. (*Id.* ¶ 13.)

On April 10, 2025—six days after he learned about the termination of his SEVIS record—Doe received an email from the U.S. Department of State's Bureau of Consular Affairs Visa Office.[4] (*Id.* ¶ 15; Pl.'s Ex. C at 2.) The email began by stating that Doe's F-1 visa "ha[d] been revoked" based on "additional information [that] became available after [his] visa was issued." (Pl.'s Ex. C at 2.) It did not elaborate on what that "additional information" was. The email then continued:

---

[4] The email was signed by the Consular Section of the U.S. Embassy in a Latin American country that was not Doe's country of origin. (*See* Compl. ¶ 30; Pl.'s Ex. C at 2.)

The Bureau of Consular Affairs Visa Office has alerted the Department of Homeland Security's Immigration and Customs Enforcement, which manages the Student Exchange Visitor Program and is responsible for removal proceedings. They may notify your designated school official about the revocation of your F-1 visa.

Remaining in the United States without a lawful immigration status can result in fines, detention, and/or deportation. It may also make you ineligible for a future U.S. visa. Please note that deportation can take place at a time that does not allow the person being deported to secure possessions or conclude affairs in the United States. Persons being deported may be sent to countries other than their countries of origin.

Given the gravity of this situation, individuals whose visa was revoked may wish to demonstrate their intent to depart the United States using the CBP Home App . . . .

(*Id.*)

According to Defendants, the Department of State revoked Doe's visa on April 4, 2025, the same day SEVP terminated his SEVIS record. (Defs.' Mem. in Opp'n to Doe's Mot. for Prelim. Inj. at 5 (Dkt. 16) [hereinafter "Defs.' Mem."].) Defendants have represented that the Department of State informed them that the revocation was "prudential," meaning that it does not render Doe removable. (*Id.* at 2–3; *see* Defs.' Suppl. Filing at 1–2.) However, Defendants have not submitted any documentation confirming that Doe's visa was revoked, when the revocation occurred, or that it was prudential in nature. The evidence in the record indicates that DHS did not learn about the revocation until April 16, 2025. (*See* Decl. of Andre Watson ¶ 9.) To date, DHS has not initiated removal proceedings against Doe. (Compl. ¶ 35.)

Doe reports that he is unable to attend in-person classes for his graduate program due to the termination of his SEVIS record and the resulting uncertainty about his F-1 status. (Decl. of Doe ¶ 21.) He states that this disruption will negatively affect his attendance and grades and place him at risk of losing his partial-tuition scholarship. (*Id.*). Doe took out

Case 3:25-cv-00233-JHY-CHL Document 32 Filed 05/14/25 Page 8 of 34
Case 4:25-cv-00234-JSW Document 57 Filed 05/14/25 Page 12 of 95
Pageid#: 338

substantial loans to pay for the graduate program, and he explains that losing access to the program will place him "in an extremely difficult financial and academic position." (*Id.*) He explains that his "entire academic identity is rooted in the path [he has] built here in the United States, and the possibility of losing that feels overwhelming and deeply unsettling." (*Id.* ¶ 18.)

In addition to the actual and threatened academic consequences, Doe reports that he has struggled to find a summer internship, which is an integral part of his graduate program, due to Defendants' actions. (*Id.* ¶ 22.) He notes that he will lose the career-development opportunities his graduate program provides if he is forced to leave the United States, which will harm his professional career. (*Id.* ¶ 23.)

Doe also states that he is experiencing high levels of stress and anxiety due to the uncertainty about his legal status. (*Id.* ¶¶ 17, 24.) He fears that the loss of his F-1 status will result in his detention and deportation, potentially to a place other than his country of origin, as warned by the Bureau of Consular Affairs Visa Office. (*Id.* ¶¶ 19–20.) Because of those feared consequences, Doe is "too scared to leave [his] home to see friends or purchase groceries." (*Id.* ¶ 24.) He states that "[t]his disruption has caused irreparable harm to both [his] academic trajectory and personal well-being, undermining years of effort and jeopardizing the continuation of [his] education." (*Id.*)

## C. Procedural History

On April 17, 2025, Doe filed a complaint for declaratory and injunctive relief against Defendants in this court. (*See* Compl.) His six-count complaint challenges both the termination of his F-1 status in SEVIS and the revocation of his visa. Counts 1, 3, and 4 allege that the termination of his SEVIS record violated the Administrative Procedure Act ("APA").

Count 1 alleges that the termination should be set aside under 5 U.S.C. § 706(2) because it was not in accordance with law, in excess of statutory authority, and without observance of procedure required by law. (*Id.* ¶¶ 41–44.) Count 3 alleges that the termination of his SEVIS record violated the APA's procedural due process provision, 5 U.S.C. § 706(2)(B). (*Id.* ¶¶ 50–52.) Count 4 asks the court to set aside the termination as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2) because Defendants failed to articulate any factual basis for the decision. (*Id.* ¶¶ 53–56.)

Count 2 of the complaint alleges that the termination of Doe's SEVIS record violated his due process rights under the Fifth Amendment. (*Id.* ¶¶ 45–49.) Counts 5 and 6 challenge the revocation of Doe's F-1 visa. Count 5 asserts that the visa revocation violated his due process rights, (*id.* ¶¶ 57–59), and Count 6 alleges that the visa revocation was arbitrary and capricious in violation of the APA, (*id.* ¶¶ 60–62).

The same day he filed his complaint, Doe moved for a temporary restraining order. (Dkt. 5.) His motion sought emergency injunctive relief against the termination of his F-1 status and SEVIS record and consequences that might flow from the termination. Doe did not ask the court for temporary injunctive relief related to the revocation of his visa. (*See* Pl.'s Mem. in Supp. of Mot. for TRO at 3 (Dkt. 5-1).)

The court granted an *ex parte* temporary restraining order at approximately 10:35 p.m. on April 17, 2025. (Dkt. 8.) The order temporarily enjoined Defendants from terminating Doe's F-1 status under SEVIS; ordered that Defendants' prior termination of his SEVIS record had no legal effect; and enjoined Defendants from arresting or detaining Doe, transferring him out of this court's jurisdiction, removing him from the United States, or

taking any other action as the result of the decision to terminate his F-1 status records from SEVIS.  (*Id.* at 2.)  On April 21, 2025, Defendants reactivated Doe's SEVIS record to comply with the court's order.  (Decl. of Andre Watson ¶ 10.)

When it issued the temporary restraining order, the court informed the parties that it would convert Doe's motion for a temporary restraining order to a motion for a preliminary injunction and set an expedited briefing schedule.  (Dkt. 8 at 2.)  Defendants filed a response in opposition to a preliminary injunction, along with multiple supplemental exhibits, and Doe filed a reply.  The court held a preliminary injunction hearing on May 1, 2025.  Later that day, the court extended the temporary restraining order for a period of fourteen days to ensure it had time to fully consider the parties' submissions and arguments on the preliminary injunction motion.  (Dkt. 26.)

When it extended the temporary restraining order, the court also ordered the parties to meet and confer to determine whether Defendants would agree to conditions that would provide satisfactory relief to Doe while this litigation is ongoing.  (*Id.*)  On May 8, 2025, the parties filed separate status reports confirming they were unable to reach an agreement that would eliminate the need for a ruling on Doe's preliminary injunction motion.  (Dkts. 30, 31.)

### D. New ICE Policy for Terminating SEVIS Records

While Doe's preliminary injunction motion was pending, Defendants informed the court that ICE had promulgated a new policy governing the termination of SEVIS records.[5]

---

[5] On April 25, 2025—one day before ICE implemented the new policy—Defendants notified the court that ICE was developing a new policy framework for terminating SEVIS records.  (Dkt. 17 at 2.)  They also stated that Doe's SEVIS record would remain active until the new policy went into effect.  (*Id.*)  Defendants argued that those developments eliminated the need for injunctive relief and mooted Doe's claims challenging the April 4, 2025 termination of his SEVIS record.  (*Id.*)  The court denied the motion because Defendants did not file any materials that indicated what effect, if any, the new policy framework would have on Doe's SEVIS record.  (Dkt. 20.)

- 10 -

(Dkt. 22.)  The new policy, which was distributed to SEVP personnel on April 26, 2025, states that "[a] terminated record in SEVIS could indicate that the nonimmigrant no longer maintains F or M status."  (SEVIS Notice – Policy Regarding Termination of Records at 1 (Dkt. 22-1) [hereinafter "New SEVIS Policy"].)  At the same time, it states that "termination does not always result in an adverse impact on the student" and notes that "DSOs and SEVP can terminate records for several normal, administrative reasons."  (*Id.*)

The policy goes on to identify a list of reasons for terminating SEVIS records, which it makes clear are non-exhaustive.  Those reasons include "Evidence of a Failure to Comply with the Terms of Nonimmigrant Status Exists" and "U.S. Department of State Visa Revocation (Effective Immediately)."  (*Id.*)  The policy includes additional guidance on the effect of visa revocations.  It states:

> Pursuant to INA § 221(i), the U.S. Department of State (State) may at any time, in its discretion, revoke an alien's visa.  State can consider derogatory information provided by ICE and other U.S. law enforcement agencies in its assessment of whether visa revocation is appropriate for an alien.  When State revokes an alien's visa with immediate effect, ICE should take steps to initiate removal proceedings.
>
> If State revokes a nonimmigrant visa effective immediately, SEVP may terminate the nonimmigrant's SEVIS record based on the visa revocation with immediate effect, as such a revocation can serve as a basis of removability under INA § 237(a)(1)(B).  SEVP should not, however, terminate a nonimmigrant's SEVIS record on this basis until it has confirmed that State has revoked the visa.

(*Id.* at 2.)  The policy does not expressly address the effect of prudential visa revocations.

## II.    Standard of Review

Federal Rule of Civil Procedure 65(a) authorizes courts to issue preliminary injunctions.

- 11 -

"A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). The court may grant a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A preliminary injunction is "never awarded as of right." *Id.* at 24.

A plaintiff seeking a preliminary injunction must demonstrate (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm without preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Id.* at 20. The court must separately consider each *Winter* factor. *Di Biase*, 872 F.3d at 230. To satisfy the first factor, "[a] plaintiff need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." *Id.* (internal quotation marks omitted). To satisfy the second, "a plaintiff must demonstrate more than just a 'possibility' of irreparable harm." *Id.* The third and fourth factors "merge" where, as here, the Government is the opposing party. *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## III.    Analysis

### A. Discussion of Preliminary Injunction Factors

Based on the parties' submissions and their arguments at the May 1, 2025 preliminary injunction hearing, the court finds that each of the four *Winter* factors favors an award of

preliminary injunctive relief to maintain the status quo while Doe's lawsuit is ongoing. An analysis of each factor follows.

    1.  <u>Likelihood of success on the merits</u>

Doe argues that the termination of his SEVIS record violated both the APA (Counts 1, 3, and 4) and the Due Process Clause of the Fifth Amendment (Count 2). When a complaint alleges multiple causes of action, a plaintiff need only show a likelihood of success on one claim to justify preliminary injunctive relief. *See Abrego Garcia v. Noem*, -- F. Supp. 3d --, 2025 WL 1014261, at *9 (D. Md. Apr. 6, 2025); *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 505 (E.D. Va. 2021); *Nabisco Brands, Inc. v. Conusa Corp.*, 722 F. Supp. 1287, 1292 n.4 (M.D.N.C.), *aff'd*, 892 F.2d 74 (4th Cir. 1989) (table decision).

As it did when considering Doe's motion for a temporary restraining order, the court will focus on whether Doe is likely to establish a violation of the APA—specifically, that the April 4, 2025 termination of his SEVIS record was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A). Defendants argue that Doe cannot establish a likelihood of success under the APA because the APA's waiver of sovereign immunity does not extend to claims challenging the termination of SEVIS records. They also suggest that Doe's APA claims fail because other adequate remedies exist. Neither argument is persuasive, and Doe has shown a clear likelihood that the termination of his SEVIS record violated the APA.

        i.  *Doe's APA claims are not barred by sovereign immunity.*

Sovereign immunity is jurisdictional in nature and, unless waived by the federal government, shields the government and its agencies from suit. *FDIC v. Meyer*, 510 U.S. 471,

475 (1994). "[T]he terms of [the United States's] consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). The plaintiff bears the "burden to show that an unequivocal waiver of sovereign immunity exists and that none of the statute's waiver exceptions apply to his particular claim." *Lancaster v. Sec'y of the Navy*, 109 F.4th 283, 293 (4th Cir. 2024) (quoting *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005)).

The APA waives sovereign immunity for actions in federal court brought by "person[s] suffering legal wrong because of agency action." 5 U.S.C. § 702. Section 702 sets certain limitations on the scope of that waiver. To fall within the statutory waiver of sovereign immunity, the action must "seek[] relief other than money damages." *Id.* In addition, Section 702 does not "confer[] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.* A statute forbids relief under the APA when it provides the exclusive remedy for the claim in question. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 (2012). As the Supreme Court has explained, "[w]hen Congress has dealt in particularity with a claim and has intended a specified remedy—including its exceptions—to be exclusive, that is the end of the matter; the APA does not undo the judgment." *Id.* (cleaned up).

Defendants argue that the Privacy Act of 1974 is one such statute. That Act, they contend, provides the exclusive means of challenging the termination of a governmental record like a SEVIS record and therefore precludes Doe from seeking relief under the APA. This argument is unconvincing and overlooks contrary Supreme Court precedent. The U.S. District Court for the District of Columbia's recent opinion in *Alliance for Retired Americans v.*

*Bessent*, -- F. Supp. 3d --, 2025 WL 740401 (D.D.C. Mar. 7, 2025), is instructive on this point. There, the court held that the Privacy Act does not impliedly forbid related forms of relief under the APA. *Id.* at *18–19. It noted that the Supreme Court's decision in *Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42 (2024), "suggests that the Privacy Act is not the kind of comprehensive and 'exclusive' remedial statute that impliedly displaces related remedies under other statutes." *All. for Retired Ams.*, 2025 WL 740401, at *19. In *Kirtz*, the Supreme Court rejected an argument that the Privacy Act's remedies for the improper retention or disclosure of personal information indicated that similar remedies were not available under the Fair Credit Reporting Act. *See Kirtz*, 601 U.S. at 63. Relying on the reasoning in *Kirtz*, the District of Columbia concluded that "Congress did not intend for the Privacy Act to be an 'exclusive' source of claims or remedies for alleged mishandling of records about individuals that impliedly forbids other relief under the APA." *All. for Retired Ams.*, 2025 WL 740401, at *19.

Defendants fail to explain how the Supreme Court's reasoning in *Kirtz* is not applicable here. Instead, they claim it is "well-settled that the Privacy Act is a comprehensive statutory scheme that precludes other avenues of relief." (Defs.' Mem. at 8.) But neither of the two decisions they cite addressed whether the Privacy Act precludes any APA claim that implicates records maintained by federal agencies. *See Wilson v. Libby*, 535 F.3d 697, 708–09 (D.C. Cir. 2008) (holding that the Privacy Act precluded a constitutional *Bivens* remedy); *Chichakli v. Kerry*, 203 F. Supp. 3d 48, 52 (D.D.C. 2016) (stating that claims arising from the improper *disclosure* of personal information needed to be brought under the Privacy Act). In any event, both decisions predate the Supreme Court's decision in *Kirtz*, which clarified that the remedies

provided by the Privacy Act may coexist with similar remedies provided by other federal statutes. And even before its decision in *Kirtz*, the Supreme Court recognized that the APA may provide injunctive remedies the Privacy Act does not address. *See Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004) ("The Privacy Act says nothing about standards of proof governing equitable relief that may be open to victims of adverse determinations or effects, although it may be that this inattention is explained by the general provisions for equitable relief within the Administrative Procedure Act . . . .").

In short, there is no basis for holding that the Privacy Act impliedly forbids APA claims challenging the termination of an international student's SEVIS record.[6] Several other courts have recently reached the same conclusion. *See, e.g., Isserdasani v. Noem*, No. 25-cv-283, 2025 WL 1330188, at *5 (W.D. Wis. May 7, 2025); *Doe #1 v. Noem*, No. 25-cv-926, 2025 WL 1194080, at *5 (S.D. Cal. Apr. 24, 2025); *Madan B.K. v. Noem*, No. 1:25-cv-419, 2025 WL 1171572, at *5 (W.D. Mich. Apr. 23, 2025); *Chen v. Noem*, No. 1:25-cv-00733, 2025 WL 1163653, at *4–5 (S.D. Ind. Apr. 21, 2025). Doe's APA claims therefore fall within the waiver of sovereign immunity in § 702, and this court may exercise jurisdiction over them.

>    *ii. Doe's claims satisfy the APA's other requirements for judicial review.*

Section 704 of the APA authorizes judicial review of a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Defendants do not contest

---

[6] While the court need not reach the issue, it is also doubtful that the Privacy Act even "deal[s] in particularity" with claims challenging the termination of a SEVIS record. *Patchak*, 567 U.S. at 216. The Privacy Act authorizes civil actions against federal agencies that "fail[] to maintain any record concerning any individual with such accuracy . . . as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record." 5 U.S.C. § 552a(g)(1)(C). An agency's deliberate termination of a record is quite different than a mere "fail[ure] to maintain" accurate records. *See Isserdasani v. Noem*, No. 25-cv-283, 2025 WL 1330188, at *5 (W.D. Wis. May 7, 2025); *Doe v. Noem*, No. 5:25-cv-00847, 2025 BL 141098, at n.1 (C.D. Cal. Apr. 25, 2025).

that the termination of Doe's SEVIS record qualifies as a "final agency action" under § 704,[7] but they argue that his APA claims are not reviewable because the Privacy Act provides an "other adequate remedy." (Defs.' Mem. at 9–10.)

This argument defies logic. "An alternative remedy will not be adequate under § 704 if the remedy offers only 'doubtful and limited relief.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 901 (1988)). Here, relief under the Privacy Act is not merely "doubtful and limited"—it is categorically unavailable. The Privacy Act authorizes two classes of "individual[s]" to bring civil actions: U.S. citizens and lawful permanent residents. 5 U.S.C. § 552a(a)(2), (g)(1). Defendants themselves acknowledge that the Privacy Act "precludes review [here] because Doe is not a U.S. citizen or lawful permanent resident." (Defs.' Mem. at 9.) In fact, no student with F-1 status could *ever* even bring a civil action, let alone obtain relief under the Privacy Act, as a student with F-1 status is, by definition, not a permanent legal resident. Other courts have consistently recognized that the Privacy Act does not provide an adequate remedy to plaintiffs who are not authorized to sue under the Act, including students with F-1 status. *See Doe v. Noem*, No. 2:25-cv-01103, 2025 WL 1134977, at *4–5 (E.D. Cal. Apr. 17, 2025); *Doe*, 2025 WL 1194080, at *5–6; *Doe v. Trump*, No. CV-25-00174, 2025 WL 1192826, at *4 (D. Ariz. Apr. 24, 2025). And even if Doe were an authorized plaintiff, the Privacy Act would not provide an adequate remedy because

---

[7] Even if Defendants had contested this issue, the court would hold that the termination of Doe's SEVIS record is a final agency action reviewable under the APA. Several courts in other jurisdictions have reached the same conclusion, and this court finds their reasoning persuasive. *See, e.g., Jie Fang*, 935 F.3d at 182; Prelim. Inj. Order & Op., *Doe 1 v. Bondi*, No. 1:25-cv-01998, slip op. at 18–20 (N.D. Ga. May 2, 2025); *Doe v. Noem*, -- F. Supp. 3d --, 2025 WL 1141279, at *3 (W.D. Wash. Apr. 17, 2025); *Patel v. Bondi*, No. 1:25-CV-00101, 2025 WL 1134875, at *2 (W.D. Pa. Apr. 17, 2025); *Doe v. Noem*, No. 2:25-cv-01103, 2025 WL 1134977, at *5 (E.D. Cal. Apr. 17, 2025).

it "does not allow courts to grant injunctive or declaratory relief," which Doe seeks in this case. *Doe v. Chao*, 435 F.3d 492, 504 (4th Cir. 2006).

Because the Privacy Act does not provide another adequate remedy here, the court concludes that Doe may seek judicial review under the APA.

> ### iii. *Doe has made a clear showing that the April 4, 2025 termination of his SEVIS record likely violated the APA.*

As noted above, Doe alleges that the April 4, 2025 termination of his SEVIS record was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A). (Compl. ¶¶ 53–56.) Based on the facts available at this stage, Doe is almost certain to prevail on this claim.

Defendants concede that they had no lawful justification for terminating Doe's F-1 status under the relevant regulations. They admit that Doe's SEVIS record was terminated because of his dismissed misdemeanor battery charge from 2015. (*See* Decl. of Andre Watson ¶¶ 7–8.) That charge clearly fails to meet the definition of "criminal activity" that constitutes a failure to maintain F-1 status because Doe was never convicted of the offense and, even if he had been, the offense was not punishable by at least one year of imprisonment. *See* 8 C.F.R. § 214.1(g). At the preliminary injunction hearing, Defendants' counsel agreed that the 2015 charge was not a valid reason to terminate Doe's F-1 status. (Tr. of Prelim. Inj. Hr'g at 20:12–15 (Dkt. 29).) Counsel also agreed that the prudential revocation of Doe's visa was not a valid reason for terminating his F-1 status under the regulations. (*Id.* at 16:16–22.)

Instead, Defendants claim that they never actually terminated Doe's F-1 status. (Defs.' Mem. at 6.) They assert that SEVP merely terminated Doe's *SEVIS record*, and that

"[t]erminating a record in SEVIS does not terminate an individual's nonimmigrant status in the United States." (Decl. of Andre Watson ¶ 11.)

This *post-hoc* distinction offends common sense. In fact, it appears Defendants have invented this distinction to avoid responsibility for an obvious attempt to communicate that Doe had lost F-1 status. It is implausible to suggest that the April 4, 2025 update to Doe's SEVIS record had no implications for his F-1 status. That update communicated in quite clear terms that Defendants terminated Doe's SEVIS record *because* his F-1 status was terminated. As of that date, Doe's SEVIS record identified him as an "F-1 Student" and listed his "Status" as "TERMINATED." (Decl. of Seth Hall ¶ 3 (Dkt. 5-4).) The "TERMINATION REASON" provided read: "OTHERWISE FAILING TO MAINTAIN STATUS – Individual identified in criminal records check and/or has had their VISA revoked." (*Id.*) Only after providing that information did the April 4, 2025 update state: "SEVIS record has been terminated." (*Id.*) The termination reason contains the exact same language the regulations use when identifying grounds for losing F-1 status. *See* 8 C.F.R. § 214.1(g) (stating that "criminal activity," as defined by the regulation, "constitutes a failure to maintain [F-1] status"). When asked about the "failing to maintain status" language at the preliminary injunction hearing, Defendants' counsel conceded that it was an apparent reference to Doe's F-1 status. (Tr. of Prelim. Inj. Hr'g at 16:10–12.)

DHS's published guidance on the termination of SEVIS records further reinforces this conclusion.[8] It explains that the termination reason "Otherwise Failing to Maintain Status"—

---

[8] The court may take judicial notice of this guidance, which is published on a website managed by DHS. *See, e.g.*, *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 255 n.3 (4th Cir. 2018).

the one used in Doe's case—applies when "[t]he student has not maintained status" and "[n]one of the other terminations [sic] reasons applies." DHS, *Termination Reasons*, SEVIS Help Hub, https://perma.cc/8VB9-SPFB (last updated Apr. 9, 2025). Other DHS guidance similarly states that a SEVIS record should be terminated when "[t]he student did not maintain [F-1] status per regulations." DHS, *Terminate a Student*, SEVIS Help Hub, https://perma.cc/5P7C-5BCB (last updated Nov. 7, 2024); *see also id.* ("A terminated record in [SEVIS] could indicate that the nonimmigrant no longer maintains F or M status.").

Defendants now claim that the April 4, 2025 update to Doe's SEVIS record did not mean what it said. They say the update was merely a "flag" that Doe *might* have failed to maintain status, which they issued to start a "dialogue" with the University of Virginia. (*See* Tr. of Prelim. Inj. Hr'g at 12:5–14, 17:10–15.) Defendants have submitted a transcript from a hearing in a similar case in which Andre Watson, the Assistant Director for ICE, offers the same explanation for the thousands of SEVIS records ICE terminated in recent weeks. (Tr. of Hr'g on Prelim. Inj. or Summ. J., *Patel v. Lyons*, No. 1:25-cv-01096, at 28:23–29:1, 31:22–33:14 (D.D.C. Apr. 29, 2025) (Dkt. 23-1).)

This explanation does not withstand the slightest scrutiny. Defendants admit they amended Doe's SEVIS record based on National Crime Information Center ("NCIC") records for the 2015 misdemeanor battery charge, and that those "records indicated that the charge was expunged." (Decl. of Andre Watson ¶¶ 7–8.) They would have had no legitimate reason to "flag" an expunged charge they already knew had no impact on Doe's lawful status.[9]

_____

[9] Defendants suggest that the update to Doe's SEVIS record also communicated to the University that his visa may have been revoked. (Tr. of Prelim. Inj. Hr'g at 17:6–9.) That explanation, too, is very difficult to square with the references to the termination of Doe's F-1 status. Again, Defendants have acknowledged that the prudential revocation of Doe's visa

- 20 -

The references to the termination of Doe's F-1 status in the April 4, 2025 SEVIS update further discredit the notion that Defendants sought only to start a "dialogue" with University officials. Even if a student's SEVIS record may be terminated for other reasons in some cases, the record overwhelmingly suggests that Defendants terminated Doe's SEVIS record *based on* a purported finding that he had failed to maintain F-1 status.

As a last resort, Defendants maintain that they never terminated Doe's F-1 status because they had no lawful justification for doing so. They point out that none of the three exclusive "triggers" for termination of status in 8 C.F.R. § 214.1(d) occurred here. (Defs.' Mem. at 6.) Their declarant similarly states that "[t]he statute and regulations do not provide SEVP the authority to terminate nonimmigrant status by terminating a SEVIS record, and SEVP has never claimed that it had terminated DOE's nonimmigrant status." (Decl. of Andre Watson ¶ 11.) But Doe filed this lawsuit precisely because he believes Defendants acted beyond the bounds of their lawful authority. And whether SEVP has "claimed" responsibility for terminating Doe's F-1 status, the facts show that the termination of Doe's SEVIS record likely had that effect, as communicated clearly through the language SEVP used when updating Doe's SEVIS record.

In short, the existing facts demonstrate that Defendants effectively terminated Doe's F-1 status via the April 4, 2025 update to his SEVIS record. Other courts have concluded that very similar updates to SEVIS records likely had the same effect. *See Isserdasani*, 2025 WL

---

does not trigger a loss of F-1 status under 8 C.F.R. § 214.1. (*Id.* at 16:16–22.) The court also notes that the record does not contain any evidence confirming that the Department of State prudentially revoked Doe's visa prior to April 4, 2025. Doe first learned of the purported revocation via the email he received from the Bureau of Consular Affairs Visa Office on April 10, 2025. (*See* Decl. of Doe ¶ 15.) And Watson's declaration states that DHS first received notice of the revocation on April 16, 2025. (Decl. of Andre Watson ¶ 9.)

1330188, at *6 (rejecting defendant's attempt to distinguish the termination of a SEVIS record from the termination of F-1 status as "semantics"); *Chen*, 2025 WL 1163653, at *7; *Hinge v. Lyons*, No. 25-1097, 2025 WL 1134966, at *4 & n.10 (D.D.C. Apr. 15, 2025). Because it is undisputed that Defendants had no lawful reason under § 214.1 to find that Doe had lost F-1 status, Doe has made a clear showing that he likely will succeed in establishing that the termination was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

2. Irreparable harm

To satisfy the irreparable-harm element, Doe must make a "clear showing" that, without injunctive relief, he will "suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). An injury qualifies as irreparable when it "cannot be fully rectified by the final judgment after trial." *Id.* (citation omitted).

The court finds that Doe has made a clear showing of irreparable harm. The April 4, 2025 termination of his SEVIS record and his apparent loss of F-1 status has caused several different forms of harm. For one, it has prevented him from attending in-person classes for his graduate program, which negatively impacts his grades and places him at risk of losing his scholarship. (Decl. of Doe ¶ 21.) The termination of Doe's SEVIS record and resulting uncertainty about his authorization to work in the United States also has interfered with his ability to obtain a summer internship, which is an integral component of his graduate program. (*Id.* ¶ 22.) Doe took out substantial loans to complete his graduate course of study, and he

Case 3:25-cv-00340-JSC Document 32 Filed 05/14/25 Page 27 of 95
Case 2:25-cv-00340-JSC Document 32 Filed 05/14/25 Page 27 of 95
Pageid#: 353

will face "extremely difficult" financial consequences if he is unable to complete the program.[10]  (*Id.* ¶ 21.)  Courts have recognized that similar disruptions to academic progress caused by the termination of students' SEVIS records support a finding of irreparable harm.  *See, e.g.*, Prelim. Inj. Order and Op., *Doe 1 v. Bondi*, No. 1:25-cv-01998, slip op. at 26–28 (N.D. Ga. May 2, 2025); *Isserdasani*, 2025 WL 1330188, at *8; *Doe v. Noem*, -- F. Supp. 3d --, 2025 WL 1141279, at *8 (W.D. Wash. Apr. 17, 2025).  In addition, Doe reports that he is experiencing high levels of stress and anxiety due to the uncertainty about his legal status.  (*Id.* ¶ 24.)  He explains that his "entire academic identity is rooted in the path [he has] built here in the United States" through years of effort, "and the possibility of losing that feels overwhelming and deeply unsettling."  (*Id.* ¶¶ 18, 24.)

Doe also fears that he will be detained and deported before he can complete his course of study.  (*Id.* ¶¶ 17–20, 24.)  While Defendants try to argue otherwise, the available evidence shows that his fears are far from speculative.  The email he received from the Bureau of Consular Affairs Visa Office shortly after Defendants terminated his SEVIS record makes that much clear.  The email warned him that "[r]emaining in the United States without a lawful immigration status can result in fines, detention, and/or deportation"; that "deportation can take place at a time that does not allow the person being deported to secure possessions or

---

[10] Because money damages are not recoverable in this case, *see* 5 U.S.C. § 702, Doe's threatened financial losses can support a finding of irreparable harm.  *See Doe 1*, slip op. at 28–29 (holding that loss of scholarships and other monetary losses students would suffer due to SEVIS terminations constituted irreparable harm because they were not recoverable under the APA); *see also Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 500 (D. Md. 2020) (holding that "severe economic losses can qualify as irreparable harm" because "no monetary damages are available" under § 702); *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011) ("[I]f a movant seeking a preliminary injunction will be unable to sue to recover any monetary damages against a government agency in the future because of, among other things, sovereign immunity, financial loss can constitute irreparable injury.") (internal quotation marks omitted).  Because the APA does not waive sovereign immunity for actions seeking monetary damages, this is not a case "[w]here the harm suffered by the moving party may be compensated by an award of money damages at judgment."  *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).  Ultimately, however, the court would find that Doe has made a clear showing of irreparable harm even if it did not consider the threatened financial injuries.

conclude affairs in the United States"; and, most alarmingly, that "[p]ersons being deported may be sent to countries other than their countries of origin." (Pl.'s Ex. C at 2). After emphasizing "the gravity of the situation," the email concluded by encouraging Doe to self-deport. (*Id.*) It is hardly surprising that Doe is now "too scared to leave [his] home to see friends or purchase groceries." (Decl. of Doe ¶ 24.)

DHS's own public guidance confirms that Doe's fears are well-founded. It states that a student whose "F-1/M-1 SEVIS record" is terminated "loses all on- and/or off-campus employment authorization"; that a student "cannot re-enter the United States on the terminated SEVIS record"; and, most relevant here, that "[ICE] agents may investigate to confirm the departure of the student." DHS, *Terminate a Student*, SEVIS Help Hub, https://perma.cc/5P7C-5BCB (last updated Nov. 7, 2024).

While Defendants have made certain representations during this litigation, they do not mitigate the threat of injury in any meaningful way. Defendants say ICE "understands" that Doe currently is in lawful F-1 status, and they agree not to re-terminate his SEVIS record based solely on the expunged 2015 charge.[11] (Defs.' Status Report at 1–2 (Dkt. 30).) Those representations do little to assuage Doe's concerns, because in the next breath Defendants take the position that the new SEVIS policy gives ICE near-limitless discretion to terminate students' SEVIS records. (Tr. of Prelim. Inj. Hr'g at 28:2–29:2.) In fact, they assert that the new policy allows them to re-terminate Doe's SEVIS record as of today—although he continues to satisfy all conditions for maintaining F-1 status under 8 C.F.R. § 214.1. (*Id.* at

---

[11] The court appreciates Defendants' additional representation that ICE, after reactivating Doe's SEVIS record following the court's temporary restraining order, made the reactivation retroactive to April 4, 2025, to ensure there is no gap in his record. (Defs.' Status Report at 2 (Dkt. 30).)

27:16–19.)  Because the termination reasons listed in the new policy are not exhaustive, (*see* New SEVIS Policy), nothing prevents Defendants from immediately re-terminating Doe's SEVIS record based on the prudential revocation of his visa or some other reason that conflicts with the regulations governing F-1 status.  (*See* Tr. of Prelim. Inj. Hr'g at 28:15–19.)

Defendants also say "there would be no indication that upon [an] individualized review, [Doe] would have his SEVIS status re-terminated."  (*Id.* at 30:7–10.)  Given the events that led to this lawsuit, though, there is reason to doubt whether Defendants intend to conduct individualized reviews of student records before making termination decisions.  Further, it is difficult to put much stock in this representation when Defendants also claim the authority to re-terminate Doe's SEVIS record as soon as the temporary restraining order expires.  Notably, Defendants would not agree to refrain from re-terminating Doe's SEVIS record unless one of the grounds for terminating F-1 status identified in the regulations applied.  (*See id.* at 31:15–22; Defs.' Status Report at 1–2.)  And as Doe points out, a senior DHS official recently stated that students whose status is temporarily restored "could still very well have it terminated in the future, along with their visas."  (Doe's Reply Mem. in Supp. of Mot. for Prelim. Inj. at 5–6 (Dkt. 21) (quoting Zach Montague and Hamed Aleaziz, *U.S. Restores Legal Status for Many International Students, but Warns of Removals to Come*, N.Y. Times (Apr. 25, 2025), https://www.nytimes.com/2025/04/25/us/politics/trump-student-visa-cancellations.html.).)

Instead of agreeing not to re-terminate Doe's SEVIS record during the pendency of this litigation, Defendants resort to a familiar argument.  They suggest that any re-termination would not cause irreparable harm because the termination of a SEVIS record "has no bearing

on nonimmigrant status." (Defs.' Status Report at 2.) For the reasons already discussed, that argument lacks support in the record or in DHS's own public-facing guidance. *See* DHS, *Terminate a Student*, SEVIS Help Hub, https://perma.cc/5P7C-5BCB (last updated Nov. 7, 2024) (stating that "[ICE] agents may investigate to confirm the departure of the student" when the student's SEVIS record is terminated); *see also Doe 1*, slip op. at 6–7 (noting that students without an active SEVIS record "effectively have no legal status and therefore face uncertainty about being able to attend classes, graduate, obtain and maintain employment, and keep housing and insurance"). Defendants themselves have confirmed that Doe does not have access to any other database that would enable him to confirm whether his F-1 status is active. (Defs.' Suppl. Filing at 1.) Thus, a re-termination of Doe's SEVIS record likely would create the same harmful uncertainty about his lawful presence in the United States, his potential accrual of unlawful presence time, and the threat of deportation.

Finally, the fact that the Department of State has prudentially revoked Doe's F-1 visa places him in a particularly vulnerable position. Defendants acknowledge that DHS initiated the visa revocation process by sending Doe's NCIC criminal history records to the Department of State, but they emphasize that the Department of State has complete discretion over visa revocations and is not a party to this action. (*See* Tr. of Prelim. Inj. Hr'g at 13:7–15:2.) That may well be true. But if DHS is in the business of sharing records with the Department of State for the obvious purpose of facilitating visa revocations, the court presumes that DHS can also inform the Department of State when those records did not in fact provide lawful grounds for terminating F-1 status. The fact that Defendants seem uninterested in even suggesting that the Department of State reconsider its decision to

prudentially revoke Doe's visa raises concerns that they plan to rely on that revocation to re-terminate his SEVIS record. They have already asserted that the new policy allows them to do just that. (*Id.* at 28:15–19.)

In short, while Defendants reinstated Doe's SEVIS record to comply with this court's temporary restraining order, Doe has very real reason to fear that they will re-terminate his record as soon as that order expires. The new SEVIS policy purports to give Defendants even broader discretion to terminate SEVIS records, even when the student has maintained F-1 status under the regulations. Further, Defendants have not offered any persuasive support for their claim that re-terminating Doe's SEVIS record would not impact his F-1 status. Based on the serious threat of re-termination—and the serious consequences that would result—the court finds that Doe has made a clear showing that a preliminary injunction is necessary to prevent irreparable harm.

### 3. Balancing of equities and public interest

The third and fourth factors, which ask the court to balance the equities and weigh the public interest in preliminary injunctive relief, "merge when the Government is the opposing party." *Miranda*, 34 F.4th at 365 (quoting *Nken*, 556 U.S. at 435). A court "should pay particular regard for the public consequences" of a preliminary injunction. *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

Here, the balance of harms weighs heavily in Doe's favor. Doe faces immediate and severe consequences if his SEVIS record is terminated, including a loss of his lawful status and access to his graduate program, damage to his career prospects, significant financial losses, and deportation. Those harms outweigh any minimal hardship Defendants will face if the

court enjoins them from terminating Doe's SEVIS record or taking any other action inconsistent with his F-1 status while this litigation is ongoing.

Defendants argue that a preliminary injunction would interfere with the Executive Branch's "sovereign prerogative" to control immigration. (Defs.' Mem. at 16 (quoting *El Rescate Legal Servs., Inc. v. Exec. Off. of Immigr. Rev.*, 959 F.2d 742, 750 (9th Cir. 1991)).) While the Executive Branch has broad authority to enforce immigration laws, there is no public interest in allowing government officials to violate applicable regulations. *See, e.g., Ajugwe v. Noem*, No. 8:25-cv-982, 2025 WL 1148689, at *3 (M.D. Fla. Apr. 18, 2025); *Ratsantiboon v. Noem*, No. 25-CV-01315, 2025 WL 1118645, at *3 (D. Minn. Apr. 15, 2025). Just as the Executive Branch has the authority to enforce immigration laws, the Judiciary has the power and responsibility to ensure that the Executive Branch's action is lawful and constitutional. This system of checks and balances is a cornerstone of American democracy, which exists to protect the public interest. Doe is not asking for relief that intrudes on the Executive Branch's power over immigration; he simply seeks a remedy from this court to ensure Defendants comply with the applicable laws and regulations when exercising that power. This court agrees that "there is substantial public interest in ensuring government agencies abide by federal laws even when they are pursuing their prerogatives." *Doe 1*, slip op. at 31–32; *see Doe*, 2025 WL 1141279, at *9.

*       *       *

For the reasons outlined above, the court concludes that Doe has sufficiently demonstrated that all four *Winter* factors favor preliminary injunctive relief.

## B. Scope of Preliminary Injunctive Relief

To maintain the status quo during the pendency of this litigation, the court will enjoin Defendants from terminating or reversing the reinstatement of Doe's SEVIS record without further showing and approval by this court. The court will further enjoin Defendants from taking any direct or indirect action that is inconsistent with Doe maintaining lawful F-1 status in the United States—including detaining him or transporting him out of this court's jurisdiction based on a finding that he is out of status—unless Doe fails to maintain F-1 status for one of the reasons enumerated in 8 C.F.R. § 214.1.

Defendants argue that 8 U.S.C. § 1252(g) and 8 U.S.C. § 1226(e) prohibit the court from granting any injunctive relief that limits their power to detain or transport Doe. (Defs.' Mem. at 16.) After careful consideration of both statutes, the court concludes that neither applies here.

8 U.S.C. § 1252 authorizes judicial review of final orders of removal and limits the jurisdiction of courts to hear other claims arising from removal proceedings. Section 1252(g) states as follows:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

The Supreme Court has instructed courts to read § 1252(g) narrowly. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486 (1999). The provision "applies only to three discrete actions that the Attorney General make take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Id.* at 482 (emphasis in original). The Supreme

- 29 -

Court has explained that limiting courts' jurisdiction to review those actions—"which represent the initiation or prosecution of various stages in the deportation process"—leaves room for the Executive Branch to exercise its "discretion to abandon the endeavor." *Id.* at 483.

Here, Doe does not ask the court to enjoin Defendants from initiating removal proceedings. Defendants nevertheless argue that an injunction temporarily limiting their power to detain Doe or transport him out of this jurisdiction violates § 1252(g) because it "is linked to the Attorney General's discretion to commence proceedings, as well as the conclusion of those proceedings." (Defs.' Mem. at 17.) They cite several Ninth Circuit decisions holding that § 1252(g) bars judicial review of decisions *when* to commence removal proceedings. *See, e.g., Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002); *Cortez-Felipe v. I.N.S.*, 245 F.3d 1054, 1057 (9th Cir. 2001).

The court is not persuaded that granting the injunctive relief Doe seeks will run afoul of § 1252(g). While § 1252(g) may apply to claims anticipating future removal proceedings, *see Reno*, 525 U.S. at 477, Doe's claims do not "aris[e] from" any past, present, or future "decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C. § 1252(g). Rather, his claims stem from the decision to terminate his SEVIS record. While the SEVIS termination might lead to removal proceedings, the termination decision itself was not a decision or action covered by § 1252(g). *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (noting that the Supreme Court's decision in *Reno* rejected the notion that § 1252(g) "imposes a general jurisdictional limitation") (internal quotation marks omitted).

- 30 -

At least three other courts have held that § 1252(g) did not bar them from granting similar—and even more expansive—forms of injunctive relief in cases involving challenges to the termination of SEVIS records and/or F-1 status. *See Chen*, 2025 WL 1163653, at *8–10 (holding that § 1252(g) did not prohibit the court from temporarily enjoining removal proceedings because the plaintiff "d[id] not challenge a decision to commence removal proceedings and instead challenge[d] Defendants' termination of his SEVIS record and F-1 status"); *Doe*, 2025 WL 1134977, at *7–8 (holding that 1252(g) did not bar the court from temporarily enjoining detention and removal based on a SEVIS termination because the statute "does not divest courts of jurisdiction over cases that do not address prosecutorial discretion and address a purely legal question, which does not challenge the Attorney General's discretionary authority") (internal quotation marks omitted); *Ozturk v. Trump*, -- F. Supp. 3d --, 2025 WL 1145250, at *11–13 (D. Vt. Apr. 18, 2025) (holding that § 1252(g) did not apply when a student sought injunctive relief based on claims "challenging her apprehension, detention, and the termination of her SEVIS"); *see also Fornalik v. Perryman*, 223 F.3d 523, 532 (7th Cir. 2000) (holding that § 1252(g) did not apply because the plaintiff's claim was "not that the Attorney General is unfairly executing a removal order, but rather that a prior, unrelated error makes his removal improper").

Defendants next argue that 8 U.S.C. § 1226(e) prohibits injunctive relief that restricts their ability to detain Doe. Section 1226 governs the apprehension and detention of noncitizens. Section 1226(e) states that "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention of

any alien or the revocation or denial of bond or parole." 8 U.S.C. § 1226(e). Section 1252(a) similarly bars judicial review of "any . . . decision or action of the Attorney General . . . the authority for which is specified under this subchapter [which includes § 1226(e)] to be in the discretion of the Attorney General." *Id.* § 1252(a)(2)(B)(ii).

Defendants cite several out-of-circuit cases to support their argument that § 1226(e) applies here, but each of those cases addressed claims brought by noncitizens who were already detained. *See Van Dinh v. Reno*, 197 F.3d 427, 429 (10th Cir. 1999); *Avramenkov v. I.N.S.*, 99 F. Supp. 2d 210, 211 (D. Conn. 2000); *Mayorga v. Meade*, No. 24-cv-22131, 2024 WL 4298815, at *1 (S.D. Fla. Sept. 26, 2024); *Saadulloev v. Garland*, No. 3:23-cv-00106, 2024 WL 1076106, at *1 (W.D. Pa. Mar. 12, 2024); *Salazar v. Dubois*, No. 17-CV-2186, 2017 WL 4045304, at *1 (S.D.N.Y. Sept. 11, 2017). Doe, by contrast, has not been detained, so he does not seek an order "set[ting] aside any action or decision by the Attorney General . . . regarding [his] detention." 8 U.S.C. § 1226(e). Rather, he asks the court to enjoin Defendants from detaining him based on the termination of his SEVIS record and/or F-1 status, which, he has shown, was likely unlawful under the APA.

Doe's claims challenging that termination decision implicate "the extent of the Government's detention authority," which "is not a matter of 'discretionary judgment,' 'action,' or 'decision'" that § 1226(e) shields from judicial review. *Jennings v. Rodriguez*, 583 U.S. 281, 295–96 (2018) (plurality opinion); *see Demore v. Kim*, 538 U.S. 510, 516–17 (2003). Thus, § 1226(e) does not bar an injunction preventing Defendants from detaining Doe based on an unlawful termination of his SEVIS record and/or F-1 status. *See Doe*, 2025 WL 1134977, at *7–8 (reaching same conclusion); *Chen*, 2025 WL 1163653, at *10 (collecting cases in which

courts temporarily enjoined immigration officials from detaining international students whose SEVIS records were terminated).

Accordingly, the court concludes that it may enjoin Defendants from detaining Doe or transporting him outside this court's jurisdiction based on Defendants' finding that he is out of status, unless he fails to maintain his lawful F-1 status for one of the reasons enumerated in 8 C.F.R. § 214.1.

## C. Security

Finally, Defendants ask the court to require Doe to post security if it grants a preliminary injunction. Rule 65(c) provides that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A "district court retains the discretion to set the bond amount as it sees fit or waive the security requirement" altogether, as long as it articulates the reasons for the waiver. *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013), *abrogated on other grounds by Winter*, 555 U.S. 7.

The court finds it appropriate to waive the security requirement in this case. Defendants do not identify any purpose security would serve, and there is no reason to believe a preliminary injunction will impose any significant financial burden on them.

## IV. Conclusion

For the reasons outlined above, the court will **GRANT** Doe's motion for a preliminary injunction (Dkt. 5). A Preliminary Injunction Order will accompany this Memorandum Opinion.

- 33 -

**ENTERED** this <u>14th</u> day of May, 2025.

_____
HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE

CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

May 14, 2025

LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| John Doe, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:25-cv-00023 |
| | ) | |
| Kristi Noem, in her official capacity as | ) | |
| Secretary of Homeland Security, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## **PRELIMINARY INJUNCTION**

This matter is before the court on Plaintiff John Doe's motion for a preliminary injunction (Dkt. 5). For the reasons stated in the court's accompanying Memorandum Opinion, Doe's motion for a preliminary injunction is **GRANTED**. The court finds that Doe has made a clear showing he is likely to succeed on the merits of at least one of his claims; that Doe has made a clear showing of irreparable harm in the absence of a preliminary injunction; and that the balance of equities and the public interest weigh in favor of injunctive relief.

Accordingly, it is **ORDERED** that Defendants, for the pendency of this litigation, are **ENJOINED** from:

1. Terminating Doe's student record in the Student and Exchange Visitor Information System ("SEVIS") or reversing the reinstatement of Doe's SEVIS record without further showing and approval by this court.

2. Taking any direct or indirect action that is inconsistent with Doe maintaining lawful F-1 status in the United States—including detaining Doe or transporting him out

Case 3:25-cv-00923-JHY-JCH Document 33 Filed 05/14/25 Page 2 of 2
Case 4:25-cv-09240-JSW Document 87 Filed 05/14/25 Page 40 of 95
Pageid#: 366

of this court's jurisdiction based on a finding that he is out of status—unless Doe

fails to maintain F-1 status for one of the reasons enumerated in 8 C.F.R. § 214.1.

This Order is effective immediately. The court waives the security requirement under

Federal Rule of Civil Procedure 65(c).

**ENTERED** this __14th__ day of May, 2025.

_____
HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE

# EXHIBIT B

```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3   AKSHAR PATEL,                      )
                                       )
 4           Plaintiff,                )
                                       )
 5       vs.                           )  CASE NO. 1:25-cv-01096-ACR
                                       )
 6   TODD M. LYONS, Acting             )
     Director, U.S. Immigration        )
 7   and Customs Enforcement,          )
                                       )
 8           Defendant.                )
     _____  )
 9
         TRANSCRIPT OF HEARING ON MOTION FOR PRELIMINARY INJUNCTION
10                    OR SUMMARY JUDGMENT
            BEFORE THE HONORABLE ANA C. REYES, DISTRICT JUDGE
11                    Tuesday - April 29, 2025
                      10:05 a.m. - 11:00 a.m.
12                       Washington, DC

13   FOR THE PLAINTIFF:
             Banias Law, LLC
14           BY:  BRADLEY BRUCE BANIAS
             602 Rutledge Avenue
15           Charleston, South Carolina 29403

16           Reddy Neumann Brown, P.C.
             BY:  STEVEN A. BROWN
17           10333 Richmond Avenue, Suite 1050
             Houston, Texas 77042
18

19   FOR THE DEFENDANT:
             U.S. Department of Justice, Civil Division
20           BY:  JOHNNY HILLARY WALKER, III
             601 D Street, NW
21           Washington, DC 20004

22   _____
                         SONJA L. REEVES
23                 Registered Diplomate Reporter
                    Certified Realtime Reporter
24                 Federal Official Court Reporter
                   333 Constitution Avenue, NW
25                      Washington, DC 20001
          Transcript Produced from the Stenographic Record
```

```
 1              (Call to Order of the Court at 10:05 a.m.)

 2              DEPUTY CLERK:  This is Civil Action 25-1096, Akshar

 3  Patel versus Todd M. Lyons.

 4              Would the parties please come forward and identify

 5  themselves for the record.

 6              MR. BANIAS:  Good morning, Your Honor.  Brad Banias

 7  and Steven Brown for the plaintiff.

 8              MR. WALKER:  Good morning, Your Honor.  Johnny Walker

 9  with the United States Attorney's Office for the defendant.

10  I'm joined at counsel table by Andre Watson, the assist

11  director with Homeland Security; Macklin Everly, who is an

12  associate legal advisor in the district court litigation

13  section at ICE; and Annemarie Brennan-Linnan, chief of the

14  district court litigation section at ICE.

15              THE COURT:  What a great name you have.

16              First of all, can anyone tell me why today is also an

17  important day?  It's been on my calendar for a long time.

18  Anyone?  No one?

19              Today is the day that Rick Atkinson has released his

20  second book in the trilogy on the American Revolution.  If you

21  haven't read his World War II trilogy, I highly recommend it.

22  If you're at all interested in the founding of America and the

23  constitutional system and the Revolutionary War, I highly

24  recommend the first book.

25              The second book starts off in France with the King and
```

1    Marie Antoinette hanging out with Ben Franklin, and the
2    precarious situation that the French were in because they hated
3    England, they just lost the seven-year war and were super upset
4    about that, so they wanted to support the U.S., but they didn't
5    really want to be seen as supporting a bunch of rebels seeking
6    republicanism against the monarchy.
7            So if you want to hear about how we got rid of the
8    monarchy in the United States, I commend to you his second
9    book.
10           With that, Mr. Walker, I have a number of questions
11   for you about the administrative record that you filed last
12   night.
13           MR. WALKER:  Certainly.
14           THE COURT:  And thank you for doing that.
15           First -- so the first thing I have is a Tuesday,
16   April 1st, 2025 email at 4:58 p.m. from an Andre Watson to a
17   Mr. Meyers.  And Mr. Watson is the assistant director for the
18   U.S. Department of Homeland Security, ICE.  And he says, "In
19   furtherance of our student criminal alien initiative, the
20   attached letterhead," et cetera.
21           What is the student criminal alien initiative?
22           MR. WALKER:  I don't know precisely what the scope of
23   that is.  I think what you see described in this record and
24   throughout the administrative record is sort of the process
25   that Mr. Watson described.

```
 1              THE COURT:  Well, there was no process, just to be
 2   clear.  There was an email saying "here are the people," and an
 3   email saying "get rid of them all."  So we'll go through that
 4   process, but I want to know, what is the student criminal alien
 5   initiative?
 6              MR. WALKER:  Like I said, I don't know the exact scope
 7   of what that is.
 8              THE COURT:  Well, where is it?  Where can I find it?
 9              MR. WALKER:  Where is the initiative?
10              THE COURT:  Yeah, where can I find it?
11              MR. WALKER:  I believe that that's just a term that is
12   being used here by Mr. Watson to refer to what was described in
13   the declaration where ICE ran a number of students through the
14   NCIC, passed the hits along to the Department of State, and
15   then the Department of State passed the information back to ICE
16   about requesting that certain of those records be terminated in
17   SEVIS, and the records were terminated in SEVIS based on the
18   criminal record.
19              THE COURT:  Okay.  You're from DHS?
20              MR. WATSON:  Yes, ma'am.
21              THE COURT:  Do you know what the student criminal
22   alien initiative is?
23              MR. WATSON:  Yes, ma'am.
24              THE COURT:  What is it?
25              MR. WATSON:  This initiative --
```

```
 1              THE COURT:  First of all, come on up.  Are you an
 2   attorney?
 3              MR. WATSON:  No, ma'am.
 4              THE COURT:  Great.  You survived not having to go to
 5   law school, and, yet, here you are.
 6              Give me your name again, sir.
 7              MR. WATSON:  It's Andre Watson.
 8              THE COURT:  Oh, we met last time.
 9              MR. WATSON:  Yes, ma'am.
10              THE COURT:  Welcome to the DC area.
11              MR. WATSON:  Thank you.
12              THE COURT:  First of all, where can I find the student
13   criminal alien initiative?
14              MR. WATSON:  This initiative is centered at DHS
15   headquarters.
16              THE COURT:  Is it in writing anywhere?
17              MR. WATSON:  No, ma'am.
18              THE COURT:  It's just out there in the world?
19              MR. WATSON:  It's a name that was given by my staff to
20   this specific effort to scrub records from SEVIS through NCIC
21   to determine if there were positive criminality hits within
22   NCIC.
23              THE COURT:  When you say -- tell everyone what NCIC
24   is.
25              MR. WATSON:  National Crime Information Center.
```

```
 1                THE COURT:  It's a database of people, right?

 2                MR. WATSON:  Yes, ma'am.

 3                THE COURT:  It includes people who have been arrested

 4   but not tried, right?

 5                MR. WATSON:  Yes, ma'am.

 6                THE COURT:  It includes people who have been arrested

 7   but not convicted, right?

 8                MR. WATSON:  Yes, ma'am.

 9                THE COURT:  It includes people, I suppose, who have a

10   ticket for reckless driving, even if those charges were not

11   brought, right?

12                MR. WATSON:  Yes, ma'am.

13                THE COURT:  It includes people who are missing,

14   missing people records, right?

15                MR. WATSON:  Yes, ma'am.

16                THE COURT:  So when we say the -- what did you call it

17   again?  National -- what was it again?  National what?

18                MR. WATSON:  National Security Division.

19                THE COURT:  No, no, NCIC.

20                MR. WATSON:  National Crime Information Center.

21                THE COURT:  So when we say the National Crime

22   Information Center, we don't mean that everyone in the database

23   has committed a crime, right?

24                MR. WATSON:  Yes, ma'am.

25                THE COURT:  I'm right about that?
```

1          MR. WATSON:  Yes, ma'am.

2          THE COURT:  For example, it would be inappropriate to

3     run NCIC for a bunch of names, have them pop up and terminate

4     them based on that reason alone, right?

5          MR. WATSON:  I'm sorry?

6          THE COURT:  It would be inappropriate to run through

7     the SEVIS database a number of names, have them pop up as being

8     in the database, and then terminate them on that reason alone,

9     right?  Because it could be that they were never charged.  It

10    could be that they were just there for speeding.  It could be

11    that they were just missing persons, right?

12         MR. WATSON:  That's fair, but it's done on a

13    case-by-case review, and that is what my staff endeavored to do

14    based on the positive hits that were identified.  And as such,

15    we categorized those positive hits based on the charge and any

16    disposition.  And from there, the appropriate responses were

17    categorized in spreadsheets that were then sent to the

18    Department of State.

19         THE COURT:  How big of a staff did you have doing

20    this?

21         MR. WATSON:  Rough order of magnitude, I would put it

22    between 10 to 20 federal employees.

23         THE COURT:  What exactly did they do?  How did they

24    start?

25         MR. WATSON:  I'm sorry, ma'am?

1          THE COURT:  What exactly did these 10 to 20 people do?

2          MR. WATSON:  These 10 to 20 people serve in various

3   roles as analysts --

4          THE COURT:  I don't care what they do.  I mean,

5   apparently what they did was not important enough to pull 10 to

6   20 federal employees to search a bunch of records for students

7   who were in the U.S. legally.

8          Let's put aside what they do during their day jobs and

9   just focus for me right now on what they did with respect to

10  this effort.  You got them together and you told them to do

11  what?

12         Were you in charge of this effort, sir?  You said it

13  was your staff.

14         MR. WATSON:  My staff supported the effort, so --

15         THE COURT:  Who is in charge of the effort?  Who is

16  like the head honcho on this effort?

17         MR. WATSON:  For my program office, that is acting

18  executive associate director Robert Hammer.

19         THE COURT:  Hammer?

20         MR. WATSON:  Yes, ma'am.

21         THE COURT:  Appropriate last name given what has

22  happened, but go ahead.

23         MR. WATSON:  So at the instruction of leadership, we,

24  being ICE, took action --

25         THE COURT:  Leadership at DHS?

1          MR. WATSON:  Yes, ma'am.

2          THE COURT:  You, ICE, took action.

3          MR. WATSON:  To take the population of nonimmigrant

4     students studying in the United States and run them through

5     NCIC.

6          THE COURT:  So name by name, everyone had to be run

7     through this database?

8          MR. WATSON:  Yes, ma'am.

9          THE COURT:  How many people did you run through this

10    database?

11         MR. WATSON:  Just under 1.3 million.

12         THE COURT:  Are you telling me that with all of the

13    cost-cutting that we have going on right now, because

14    apparently we're spending too much money on the federal

15    government doing things like, oh, I don't know, funding cancer

16    research, can't afford to do that, that we had -- not "we,"

17    someone had 10 to 20 federal employees spend their time going

18    name by name in a database to see what hits they got for

19    1.3 million people?  Is that what happened?  Yes or no.

20         MR. WATSON:  Yes, with contract support.

21         THE COURT:  Hold on.  And once you ran -- how long did

22    that take?

23         MR. WATSON:  I would estimate between two to three

24    weeks.

25         THE COURT:  Okay.  Now, humor me.  What were these

1    other people who were taken away from their jobs for two to

2    three weeks putting names into a database to see what hits they

3    would get, what other things would they normally be doing?

4        MR. WATSON:  This is part of our lines of effort.  So

5    within my division annually, we are responsible for taking data

6    from various sources to determine if in fact we have overstays

7    or people that are out of status.

8        THE COURT:  When was the last time that the government

9    made an effort to take a number of employees to put all

10   students who are here on visas through the NCIC database?

11       How long have you been in your office?

12       MR. WATSON:  I've been in this role for over four

13   years.

14       THE COURT:  In your four years in the role, how often

15   has that happened, for the students -- to put all the students

16   in the U.S. here on visas through the database, NCIC database?

17       MR. WATSON:  We do in addition to students.

18       THE COURT:  No, no, I'm just asking about students.

19   When was the last time that there was an initiative somewhere

20   along the line of the student criminal alien initiative?

21       MR. WATSON:  For specific students, I'm not aware of

22   an effort at this magnitude.

23       THE COURT:  Now, of the 1.3 million people that 10 to

24   20 federal employees spent to two to three weeks -- I just want

25   to make sure I understand this.

1        If I'm one of the federal employees, I would have a

2   list of all the students here on F-1 visas, right?

3        MR. WATSON:  Uh-huh.

4        THE COURT:  And I would be given, I don't know, 1,000

5   of the names to handle.  And the first name would be Jane

6   Smith.  So I would go to the NCIC database and put in the name

7   Jane Smith, correct?

8        MR. WATSON:  In that instance, these were batch runs,

9   so based on the capabilities that already exist within --

10       THE COURT:  How many batch runs were run?

11       MR. WATSON:  I don't have the exact number.

12       THE COURT:  But enough for us to be spending time

13   going through 1.3 million people, right?

14       MR. WATSON:  Yes, ma'am.

15       THE COURT:  And out of those 1.3 million people that

16   10 to 20 federal employees spent to two to three weeks tracking

17   down in NCIC, how many of those came up as a hit in the NCIC

18   system?

19       MR. WATSON:  Over 16,000, and then from there, the

20   number went down to 13,900.

21       THE COURT:  And then what went down from there?  Hold

22   on one second.  16,000 out of 1.3 million people?

23       MR. WATSON:  Yes, ma'am.

24       THE COURT:  You want to tell me what percent that is?

25       MR. WATSON:  I don't know off the top of my head.

1          THE COURT:  All right.  It's less than 1 percent.
2    It's less than 100th of a percent.
3          Now, of those 16,000 people --
4          Sam, can you get me the right number since you're our
5    math person?
6          Of those 16,000 people, what happened next?
7          MR. WATSON:  Continued analysis to, one, validate the
8    match between what the NCIC record was against what the SEVIS
9    record was.
10         THE COURT:  Because you might have a John Smith, then
11   it would be a different John Smith?
12         MR. WATSON:  Yes, ma'am.
13         THE COURT:  So when we did that, how many people came
14   out of the 16,000?
15         MR. WATSON:  Just over 6,400.
16         THE COURT:  So then we're down to 10,000.
17         MR. WATSON:  Below 10,000.
18         THE COURT:  What happened next with those 10,000?
19         MR. WATSON:  Those were consolidated on spreadsheets
20   based on close of business activities, and then referred to the
21   Department of State.
22         THE COURT:  What does "close of business activities"
23   mean?
24         MR. WATSON:  How many you can do in one day.
25         THE COURT:  Oh, so batches would go to them?

1          MR. WATSON:  Correct.

2          THE COURT:  And then you sent that off to State?

3          MR. WATSON:  Yes, ma'am.

4          THE COURT:  And then what happened?

5          MR. WATSON:  State conducted their own analysis.

6          THE COURT:  Do you know what State did?

7          MR. WATSON:  No, ma'am.

8          THE COURT:  Okay.  Go ahead.  Do you know who you were

9   interacting with at State?

10         MR. WATSON:  Primarily, John Armstrong.

11         THE COURT:  What's his role?

12         MR. WATSON:  But in his absence, there were delegates.

13         THE COURT:  Who is Mr. Armstrong?  What's his role at

14  the State Department?

15         MR. WATSON:  He's the senior official for the Bureau

16  of Consular Affairs.

17         THE COURT:  Consular affairs, that's diplomats?

18         MR. WATSON:  I don't know.

19         THE COURT:  You don't know.  Okay.

20         So then how many hits do you get back -- you don't

21  know how many people at the State Department were running these

22  10,000 names, right?

23         MR. WATSON:  Not exactly, no, but I know we referred

24  over 6,400 to them.

25         THE COURT:  6,400 is the number you referred to them?

1          MR. WATSON:  That's correct.

2          THE COURT:  Got it.  I made a mistake.  You referred

3    to State 6,400 names out of the 1.3 million?

4          MR. WATSON:  Yes, ma'am.

5          THE COURT:  Sam, can you tell me what percentage that

6    is when you get it?

7          MS. BLOND:  0.5 percent.

8          THE COURT:  So less than half of a percent?

9          MR. WATSON:  Yes, ma'am.

10         THE COURT:  How many names did State send back to you?

11         MR. WATSON:  All of the names came back, but there

12   were some who had revocations based on a valid visa.

13         THE COURT:  Tell me what that means.  What's a

14   revocation based on a valid visa?

15         MR. WATSON:  That they are in status for the purposes

16   of the visa, but State conducted revocation.

17         THE COURT:  You mean State took the visa away?

18         MR. WATSON:  I think so.

19         THE COURT:  Okay.  And State didn't tell you why they

20   did it?

21         MR. WATSON:  I did not see the State response to say

22   why.

23         THE COURT:  It's just they gave you a bunch of names

24   back -- one set of names they gave you back is these are visas

25   we revoked, right?

1          How long did that turnaround take, by the way?  You

2    gave them 6,000 names.  When did they give you back the names?

3          MR. WATSON:  The names came back as they completed

4    their activities on specific spreadsheets.

5          THE COURT:  What was the time lag for the first

6    rolling production?

7          MR. WATSON:  There was, I would estimate, within a

8    weekly cadence of responses that occurred for at least three

9    weeks.

10          THE COURT:  So we basically have another three weeks

11    of work at the State Department?

12          MR. WATSON:  I believe that's accurate.

13          THE COURT:  So they send you back a list of names of

14    people that you had sent them, and here people who were in

15    status, their visas were fine, but now State has revoked them,

16    right?

17          MR. WATSON:  There were some, yes.

18          THE COURT:  How many of those were there?

19          MR. WATSON:  By rough order of magnitude, over 3,000.

20          THE COURT:  3,000 people?

21          MR. WATSON:  Yes, ma'am.

22          THE COURT:  Who were in status, they were going about

23    their days, you send a list to State, and State sends you a

24    list of 3,000 people and we're going to revoke their visa,

25    right?

1          MR. WATSON:  Yes, ma'am.

2          THE COURT:  They told you to terminate those people in

3     SEVIS, right?

4          MR. WATSON:  Yes, ma'am.

5          THE COURT:  Who else did they send back?

6          MR. WATSON:  Those with expired visas.

7          THE COURT:  And then there were people with expired

8     visas?

9          MR. WATSON:  Visas that are not valid, yes, ma'am.

10         THE COURT:  And so those people they didn't need to

11    revoke because they were already expired and they told you to

12    terminate in SEVIS, right?

13         MR. WATSON:  Yes, ma'am.

14         THE COURT:  Do you have any understanding whether

15    State reached out to any of those individuals before sending

16    the list back to you to say, "Hey, we're about to terminate

17    your visa," or, "Hey, why aren't you in status, why is this

18    expired," or, "Hey, just as a heads-up, you're about to be

19    getting, you know, a notice that you have been terminated from

20    SEVIS and we want you to have the opportunity to tell us why

21    you shouldn't have your visa revoked"?  Do you know if that

22    happened?

23         MR. WATSON:  I would defer to State on that.

24         THE COURT:  Can you and I both agree that since you

25    were getting these back within a week and within three weeks

1    total that there was no notice sent out?

2         MR. WATSON:  I think that's a case-by-case assessment.

3         THE COURT:  Mr. Walker, are you aware as to whether or

4    not State sent a notice to anyone?

5         MR. WALKER:  I'm not aware, Your Honor.  I want to

6    clarify one point on the discussion that was just had.  I just

7    wanted to clarify that when we're talking about the State

8    Department revoking visas, we're talking about the State

9    Department revoking a travel visa to travel into the United

10   States, not status.

11        THE COURT:  Okay.  So they were still in status?

12        MR. WALKER:  Yes, ma'am.

13        THE COURT:  Even though they were still in status and

14   validly here on status, the State Department sent them back to

15   you and told you to terminate them in SEVIS?

16        MR. WALKER:  Yes.

17        THE COURT:  All right.  Plaintiff's counsel, did

18   Mr. Patel receive any notice from State that his visa was being

19   revoked or he was about to be terminated?

20        MR. BANIAS:  No, Your Honor.  His visa was expired at

21   the time this all happened.

22        THE COURT:  He was in status?

23        MR. BANIAS:  Yes, Your Honor.

24        THE COURT:  It's okay if your visa is expired because

25   a visa just gets you into the country.  The question is whether

1    or not you're in status?

2         MR. BANIAS:  Correct, Your Honor.  He had legally and

3    properly changed his status after entering the country.

4         THE COURT:  Got it.  Your represent a number of these

5    plaintiffs, right?

6         MR. BANIAS:  Yes, Your Honor.

7         THE COURT:  How many do you represent about,

8    approximately?

9         MR. BANIAS:  Probably about 125.

10        THE COURT:  Of those, are you aware of State sending

11   or DHS or anyone sending them any kind of notice that these

12   actions were about to occur?

13        MR. BANIAS:  Not a single one.

14        THE COURT:  So then State sends you back the list, and

15   then what happens?

16        MR. WATSON:  We provided instructions to -- "we" being

17   National Security Division, working group counterthreat lead

18   development, provided instructions to the Student Exchange

19   Visitor Program.

20        THE COURT:  Say that again.  I wasn't listening.  I

21   apologize.

22        MR. WATSON:  The National Security Division

23   counterthreat lead development unit passed the list from the

24   Department of State to the Student and Exchange Visitor Program

25   to action termination in SEVIS.

```
 1              THE COURT:  So what happened was State gives it back
 2     to DHS and DHS says -- and State says terminate these people,
 3     and then you do?
 4              MR. WATSON:  Yes, ma'am.
 5              THE COURT:  I want to go through some timeline here
 6     for you so you can sort of help me out with this.
 7              MR. WATSON:  Yes, ma'am.
 8              THE COURT:  Does he have a copy of the administrative
 9     record?
10              MR. WALKER:  It's right here in front of him.
11              THE COURT:  Sir, the first email I see in the
12     administrative record is from Tuesday, April 1, 2025 at
13     4:58 p.m.  Do you see that?
14              MR. WATSON:  Yes, ma'am.
15              THE COURT:  And you sent it to Shane Meyers?
16              MR. WATSON:  Yes, ma'am.
17              THE COURT:  Who is Shane?
18              MR. WATSON:  He is the acting principal deputy
19     assistant secretary.
20              THE COURT:  For?
21              MR. WATSON:  The Department of State.
22              THE COURT:  So you send this list to State of 735
23     names.  This is part of the 6,000 names.  This would have been
24     one batch?
25              MR. WATSON:  Yes, ma'am.
```

1      THE COURT:  And you send this to him April 1, 2025 at

2  4:58 p.m.?

3      MR. WATSON:  Yes, ma'am.

4      THE COURT:  Okay.  And then if you look down, there is

5  an email on April 2nd, 2025 at 3:35 p.m. from someone at State

6  to someone at DHS.  Do you see that?

7      MR. WATSON:  No, ma'am.

8      THE COURT:  If you go to page -- at the bottom you

9  will see AR023.

10     MR. WATSON:  Yes, ma'am.

11     THE COURT:  So you see that on April 2nd, 2025, 3:35

12  p.m., someone from State sends an email to someone from DHS.

13     Do you see that?

14     MR. WATSON:  Yes, ma'am.

15     THE COURT:  Okay.  So this would be less than 24 hours

16  after you sent your email to Mr. Meyers, right?

17     MR. WATSON:  Appears to be the case, yes, ma'am.

18     THE COURT:  And in your email, you said, "Here is 735

19  foreign students submitted for your review and any action

20  deemed appropriate," right?

21     MR. WATSON:  Yes, ma'am.

22     THE COURT:  And the reason I have this email from you,

23  this particular email, is because Mr. Patel, the plaintiff in

24  this case, came up in this spreadsheet, right?

25     MR. WALKER:  We have unredacted that portion.

```
 1              THE COURT:  And then he responds within less than
 2    24 hours, "We have run the delta data against our systems.  The
 3    first tab lists individuals with valid visas.  How would you
 4    like us to prioritize revocation of these visas?"
 5              Do you see that?
 6              MR. WATSON:  I do.
 7              THE COURT:  The second tab is, "Students without a
 8    valid visa, we request that DHS terminate SEVIS status for
 9    these individuals, as there is no valid visa for us to revoke
10    and they are admitted under duration of status."
11              Do you see that?
12              MR. WATSON:  I do.
13              THE COURT:  So then someone at Homeland Security
14    Investigations -- is that DHS or is that State, National
15    Security Division?
16              MR. WATSON:  That's DHS.
17              THE COURT:  So someone sends back -- that's not you
18    though, right?
19              MR. WATSON:  That's correct.
20              THE COURT:  So someone at State, the division chief --
21    who is the division chief?
22              Mr. Walker, why is this redacted?
23              MR. WALKER:  We have redacted the level of certain
24    employees.  Some are not redacted, but it's just a privacy
25    interest.
```

1          THE COURT:  Well, you know I could go online and find

2     out who the division chief is, right?  You can assume I have

3     asked my clerk to do that.  So you want to just tell me the

4     name?

5          MR. WALKER:  I don't know that, Your Honor.  It may or

6     may not be online.

7          THE COURT:  Who was it?

8          Oh, Mr. Hammer.  Robert Hammer would be the person who

9     communicated back to you.

10          MR. WATSON:  This Exhibit 17?

11          THE COURT:  Yeah.

12          MR. WATSON:  Well, the division chief is not me.

13          THE COURT:  No, no, no.  I'm sorry.  Someone responded

14     to --

15          MR. WATSON:  Yes, that is a subordinate employee

16     within the National Security Division.

17          THE COURT:  Okay.  And that person sent back the

18     response on April 2nd, 2025 at 3:50 p.m.  Do you see that?

19          MR. WATSON:  I do.

20          THE COURT:  So a question goes out.  We have 700 names

21     here, because the list from April 2nd, 2025 is also the list --

22     the same list from the day before because it also contains

23     Mr. Patel, right?

24          MR. WATSON:  I believe so.

25          THE COURT:  Thank you.  So with less than 24 hours,

1   someone has run this list through something, and says, "We have

2   people with a valid visa.  How would you like us to prioritize

3   revoking these visas?"

4         And then we have another person -- we have groups

5   without valid visas because they are expired.  And State says,

6   "Terminate both of these," right?  "Terminate the people

7   without the valid visa from SEVIS," right?

8         MR. WATSON:  Yes, ma'am.

9         THE COURT:  State does not ask that the people in the

10  first tab be terminated from SEVIS, right?

11        MR. WATSON:  I don't see that in the instruction.  I

12  don't see that in the email.

13        THE COURT:  All right.  And then somebody, Mr. Hammer,

14  within 15 minutes of careful thought and consideration, says,

15  "Please terminate everyone in SEVIS," right?

16        MR. WATSON:  Ma'am, that's not Mr. Hammer.  He doesn't

17  serve as the division chief.

18        THE COURT:  Well, whoever.  Someone at National

19  Security Division, Homeland Security Investigations division

20  chief -- and, Mr. Walker, I want a name of that by the time we

21  leave today, so if someone can get on that -- sends, after

22  careful consideration for 15 minutes, "Terminate everybody,"

23  right?

24        MR. WATSON:  Yes, ma'am.

25        THE COURT:  Can you and I agree that nowhere in this

1  entire process has anyone done an individualized determination

2  of any of these individuals before their names were terminated

3  in SEVIS?

4        MR. WATSON:  When you say "individualized

5  determination," that is --

6        THE COURT:  I mean no one looked at Mr. Patel's case

7  and said, "Yeah, here is somebody who should no longer be in

8  the United States," right?

9        MR. WATSON:  Ma'am, my team --

10        THE COURT:  To your knowledge, no one did an

11  individualized assessment as to whether or not Mr. Patel should

12  be or should not be in the United States, right?

13        MR. WATSON:  Individualized assessment of every

14  person?

15        THE COURT:  Yes.

16        MR. WATSON:  Each record was scrutinized based on the

17  criminal history.

18        THE COURT:  Yeah, but Mr. Patel got a citation for

19  reckless driving, which is a misdemeanor in Texas.  By the way,

20  it's also a misdemeanor in Virginia.  If you go over 70 miles

21  an hour, you actually have a criminal defense case against you.

22  Don't ask how I know that.

23        And he was pulled over for, quote-unquote, "reckless

24  driving," which just meant he was speeding, and no charges were

25  ever brought.  In fact, when I looked at his record that you

1   sent me in the administrative record, it said very clearly,

2   "case dismissed," right?

3        MR. WATSON:  Following a complaint being filed and him

4   meeting the terms of the agreement, yes.

5        THE COURT:  Well, can you and I both agree that if we

6   deported every single individual in this country who has been

7   tagged for speeding, there would be very few people left and

8   almost all of them would not have driver's licenses?

9        MR. WATSON:  I don't know that we have the capacity at

10   this present time to do that, Your Honor.

11        THE COURT:  But you and I both know that Mr. Patel is

12   not a criminal, right?  And anyone looking at the record would

13   know that he's not a criminal, right?

14        In fact, Mr. Patel tells me, and I assume you have no

15   reason to not believe him, that he had disclosed the speeding

16   ticket at least two times to government agencies when seeking

17   to keep in status.  He was quite forthright about it, and,

18   obviously, the government people said, "Fine.  People speed.

19   Let's all move on."  They weren't tagged.

20        By the way, did you know that?  Was there an

21   individualized assessment with Mr. Patel where you knew or

22   State knew that the government, the United States government

23   had already assessed this speeding ticket and had found it not

24   to be a reason to take him out of status?

25        MR. WALKER:  Just to clarify, Your Honor, Mr. Patel

 1  was not taken out of status.  His SEVIS record was terminated.

 2          THE COURT:  But upon termination, the law they cite me

 3  says he has to leave the country.

 4          MR. WALKER:  Your Honor, one of the questions you

 5  wanted us to answer today was, was Mr. Patel lawfully present

 6  in the United States?  Is he now and was he at the time that

 7  his SEVIS record was terminated?  The answer to that is yes.

 8          THE COURT:  Did the termination require him upon

 9  termination to leave the country immediately?

10          MR. WALKER:  It did not.  He was lawfully present in

11  the United States.

12          THE COURT:  No, no, no.  You're not answering my

13  question.  I want to know what the effect is of a termination

14  of SEVIS.  They are telling me based on the law that the actual

15  law is he has to either leave the country immediately or get it

16  changed somehow, which I assume is legally, through the court

17  system.

18          MR. WALKER:  No.  Upon the termination of a record in

19  SEVIS, he remains lawfully present in the United States.

20          THE COURT:  So what are his obligations?

21          MR. WALKER:  It depends on how the school reacts to

22  the termination of the record in SEVIS.  The school may

23  require --

24          THE COURT:  We're going to get into the merits of this

25  later, because I know that they disagree with everything that

 1    you're saying right now.  Let's keep on the non-process process

 2    here for a bit.

 3            Mr. Patel and 6,000 other people with 15 minutes of

 4    consideration by people after they hear from State and less

 5    than 24 hours of consideration by State, thousands of people

 6    get terminated from SEVIS, right?

 7            MR. WATSON:  Yes, ma'am.

 8            THE COURT:  Students?

 9            MR. WATSON:  Yes, ma'am.

10            THE COURT:  Students who are in the country studying,

11    right?

12            MR. WATSON:  Yes, ma'am.

13            THE COURT:  A number of them, if not thousands of

14    them, who were legally in status and had no issue with their

15    being in the country, right?

16            MR. WATSON:  To the best of my knowledge.

17            THE COURT:  To the best of your knowledge, right?

18            MR. WATSON:  Yes.

19            THE COURT:  Okay.  Let's do a quiz today.  Anyone know

20    where the due process clause from the Fifth Amendment comes

21    from?  Anybody?  Nobody knows where the due process clause or

22    the Fifth Amendment comes from?  Not my clerks?  We're going to

23    have discussions afterwards.

24            It comes from Article -- Chapter, Article, whatever

25    you want to the call it, 39 of the Magna Carta.  That's where

1  it first appeared.  It appeared as the law of the land.  It was

2  amended in the 1300s to be due process, but the due process

3  comes from the Magna Carta.

4       Anyone want to remind me what century the Magna Carta

5  was in?  It was in the 1200s.  So when I say, or when the

6  courts say due process is important, we're not unhinged, we're

7  not radicals; we are literally trying to enforce a process

8  embodied in probably the most significant document with respect

9  to peoples' rights against tyrannical government oppression.

10  That's what we're doing here.  Okay?

11       I'm not on a lark questioning why students who have

12  been here legally, who paid to be in this country by paying

13  their universities, who have studied to try to become better

14  people if they stay in the U.S. or when they go back to their

15  homes or countries, people who are trying or months away from

16  getting engineering degrees, and they are cut off with less

17  than 24 hours of consideration and no notice whatsoever.

18       So, Mr. Walker, we're going to have a long discussion

19  about that.

20       Mr. Watson, is there anything else -- and I may have

21  questions for you later on.  Is there anything else about the

22  process that I should know about?

23       MR. WATSON:  Your Honor, I would just note that with

24  the terminations, that is a red flag, and it is a red flag to

25  determine if the student is still in compliance with their F

1    and/or M visa.

2          THE COURT:  But you didn't have to terminate people in

3    SEVIS to do that, right?  You could have sent a letter to all

4    the universities that had these students and said, "These

5    people have come up on a hit, you may want to check them out,"

6    because termination is -- well, all right.  I understand your

7    view.  Thank you.

8          Mr. Watson, I will say I know that this isn't pleasant

9    for you, because you're on the end of a bunch of questions, but

10   I have to say I have found you both last hearing and this

11   hearing to be very on top of what's going on and very

12   forthright and very helpful.  So thank you.

13         MR. WATSON:  Thank you, Your Honor.

14         THE COURT:  You can be seated.  I can't promise you

15   won't be up here again.

16         MR. WALKER:  Your Honor, the name you asked for is

17   Antoine Rines (ph).

18         THE COURT:  Thank you.

19         Can I get the plaintiffs up here.  Actually, let me do

20   this.  Let me go through these questions I had for you.

21         Since I'm from Kentucky, you'd probably be doing a lot

22   better with me if your name was "Maker's Mark."

23         MR. WALKER:  I'm also from Kentucky.

24         THE COURT:  Where are you from?

25         MR. WALKER:  I was born in Louisville and went to

1    school in Mount Washington, just outside of Louisville.

2         THE COURT:  I lived in Louisville.  What made you

3    leave KY?

4         MR. WALKER:  My dad got transferred down to Georgia,

5    so we moved to Georgia, but always went back to Louisville to

6    visit Mamma and Pappa.

7         THE COURT:  Awesome.  Was your dad in the military?

8         MR. WALKER:  No, he works in packaging.

9         THE COURT:  Okay.  Well, always happy to see a

10   Kentuckian.  I don't understand how they called you Johnny

11   Walker if you were born in Kentucky, but --

12        MR. WALKER:  There is a lot of brown liquors involved.

13        THE COURT:  So first question.  In your view, is the

14   plaintiff lawfully in the United States, assuming that I had

15   not entered my TRO?

16        MR. WALKER:  Yes, Your Honor.  The answer to that

17   question is yes.  Based on the information currently available

18   to ICE, Mr. Patel is lawfully present in the United States and

19   was at the time that his SEVIS record was terminated.

20        THE COURT:  Is plaintiff currently subject to

21   immediate detention or removal from the United States?

22        MR. WALKER:  No.  Again, I have to provide the caveat

23   that based on the information currently available to ICE, we

24   don't -- it's a law enforcement agency and they are obviously

25   sensitive about hampering their ability to enforce the law.

1          THE COURT:  But based on everything we know in the

2     record to date.

3          MR. WALKER:  Based on everything ICE knows right now,

4     he is not subject to immediate detention or removal.

5          THE COURT:  Okay.  It seems like we have gone through

6     four.  Seems like we have gone through five.

7          Number six, has the government identified any error in

8     any of its recent SEVIS termination actions?

9          MR. WALKER:  Yes, and I think this gets to the quality

10    control effort that some of the other questions deal with and

11    that Your Honor addressed at the prior hearing.  The quality

12    control effort that Mr. Watson was talking about was to make

13    sure that the identity of the individual associated with the

14    SEVIS record matched the individual associated with the NCIC

15    hit.

16         THE COURT:  If we have a John Smith, we need to make

17    sure that it's the right John Smith.

18         MR. WALKER:  Precisely.  So the government has

19    completed that process.  It identified 23 false matches between

20    the SEVIS record and the NCIC record, and it has remedied those

21    false hits.

22         THE COURT:  What is the government's purpose in

23    changing a student's SEVIS record from active to terminated?

24         MR. WALKER:  I think Mr. Watson addressed this a

25    little bit.  It is intended as an investigative red flag for

1   either the university or the school or some other government

2   agency to follow up on.

3          THE COURT:  Well, where can I go -- if I'm a student

4   counselor and I get a termination that says Mr. Patel's SEVIS

5   record has been terminated, where would I go to find out what

6   it means -- what that means?

7          Like where would I go to know that he was still in the

8   country lawfully and that he was still in status?

9          MR. WALKER:  I think there are designated school

10  officials, so the school official has a contact at ICE field

11  offices that they can go to to follow up on those questions.

12         THE COURT:  But there is no document?  I mean, there

13  must be a document somewhere in the world that says "here is

14  the effect of being terminated in SEVIS."

15         MR. WALKER:  There is the study in State's website

16  that the plaintiff have cited a little bit that has some

17  information about SEVIS and the effect of a termination.

18         THE COURT:  Where is that in my papers so I can look

19  at it and talk to you about it?

20         MR. WALKER:  It's in their brief and there is some

21  perma CC links to it.  I know that they have sort of snipped

22  some images from it, so if you scan their brief for that, I

23  think you would find it.

24         What we have noted is what that study in State's cite

25  says is that a termination of a SEVIS record could indicate a

1    change in status.  It does not necessarily indicate a change in

2    status.  The website also notes that a termination in SEVIS is

3    not necessarily negative.  A termination in SEVIS can be done

4    for administrative reasons that are not necessarily negative.

5         THE COURT:  Where am I looking?

6         MR. WALKER:  We sort of pulled these quotes in our

7    brief.  The website is mostly visible through clicking on it.

8         Plaintiffs have captured some images of it on page 11

9    of their brief.  So there is this thing that provides some

10   reasons for termination and duration of status.  What we

11   pointed out here is that this particular termination reason is

12   associated with a termination for a violation of status, but,

13   again, a termination of a SEVIS record is not necessarily

14   indicative of a lack of status.

15        THE COURT:  I didn't see, and maybe I'm wrong, but I

16   didn't see in SEVIS where it says -- my understanding is that

17   SEVIS just says "active" or "terminated."  It doesn't say why

18   it was terminated; is that right?

19        MR. WALKER:  No.  There is a list of drop-down items

20   that you can select as to why it was terminated.

21        THE COURT:  What was the drop-down item for Mr. Patel?

22        MR. BANIAS:  Your Honor, it said "failure to maintain

23   status, criminal hit and/or visa revocation."

24        THE COURT:  Sounds pretty bad to me.

25        MR. WALKER:  I acknowledge that that particular choice

 1    that was made to describe this hit was not necessarily the

 2    right one to describe it.

 3         THE COURT:  Maybe that happened because this was a

 4    rushed process and maybe -- and this is absolutely no criticism

 5    to Mr. Watson or his group at all -- maybe a little bit more

 6    care should have been taken.

 7         MR. WALKER:  I can sort of provide -- and we don't

 8    know who actually undertook this process.  It could have been a

 9    contractor.  It could have been a lower-level employee.  The

10    best guess I can give, Your Honor, and this is based on no

11    information whatsoever that I have actually obtained firsthand,

12    the best guess that I have is that that's sort of a catchall

13    option, and based on the SEVIS website, that is the only option

14    that sort of has a fillable field associated with it where ICE

15    could put in the information about the NCIC hit.

16         THE COURT:  But a violation, it says, has no grace

17    period.

18         MR. WALKER:  Again, that is for a termination that is

19    for a failure to maintain status.  Mr. Patel was --

20         THE COURT:  It says "termination for any violation of

21    status," and you just told me that his termination said

22    "failure to maintain status."

23         MR. WALKER:  Yes.  That was not the most descriptive

24    option to select.

25         THE COURT:  Mr. Walker, I have to say I'm pretty

1    impressed with you right now.  I think have you been

2    forthright.  You have gotten me the administrative record.

3    You're answering my questions.  Thank you.  So this is not

4    directed at you.  All right.

5          But what happens when we do things willy-nilly with

6    very little time, and certainly with zero due process, is that

7    mistakes happen, a wrong catchall is used, and the next thing

8    somebody is being told or would know if they went to the

9    website that they have no grace period and that they must

10   either apply for reinstatement immediately or leave the U.S.

11   immediately.

12         And then what happens -- now, if someone had sent, for

13   example, Mr. Patel a letter that says, "We're going to

14   terminate you for violation of status," Mr. Patel or his

15   lawyers would have said, "No, no, no, I'm in status," and then

16   this wouldn't have happened.

17         And the reason that I'm particularly concerned about

18   this, Mr. Walker, aside from the utter lack of concern for

19   human individuals who we have invited into our country and who

20   have communities richer by being students who have contributed

21   to our colleges and who have paid our colleges, the reason I'm

22   concerned and particularly troubled is because those

23   plaintiffs' lawyers, like all lawyers, have to get paid.

24         And so now we have got thousands of people who are

25   having to pay plaintiffs' attorneys to have litigation, to file

1    briefs, to appear in court, to prepare for court, to get the

2    information, and that's not cheap, right.  And all of this

3    could have been avoided if individuals had taken a beat, and

4    instead of just rushing things -- and, again, I'm not

5    criticizing Mr. Watson at all for this -- but that's not

6    happening.  And so instead we end up with -- how many cases are

7    there now nationwide?

8            MR. BANIAS:  I think it's about 60.

9            THE COURT:  60 cases, but about with hundreds of

10   plaintiffs, right?

11           MR. BANIAS:  There are a handful of group cases, yes,

12   Your Honor.

13           THE COURT:  You have 100 yourself, right?

14           MR. BANIAS:  I have two group cases with 100 people

15   total, yes, ma'am.

16           THE COURT:  We're taking up court time.  We're taking

17   up government time.  I imagine you have better things to do.  I

18   imagine Mr. Watson has better things to do.

19           All right.  Is there anything that you can say right

20   now, Mr. Walker, or anything that the government can do, so

21   that instead of having a gazillion or 60 judges have to rule on

22   60 motions, that we can sort of short-circuit this and maybe

23   start afresh?

24           MR. WALKER:  I'm happy to get to that, Your Honor.

25   With respect to Mr. Patel, so we filed with our brief last

1    night a new policy that ICE has issued with respect to

2    terminations of records in SEVIS.  It is at ECF 16-1.  It's

3    Exhibit A to our opposition to the motion for preliminary

4    injunction.

5          THE COURT:  One second.  This is to all SEVP

6    personnel.  Who is SEVP?

7          MR. WALKER:  It's the Student and Exchange Visitor

8    Program.

9          THE COURT:  This is dated April 26, 2025.  So explain

10   this to me.

11         MR. WALKER:  This was issued over the weekend, and

12   this provides specific guidance to SEVP personnel about when to

13   terminate a record in SEVIS.  This document does retain ICE's

14   broad discretion, which it does always have and continues to

15   have to terminate records at its discretion, but the specific

16   guidance provided here, you will note these bullet points here,

17   those do not apply to Mr. Patel.

18         There is the failure to comply with the terms of

19   nonimmigrant status, which does not apply to Mr. Patel.  The

20   one I want to highlight is the visa revocation issue.

21         If you look at the middle paragraph here, the second

22   of the three.  "If State revokes a nonimmigrant visa effective

23   immediately, SEVP may terminate the nonimmigrant's SEVIS record

24   based on the visa revocation with immediate effect.  As such, a

25   revocation can serve as a basis for removability under Section

237(a)(1)(B) of the INA.  SEVP should not, however, terminate a
nonimmigrant's SEVIS record on this basis until it has
confirmed that State has revoked the visa."

And you will recall, Your Honor, when you were looking
at the administrative record with Mr. Watson, Mr. Patel fell
into a class of individuals who had not had a visa revoked.  He
had -- I think this was sort of described at the prior hearing.
Mr. Patel started his studies when he was under an H-4 visa, as
the family member of an H-1 B worker.

He then traveled out of the United States and returned
to the United States on a tourist visa, an H-2 visa.  Those
last for 45 days.  While in the United States on a tourist
visa, he converted to an F status.  So he got the status to
remain as a student in the United States under F-1.

So his tourist visa expired by its terms, and at the
time that this review was conducted, he had no visa to revoke.
Because he had no visa to revoke, this visa revocation basis
for terminating a SEVIS record would not apply to him.

THE COURT:  I don't see anything in here about a hit
on the NCIC system.  That's not a hit, right?  That's not a
basis?

MR. WALKER:  That's not in here.  I don't want to say
-- I can't tell you that it would be outside of ICE's
discretion to terminate a record based on an NCIC hit.  But
here what you had was a colloquy with the State Department

1  where they returned some information based on their visa

2  records.  They noted that Mr. Patel had no visa to revoke, but

3  the current policy, as of this weekend, is that the visa basis

4  for a termination of a SEVIS record has to be a revoked visa.

5        THE COURT:  So absent a TRO, preliminary injunction,

6  Mr. Patel, because he's here in status and has not -- does not

7  have a visa because he's here in status legally, he would

8  remain active absent something happening, you know, we found

9  out that while he was here he did something actually illegal?

10        MR. WALKER:  I have discussed this with Mr. Watson.

11  Based on the information currently available to ICE at this

12  time, absent a TRO or injunction, Mr. Patel would remain active

13  in SEVIS.

14        THE COURT:  Okay.  So I guess I still don't

15  understand.  Let's say that we had Mr. Smith, his visa -- can

16  someone have a valid visa and be in country status -- in the

17  country in status, and so if you revoked their visa, they would

18  still be in status?

19        MR. WALKER:  Yes.  I think, as this notes, a visa

20  revocation can be a basis for removability, but it's two

21  separate things.  State Department revokes the travel visa, but

22  it would require removal proceedings to eliminate the status

23  and actually accomplish the removal.

24        THE COURT:  So I still do not understand what happens

25  if I'm terminated in SEVIS.  What is the practical -- I mean, I

1    guess what I'm asking is -- this is helpful.  This tells me

2    when someone can be terminated.  What I'm more interested in

3    is, I'm a school counselor and it pops up that Mr. Patel's

4    SEVIS record has been terminated, or Mr. Smith's.

5          So far the only thing I understand from you all is

6    that it's a red flag, the person does not have to leave

7    immediately, correct?

8          MR. WALKER:  That's correct.

9          THE COURT:  Okay.  And then can the person go to

10   classes?

11         MR. WALKER:  That's up to the school.  The school may

12   see that hit and tell the individual they can't go to classes.

13   I know that has happened in some cases, but upon follow-up by

14   the designated school official with their ICE field office that

15   could clarify that the person does in fact have status and can

16   attend classes.

17         THE COURT:  We have to assume that the person at the

18   ICE field office actually knows what's going on.

19         MR. WALKER:  I think that's fair to assume that the

20   person in the ICE field office would have access to the

21   individual's information.

22         THE COURT:  You and I have different assessments of

23   what's fair to assume that government officials have these days

24   with respect to updated knowledge.  We have that disagreement,

25   that's fine.

 1          I'm going to let you obviously talk as long as you

 2     want, but before I get to plaintiff's counsel on this effective

 3     termination issue.

 4          MR. WALKER:  I think the primary things I wanted to

 5     do, Your Honor, was talk about that policy that I have been

 6     able to describe to you and answer Your Honor's questions from

 7     the prior hearing.

 8          THE COURT:  I'm not sure I got through all of them.  I

 9     think we have actually.  Thank you, sir.

10          Look, I know that I think technically, you know, the

11     fact that they will agree to keep Mr. Patel in active status

12     pending some other information coming out, I suppose that -- my

13     clerk found a Supreme Court case that said that government

14     making something moot does not necessarily -- I mean, giving

15     the relief does not necessarily make something moot, but I'm

16     kind of at a loss as to what I'm still doing with respect to

17     Mr. Patel if we have a representation from the government -- I

18     guess I could say -- I guess I could get a representation from

19     the government that if they are going to do anything else with

20     Mr. Patel, he be given two weeks or 30 days notice, but other

21     than that, I'm not sure what else to do for you.

22          MR. BANIAS:  Your Honor, we made various arguments

23     about why it's arbitrary and capricious.

24          THE COURT:  I think we can all agree it was arbitrary

25     and capricious.  My question to you is, yeah, this was not

1    ideal by any stretch of the imagination.  It still boggles my

2    mind that we're firing tens of thousands of federal workers on

3    no notice and then spend -- take 10 or 20 of them to run a

4    bunch of names through a database to see if they are students

5    if they have a speeding record.

6        You know what, it's not my call.  But my question is

7    with respect specifically to Mr. Patel, I mean, he's on active.

8    He's going to remain on active, pending any new information.

9    You know, so I'm not sure what else to do for you.

10        MR. BANIAS:  Your Honor, we think that he's definitely

11    subject to termination under this, quote, "new policy."

12        THE COURT:  I can get a representation from the

13    government that absent new information, he's not going to be

14    terminated, and that if they plan to terminate him, he gets

15    notice.  I don't know what else I could do for you.

16        MR. BANIAS:  Your Honor, one of our arguments is that

17    this is ultra vires and that this new policy is even more ultra

18    vires.  If this Court rules this an ultra vires act, it

19    protects my client because they can't go and use power they

20    don't have again.

21        THE COURT:  But I don't need to go that far.  Look,

22    I'm not going to wade into whether or not the policy makes

23    sense or doesn't if I don't need to.  Okay.  And I'm just not

24    going to do it.  So I think if Mr. Walker and you want to come

25    up with some language that Mr. Walker can give me or some

1    representation that the government will make, you know, that

2    Mr. Patel based on the current -- Mr. Walker, come up.  I think

3    you have already said.  In your understanding, based on the

4    current record, having Mr. Patel's NCIC status here, with

5    Mr. Watson here, your understanding, the government's position

6    is that under the new policy he is not subject to termination

7    based on what we know today?

8            MR. WALKER:  I have to provide caveats to this, Your

9    Honor.  I'm going to provide the caveats.  He's not subject to

10   termination for the visa revocation purpose on that policy, and

11   based on the information currently available to ICE at this

12   time, he would not be terminated absent a court order.  So

13   without a court order, he won't be.

14           THE COURT:  He can't say that he's not going to be

15   terminated at all, because they could come up -- I'm not going

16   to use Mr. Patel.  Let's say there's a Mr. Smith who is exactly

17   in your client's position, and Mr. Walker is saying the same

18   thing about Mr. Smith, and the reason Mr. Walker is saying that

19   and Mr. Watson is asking him to say that is because, you know,

20   Mr. Smith might have killed puppies while at school and we just

21   didn't know that, right.  So that's why there is that caveat.

22   He's never going to be able to not give you that caveat.

23           MR. WALKER:  One additional thing I want to add, Your

24   Honor, is that Mr. Patel is on the brink of finishing his

25   education.  I think he has his last final next week.  He's

1    graduating on the 15th, so his interests are in the very, very

2    immediate term.

3              MR. BANIAS:  If I may, Your Honor.

4              THE COURT:  He's in classes right now because I

5    entered the TRO that he could go to classes, right?

6              MR. BANIAS:  Yes, Your Honor.

7              THE COURT:  He's getting an engineering degree?

8              MR. BANIAS:  Information systems, Your Honor.

9              THE COURT:  Ironic.

10             MR. BANIAS:  He's also applied for postgraduate

11   optional practical training.  This is an application that will

12   allow him to work, because he's in a STEM major, for up to

13   three years within his field of study.  That's going to go to

14   United States Citizenship and Immigration Services.

15             THE COURT:  We can give -- Mr. Walker, can you work

16   with me so that I don't have to look at the entire policy,

17   which I'm quite confident you don't want me to do in

18   particular.  Can you guys come up with some language that we

19   will enter on the court docket about Mr. Patel specifically?

20   And your co-counsel wants to give you a note.

21             MR. WALKER:  I'm very happy to try that, Your Honor.

22   I can't promise we will be able to, but we will endeavor to do

23   that.

24             THE COURT:  I just want to make clear for the record

25   that I'm trying very hard to not enjoin an entire policy, and

1    I'm trying very hard to get just one person relief.

2          MR. WALKER:  I understand.

3          THE COURT:  That's what I'm trying to do.

4          MR. BANIAS:  Your Honor, we are happy to work with the

5    government to agree to language.  We have been doing that for

6    the last three weeks and we've gotten nowhere.

7          THE COURT:  I'm telling Mr. Walker right now that

8    based on what I have seen so far, he does not want me to issue

9    a ruling in this case.  He really does not want me to issue a

10   ruling in this case.  He really, really, really -- I'm looking

11   at you and not Mr. Walker, and I assume Mr. Walker is paying

12   attention to me -- does not want me to issue a ruling in this

13   case.

14         MR. WALKER:  Loud and clear, Your Honor.

15         THE COURT:  I understand that your client is going to

16   have concerns and words and what you call it and what you all

17   say to your client is, you can add in the language that this is

18   not binding on the government as to anybody else, that this is

19   not conceding anything by government, and you tell your client

20   that they want to just keep Mr. Patel in the country and happy

21   so they can avoid me issuing a ruling which they will not like.

22         Okay.  And contrary to the belief of a number of

23   people, I am literate and I can actually write a long ruling

24   that explains in detail all the issues that I see with what's

25   happened here.

1          MR. WALKER:  Understood.

2          THE COURT:  You guys have a week to get that language

3    to me.  If you need more time, let me know.  If there is an

4    issue that you guys can't agree, before you file something,

5    email my chambers.  We'll have a quick call and we'll see where

6    to go from there.

7          The TRO expires on Thursday.  I assume, Mr. Walker,

8    you can represent that nothing is going to happen to Mr. Patel

9    while you two are working this out, right?

10          MR. WALKER:  Yes, Your Honor.

11          THE COURT:  Okay.  Thank you, everyone.

12       (Proceedings concluded at 11:00 a.m.)

13                          CERTIFICATE

14       I, Sonja L. Reeves, Federal Official Court Reporter in and
     for the United States District Court of the District of
15   Columbia, do hereby certify that the foregoing transcript is a
     true and accurate transcript from the original stenographic
16   record in the above-entitled matter and that the transcript
     page format is in conformance with the regulations of the
17   Judicial Conference of the United States.

18       Dated this 29th day of April, 2025.

19

20                      /s/ Sonja L. Reeves
                        SONJA L. REEVES, RDR-CRR
21                      FEDERAL OFFICIAL COURT REPORTER

22

23

24

25

**/**

**/s** [1] - 46:20

**0**

**0.5** [1] - 14:7

**1**

**1** [3] - 12:1, 19:12, 20:1
**1,000** [1] - 11:4
**1.3** [7] - 9:11, 9:19, 10:23, 11:13, 11:15, 11:22, 14:3
**10** [8] - 7:22, 8:1, 8:2, 8:5, 9:17, 10:23, 11:16, 42:3
**10,000** [4] - 12:16, 12:17, 12:18, 13:22
**100** [2] - 36:13, 36:14
**100th** [1] - 12:2
**10333** [1] - 1:17
**1050** [1] - 1:17
**10:05** [2] - 1:11, 2:1
**11** [1] - 33:8
**11:00** [2] - 1:11, 46:12
**1200s** [1] - 28:5
**125** [1] - 18:9
**13,900** [1] - 11:20
**1300s** [1] - 28:2
**15** [3] - 23:14, 23:22, 27:3
**15th** [1] - 44:1
**16,000** [5] - 11:19, 11:22, 12:3, 12:6, 12:14
**16-1** [1] - 37:2
**17** [1] - 22:10
**1:25-cv-01096-ACR** [1] - 1:5
**1st** [1] - 3:16

**2**

**20** [8] - 7:22, 8:1, 8:2, 8:6, 9:17, 10:24, 11:16, 42:3
**20001** [1] - 1:25
**20004** [1] - 1:21
**2025** [10] - 1:11, 3:16, 19:12, 20:1, 20:5, 20:11, 22:18, 22:21, 37:9, 46:18
**23** [1] - 31:19
**237(a)(1)(B** [1] - 38:1
**24** [5] - 20:15, 21:2, 22:25, 27:5, 28:17

**25-1096** [1] - 2:2
**26** [1] - 37:9
**29** [1] - 1:11
**29403** [1] - 1:15
**29th** [1] - 46:18
**2nd** [4] - 20:5, 20:11, 22:18, 22:21

**3**

**3,000** [3] - 15:19, 15:20, 15:24
**30** [1] - 41:20
**333** [1] - 1:24
**39** [1] - 27:25
**3:35** [2] - 20:5, 20:11
**3:50** [1] - 22:18

**4**

**45** [1] - 38:12
**4:58** [3] - 3:16, 19:13, 20:2

**6**

**6,000** [3] - 15:2, 19:23, 27:3
**6,400** [4] - 12:15, 13:24, 13:25, 14:3
**60** [4] - 36:8, 36:9, 36:21, 36:22
**601** [1] - 1:20
**602** [1] - 1:14

**7**

**70** [1] - 24:20
**700** [1] - 22:20
**735** [2] - 19:22, 20:18
**77042** [1] - 1:17

**A**

**a.m** [4] - 1:11, 2:1, 46:12
**ability** [1] - 30:25
**able** [3] - 41:6, 43:22, 44:22
**above-entitled** [1] - 46:16
**absence** [1] - 13:12
**absent** [5] - 39:5, 39:8, 39:12, 42:13, 43:12
**absolutely** [1] - 34:4
**access** [1] - 40:20
**accomplish** [1] - 39:23
**accurate** [2] - 15:12,

46:15
**acknowledge** [1] - 33:25
**act** [1] - 42:18
**acting** [2] - 8:17, 19:18
**Acting** [1] - 1:6
**action** [4] - 8:24, 9:2, 18:25, 20:19
**Action** [1] - 2:2
**actions** [2] - 18:12, 31:8
**active** [7] - 31:23, 33:17, 39:8, 39:12, 41:11, 42:7, 42:8
**activities** [3] - 12:20, 12:22, 15:4
**actual** [1] - 26:14
**add** [2] - 43:23, 45:17
**addition** [1] - 10:17
**additional** [1] - 43:23
**addressed** [2] - 31:11, 31:24
**administrative** [8] - 3:11, 3:24, 19:8, 19:12, 25:1, 33:4, 35:2, 38:5
**admitted** [1] - 21:10
**advisor** [1] - 2:12
**Affairs** [1] - 13:16
**affairs** [1] - 13:17
**afford** [1] - 9:16
**afresh** [1] - 36:23
**afterwards** [1] - 27:23
**agencies** [1] - 25:16
**agency** [2] - 30:24, 32:2
**agree** [7] - 16:24, 23:25, 25:5, 41:11, 41:24, 45:5, 46:4
**agreement** [1] - 25:4
**ahead** [2] - 8:22, 13:8
**AKSHAR** [1] - 1:3
**Akshar** [1] - 2:2
**alien** [6] - 3:19, 3:21, 4:4, 4:22, 5:13, 10:20
**allow** [1] - 44:12
**almost** [1] - 25:8
**alone** [2] - 7:4, 7:8
**amended** [1] - 28:2
**Amendment** [2] - 27:20, 27:22
**America** [1] - 2:22
**American** [1] - 2:20
**ANA** [1] - 1:10
**analysis** [2] - 12:7, 13:5

**analysts** [1] - 8:3
**Andre** [3] - 2:10, 3:16, 5:7
**Annemarie** [1] - 2:13
**annually** [1] - 10:5
**answer** [4] - 26:5, 26:7, 30:16, 41:6
**answering** [2] - 26:12, 35:3
**Antoine** [1] - 29:17
**Antoinette** [1] - 3:1
**apologize** [1] - 18:21
**appear** [1] - 36:1
**appeared** [2] - 28:1
**application** [1] - 44:11
**applied** [1] - 44:10
**apply** [4] - 35:10, 37:17, 37:19, 38:18
**appropriate** [3] - 7:16, 8:21, 20:20
**April** [10] - 1:11, 3:16, 19:12, 20:1, 20:5, 20:11, 22:18, 22:21, 37:9, 46:18
**AR023** [1] - 20:9
**arbitrary** [2] - 41:23, 41:24
**area** [1] - 5:10
**arguments** [2] - 41:22, 42:16
**Armstrong** [2] - 13:10, 13:13
**arrested** [2] - 6:3, 6:6
**Article** [2] - 27:24
**aside** [2] - 8:8, 35:18
**assessed** [1] - 25:23
**assessment** [4] - 17:2, 24:11, 24:13, 25:21
**assessments** [1] - 40:22
**assist** [1] - 2:10
**assistant** [2] - 3:17, 19:19
**associate** [2] - 2:12, 8:18
**associated** [4] - 31:13, 31:14, 33:12, 34:14
**assume** [8] - 22:2, 25:14, 26:16, 40:17, 40:19, 40:23, 45:11, 46:7
**assuming** [1] - 30:14
**Atkinson** [1] - 2:19
**attached** [1] - 3:20
**attend** [1] - 40:16
**attention** [1] - 45:12
**attorney** [1] - 5:2

**Attorney's** [1] - 2:9
**attorneys** [1] - 35:25
**available** [4] - 30:17, 30:23, 39:11, 43:11
**Avenue** [3] - 1:14, 1:17, 1:24
**avoid** [1] - 45:21
**avoided** [1] - 36:3
**aware** [4] - 10:21, 17:3, 17:5, 18:10
**awesome** [1] - 30:7

**B**

**bad** [1] - 33:24
**Banias** [2] - 1:13, 2:6
**BANIAS** [20] - 1:14, 2:6, 17:20, 17:23, 18:2, 18:6, 18:9, 18:13, 33:22, 36:8, 36:11, 36:14, 41:22, 42:10, 42:16, 44:3, 44:6, 44:8, 44:10, 45:4
**based** [25] - 4:17, 7:4, 7:14, 7:15, 11:9, 12:20, 14:12, 14:14, 24:16, 26:14, 30:17, 30:23, 31:1, 31:3, 34:10, 34:13, 37:24, 38:24, 39:1, 39:11, 43:2, 43:3, 43:7, 43:11, 45:8
**basis** [6] - 37:25, 38:2, 38:17, 38:21, 39:3, 39:20
**batch** [3] - 11:8, 11:10, 19:24
**batches** [1] - 12:25
**beat** [1] - 36:3
**become** [1] - 28:13
**BEFORE** [1] - 1:10
**belief** [1] - 45:22
**below** [1] - 12:17
**Ben** [1] - 3:1
**best** [4] - 27:16, 27:17, 34:10, 34:12
**better** [4] - 28:13, 29:22, 36:17, 36:18
**between** [4] - 7:22, 9:23, 12:8, 31:19
**big** [1] - 7:19
**binding** [1] - 45:18
**bit** [4] - 27:2, 31:25, 32:16, 34:5
**BLOND** [1] - 14:7
**boggles** [1] - 42:1
**book** [4] - 2:20, 2:24, 2:25, 3:9
**born** [2] - 29:25,

30:11
**bottom** [1] - 20:8
**Brad** [1] - 2:6
**BRADLEY** [1] - 1:14
**Brennan** [1] - 2:13
**Brennan-Linnan** [1] - 2:13
**brief** [5] - 32:20, 32:22, 33:7, 33:9, 36:25
**briefs** [1] - 36:1
**brink** [1] - 43:24
**broad** [1] - 37:14
**brought** [2] - 6:11, 24:25
**brown** [1] - 30:12
**Brown** [2] - 1:16, 2:7
**BROWN** [1] - 1:16
**BRUCE** [1] - 1:14
**bullet** [1] - 37:16
**bunch** [6] - 3:5, 7:3, 8:6, 14:23, 29:9, 42:4
**Bureau** [1] - 13:15
**business** [2] - 12:20, 12:22
**BY** [3] - 1:14, 1:16, 1:20

## C

**cadence** [1] - 15:8
**calendar** [1] - 2:17
**cancer** [1] - 9:15
**capabilities** [1] - 11:9
**capacity** [1] - 25:9
**capricious** [2] - 41:23, 41:25
**captured** [1] - 33:8
**care** [2] - 8:4, 34:6
**careful** [2] - 23:14, 23:22
**Carolina** [1] - 1:15
**Carta** [3] - 27:25, 28:3, 28:4
**case** [13] - 7:13, 17:2, 20:17, 20:24, 24:6, 24:21, 25:2, 41:13, 45:9, 45:10, 45:13
**CASE** [1] - 1:5
**case-by-case** [2] - 7:13, 17:2
**cases** [5] - 36:6, 36:9, 36:11, 36:14, 40:13
**catchall** [2] - 34:12, 35:7
**categorized** [2] - 7:15, 7:17

**caveat** [3] - 30:22, 43:21, 43:22
**caveats** [2] - 43:8, 43:9
**CC** [1] - 32:21
**Center** [3] - 5:25, 6:20, 6:22
**centered** [1] - 5:14
**century** [1] - 28:4
**certain** [2] - 4:16, 21:23
**certainly** [2] - 3:13, 35:6
**CERTIFICATE** [1] - 46:13
**Certified** [1] - 1:23
**certify** [1] - 46:15
**cetera** [1] - 3:20
**chambers** [1] - 46:5
**change** [2] - 33:1
**changed** [2] - 18:3, 26:16
**changing** [1] - 31:23
**Chapter** [1] - 27:24
**charge** [3] - 7:15, 8:12, 8:15
**charged** [1] - 7:9
**charges** [2] - 6:10, 24:24
**Charleston** [1] - 1:15
**cheap** [1] - 36:2
**check** [1] - 29:5
**chief** [7] - 2:13, 21:20, 21:21, 22:2, 22:12, 23:17, 23:20
**choice** [1] - 33:25
**circuit** [1] - 36:22
**citation** [1] - 24:18
**cite** [2] - 26:2, 32:24
**cited** [1] - 32:16
**Citizenship** [1] - 44:14
**Civil** [2] - 1:19, 2:2
**clarify** [4] - 17:6, 17:7, 25:25, 40:15
**class** [1] - 38:6
**classes** [5] - 40:10, 40:12, 40:16, 44:4, 44:5
**clause** [2] - 27:20, 27:21
**clear** [3] - 4:2, 44:24, 45:14
**clearly** [1] - 25:1
**clerk** [2] - 22:3, 41:13
**CLERK** [1] - 2:2
**clerks** [1] - 27:22
**clicking** [1] - 33:7

**client** [4] - 42:19, 45:15, 45:17, 45:19
**client's** [1] - 43:17
**close** [2] - 12:20, 12:22
**co** [1] - 44:20
**co-counsel** [1] - 44:20
**colleges** [2] - 35:21
**colloquy** [1] - 38:25
**Columbia** [1] - 46:15
**COLUMBIA** [1] - 1:1
**coming** [1] - 41:12
**commend** [1] - 3:8
**committed** [1] - 6:23
**communicated** [1] - 22:9
**communities** [1] - 35:20
**complaint** [1] - 25:3
**completed** [2] - 15:3, 31:19
**compliance** [1] - 28:25
**comply** [1] - 37:18
**conceding** [1] - 45:19
**concern** [1] - 35:18
**concerned** [2] - 35:17, 35:22
**concerns** [1] - 45:16
**concluded** [1] - 46:12
**conducted** [2] - 13:5, 14:16, 38:16
**Conference** [1] - 46:17
**confident** [1] - 44:17
**confirmed** [1] - 38:3
**conformance** [1] - 46:16
**consideration** [5] - 23:14, 23:22, 27:4, 27:5, 28:17
**consolidated** [1] - 12:19
**Constitution** [1] - 1:24
**constitutional** [1] - 2:23
**Consular** [2] - 13:16, 13:17
**contact** [1] - 32:10
**contains** [1] - 22:22
**continued** [1] - 12:7
**continues** [1] - 37:14
**contract** [1] - 9:20
**contractor** [1] - 34:9
**contrary** [1] - 45:22

**contributed** [1] - 35:20
**control** [2] - 31:10, 31:12
**converted** [1] - 38:13
**convicted** [1] - 6:7
**copy** [1] - 19:8
**correct** [6] - 11:7, 13:1, 14:1, 21:19, 40:7, 40:8
**Correct** [1] - 18:2
**cost** [1] - 9:13
**cost-cutting** [1] - 9:13
**counsel** [4] - 2:10, 17:17, 41:2, 44:20
**counselor** [2] - 32:4, 40:3
**counterthreat** [2] - 18:17, 18:23
**countries** [1] - 28:15
**country** [14] - 17:25, 18:3, 25:6, 26:3, 26:9, 26:15, 27:10, 27:15, 28:12, 32:8, 35:19, 39:16, 39:17, 45:20
**COURT** [198] - 1:1, 2:15, 3:14, 4:1, 4:8, 4:10, 4:19, 4:21, 4:24, 5:1, 5:4, 5:8, 5:10, 5:12, 5:16, 5:18, 5:23, 6:1, 6:3, 6:6, 6:9, 6:13, 6:16, 6:19, 6:21, 6:25, 7:2, 7:6, 7:19, 7:23, 8:1, 8:4, 8:15, 8:19, 8:21, 8:25, 9:2, 9:6, 9:9, 9:12, 9:21, 9:25, 10:8, 10:14, 10:18, 10:23, 11:4, 11:10, 11:12, 11:15, 11:21, 11:24, 12:1, 12:10, 12:13, 12:16, 12:18, 12:22, 12:25, 13:2, 13:4, 13:6, 13:8, 13:11, 13:13, 13:17, 13:19, 13:25, 14:2, 14:5, 14:8, 14:10, 14:13, 14:17, 14:19, 14:23, 15:5, 15:10, 15:13, 15:18, 15:20, 15:22, 16:2, 16:5, 16:7, 16:10, 16:14, 16:24, 17:3, 17:11, 17:13, 17:17, 17:22, 17:24, 18:4, 18:7, 18:10, 18:14, 18:20, 19:1, 19:5, 19:8, 19:11, 19:15, 19:17, 19:20, 19:22, 20:1, 20:4, 20:8, 20:11,

20:15, 20:18, 20:22, 21:1, 21:7, 21:13, 21:17, 21:20, 22:1, 22:7, 22:11, 22:13, 22:17, 22:20, 22:25, 23:9, 23:13, 23:18, 23:25, 24:6, 24:10, 24:15, 24:18, 25:5, 25:11, 26:2, 26:8, 26:12, 26:20, 26:24, 27:8, 27:10, 27:13, 27:17, 27:19, 29:2, 29:14, 29:18, 29:24, 30:2, 30:7, 30:9, 30:13, 30:20, 31:1, 31:5, 31:16, 31:22, 32:3, 32:12, 32:18, 33:5, 33:15, 33:21, 33:24, 34:3, 34:16, 34:20, 34:25, 36:9, 36:13, 36:16, 37:5, 37:9, 38:19, 39:5, 39:14, 39:24, 40:9, 40:17, 40:22, 41:8, 41:24, 42:12, 42:21, 43:14, 44:4, 44:7, 44:9, 44:15, 44:24, 45:3, 45:7, 45:15, 46:2, 46:11, 46:21
**court** [9] - 2:12, 2:14, 26:16, 36:1, 36:16, 43:12, 43:13, 44:19
**Court** [6] - 1:24, 2:1, 41:13, 42:18, 46:14, 46:14
**courts** [1] - 28:6
**Crime** [3] - 5:25, 6:20, 6:21
**crime** [1] - 6:23
**criminal** [12] - 3:19, 3:21, 4:4, 4:18, 4:21, 5:13, 10:20, 24:17, 24:21, 25:12, 25:13, 33:23
**criminality** [1] - 5:21
**criticism** [1] - 34:4
**criticizing** [1] - 36:5
**CRR** [1] - 46:20
**current** [3] - 39:3, 43:2, 43:4
**Customs** [1] - 1:7
**cut** [1] - 28:16
**cutting** [1] - 9:13

## D

**dad** [2] - 30:4, 30:7
**data** [2] - 10:5, 21:2
**database** [13] - 6:1, 6:22, 7:7, 7:8, 9:7,

9:10, 9:18, 10:2,
10:10, 10:16, 11:6,
42:4
  **date** [1] - 31:2
  **dated** [1] - 37:9
  **Dated** [1] - 46:18
  **days** [4] - 15:23,
38:12, 40:23, 41:20
  **DC** [4] - 1:12, 1:21,
1:25, 5:10
  **deal** [1] - 31:10
  **declaration** [1] - 4:13
  **deemed** [1] - 20:20
  **defendant** [1] - 2:9
  **Defendant** [1] - 1:8
  **DEFENDANT** [1] -
1:19
  **defense** [1] - 24:21
  **defer** [1] - 16:23
  **definitely** [1] - 42:10
  **degree** [1] - 44:7
  **degrees** [1] - 28:16
  **delegates** [1] - 13:12
  **delta** [1] - 21:2
  **Department** [16] -
1:19, 3:18, 4:14, 4:15,
7:18, 12:21, 13:14,
13:21, 15:11, 17:8,
17:9, 17:14, 18:24,
19:21, 38:25, 39:21
  **deported** [1] - 25:6
  **DEPUTY** [1] - 2:2
  **deputy** [1] - 19:18
  **describe** [3] - 34:1,
34:2, 41:6
  **described** [4] - 3:23,
3:25, 4:12, 38:7
  **descriptive** [1] -
34:23
  **designated** [2] -
32:9, 40:14
  **detail** [1] - 45:24
  **detention** [2] - 30:21,
31:4
  **determination** [2] -
24:1, 24:5
  **determine** [3] - 5:21,
10:6, 28:25
  **development** [2] -
18:18, 18:23
  **DHS** [11] - 4:19, 5:14,
8:25, 18:11, 19:2,
20:6, 20:12, 21:8,
21:14, 21:16
  **different** [2] - 12:11,
40:22
  **Diplomate** [1] - 1:23
  **diplomats** [1] - 13:17
  **directed** [1] - 35:4
  **director** [3] - 2:11,

3:17, 8:18
  **Director** [1] - 1:6
  **disagree** [1] - 26:25
  **disagreement** [1] -
40:24
  **disclosed** [1] - 25:15
  **discretion** [3] -
37:14, 37:15, 38:24
  **discussed** [1] -
39:10
  **discussion** [2] -
17:6, 28:18
  **discussions** [1] -
27:23
  **dismissed** [1] - 25:2
  **disposition** [1] - 7:16
  **DISTRICT** [3] - 1:1,
1:1, 1:10
  **District** [2] - 46:14
  **district** [2] - 2:12,
2:14
  **division** [7] - 10:5,
21:20, 21:21, 22:2,
22:12, 23:17, 23:19
  **Division** [7] - 1:19,
6:18, 18:17, 18:22,
22:15, 22:16, 23:19
  **docket** [1] - 44:19
  **document** [4] - 28:8,
32:12, 32:13, 37:13
  **done** [3] - 7:12, 24:1,
33:3
  **down** [8] - 11:17,
11:20, 11:21, 12:16,
20:4, 30:4, 33:19,
33:21
  **driver's** [1] - 25:8
  **driving** [3] - 6:10,
24:19, 24:24
  **drop** [2] - 33:19,
33:21
  **drop-down** [2] -
33:19, 33:21
  **due** [6] - 27:20,
27:21, 28:2, 28:6,
35:6
  **duration** [2] - 21:10,
33:10
  **during** [1] - 8:8

**E**

  **ECF** [1] - 37:2
  **education** [1] - 43:25
  **effect** [4] - 26:13,
32:14, 32:17, 37:24
  **effective** [2] - 37:22,
41:2
  **effort** [11] - 5:20,
8:10, 8:12, 8:14, 8:15,

8:16, 10:4, 10:9,
10:22, 31:10, 31:12
  **either** [3] - 26:15,
32:1, 35:10
  **eliminate** [1] - 39:22
  **email** [12] - 3:16, 4:2,
4:3, 19:11, 20:5,
20:12, 20:16, 20:18,
20:22, 20:23, 23:12,
46:5
  **embodied** [1] - 28:8
  **employee** [2] -
22:15, 34:9
  **employees** [8] -
7:22, 8:6, 9:17, 10:9,
10:24, 11:1, 11:16,
21:24
  **end** [2] - 29:9, 36:6
  **endeavor** [1] - 44:22
  **endeavored** [1] -
7:13
  **enforce** [2] - 28:7,
30:25
  **enforcement** [1] -
30:24
  **Enforcement** [1] -
1:7
  **engineering** [2] -
28:16, 44:7
  **England** [1] - 3:3
  **enjoin** [1] - 44:25
  **enter** [1] - 44:19
  **entered** [2] - 30:15,
44:5
  **entering** [1] - 18:3
  **entire** [3] - 24:1,
44:16, 44:25
  **entitled** [1] - 46:16
  **error** [1] - 31:7
  **estimate** [2] - 9:23,
15:7
  **et** [1] - 3:20
  **Everly** [1] - 2:11
  **exact** [2] - 4:6, 11:11
  **exactly** [4] - 7:23,
8:1, 13:23, 43:16
  **example** [2] - 7:2,
35:13
  **Exchange** [3] -
18:18, 18:24, 37:7
  **executive** [1] - 8:18
  **Exhibit** [2] - 22:10,
37:3
  **exist** [1] - 11:9
  **expired** [8] - 16:6,
16:7, 16:11, 16:18,
17:20, 17:24, 23:5,
38:15
  **expires** [1] - 46:7
  **explain** [1] - 37:9

  **explains** [1] - 45:24

**F**

  **F-1** [2] - 11:2, 38:14
  **fact** [5] - 10:6, 24:25,
25:14, 40:15, 41:11
  **failure** [4] - 33:22,
34:19, 34:22, 37:18
  **fair** [3] - 7:12, 40:19,
40:23
  **false** [2] - 31:19,
31:21
  **family** [1] - 38:9
  **far** [3] - 40:5, 42:21,
45:8
  **Federal** [1] - 46:14
  **federal** [9] - 1:24,
7:22, 8:6, 9:14, 9:17,
10:24, 11:1, 11:16,
42:2
  **FEDERAL** [1] - 46:21
  **fell** [1] - 38:5
  **few** [1] - 25:7
  **field** [6] - 32:10,
34:14, 40:14, 40:18,
40:20, 44:13
  **Fifth** [1] - 27:20,
27:22
  **file** [2] - 35:25, 46:4
  **filed** [3] - 3:11, 25:3,
36:25
  **fillable** [1] - 34:14
  **final** [1] - 43:25
  **fine** [2] - 15:15,
40:25
  **Fine** [1] - 25:18
  **finishing** [1] - 43:24
  **firing** [1] - 42:2
  **First** [1] - 2:16
  **first** [12] - 2:24, 3:15,
5:1, 5:12, 11:5, 15:5,
19:11, 21:3, 23:10,
28:1, 30:13
  **firsthand** [1] - 34:11
  **five** [1] - 31:6
  **flag** [4] - 28:24,
31:25, 40:6
  **focus** [1] - 8:9
  **follow** [3] - 32:2,
32:11, 40:13
  **follow-up** [1] - 40:13
  **following** [1] - 25:3
  **FOR** [4] - 1:1, 1:9,
1:13, 1:19
  **foregoing** [1] - 46:15
  **foreign** [1] - 20:19
  **format** [1] - 46:16
  **forthright** [3] - 25:17,
29:12, 35:2

  **forward** [1] - 2:4
  **founding** [1] - 2:22
  **four** [3] - 10:12,
10:14, 31:6
  **France** [1] - 2:25
  **Franklin** [1] - 3:1
  **French** [1] - 3:2
  **front** [1] - 19:10
  **funding** [1] - 9:15
  **furtherance** [1] -
3:19

**G**

  **gazillion** [1] - 36:21
  **Georgia** [2] - 30:4,
30:5
  **given** [4] - 5:19,
8:21, 11:4, 41:20
  **government** [21] -
9:15, 10:8, 25:16,
25:18, 25:22, 28:9,
31:7, 31:18, 32:1,
36:17, 36:20, 40:23,
41:13, 41:17, 41:19,
42:13, 43:1, 45:5,
45:18, 45:19
  **government's** [2] -
31:22, 43:5
  **grace** [2] - 34:16,
35:9
  **graduating** [1] - 44:1
  **Great** [1] - 5:4
  **great** [1] - 2:15
  **group** [4] - 18:17,
34:5, 36:11, 36:14
  **groups** [1] - 23:4
  **guess** [6] - 34:10,
34:12, 39:14, 40:1,
41:18
  **guidance** [2] - 37:12,
37:16
  **guys** [3] - 44:18,
46:2, 46:4

**H**

  **H-1** [1] - 38:9
  **H-2** [1] - 38:11
  **H-4** [1] - 38:8
  **half** [1] - 14:8
  **Hammer** [2] - 8:18,
22:8
  **hammer** [4] - 8:19,
22:8, 23:13, 23:16
  **hampering** [1] -
30:25
  **handful** [1] - 36:11
  **handle** [1] - 11:5
  **hanging** [1] - 3:1

**happy** [5] - 30:9, 36:24, 44:21, 45:4, 45:20
**hard** [2] - 44:25, 45:1
**hated** [1] - 3:2
**head** [2] - 8:16, 11:25
**headquarters** [1] - 5:15
**heads** [1] - 16:18
**heads-up** [1] - 16:18
**hear** [2] - 3:7, 27:4
**HEARING** [1] - 1:9
**hearing** [5] - 29:10, 29:11, 31:11, 38:7, 41:7
**help** [1] - 19:6
**helpful** [2] - 29:12, 40:1
**hereby** [1] - 46:15
**highlight** [1] - 37:20
**highly** [2] - 2:21, 2:23
**HILLARY** [1] - 1:20
**history** [1] - 24:17
**hit** [10] - 11:17, 29:5, 31:15, 33:23, 34:1, 34:15, 38:19, 38:20, 38:24, 40:12
**hits** [8] - 4:14, 5:21, 7:14, 7:15, 9:18, 10:2, 13:20, 31:21
**hold** [2] - 9:21, 11:21
**Homeland** [4] - 2:11, 3:18, 21:13, 23:19
**homes** [1] - 28:15
**honcho** [1] - 8:16
**Honor** [34] - 2:6, 2:8, 17:5, 17:20, 17:23, 18:2, 18:6, 22:5, 25:10, 25:25, 26:4, 28:23, 29:13, 29:16, 30:16, 31:11, 33:22, 34:10, 36:12, 36:24, 38:4, 41:5, 41:22, 42:10, 42:16, 43:9, 43:24, 44:3, 44:6, 44:8, 44:21, 45:4, 45:14, 46:10
**Honor's** [1] - 41:6
**HONORABLE** [1] - 1:10
**hour** [1] - 24:21
**hours** [5] - 20:15, 21:2, 22:25, 27:5, 28:17
**Houston** [1] - 1:17
**human** [1] - 34:1
**humor** [1] - 9:25
**hundreds** [1] - 36:9

**I**

**ICE** [18] - 2:13, 2:14, 3:18, 4:13, 4:15, 8:24, 9:2, 30:18, 30:23, 31:3, 32:10, 34:14, 37:1, 39:11, 40:14, 40:18, 40:20, 43:11
**ICE's** [2] - 37:13, 38:23
**ideal** [1] - 42:1
**identified** [3] - 7:14, 31:7, 31:19
**identify** [1] - 2:4
**identity** [1] - 31:13
**II** [1] - 2:21
**III** [1] - 1:20
**illegal** [1] - 39:9
**images** [2] - 32:22, 33:8
**imagination** [1] - 42:1
**imagine** [1] - 36:17, 36:18
**immediate** [4] - 30:21, 31:4, 37:24, 44:2
**immediately** [6] - 26:9, 26:15, 35:10, 35:11, 37:23, 40:7
**Immigration** [2] - 1:6, 44:14
**important** [3] - 2:17, 8:5, 28:6
**impressed** [1] - 35:1
**INA** [1] - 38:1
**inappropriate** [2] - 7:2, 7:6
**includes** [4] - 6:3, 6:6, 6:9, 6:13
**indicate** [2] - 32:25, 33:1
**indicative** [1] - 33:14
**individual** [4] - 25:6, 31:13, 31:14, 40:12
**individual's** [1] - 40:21
**individualized** [5] - 24:1, 24:4, 24:11, 24:13, 25:21
**individuals** [7] - 16:15, 21:3, 21:9, 24:2, 35:19, 36:3, 38:6
**information** [15] - 4:15, 30:17, 30:23, 32:17, 34:11, 34:15, 36:2, 39:1, 39:11, 40:21, 41:12, 42:8, 42:13, 43:11, 44:8

**Information** [3] - 5:25, 6:20, 6:22
**initiative** [10] - 3:19, 3:21, 4:5, 4:9, 4:22, 4:25, 5:13, 5:14, 10:19, 10:20
**INJUNCTION** [1] - 1:9
**injunction** [3] - 37:4, 39:5, 39:12
**instance** [1] - 11:8
**instead** [3] - 36:4, 36:6, 36:21
**instruction** [2] - 8:23, 23:11
**instructions** [2] - 18:16, 18:18
**intended** [1] - 31:25
**interacting** [1] - 13:9
**interest** [1] - 21:25
**interested** [2] - 2:22, 40:2
**interests** [1] - 44:1
**Investigations** [2] - 21:14, 23:19
**investigative** [1] - 31:25
**invited** [1] - 35:19
**involved** [1] - 30:12
**ironic** [1] - 44:9
**issue** [7] - 27:14, 37:20, 41:3, 45:8, 45:9, 45:12, 46:4
**issued** [1] - 37:1, 37:11
**issues** [1] - 45:24
**issuing** [1] - 45:21
**item** [1] - 33:21
**items** [1] - 33:19

**J**

**Jane** [2] - 11:5, 11:7
**jobs** [2] - 8:8, 10:1
**John** [5] - 12:10, 12:11, 13:10, 31:16, 31:17
**JOHNNY** [1] - 1:20
**Johnny** [2] - 1:8, 30:10
**joined** [1] - 2:10
**JUDGE** [1] - 1:10
**judges** [1] - 36:21
**JUDGMENT** [1] - 1:10
**Judicial** [1] - 46:17
**Justice** [1] - 1:19

**K**

**keep** [4] - 25:17, 27:1, 41:11, 45:20
**Kentuckian** [1] - 30:10
**Kentucky** [3] - 29:21, 29:23, 30:11
**killed** [1] - 43:20
**kind** [2] - 18:11, 41:16
**King** [1] - 2:25
**knowledge** [4] - 24:10, 27:16, 27:17, 40:24
**knows** [3] - 27:21, 31:3, 40:18
**KY** [1] - 30:3

**L**

**lack** [2] - 33:14, 35:18
**lag** [1] - 15:5
**land** [1] - 28:1
**language** [5] - 42:25, 44:18, 45:5, 45:17, 46:2
**lark** [1] - 28:11
**last** [10] - 3:11, 5:8, 8:21, 10:8, 10:19, 29:10, 36:25, 38:12, 43:25, 45:6
**Law** [1] - 1:13
**law** [7] - 5:5, 26:2, 26:14, 26:15, 28:1, 30:24, 30:25
**lawfully** [6] - 26:5, 26:10, 26:19, 30:14, 30:18, 32:8
**lawyers** [3] - 35:15, 35:23
**lead** [2] - 18:17, 18:23
**leadership** [2] - 8:23, 8:25
**least** [2] - 15:8, 25:16
**leave** [7] - 23:21, 26:3, 26:9, 26:15, 30:3, 35:10, 40:6
**left** [1] - 25:7
**legal** [1] - 2:12
**legally** [6] - 8:7, 18:2, 26:16, 27:14, 28:12, 39:7
**less** [8] - 12:1, 12:2, 14:8, 20:15, 21:1, 22:25, 27:4, 28:16
**letter** [2] - 29:3, 35:13

**letterhead** [1] - 3:20
**level** [2] - 21:23, 34:9
**licenses** [1] - 25:8
**line** [1] - 10:20
**lines** [1] - 10:4
**links** [1] - 32:21
**Linnan** [1] - 2:13
**liquors** [1] - 30:12
**list** [13] - 11:2, 15:13, 15:23, 15:24, 16:16, 18:14, 18:23, 19:22, 22:21, 22:22, 23:1, 33:19
**listening** [1] - 18:20
**lists** [1] - 21:3
**literally** [1] - 28:7
**literate** [1] - 45:23
**litigation** [3] - 2:12, 2:14, 35:25
**lived** [1] - 30:2
**LLC** [1] - 1:13
**look** [6] - 20:4, 32:18, 37:21, 41:10, 42:21, 44:16
**looked** [2] - 24:6, 24:25
**looking** [4] - 25:12, 33:5, 38:4, 45:10
**loss** [1] - 41:16
**lost** [1] - 3:3
**loud** [1] - 45:14
**Louisville** [4] - 29:25, 30:1, 30:2, 30:5
**lower** [1] - 34:9
**lower-level** [1] - 34:9
**LYONS** [1] - 1:6
**Lyons** [1] - 2:3

**M**

**ma'am** [48] - 4:20, 4:23, 5:3, 5:9, 5:17, 6:2, 6:5, 6:8, 6:12, 6:15, 6:24, 7:1, 7:25, 8:20, 9:1, 9:8, 11:14, 11:23, 12:12, 13:3, 13:7, 14:4, 14:9, 15:21, 16:1, 16:4, 16:9, 16:13, 17:12, 19:4, 19:7, 19:14, 19:16, 19:25, 20:3, 20:7, 20:10, 20:14, 20:17, 20:21, 23:8, 23:16, 23:24, 24:9, 27:7, 27:9, 27:12, 36:15
**Macklin** [1] - 2:11
**Magna** [3] - 27:25, 28:3, 28:4

**magnitude** [3] - 7:21, 10:22, 15:19
**maintain** [3] - 33:22, 34:19, 34:22
**major** [1] - 44:12
**Maker's** [1] - 29:22
**Mamma** [1] - 30:6
**Marie** [1] - 3:1
**Mark** [1] - 29:22
**match** [1] - 12:8
**matched** [1] - 31:14
**matches** [1] - 31:19
**math** [1] - 12:5
**matter** [1] - 46:16
**mean** [6] - 6:22, 8:4, 12:23, 14:17, 24:6, 32:12, 39:25, 41:14, 42:7
**means** [3] - 14:13, 32:6
**meant** [1] - 24:24
**meeting** [1] - 25:4
**member** [1] - 38:9
**merits** [1] - 26:24
**met** [1] - 5:8
**Meyers** [3] - 3:17, 19:15, 20:16
**middle** [1] - 37:21
**might** [2] - 12:10, 43:20
**miles** [1] - 24:20
**military** [1] - 30:7
**million** [7] - 9:11, 9:19, 10:23, 11:13, 11:15, 11:22, 14:3
**mind** [1] - 42:2
**minutes** [3] - 23:14, 23:22, 27:3
**misdemeanor** [2] - 24:19, 24:20
**missing** [3] - 6:13, 6:14, 7:11
**mistake** [1] - 14:2
**mistakes** [1] - 35:7
**monarchy** [2] - 3:6, 3:8
**money** [1] - 9:14
**months** [1] - 28:15
**moot** [2] - 41:14, 41:15
**morning** [2] - 2:6, 2:8
**most** [2] - 28:8, 34:23
**mostly** [1] - 33:7
**motion** [1] - 37:3
**MOTION** [1] - 1:9
**motions** [1] - 36:22
**Mount** [1] - 30:1

**move** [1] - 25:19
**moved** [1] - 30:5
**MR** [197] - 2:6, 2:8, 3:13, 3:22, 4:6, 4:9, 4:11, 4:20, 4:23, 4:25, 5:3, 5:7, 5:9, 5:11, 5:14, 5:17, 5:19, 5:25, 6:2, 6:5, 6:8, 6:12, 6:15, 6:18, 6:20, 6:24, 7:1, 7:5, 7:12, 7:21, 7:25, 8:2, 8:14, 8:17, 8:20, 8:23, 9:1, 9:3, 9:8, 9:11, 9:20, 9:23, 10:4, 10:12, 10:17, 10:21, 11:3, 11:8, 11:11, 11:14, 11:19, 11:23, 11:25, 12:7, 12:12, 12:15, 12:17, 12:19, 12:24, 13:1, 13:3, 13:5, 13:7, 13:10, 13:12, 13:15, 13:18, 13:23, 14:1, 14:4, 14:9, 14:11, 14:15, 14:18, 14:21, 15:3, 15:7, 15:12, 15:17, 15:19, 15:21, 16:1, 16:4, 16:6, 16:9, 16:13, 16:23, 17:2, 17:5, 17:12, 17:16, 17:20, 17:23, 18:2, 18:6, 18:9, 18:13, 18:16, 18:22, 19:4, 19:7, 19:10, 19:14, 19:16, 19:18, 19:21, 19:25, 20:3, 20:7, 20:10, 20:14, 20:17, 20:21, 20:25, 21:6, 21:12, 21:16, 21:19, 21:23, 22:5, 22:10, 22:12, 22:15, 22:19, 22:24, 23:8, 23:11, 23:16, 23:24, 24:4, 24:9, 24:13, 24:16, 25:3, 25:9, 25:25, 26:4, 26:10, 26:18, 26:21, 27:7, 27:9, 27:12, 27:16, 27:18, 28:23, 29:13, 29:16, 29:23, 29:25, 30:4, 30:8, 30:12, 30:16, 30:22, 31:3, 31:9, 31:18, 31:24, 32:9, 32:15, 32:20, 33:6, 33:19, 33:22, 33:25, 34:7, 34:18, 34:23, 36:8, 36:11, 36:14, 36:24, 37:7, 37:11, 38:22, 39:10, 39:19, 40:8, 40:11, 40:19, 41:4, 41:22, 42:10, 42:16, 43:8, 43:23,

44:3, 44:6, 44:8, 44:10, 44:21, 45:2, 45:4, 45:14, 46:1, 46:10
**MS** [1] - 14:7
**must** [2] - 32:13, 35:9

# N

**name** [14] - 2:15, 5:6, 5:19, 8:21, 9:6, 9:18, 11:5, 11:6, 22:4, 23:20, 29:16, 29:22
**names** [19] - 7:3, 7:7, 10:2, 11:5, 13:22, 14:3, 14:10, 14:11, 14:23, 14:24, 15:2, 15:3, 15:13, 19:23, 22:20, 24:2, 42:4
**National** [7] - 5:25, 6:21, 18:17, 18:22, 21:14, 22:16, 23:18
**national** [4] - 6:17, 6:18, 6:20
**nationwide** [1] - 36:7
**NCIC** [19] - 4:14, 5:20, 5:22, 5:23, 6:19, 7:3, 9:5, 10:10, 10:16, 11:6, 11:17, 12:8, 31:14, 31:20, 34:15, 38:20, 38:24, 43:4
**necessarily** [7] - 33:1, 33:3, 33:4, 33:13, 34:1, 41:14, 41:15
**need** [5] - 16:10, 31:16, 42:21, 42:23, 46:3
**negative** [1] - 33:3, 33:4
**Neumann** [1] - 1:16
**never** [2] - 7:9, 43:22
**new** [6] - 37:1, 42:8, 42:11, 42:13, 42:17, 43:6
**next** [4] - 12:6, 12:18, 35:7, 43:25
**night** [2] - 3:12, 37:1
**nilly** [1] - 35:5
**NO** [1] - 1:5
**nobody** [1] - 27:21
**non** [1] - 27:1
**non-process** [1] - 27:1
**nonimmigrant** [3] - 9:3, 37:19, 37:22
**nonimmigrant's** [1] - 37:23, 38:2
**normally** [1] - 10:3

**note** [3] - 28:23, 37:16, 44:20
**noted** [2] - 32:24, 39:2
**notes** [2] - 33:2, 39:19
**nothing** [1] - 46:8
**notice** [9] - 16:19, 17:1, 17:4, 17:18, 18:11, 28:17, 41:20, 42:3, 42:15
**nowhere** [2] - 23:25, 45:6
**number** [11] - 3:10, 4:13, 7:7, 10:9, 11:11, 11:20, 12:4, 13:25, 18:4, 27:13, 45:22
**Number** [1] - 31:7
**NW** [2] - 1:20, 1:24

# O

**obligations** [1] - 26:20
**obtained** [1] - 34:11
**obviously** [3] - 25:18, 30:24, 41:1
**occur** [1] - 18:12
**occurred** [1] - 15:8
**OF** [2] - 1:1, 1:9
**office** [5] - 8:17, 10:11, 40:14, 40:18, 40:20
**Office** [1] - 2:9
**offices** [1] - 32:11
**OFFICIAL** [1] - 46:21
**official** [3] - 13:15, 32:10, 40:14
**Official** [1] - 1:24, 46:14
**officials** [2] - 32:10, 40:23
**often** [1] - 10:14
**ON** [1] - 1:9
**once** [1] - 9:21
**one** [18] - 2:18, 11:1, 11:22, 12:7, 12:24, 14:24, 17:6, 18:13, 19:24, 24:6, 24:10, 26:4, 34:2, 37:5, 37:20, 42:16, 43:23, 45:1
**online** [2] - 22:1, 22:6
**opportunity** [1] - 16:20
**opposition** [1] - 37:3
**oppression** [1] - 28:9
**option** [3] - 34:13,

34:24
**optional** [1] - 44:11
**OR** [1] - 1:10
**order** [4] - 7:21, 15:19, 43:12, 43:13
**Order** [1] - 2:1
**original** [1] - 46:15
**outside** [2] - 30:1, 38:23
**overstays** [1] - 10:6
**own** [1] - 13:5

# P

**P.C** [1] - 1:16
**p.m** [6] - 3:16, 19:13, 20:2, 20:5, 20:12, 22:18
**packaging** [1] - 30:8
**page** [3] - 20:8, 33:8, 46:16
**paid** [3] - 28:12, 35:21, 35:23
**papers** [1] - 32:18
**Pappa** [1] - 30:6
**paragraph** [1] - 37:21
**part** [2] - 10:4, 19:23
**particular** [4] - 20:23, 33:11, 33:25, 44:18
**particularly** [2] - 35:17, 35:22
**parties** [1] - 2:4
**passed** [3] - 4:14, 4:15, 18:23
**PATEL** [1] - 1:3
**Patel** [35] - 2:3, 17:18, 20:23, 22:23, 24:11, 24:18, 25:11, 25:14, 25:21, 25:25, 26:5, 27:3, 30:18, 33:21, 34:19, 35:13, 35:14, 36:25, 37:17, 37:19, 38:5, 38:8, 39:2, 39:6, 39:12, 41:11, 41:17, 41:20, 42:7, 43:2, 43:16, 43:24, 44:19, 45:20, 46:8
**Patel's** [4] - 24:6, 32:4, 40:3, 43:4
**pay** [1] - 35:25
**paying** [2] - 28:12, 45:11
**pending** [2] - 41:12, 42:8
**people** [45] - 4:2, 6:1, 6:3, 6:6, 6:9, 6:13, 6:14, 8:1, 8:2, 9:9,

9:19, 10:1, 10:7, 10:23, 11:13, 11:15, 11:22, 12:3, 12:6, 12:13, 13:21, 15:14, 15:20, 15:24, 16:2, 16:7, 16:10, 19:2, 23:2, 23:6, 23:9, 25:7, 25:18, 27:3, 27:4, 27:5, 28:14, 28:15, 29:2, 29:5, 35:24, 36:14, 45:23

**peoples'** [1] - 28:9
**percent** [5] - 11:24, 12:1, 12:2, 14:7, 14:8
**percentage** [1] - 14:5
**period** [2] - 34:17, 35:9
**perma** [1] - 32:21
**person** [11] - 12:5, 22:8, 22:17, 23:4, 24:14, 40:6, 40:9, 40:15, 40:17, 40:20, 45:1
**personnel** [2] - 37:6, 37:12
**persons** [1] - 7:11
**ph)** [1] - 29:17
**Plaintiff** [1] - 1:4
**plaintiff** [5] - 2:7, 20:23, 30:14, 30:20, 32:16
**PLAINTIFF** [1] - 1:13
**plaintiff's** [2] - 17:17, 41:2
**plaintiffs** [4] - 18:5, 29:19, 33:8, 36:10
**plaintiffs'** [2] - 35:23, 35:25
**plan** [1] - 42:14
**pleasant** [1] - 29:8
**point** [1] - 17:6
**pointed** [1] - 33:11
**points** [1] - 37:16
**policy** [10] - 37:1, 39:3, 41:5, 42:11, 42:17, 42:22, 43:6, 43:10, 44:16, 44:25
**pop** [2] - 7:3, 7:7
**pops** [1] - 40:3
**population** [1] - 9:3
**portion** [1] - 20:25
**position** [2] - 43:5, 43:17
**positive** [3] - 5:21, 7:14, 7:15
**postgraduate** [1] - 44:10
**power** [1] - 42:19
**practical** [2] - 39:25, 44:11

**precarious** [1] - 3:2
**Precisely** [1] - 31:18
**precisely** [1] - 3:22
**preliminary** [2] - 37:3, 39:5
**PRELIMINARY** [1] - 1:9
**prepare** [1] - 36:1
**present** [5] - 25:10, 26:5, 26:10, 26:19, 30:18
**pretty** [2] - 33:24, 34:25
**primarily** [1] - 13:10
**primary** [1] - 41:4
**principal** [1] - 19:18
**prioritize** [1] - 21:4, 23:2
**privacy** [1] - 21:24
**Proceedings** [1] - 46:12
**proceedings** [1] - 39:22
**process** [17] - 3:24, 4:1, 4:4, 24:1, 27:1, 27:20, 27:21, 28:2, 28:6, 28:7, 28:22, 31:19, 34:4, 34:8, 35:6
**Produced** [1] - 1:25
**production** [1] - 15:6
**program** [1] - 8:17
**Program** [3] - 18:19, 18:24, 37:8
**promise** [2] - 29:14, 44:22
**properly** [1] - 18:3
**protects** [1] - 42:19
**provide** [4] - 30:22, 34:7, 43:8, 43:9
**provided** [3] - 18:16, 18:18, 37:16
**provides** [1] - 33:9, 37:12
**pull** [1] - 8:5
**pulled** [1] - 24:23, 33:6
**puppies** [1] - 43:20
**purpose** [2] - 31:22, 43:10
**purposes** [1] - 14:15
**put** [6] - 7:21, 8:8, 10:9, 10:15, 11:6, 34:15
**putting** [1] - 10:2

## Q

**quality** [2] - 31:9, 31:11

**questioning** [1] - 28:11
**questions** [9] - 3:10, 26:4, 28:21, 29:9, 29:20, 31:10, 32:11, 35:3, 41:6
**quick** [1] - 46:5
**quite** [2] - 25:17, 44:17
**quiz** [1] - 27:19
**quote** [2] - 24:23, 42:11
**quote-unquote** [1] - 24:23
**quotes** [1] - 33:6

## R

**radicals** [1] - 28:7
**ran** [2] - 4:13, 9:21
**RDR** [1] - 46:20
**RDR-CRR** [1] - 46:20
**reached** [1] - 16:15
**reacts** [1] - 26:21
**read** [1] - 2:21
**really** [5] - 3:5, 45:9, 45:10
**Realtime** [1] - 1:23
**reason** [9] - 7:4, 7:8, 20:22, 25:15, 25:24, 33:11, 35:17, 35:21, 43:18
**reasons** [2] - 33:4, 33:10
**rebels** [1] - 3:5
**receive** [1] - 17:18
**recent** [1] - 31:8
**reckless** [3] - 6:10, 24:19, 24:23
**recommend** [2] - 2:21, 2:24
**Record** [1] - 1:25
**record** [39] - 2:5, 3:11, 3:23, 3:24, 4:18, 12:8, 12:9, 19:9, 19:12, 24:16, 24:25, 25:1, 25:12, 26:1, 26:7, 26:18, 26:22, 30:19, 31:2, 31:14, 31:20, 31:23, 32:5, 32:25, 33:13, 35:2, 37:13, 37:23, 38:2, 38:5, 38:18, 38:24, 39:4, 40:4, 42:5, 43:4, 44:24, 46:16
**records** [8] - 4:16, 4:17, 5:20, 6:14, 8:6, 37:2, 37:15, 39:2
**red** [4] - 28:24, 31:25, 40:6

**redacted** [3] - 21:22, 21:23, 21:24
**Reddy** [1] - 1:16
**Reeves** [2] - 46:14, 46:20
**REEVES** [2] - 1:22, 46:20
**refer** [1] - 4:12
**referred** [4] - 12:20, 13:23, 13:25, 14:2
**Registered** [1] - 1:23
**regulations** [1] - 46:16
**reinstatement** [1] - 35:10
**released** [1] - 2:19
**relief** [2] - 41:15, 45:1
**remain** [4] - 38:14, 39:8, 39:12, 42:8
**remains** [1] - 26:19
**remedied** [1] - 31:20
**remind** [1] - 28:4
**removability** [1] - 37:25, 39:20
**removal** [4] - 30:21, 31:4, 39:22, 39:23
**Reporter** [4] - 1:23, 1:24, 46:14
**REPORTER** [1] - 46:21
**represent** [3] - 18:4, 18:7, 46:8
**representation** [4] - 41:17, 41:18, 42:12, 43:1
**republicanism** [1] - 3:6
**request** [1] - 21:8
**requesting** [1] - 4:16
**require** [3] - 26:8, 26:23, 39:22
**research** [1] - 9:16
**respect** [7] - 8:9, 28:8, 36:25, 37:1, 40:24, 41:16, 42:7
**responded** [1] - 22:13
**responds** [1] - 21:1
**response** [2] - 14:21, 22:18
**responses** [2] - 7:16, 15:8
**responsible** [1] - 10:5
**retain** [1] - 37:13
**returned** [2] - 38:10, 39:1
**review** [3] - 7:13, 20:19, 38:16

**revocation** [10] - 14:14, 14:16, 21:4, 33:23, 37:20, 37:24, 37:25, 38:17, 39:20, 43:10
**revocations** [1] - 14:12
**revoke** [6] - 15:24, 16:11, 21:9, 38:16, 38:17, 39:2
**revoked** [8] - 14:25, 15:15, 16:21, 17:19, 38:3, 38:6, 39:4, 39:17
**revokes** [2] - 37:22, 39:21
**revoking** [3] - 17:8, 17:9, 23:3
**Revolution** [1] - 2:20
**Revolutionary** [1] - 2:23
**REYES** [1] - 1:10
**richer** [1] - 35:20
**Richmond** [1] - 1:17
**Rick** [1] - 2:19
**rid** [2] - 3:7, 4:3
**rights** [1] - 28:9
**Rines** [1] - 29:17
**Robert** [2] - 8:18, 22:8
**role** [4] - 10:12, 10:14, 13:11, 13:13
**roles** [1] - 8:3
**rolling** [1] - 15:6
**rough** [2] - 7:21, 15:19
**rule** [1] - 36:21
**rules** [1] - 42:18
**ruling** [5] - 45:9, 45:10, 45:12, 45:21, 45:23
**run** [9] - 7:3, 7:6, 9:4, 9:6, 9:9, 11:10, 21:2, 23:1, 42:3
**running** [1] - 13:21
**runs** [2] - 11:8, 11:10
**rushed** [1] - 34:4
**rushing** [1] - 36:4
**Rutledge** [1] - 1:14

## S

**Sam** [2] - 12:4, 14:5
**scan** [1] - 32:22
**school** [12] - 5:5, 26:21, 26:22, 30:1, 32:1, 32:9, 32:10, 40:3, 40:11, 40:14, 43:20
**scope** [2] - 3:22, 4:6

**scrub** [1] - 5:20
**scrutinized** [1] - 24:16
**search** [1] - 8:6
**seated** [1] - 29:14
**second** [7] - 2:20, 2:25, 3:8, 11:22, 21:7, 37:5, 37:21
**secretary** [1] - 19:19
**Section** [1] - 37:25
**section** [2] - 2:13, 2:14
**Security** [10] - 2:11, 3:18, 6:18, 18:17, 18:22, 21:13, 21:15, 22:16, 23:19
**see** [23] - 3:23, 9:18, 10:2, 14:21, 19:11, 19:13, 20:6, 20:9, 20:11, 20:13, 21:5, 21:11, 22:18, 23:11, 23:12, 30:9, 33:15, 33:16, 38:19, 40:12, 42:4, 45:24, 46:5
**seeking** [2] - 3:5, 25:16
**select** [2] - 33:20, 34:24
**send** [6] - 14:10, 15:13, 15:23, 16:5, 19:22, 20:1
**sending** [3] - 16:15, 18:10, 18:11
**sends** [5] - 15:23, 18:14, 20:12, 21:17, 23:21
**senior** [1] - 13:15
**sense** [1] - 42:23
**sensitive** [1] - 30:25
**sent** [12] - 7:17, 13:2, 15:14, 17:1, 17:4, 17:14, 19:15, 20:16, 22:17, 25:1, 29:3, 35:12
**separate** [1] - 39:21
**serve** [3] - 8:2, 23:17, 37:25
**Services** [1] - 44:14
**set** [1] - 14:24
**seven** [1] - 3:3
**seven-year** [1] - 3:3
**SEVIS** [46] - 4:17, 5:20, 7:7, 12:8, 16:3, 16:12, 16:20, 17:15, 18:25, 21:8, 23:7, 23:10, 23:15, 24:3, 26:1, 26:7, 26:14, 26:19, 26:22, 27:6, 29:3, 30:19, 31:8, 31:14, 31:20, 31:23,

32:4, 32:14, 32:17, 32:25, 33:2, 33:3, 33:13, 33:16, 33:17, 34:13, 37:2, 37:13, 37:23, 38:2, 38:18, 39:4, 39:13, 39:25, 40:4
**SEVP** [5] - 37:5, 37:6, 37:12, 37:23, 38:1
**Shane** [2] - 19:15, 19:17
**short** [1] - 36:22
**short-circuit** [1] - 36:22
**significant** [1] - 28:8
**single** [2] - 18:13, 25:6
**situation** [1] - 3:2
**six** [1] - 31:7
**Smith** [10] - 11:6, 11:7, 12:10, 12:11, 31:16, 31:17, 39:15, 43:16, 43:18, 43:20
**Smith's** [1] - 40:4
**snipped** [1] - 32:21
**someone** [15] - 9:17, 20:5, 20:6, 20:12, 21:13, 21:17, 21:20, 22:13, 23:1, 23:18, 23:21, 35:12, 39:16, 40:2
**somewhere** [2] - 10:19, 32:13
**SONJA** [2] - 1:22, 46:20
**Sonja** [2] - 46:14, 46:20
**sorry** [3] - 7:5, 7:25, 22:13
**sort** [9] - 3:24, 19:6, 32:21, 33:6, 34:7, 34:12, 34:14, 36:22, 38:7
**sounds** [1] - 33:24
**sources** [1] - 10:6
**South** [1] - 1:15
**specific** [5] - 5:20, 10:21, 15:4, 37:12, 37:15
**specifically** [2] - 42:7, 44:19
**speed** [1] - 25:18
**speeding** [6] - 7:10, 24:24, 25:7, 25:15, 25:23, 42:5
**spend** [2] - 9:17, 42:3
**spending** [2] - 9:14, 11:12

**spent** [2] - 10:24, 11:16
**spreadsheet** [1] - 20:24
**spreadsheets** [3] - 7:17, 12:19, 15:4
**staff** [5] - 5:19, 7:13, 7:19, 8:13, 8:14
**start** [2] - 7:24, 36:23
**started** [1] - 38:8
**starts** [1] - 2:25
**state** [2] - 13:5, 23:9
**State** [45] - 4:14, 4:15, 7:18, 12:21, 13:2, 13:6, 13:9, 13:14, 13:21, 14:3, 14:10, 14:16, 14:17, 14:19, 14:21, 15:11, 15:15, 15:23, 16:15, 16:23, 17:4, 17:7, 17:8, 17:14, 17:18, 18:10, 18:14, 18:24, 19:1, 19:2, 19:21, 19:22, 20:5, 20:12, 21:14, 21:20, 23:5, 25:22, 27:4, 27:5, 37:22, 38:3, 38:25, 39:21
**State's** [2] - 32:15, 32:24
**STATES** [1] - 1:1
**States** [20] - 2:9, 3:8, 9:4, 17:10, 24:8, 24:12, 25:22, 26:6, 26:11, 26:19, 30:14, 30:18, 30:21, 38:10, 38:11, 38:12, 38:14, 44:14, 46:14, 46:17
**status** [42] - 10:7, 14:15, 15:15, 15:22, 16:17, 17:10, 17:11, 17:13, 17:14, 17:22, 18:1, 18:3, 21:8, 21:10, 25:17, 25:24, 26:1, 27:14, 32:8, 33:1, 33:2, 33:10, 33:12, 33:14, 33:23, 34:19, 34:21, 34:22, 35:14, 35:15, 37:19, 38:13, 39:6, 39:7, 39:16, 39:17, 39:18, 39:22, 40:15, 41:11, 43:4
**stay** [1] - 28:14
**STEM** [1] - 44:12
**stenographic** [1] - 46:15
**Stenographic** [1] - 1:25
**STEVEN** [1] - 1:16

**Steven** [1] - 2:7
**still** [10] - 17:11, 17:13, 28:25, 32:7, 32:8, 39:14, 39:18, 39:24, 41:16, 42:1
**Street** [1] - 1:20
**stretch** [1] - 42:1
**student** [9] - 3:19, 3:21, 4:4, 4:21, 5:12, 10:20, 28:25, 32:3, 38:14
**Student** [3] - 18:18, 18:24, 37:7
**student's** [1] - 31:23
**Students** [1] - 21:7
**students** [17] - 4:13, 8:6, 9:4, 10:10, 10:15, 10:17, 10:18, 10:21, 11:2, 20:19, 27:8, 27:10, 28:11, 29:4, 35:20, 42:4
**studied** [1] - 28:13
**studies** [1] - 38:8
**study** [3] - 32:15, 32:24, 44:13
**studying** [2] - 9:4, 27:10
**subject** [5] - 30:20, 31:4, 42:11, 43:6, 43:9
**submitted** [1] - 20:19
**subordinate** [1] - 22:15
**Suite** [1] - 1:17
**SUMMARY** [1] - 1:10
**super** [1] - 3:3
**support** [2] - 3:4, 9:20
**supported** [1] - 8:14
**supporting** [1] - 3:5
**suppose** [2] - 6:9, 41:12
**Supreme** [1] - 41:13
**survived** [1] - 5:4
**system** [4] - 2:23, 11:18, 26:17, 38:20
**systems** [2] - 21:2, 44:8

**T**

**tab** [3] - 21:3, 21:7, 23:10
**table** [1] - 2:10
**tagged** [2] - 25:7, 25:19
**team** [1] - 24:9
**technically** [1] - 41:10
**tens** [1] - 42:2

**term** [2] - 4:11, 44:2
**Terminate** [2] - 23:6, 23:22
**terminate** [18] - 7:3, 7:8, 16:2, 16:12, 16:16, 17:15, 19:2, 21:8, 23:6, 23:15, 29:2, 35:14, 37:13, 37:15, 37:23, 38:1, 38:24, 42:14
**terminated** [22] - 4:16, 4:17, 16:19, 17:19, 23:10, 24:2, 26:1, 26:7, 27:6, 30:19, 31:23, 32:5, 32:14, 33:17, 33:18, 33:20, 39:25, 40:2, 40:4, 42:14, 43:12, 43:15
**terminating** [1] - 38:18
**termination** [26] - 18:25, 26:2, 26:8, 26:9, 26:13, 26:18, 26:22, 29:6, 31:8, 32:4, 32:17, 32:25, 33:2, 33:3, 33:10, 33:11, 33:12, 33:13, 34:18, 34:20, 34:21, 39:4, 41:3, 42:11, 43:6, 43:10
**terminations** [2] - 28:24, 37:2
**terms** [3] - 25:4, 37:18, 38:15
**Texas** [2] - 1:17, 24:19
**THE** [200] - 1:1, 1:10, 1:13, 1:19, 2:15, 3:14, 4:1, 4:8, 4:10, 4:19, 4:21, 4:24, 5:1, 5:4, 5:8, 5:10, 5:12, 5:16, 5:18, 5:23, 6:1, 6:3, 6:6, 6:9, 6:13, 6:16, 6:19, 6:21, 6:25, 7:2, 7:6, 7:19, 7:23, 8:1, 8:4, 8:15, 8:19, 8:21, 8:25, 9:2, 9:6, 9:9, 9:12, 9:21, 9:25, 10:8, 10:14, 10:18, 10:23, 11:4, 11:10, 11:12, 11:15, 11:21, 11:24, 12:1, 12:10, 12:13, 12:16, 12:18, 12:22, 12:25, 13:2, 13:4, 13:6, 13:8, 13:11, 13:13, 13:17, 13:19, 13:25, 14:2, 14:5, 14:8, 14:10, 14:13, 14:17, 14:19, 14:23,

15:5, 15:10, 15:13, 15:18, 15:20, 15:22, 16:2, 16:5, 16:7, 16:10, 16:14, 16:24, 17:3, 17:11, 17:13, 17:17, 17:22, 17:24, 18:4, 18:7, 18:10, 18:14, 18:20, 19:1, 19:5, 19:8, 19:11, 19:15, 19:17, 19:20, 19:22, 20:1, 20:4, 20:8, 20:11, 20:15, 20:18, 20:22, 21:1, 21:7, 21:13, 21:17, 21:20, 22:1, 22:7, 22:11, 22:13, 22:17, 22:20, 22:25, 23:9, 23:13, 23:18, 23:25, 24:6, 24:10, 24:15, 24:18, 25:5, 25:11, 26:2, 26:8, 26:12, 26:20, 26:24, 27:8, 27:10, 27:13, 27:17, 27:19, 29:2, 29:14, 29:18, 29:24, 30:2, 30:7, 30:9, 30:13, 30:20, 31:1, 31:5, 31:16, 31:22, 32:3, 32:12, 32:18, 33:5, 33:15, 33:21, 33:24, 34:3, 34:16, 34:20, 34:25, 36:9, 36:13, 36:16, 37:5, 37:9, 38:19, 39:5, 39:14, 39:24, 40:9, 40:17, 40:22, 41:8, 41:24, 42:12, 42:21, 43:14, 44:4, 44:7, 44:9, 44:15, 44:24, 45:3, 45:7, 45:15, 46:2, 46:11

**themselves** [1] - 2:5
**thousands** [4] - 27:5, 27:13, 35:24, 42:2
**three** [10] - 9:23, 10:2, 10:24, 11:16, 15:8, 15:10, 16:25, 37:22, 44:13, 45:6
**throughout** [1] - 3:24
**Thursday** [1] - 46:7
**ticket** [3] - 6:10, 25:16, 25:23
**timeline** [1] - 19:5
**today** [6] - 2:16, 2:19, 23:21, 26:5, 27:19, 43:7
**TODD** [1] - 1:6
**Todd** [1] - 2:3
**together** [1] - 8:10
**took** [3] - 8:24, 9:2,

14:17
**top** [2] - 11:25, 29:11
**total** [2] - 17:1, 36:15
**tourist** [3] - 38:11, 38:12, 38:15
**tracking** [1] - 11:16
**training** [1] - 44:11
**transcript** [3] - 46:15, 46:15, 46:16
**Transcript** [1] - 1:25
**TRANSCRIPT** [1] - 1:9
**transferred** [1] - 30:4
**travel** [3] - 17:9, 39:21
**traveled** [1] - 38:10
**tried** [1] - 6:4
**trilogy** [2] - 2:20, 2:21
**TRO** [5] - 30:15, 39:5, 39:12, 44:5, 46:7
**troubled** [1] - 35:22
**true** [1] - 46:15
**try** [2] - 28:13, 44:21
**trying** [5] - 28:7, 28:15, 44:25, 45:1, 45:3
**Tuesday** [3] - 1:11, 3:15, 19:12
**turnaround** [1] - 15:1
**two** [9] - 9:23, 10:1, 10:24, 11:16, 25:16, 36:14, 39:20, 41:20, 46:9
**tyrannical** [1] - 28:9

**U**

**U.S** [8] - 1:6, 1:19, 3:4, 3:18, 8:7, 10:16, 28:14, 35:10
**ultra** [3] - 42:17, 42:18
**under** [7] - 9:11, 21:10, 37:25, 38:8, 38:14, 42:11, 43:6
**understood** [1] - 46:1
**undertook** [1] - 34:8
**unhinged** [1] - 28:6
**unit** [1] - 18:23
**United** [20] - 2:9, 3:8, 9:4, 17:9, 24:8, 24:12, 25:22, 26:6, 26:11, 26:19, 30:14, 30:18, 30:21, 38:10, 38:11, 38:12, 38:14, 44:14, 46:14, 46:17
**UNITED** [1] - 1:1

**universities** [2] - 28:13, 29:4
**university** [1] - 32:1
**unquote** [1] - 24:23
**unredacted** [1] - 20:25
**up** [22] - 5:1, 7:3, 7:7, 11:17, 16:18, 20:24, 29:5, 29:15, 29:19, 32:2, 32:11, 36:6, 36:16, 36:17, 40:3, 40:11, 40:13, 42:25, 43:2, 43:15, 44:12, 44:18
**updated** [1] - 40:24
**upset** [1] - 3:3
**utter** [1] - 35:18

**V**

**valid** [10] - 14:12, 14:14, 16:9, 21:3, 21:8, 21:9, 23:2, 23:5, 23:7, 39:16
**validate** [1] - 12:7
**validly** [1] - 17:14
**various** [3] - 8:2, 10:6, 41:22
**versus** [1] - 2:3
**view** [2] - 29:7, 30:13
**violation** [4] - 33:12, 34:16, 34:20, 35:14
**vires** [3] - 42:17, 42:18
**Virginia** [1] - 24:20
**visa** [42] - 14:12, 14:14, 14:16, 14:17, 15:24, 16:17, 16:21, 17:9, 17:18, 17:20, 17:24, 17:25, 21:8, 21:9, 23:2, 23:7, 29:1, 33:23, 37:20, 37:22, 37:24, 38:3, 38:6, 38:8, 38:11, 38:13, 38:15, 38:16, 38:17, 39:1, 39:2, 39:3, 39:4, 39:7, 39:15, 39:16, 39:17, 39:19, 39:21, 43:10
**visas** [13] - 10:10, 10:16, 11:2, 14:24, 15:15, 16:6, 16:8, 16:9, 17:8, 21:3, 21:4, 23:3, 23:5
**visible** [1] - 33:7
**visit** [1] - 30:6
**Visitor** [3] - 18:19, 18:24, 37:7
**vs** [1] - 1:5

**W**

**wade** [1] - 42:22
**walker** [3] - 35:18, 42:24, 42:25
**WALKER** [57] - 1:20, 2:8, 3:13, 3:22, 4:6, 4:9, 4:11, 17:5, 17:12, 17:16, 19:10, 20:25, 21:23, 22:5, 25:25, 26:4, 26:10, 26:18, 26:21, 29:16, 29:23, 29:25, 30:4, 30:8, 30:12, 30:16, 30:22, 31:3, 31:9, 31:18, 31:24, 32:9, 32:15, 32:20, 33:6, 33:19, 33:25, 34:7, 34:18, 34:23, 36:24, 37:7, 37:11, 38:22, 39:10, 39:19, 40:8, 40:11, 40:19, 41:4, 43:8, 43:23, 44:21, 45:2, 45:14, 46:1, 46:10
**Walker** [17] - 2:8, 3:10, 17:3, 21:22, 23:20, 28:18, 30:11, 34:25, 36:20, 43:2, 43:17, 43:18, 44:15, 45:7, 45:11, 46:7
**wants** [1] - 44:20
**War** [2] - 2:21, 2:23
**war** [1] - 3:3
**Washington** [4] - 1:12, 1:21, 1:25, 30:1
**WATSON** [122] - 4:20, 4:23, 4:25, 5:3, 5:7, 5:9, 5:11, 5:14, 5:17, 5:19, 5:25, 6:2, 6:5, 6:8, 6:12, 6:15, 6:18, 6:20, 6:24, 7:1, 7:5, 7:12, 7:21, 7:25, 8:2, 8:14, 8:17, 8:20, 8:23, 9:1, 9:3, 9:8, 9:11, 9:20, 9:23, 10:4, 10:12, 10:17, 10:21, 11:3, 11:8, 11:11, 11:14, 11:19, 11:23, 11:25, 12:7, 12:12, 12:15, 12:17, 12:19, 12:24, 13:1, 13:3, 13:5, 13:7, 13:10, 13:12, 13:15, 13:18, 13:23, 14:1, 14:4, 14:9, 14:11, 14:15, 14:18, 14:21, 15:3, 15:7, 15:12, 15:17, 15:19, 15:21, 16:1, 16:4, 16:6, 16:9, 16:13, 16:23, 17:2,

18:16, 18:22, 19:4, 19:7, 19:14, 19:16, 19:18, 19:21, 19:25, 20:3, 20:7, 20:10, 20:14, 20:17, 20:21, 21:6, 21:12, 21:16, 21:19, 22:10, 22:12, 22:15, 22:19, 22:24, 23:8, 23:11, 23:16, 23:24, 24:4, 24:9, 24:13, 24:16, 25:3, 25:9, 27:7, 27:9, 27:12, 27:16, 27:18, 28:23, 29:13
**Watson** [17] - 2:10, 3:16, 3:17, 3:25, 4:12, 5:7, 28:20, 29:8, 31:12, 31:24, 34:5, 36:5, 36:18, 38:5, 39:10, 43:5, 43:19
**website** [5] - 32:15, 33:2, 33:7, 34:13, 35:9
**week** [3] - 16:25, 43:25, 46:2
**weekend** [2] - 37:11, 39:3
**weekly** [1] - 15:8
**weeks** [9] - 9:24, 10:2, 10:24, 11:16, 15:9, 15:10, 16:25, 41:20, 45:6
**Welcome** [1] - 5:10
**whatsoever** [2] - 28:17, 34:11
**willy** [1] - 35:5
**willy-nilly** [1] - 35:5
**words** [1] - 45:16
**worker** [1] - 38:9
**workers** [1] - 42:2
**works** [1] - 30:8
**World** [1] - 2:21
**world** [2] - 5:18, 32:13
**write** [1] - 45:23
**writing** [1] - 5:16

**Y**

**year** [1] - 3:3
**years** [3] - 10:13, 10:14, 44:13
**yourself** [1] - 36:13

**Z**

**zero** [1] - 35:6